```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                        GREENBELT DIVISION


3   _____
                                            )
4   UNITED STATES OF AMERICA,               )
                                            )
5        Plaintiff,                         )
                                            )Docket number
6             vs.                           )8:22-00109-PX-3
                                            )
7   LAMBERT MBOM,                           )
                                            )
8        Defendant.                         )
    _____)
9
                   TRANSCRIPT OF SENTENCING HEARING
10             BEFORE THE HONORABLE PAULA XINIS
               UNITED STATES DISTRICT COURT JUDGE
11          Thursday, February 8, 2024, AT 11:00 A.M.

12


13  APPEARANCES:

14  On Behalf of the Plaintiff:

15       CHRISTOPHER SARMA, ESQUIRE
         MEGAN McKOY, ESQUIRE
16       6406 Ivy Lane, 8th Floor
         Greenbelt, MD  20770
17       (301)344-4431

18  On Behalf of the Defendant:

19       G. ARTHUR ROBBINS, ESQUIRE
         Chesapeake Meridian
20       1997 Annapolis Exchange Parkway, Suite 300
         Annapolis, Maryland  21401
21       (443)454-7675

22  ALSO PRESENT:  Maria Schokman, Probation
                   James Moran, FBI
23

24       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

25
```

```
 1                     P R O C E E D I N G S

 2        (Court called to order.)

 3        DEPUTY CLERK:  All rise.  The United States District

 4   Court for the District of Maryland is now in session.  The

 5   Honorable Paula Xinis presiding.

 6        (Conference at the bench.)

 7        (It is the policy of this court that every guilty plea and

 8   sentencing proceeding include a bench conference concerning

 9   whether the defendant is or is not cooperating.)

10        (The following was held in open court:)

11        THE COURT:  All right.  Good morning, everyone.  And

12   welcome.

13        This is -- this is a session of the United States District

14   Court for the District of Maryland involving the case of United

15   States v. Lambert Mbom.

16        I'm going to ask Mr. Ulander to take over because he has

17   some preliminary comments.

18        DEPUTY CLERK:  May I have your attention, please.  By

19   order of the Court, all electronic devices, including cellular

20   telephones, cameras, recording devices, smart watches and pens,

21   laptops and tablets must be turned off and may not be used in

22   the courtroom without the express permission of the presiding

23   judge.

24        Counsel in the proceeding, while seated at counsel table,

25   are permitted to use electronic devices as necessary to assist
```

```
1    your work here in court.
2         Anyone in violation of the order may be removed from this
3    hearing and the device may be subject to confiscation and
4    inspection to determine whether court proceedings have been
5    recorded, photographed, broadcast or transmitted outside the
6    courtroom.
7         Thank you.
8         THE COURT:  All right.  Welcome, Counsel.
9         For the benefit of our attendees, would you all -- would
10   the government announce the case and put your appearances on
11   the record?
12        MR. SARMA:  Yes, Your Honor.  Case is United
13   States v. Lambert Mbom, Criminal Case Number PX22-109.  We're
14   here today for a sentencing hearing.
15        Christopher Sarma for the United States of America.  I'm
16   joined at counsel table by co-counsel Megan McKoy, and FBI
17   Special Agent Jim Moran.  Also in the courtroom are FBI Special
18   Agent Amanda Ruiz, FBI forensic accountant Johanna O'Neil, and
19   HHS OIG Special Agent Takiyah McWilson.
20        THE COURT:  Okay.  Thank you.
21        MR. ROBBINS:  Good morning, Your Honor.  Gar Robbins
22   on behalf of Mr. Mbom, who is with me here at counsel table.
23        THE COURT:  Okay.  And good morning to both of you.
24        Mr. Mbom, today is your sentencing.  My first question to
25   you is have you had enough time to view the presentence report
```

1    with your counsel so we can go forward today?

2              **THE DEFENDANT:**  Yes, Your Honor.

3              **THE COURT:**  Specifically, have you read the standard

4    and mandatory conditions of supervision that are included in

5    the presentence report?

6              **THE DEFENDANT:**  Yes, Your Honor.

7              **THE COURT:**  Do you understand them?

8              **THE DEFENDANT:**  Yes, I do, Your Honor.

9              **THE COURT:**  And if I place you on any kind of

10   supervision and impose those conditions, do you agree to abide

11   by them?

12             **THE WITNESS:**  Yes, Your Honor.

13             **THE COURT:**  Mr. Robbins, any objections to the

14   mandatory or standard conditions of supervision?

15             **MR. ROBBINS:**  None, Your Honor.

16             **THE COURT:**  And do you waive the formal reading of

17   those?

18             **MR. ROBBINS:**  We waive the reading of those.

19             **THE COURT:**  Okay.  Thank you very much.

20        Mr. Robbins, I know this is an expedited presentence

21   report, but I thought that I had noted in your pleadings that

22   you are objecting to two guideline adjustments; is that right?

23   Are you pursuing those?

24             **MR. ROBBINS:**  We are, Your Honor.

25             **THE COURT:**  You are.  Okay.  And that is the loss

1  amount and the roll adjustment; is that right?

2        **MR. ROBBINS:**  We disagree with both the calculation

3  of loss and the calculation of roll adjustment.

4        **THE COURT:**  Okay.  All right.  So we'll talk about

5  those.

6      Any other additions, corrections, or changes to the

7  presentence report?

8        **MR. ROBBINS:**  None, Your Honor.

9        **THE COURT:**  Government, same question?

10        **MR. SARMA:**  No, Your Honor.  We obviously agree with

11  the adjustments.

12        **THE COURT:**  Right.  So Ms. Schokman, thank you for

13  standing in for Ms. Crouch.  It's good to see you.

14      Other than the two adjustments that are contested, which I

15  will reach next, I do adopt the presentence report in total.

16  It's very good.  And I thank Ms. Crouch for a well-done report.

17        **PROBATION OFFICER:**  Thank you, Your Honor.

18        **THE COURT:**  No problem.

19      So where should we start?  The government has submitted to

20  me in its pleadings and supporting documentation that the loss

21  amount in this case, I believe, is the same as the requested

22  restitution amount; is that right?

23        **MR. SARMA:**  That is correct, Your Honor.

24        **THE COURT:**  And that's $4,450,588.66, which would

25  correspond, if credited, to the adjustment of -- upward

1  adjustment at Paragraph 28 that puts it at an Offense Level 27.

2      The defense, I don't -- and let me say this, that number

3  is based on the claims that were made and proven to be false

4  and fraudulent to Medicaid that Medicaid paid; am I right?

5          **MR. SARMA:**  That is correct, Your Honor.  And I

6  almost thought to put in the briefing, but we are outside,

7  therefore, what I would say is the bank's issue.  Right?  This

8  is all actual -- this is actual loss.

9          **THE COURT:**  Right, it's not intended loss.

10         **MR. SARMA:**  That is correct, Your Honor.

11         **THE COURT:**  Right.  It's hard dollars.  Okay.

12     Mr. Robbins, let me try to understand your argument, then.

13         **MR. ROBBINS:**  Your Honor, the total loss amount is

14  based on the claims paid to Holy Health.  That included claims

15  paid in a variety of different areas.  And, of course, loss

16  amount is calculated on claims paid, there's no parsing of the

17  figures, figuring out what services were actually provided,

18  what services weren't provided.  Once you end up in the fraud

19  category, then all of the claims paid to your entity become

20  part of the loss amount.

21     So the question then becomes for the fraud that was at

22  issue in this trial, does that correspond directly to the

23  claims paid numbers?

24     And the -- the thing that we are focused upon is that the

25  trial and the area where Lambert Mbom was alleged to have the

1   involvement in false numbers being generated, false claims

2   being made really was in the area of community services, or

3   community service worker counseling, and the other community

4   services work that the agency provided.

5        The other part of the total loss comes from psychotherapy,

6   and the question is whether or not that part of the billing

7   falls within the fraud that was alleged against Lambert.

8        And he was -- he was alleged to be the manager/trainer for

9   consumer service workers.  He was alleged to be the one who put

10  them in the billing system, and to actually approve whatever --

11  whatever claims came across his desk, which was -- of course,

12  wasn't the totality of the claims at Holy Health.  He was not

13  the only community service worker claims approval person.

14  There was another person present.

15        So our -- our argument and our view of the evidence is

16  that it makes sense to allocate the loss that was within the

17  context of the government's proof against Lambert Mbom during

18  the course of the trial, their allegations against him.

19        But with respect to the psychiatric care, and whether that

20  would be appropriately lodged against him as well, that -- that

21  seems to be outside the scope of the fraud that was proven

22  against Mr. Mbom.

23            **THE COURT:**  And tell me again why.

24            **MR. ROBBINS:**  Because he was -- because the

25  psychiatric care workers, the psychologists were outside of his

1    purview, if you will.  The billing that he was doing, that he

2    was approving, the workers that he was charged in the

3    government's case of training and supervising, those were the

4    community service workers.  They weren't -- that wasn't the

5    professional services in the psychiatric counseling.

6         And so in that scenario, he is looking at -- his exposure

7    on sentencing is -- is cabined by what he was involved with.

8         **THE COURT:**  Or what was reasonably foreseeable to him

9    as a member of the conspiracy, right?

10        **MR. ROBBINS:**  Right.

11        And the other piece of it, he's not really in charge of

12   what's going on with the psychologists.  He doesn't have a

13   handle on that.

14        And so in that regard, he -- he's more rationally charged

15   with the amounts that are tied to the community service work.

16        **THE COURT:**  Okay.  Government.  Your response?

17        **MR. SARMA:**  Your Honor, I think we can get to the

18   loss amount requested by the government in two different ways.

19   The first would be there was testimony from Ms. Foe at trial,

20   as well as, I believe, Ms. Margolis as well, that Mr. Mbom was

21   involved in a scheme to pay all patients, not just the patients

22   there to receive CSW support.  And there was testimony from Don

23   Shearer on behalf of D.C. Medicaid, who said that "if we were

24   aware of a patient being bribed -- or, you know, being paid the

25   money, they would not have gotten -- we would not have paid

1  that bill."

2      It is true that the jury acquitted, as to Count Three, the

3  anti-kickback statute.  But the indictment in Count One said

4  that a part of the conspiracy that Mr. Mbom was alleged to have

5  engaged in, part of that conspiracy was to bring people in and

6  pay the five dollars to take their Medicaid and write inflated

7  bills.

8      So we think that's why it is a proper measure to look at

9  all of the loss to Medicaid because there was no kind of --

10 Mr. Mbom was not involved in just suggesting there would be

11 bribes paid to those just seeking CSW work; the plan was to

12 bribe everyone.

13     Second, we would contest this idea that Mr. Mbom was just

14 involved in the CSW part of the conspiracy.  He was the program

15 administer for the entire organization.

16     He -- there was an audio recording, and I attached part of

17 the transcript to the reply brief I filed yesterday.  I

18 apologize, it was late, but I am responding to an argument that

19 Mr. Robbins made, where he's saying we need to increase billing

20 across all kind of types of services provided here, including

21 nursing, therapy, et cetera.

22     There was not -- Ms. Margolis testified there were not

23 just CSWs at that meeting.  In fact, Ms. Margolis was not a

24 CSW.  And, so, he is advising that there should be inflation

25 across all sectors.

1          I would also note, and it just came to my attention just

2     now, Ms. Gatewood is one of the people here who filed a letter

3     in support of Mr. Mbom in this case.  This is Letter 29.

4     Ms. Gatewood was one of the people -- I think when we talk

5     about psychotherapy, these aren't necessarily psychiatrists

6     providing it.  It could be a psychologist or someone with a

7     master's degree providing psychotherapy.

8          Ms. Gatewood was charging on that psychotherapy billing

9     code, and she describes Mr. Mbom as a supervisor and doesn't

10     talk about him in her letter as just supervising the CSWs.

11          So I don't think the trial evidence in any way suggests

12     that Mr. Mbom was only involved in what I'll call the CSW line

13     of business, and that's why the government believes it's

14     appropriate to hold him accountable for all of the actual loss

15     Medicaid suffered during the period when Mr. Mbom was in the

16     conspiracy.

17               **THE COURT:**  So let me ask another question of you,

18     Mr. Sarma.  Your ultimate recommended sentence is 112 months;

19     am I right about that?

20               **MR. SARMA:**  That's correct, Your Honor.

21               **THE COURT:**  And in this case, if I were to even -- if

22     I were to, in theory, even credit the defense's argument, we're

23     still within the guidelines of where you would be recommending

24     I place Mr. Mbom; is that correct?  Because what I'm trying to

25     figure out is, at the end of the day, under Rule 32, do I need

1  to even decide this?  Because it's -- I -- it takes a little

2  bit of digging in the record.

3       I think I largely agree with you, and I agree with you

4  because conspiracy is such that when you're in as deeply and

5  as -- you know, Mr. Mbom in my view was in the minutia of this.

6  He was the COO, if you will, of Holy Health, and he was

7  executing on what Mr. Bakari and Ms. Kabiwa had put together.

8  I see them as sort of a three-legged stool.

9       So it's hard for me to necessarily credit that I just say

10  that in this institution that is relatively small in size and

11  in number of employees, more than five, which we'll talk about

12  in a minute, that -- that I should just cut off the loss

13  attributable to the conspiracy.

14       But even if I did, we're still in the range that you're

15  requesting a sentence.

16       Am I right about that?

17          **MR. SARMA:**  That is correct.  I think you're -- I

18  think it might be premature for me to take a position on

19  whether I need to reach -- for two reasons -- one, I think it's

20  still relevant to the restitution calculation, so that number,

21  I think you're going to have to reach.

22       There's also this disagreement we're about to get to about

23  the adjustment for the leadership role.  And that actually has

24  a bigger swing in this case, because he's not eligible for the

25  2-point --

1          **THE COURT:**  Right.  But I see that one, I got to tell

2    you, as more straightforward, because even if I look at just

3    the CSWs, it's five or more.  Right?  I mean, at any given

4    time, there were more -- the records show that there were more

5    CSWs total that Mr. Mbom supervised.

6          So, you know, I'm not really sure why I'm not -- you know,

7    why that has any legs, in my view, because I read the

8    adjustments -- if the defendant was an organizer or leader of

9    criminal activity that involved five or more participants, four

10   levels are added.

11         He was an organizer involving five or more participants.

12   That's where I am.  That's the narrowest, I think, factually

13   supported reason for the adjustment.

14         Would you disagree with that, Mr. Sarma?

15         **MR. SARMA:**  No disagreement here, Your Honor.

16         **THE COURT:**  That's what I'm going to talk to

17   Mr. Robbins about, like, why isn't that accurate.

18         And so in that situation, assume for the sake of argument

19   that I'm denying that objection, I'm overruling it, I'm

20   imposing the four levels, then we are in that place where

21   there's overlap in the guideline range.

22         **MR. SARMA:**  Yes, Your Honor, though I think you

23   still --

24         **THE COURT:**  For restitution, you make a good point.

25   I was going to ask Mr. Robbins what his position is on

1   restitution, because I may not be able to -- sorry.

2        **MR. SARMA:**  And I believe -- I apologize for cutting

3   you off, Your Honor.

4        I think the standard of proof here is also the same.  I

5   mean, I think it's kind of part and parcel here, so --

6        **THE COURT:**  Right.  Right.  Okay.  All right.  I get

7   it.

8        Okay.  Mr. Robbins, the government raises a good point.  I

9   would assume you're taking a similar position with respect to

10  restitution that I took to carve out the psychotherapy piece?

11       **MR. ROBBINS:**  And I tried to cut the baby in our

12  letter, as you probably noticed.

13       I believe that there are -- there are issues on parsing

14  the different loss amounts for restitution.  We obviously would

15  like to see the lower number, but, again, this is one of those

16  things that it's difficult to -- to find the right balance

17  point because Mr. Mbom has accepted responsibility, and he

18  knows that he's responsible for -- he has responsibility for

19  restitution.

20       And then when we start talking --

21       **THE COURT:**  So you're accepting the number, the

22  restitution number?

23       **MR. ROBBINS:**  I think we have -- I think we have to,

24  Your Honor, because of his view of the world.

25       **THE COURT:**  Wait, I don't understand that.

1      The restitution has to be factually based.

2          **MR. ROBBINS:**  It has to be factual.  And the

3  difficulty that I have is that at some level, I have a duty to

4  say, well, do we hit these guidelines accurately for sentencing

5  purposes?  And while the standard of proof I understand to be

6  the same for both sentencing and restitution, and typically the

7  number on a loss amount is the same for both sentencing and

8  restitution, intellectually, I don't see that they have to be.

9      So while we -- while we are challenging the loss amount

10  for sentencing purposes, we do not challenge the loss amount

11  for restitution purposes.

12          **THE COURT:**  Okay.

13          **MR. ROBBINS:**  And I -- and I understand that that's

14  a -- that's an atypical approach.

15          **THE COURT:**  And I'm not sure I can do it, nor -- let

16  me say this:  If I were on the fence at all, I do believe that

17  the facts of this case support the loss amount and the

18  guideline adjustment because it was a conspiracy, and, frankly,

19  a closely held, very interweaved, interwoven conspiracy.  And I

20  do find it's extremely hard for me to separate the yogurt from

21  the blueberry, as they say, even if Mr. Mbom wasn't directly

22  involved in every dollar that was obtained.

23          **MR. ROBBINS:**  That's part of the hazard of becoming

24  involved in a conspiracy.

25          **THE COURT:**  I'm sorry?

1          **MR. ROBBINS:**  That is part of the hazard of becoming

2   involved in a conspiracy, is that you end up owning perhaps

3   more than you anticipated.

4          **THE COURT:**  Right.  Right.  Right.

5          **MR. ROBBINS:**  We understand that.  Nonetheless, we

6   need to raise the issue.

7          **THE COURT:**  I understand that, and I'm going to

8   overrule the objection, and say this much, which is the reason

9   I asked the question I did, because as we know, I have

10  flexibility in sentencing, and that includes avoiding, when I

11  can, adjustments that I don't need to reach.

12         But in this situation, I would find it to be confusing, at

13  best, in terms of a record, to say I accept that you are

14  accepting the restitution amount as the losses caused by

15  Mr. Mbom's role in the conspiracy, but yet, it's not reasonably

16  foreseeable under the guidelines.

17         So that having been said, I'm going to deny the objection.

18  Let me -- I have to do one thing.  Sorry about this.  Okay.

19  All right.

20         So that resolves Paragraph 28.

21         Mr. Robbins, I'll hear you on 32.  You -- so by Paragraph

22  32, you know my preliminary thinking on it.

23         **MR. ROBBINS:**  I do, Your Honor.

24         And here is the language that we look to in 3B1.  And it

25  really becomes organizer, is the operating term.  And the

1  question is the organizer and its -- organizer or leader.

2  Organizer is who puts it together?  Who stands this operation

3  up?  Who makes -- who makes the thing in the first place?

4  That's the organizer.

5         The leader is the person at the top.

6         In this case, both of those roles are held really jointly

7  by the Bakaris.

8         Is, in -- you use the words chief operating officer.  Is

9  Lambert Mbom the functionary that makes things move on a

10  day-to-day basis?

11             **THE COURT:**  But he's directing them, he's writing

12  procedure.  He's --

13             **MR. ROBBINS:**  And that's captured by manager and

14  supervisor.

15             **THE COURT:**  Right.  But so is it under organizer,

16  five or more people.

17         You don't dispute that there were five or more CSWs during

18  the course of the conspiracy for which fell under Mr. Mbom's

19  leadership, do you?  Or organizer-ship?

20             **MR. ROBBINS:**  What I dispute is that he didn't have

21  the organizer-ship.  He didn't put that group together.  He

22  was --

23             **THE COURT:**  You mean because he didn't hire them?

24             **MR. ROBBINS:**  That -- that was set up and running

25  when he was hired.

1     **THE COURT:**  Right, I understand that.  But then he

2  was hired, he -- he joined this conspiracy.  He may have

3  initially resisted it, that's how I'm seeing it, and tried to

4  change it.  But then if you can't beat them, join them, at

5  which point he was the person --

6     **MR. ROBBINS:**  He was the manager, he was --

7     **THE COURT:**  -- directing and assisting those CSWs who

8  were faking the records.

9     **MR. ROBBINS:**  He was the manager or supervisor, Your

10  Honor.  The plain English meaning of the words in the

11  guideline, he's the manager or supervisor.  That's clear.  He's

12  there.  He's -- he's the one --

13     **THE COURT:**  He didn't organize them?

14     **MR. ROBBINS:**  He did not organize them.

15     **THE COURT:**  Okay.

16     **MR. ROBBINS:**  He is -- he is certainly -- you know,

17  the tape that the government refers to, he's there -- even

18  there, he's saying, "We should be known for the services we

19  provide, not for the fact that stipends get paid somewhere.  We

20  should be doing services."

21     So he's clearly trying to be a manager.  He's trying to

22  change things.  But he's also facilitating in a lot of -- in a

23  lot of ways that equate to criminal conduct.  And that's what

24  he had to come to accept, was what he was doing is the

25  commission of a crime.

1      But when you look at the plain language of aggravating

2   role, he is in the role of manager or supervisor.  He is not an

3   organizer.  He didn't put the group together.  And he's not a

4   leader.  Both of those are filled by the two Bakaris.

5      And that's the problem, and that's also where five or more

6   people are otherwise involved.  The system that was set up by

7   the Bakaris was extensive.  He can't walk away from those three

8   points, Your Honor, and he couldn't -- and shouldn't, properly.

9   But to try to allocate the four is inappropriate.

10          **THE COURT:**  Okay.  Government?

11          **MR. SARMA:**  We rest on our papers, unless there's

12   additional questions on this issue.

13          **THE COURT:**  Well, tell me in your view what -- why

14   it's an organizer of five or more CSWs.  What -- what

15   particular facts would you point to where this distinction that

16   Mr. Robbins is making is really not factually -- it's not

17   consistent with the facts?

18          **MR. SARMA:**  I would go to -- I guess, it's

19   Application Note 4.

20      First, I would note under Application Note 4 that there

21   can be more than one organizer.  I think --

22          **THE COURT:**  Sure.

23          **MR. SARMA:**  Mr. Robbins, I think, is conflating that.

24   I don't think we have to choose between who is the single --

25   who is going to be the one here to get four points and who is

1  going to get three points.  I think they may all -- if the

2  facts support it, you know, we'll -- they could all get four

3  points.

4       There's then discussion here, the claim rights to a larger

5  share of the fruits of the crime.

6       You know, I think there's a debate in the record about who

7  got paid what, but we did enter evidence, including with our

8  preliminary order of forfeiture, that Mr. Mbom received

9  $250,000 during the course of the conspiracy, which is a fair

10 and large amount of money, if you consider the amount taken

11 from Medicaid, as well as the money that was being paid out as

12 bribes.

13      There's also discussion here about the ability to exercise

14 discretion and the degree of control and authority exercised

15 over others.

16      He was the one, for example, providing fake sample notes

17 to Fru Nde.  He was the one providing the fake notes to

18 Mr. Nde -- or the names to Mr. Nde to write the fake notes.  He

19 was in ICAMs.

20      There was testimony from both Special Agent Moran, as well

21 as Ms. Margolis, about when there were discrepancies in the

22 system, Mr. Mbom was the one who went in and changed notes in

23 ICAM.

24      There was testimony from Ms. Foe where she said that she

25 had written these, quote/unquote, cell phone notes about

1    providing cell phones to consumers.  And that because she was

2    not in the country legally, she could not have an ICAMS number.

3        Mr. Mbom was the one who then put them under Ms. Kabiwa's

4    name.

5        So I think the fact that he was working directly with the

6    employees in the scheme and on the ground to kind of help

7    create the -- the appearance of propriety would go towards

8    establishing that he was a leader in this -- in this case.

9        I would also note, there is -- it didn't come out at

10   trial, because Mr. Bakari was not a defendant, I am sure at his

11   sentencing this will come out, Mr. Bakari was away for large --

12   you know, for certain portions of the conspiracy.  He was in

13   Cameroon.  I think in COVID is when he got stuck in Cameroon.

14       There was also, and Your Honor heard this at Ms. Bakari's

15   sentencing, Ms. Bakari, to a certain extent, was focused on

16   doing work outside of Holy Health at the Agatha Foundation.  To

17   the extent that was a legitimate organization or not, that's

18   still a discussion to be had.

19       But Mr. Mbom was the one on the ground, and that's why the

20   government thinks the evidence is appropriate here for the

21   four-point enhancement.

22            **THE COURT:**  Okay.  All right.  Yes, I mean, I agree.

23       Well, let me ask one other question, Mr. Sarma, that is

24   bothersome to me.  Mr. Robbins' request is actually for three

25   levels, not two.  So in recognition that, you know, this is not

1   a -- this adjustment can be refined somewhat and not be used as

2   a totally blunt instrument, and to your point that you can have

3   more than one leader, you can also have people who kind of live

4   in a netherworld of not an organizer -- not an organizer of the

5   top of the heap, but not a manager either.

6       What's your response to that?

7       **MR. SARMA:**  My response would be the government's

8   evidence, based on the investigation, the evidence at trial,

9   was that -- when we're talking about the organizer of the

10  criminal activity, it was Mr. Mbom.  Right?

11      I think Mr. Bakari -- I'm not going to buy myself to my

12  recommendation in that case yet, but, you know, Mr. Bakari was

13  the CEO.  It's going to be harder for me, quite frankly, and

14  I'll say it now, I'll have to think about it, to say that he

15  was a constant organizer of the criminal activity, which is

16  what this guidelines is really talking about.

17      **THE COURT:**  Right.

18      **MR. SARMA:**  Because I don't think he even had an

19  ICAMs account, or knew how ICAMs worked, quite frankly, whereas

20  Mr. Mbom did have technical know-how.

21      **THE COURT:**  So they worked together.  This is a case

22  in which factually it was really in tandem, different roles,

23  but at the top.

24      **MR. SARMA:**  Right.  Maybe it's the COO and the CTO,

25  could be another way to think about it.

1       **THE COURT:**  Got it.  Okay.

2       I mean, I tend to agree with you.  Again, I see the

3   guidelines as important.  I have to calculate them, but they

4   are a benchmark.  They are not -- they are not the driver, the

5   ultimate driver of this sentence, and I have to be faithful to

6   what I see as the facts supporting the guideline.

7       And in this case, I do agree that the way that the facts

8   have borne out, is that, as I mentioned earlier, I do see

9   Ms. Kabiwa -- well, Mr. Bakari, from what I know of him so far,

10  and Mr. Mbom as being very much integrated, and that Mr. Mbom

11  had a boots-on-the-ground role with regard to the CSWs.

12      I don't see there to be a legal distinction here.  He

13  organized them.  And to the extent he led them, because he was

14  the one directing, is the only word that I can think of, of how

15  to fake the Medicaid -- the records so that Medicaid would pay

16  for work not performed, I do find that the four-level

17  adjustment is warranted.

18      So I'm not going to -- I'm overruling that objection as

19  well, and I'm not going to make any change.

20      Okay.  That said, we'll move on to the next questions I

21  have for you all.

22      Government, is there any representatives of your victim,

23  which I see to be Medicaid, here that wishes to address the

24  Court or provide any other information?

25      **MR. SARMA:**  Give me one minute, Your Honor.  I just

1  want to confirm one more time with the rep.

2          **THE COURT:**  Sure.  Okay.

3          **MR. SARMA:**  No, Your Honor.

4          **THE COURT:**  Okay.  All right.  And Mr. Robbins, I see

5  that there are a number of supporters of Mr. Mbom here, and I

6  have read all 25 letters that were submitted.  They were very,

7  very helpful and moving, and I appreciate them.  Is there

8  anyone who wishes to be heard today?

9          **MR. ROBBINS:**  We considered that, Your Honor, and

10  we've decided that you -- knowing you, we knew you would read

11  all the letters, so no one will need to be heard today aside

12  from Mr. Mbom himself.

13          **THE COURT:**  Okay.  Very good.

14      All right.  Government, let's start with you.

15          **MR. SARMA:**  May I speak from the podium, Your Honor?

16          **THE COURT:**  Of course.

17          **MR. SARMA:**  Thank you, Your Honor.

18      And some of what I'm about to say Your Honor heard during

19  Ms. Kabiwa's sentencing, as to the scope of the conspiracy, but

20  I think it's important to say it again here, because the record

21  would also -- because we have a new defendant here, and we have

22  a lot of people who are very concerned about Mr. Mbom, which I

23  do -- the government totally appreciates, and I think it's

24  important for them to understand it as well.

25          **THE COURT:**  Absolutely.

1          MR. SARMA:  The way I think about it is when you talk

2    about the nature and the circumstances of the offense, you have

3    to think both about just how terrible this criminal enterprise

4    was.  And we spent a lot of time just now talking about the

5    loss amount, because that's how the guidelines requires us to

6    calculate the damage here.

7          I often find that that is an odd way to measure harm in

8    the context of Medicaid because the point of Medicaid is to

9    help those in our society who don't have the financial

10   resources to have health insurance.

11         And I often don't like to bring up personal stories, but I

12   will just say my father was a physician who focused on Medicaid

13   patients, and I'm very well aware that it is hard for people

14   who are low income to get quality care.  And, oftentimes,

15   because of their financial position, they have a lot of issues

16   that required medical care.

17         And I think that was definitely true with the population

18   of D.C. that Holy Health should have been helping, and they

19   simply failed to do that.

20         And we attached, you know, the testimony from the grand

21   jury of Ms. Williams.  Ms. Williams had a son who was killed.

22   She had serious issues in her life.  She was working at the

23   direction of the FBI, but the FBI did not tell her to go grab

24   juicy nuggets.  She said just go in there and be yourself.  And

25   they didn't help her and they could have.  And that happened

1   time and again.

2       We could have played hours of video testimony of people

3   sitting in waiting rooms waiting to be seen by someone, and

4   they never were.  And that's a huge damage.

5       There was also testimony from Ms. Foe at trial that the

6   defendant was aware that the money that was being handed to

7   these people, many of them who had substance abuse problems,

8   led to them buying drugs, using drugs on the premises, only

9   exacerbating the problems.  And that is truly despicable.

10      And on top of that harm, the result is a continued

11  skepticism towards the Medicaid program, a really important

12  program.

13      And so we can talk about the millions of dollars Medicaid

14  is out, but it's really just a target at the community that

15  this is going on.

16      As to Mr. Mbom, and we've discussed this, he was really

17  the man on the ground.  He was the one directing people to

18  engage in this fraud, teaching them to be fairly -- we did not

19  seek a sophisticated, you know, means enhancement here, but

20  there was very sophisticated use of the ICAMs system, how to

21  bill time; how to -- there was a lot of testimony at trial

22  about how he taught employees to say that they were working in

23  the field, even though they were, in fact, working in the

24  office, to avoid detection.

25      There was discussion about how you start the session at

1   3:01 and say you ended it at 3:56 so you can bill for the four

2   units.  But, because of, you know, all the claims that have to

3   be reviewed, they are never going to catch on.

4       I will note that Mr. Forka testified about a fake letter

5   that he wrote to DBH that was made at the direction of

6   Mr. Mbom, when DBH started asking questions about how the heck

7   is Mr. Forka seeing all of these people?

8       There was CSW messages that were put on at trial about

9   Mr. Mbom directing CSWs to pump out letters.

10      I will also note that he was the one, according to

11  Ms. Foe's testimony at trial, who came with the -- up with the

12  idea to use the Agatha Foundation to kind of paper the bribes.

13      And I will also note, because this came out at trial, that

14  although Mr. -- when Mr. Mbom provided his phone to law

15  enforcement, he had deleted out nearly all of these inculpatory

16  messages that he had with Mr. Senesie.

17      And so were it not for the FBI being able to use a program

18  and then -- and recovering them.  By the way, the way WhatsApp

19  is set up, the message gets scrambled when you delete the

20  message, so our agents had to sit there and parse it.  And we

21  didn't get to show all the messages because it's rather

22  confusing to the jury, even if we could figure it out, to play

23  a long, scrambled message.

24      As to history and characteristics, I noted in my -- in my

25  sentencing memo, there are a lot of cases that Your Honor hears

1  in this district, unfortunately, you have young men who do not

2  have a lot of educational opportunities who find themselves in

3  trouble.  This is not that case.

4      This is a highly-educated individual.  He has a degree

5  from Columbia.  He has a degree from the Catholic University.

6  He was in his forties at the time of the commission of the

7  crime.  He could have had a legitimate job, made legitimate

8  money.  You know, he could have gone to a different

9  organization.  He stayed at Holy Health.  He could have gone

10  elsewhere.  There was plenty of opportunities for him, and he

11  did not take advantage of them.

12     You know, I really -- I also read the letters.  I do

13  recognize there's support for him in the community, but I do

14  think life can be complicated.  And I think the fact is, there

15  was testimony from people like Fru Nde, who was essentially

16  duped by the defendant, you know, to thinking what he was doing

17  was allowable, when it wasn't.

18     You heard testimony from Ms. Foe and Ms. Margolis raising

19  concerns about illegal practices at Holy Health, and Mr. Mbom

20  disregarding those practices, which I find troubling.

21     I would also note, I don't want -- I'm not going to name

22  the person who wrote this letter, I just -- as an example of

23  how people can do different things, I'm citing here from Letter

24  60, the quote is, "Honesty is a defining trait of Lambert's

25  character.  He conducts himself with transparency and honesty

1    in all interactions."

2        I would say we have years of evidence at this -- in this

3    case where that was not -- that's not a universal truth about

4    Mr. Mbom.  This case was about telling the truth.

5        And I do think even though in other interactions in his

6    life, he may have been truthful, he clearly was not here.

7        And I also would point out, unlike a violent crime case or

8    a felon in possession case, we're talking about a one-off

9    incident, right, this is not just a one-off robbing a bank, he

10   got up every morning for many years and engaged in this fraud.

11   I think that deserves a proper punishment.

12       As to respect for the law and deterrence and public

13   safety, I think we already talked about how serious this crime

14   is.  I won't repeat that.

15       In terms of like -- you know, we cited -- I know general

16   deterrence is an ever-puzzling issue.  Does it exist?  Does it

17   not exist?

18            **THE COURT:**  Does it exist?  Right.

19            **MR. SARMA:**  I do find, I think I cited to

20   Judge Posner's opinions, other opinions, I do think there is an

21   internal logic that these are economic crimes where people are

22   deciding is it worth stealing money when the risk of getting

23   caught is low?

24       And so I think there's a deterrent effect for -- for large

25   sentences here.

1    And I did not cite this.  I was reading about it this

2 morning.  I think that was one of the stated policies, the one

3 the DOJ tax division proceeds on enforcement:  The fear is you

4 can't go after every single person who evades taxes, but if you

5 bring charges, it actually increases compliance.  And maybe at

6 some later date, I find the right study and attach it to a

7 memo, we can have that discussion.

8    Lastly, I will say that even when he began -- and this

9 was -- this was a -- these were clips provided -- or introduced

10 at trial.  When he was first asked by law enforcement, after

11 his arrest, about some incidents, he also was not forthcoming

12 then, you know, a time when he could have been truthful.

13    I noted that -- and this was at Exhibit T1C, he told

14 Special Agent Moran that he didn't know that Mr. Forka was

15 really committing the fraud because Mr. Forka was often in the

16 field, which is what he had also told Mr. Forka to say.

17    He also said that he did not approve notes that Mr. Nde

18 had submitted for services purportedly provided before Mr. Nde

19 had joined the company.  We know that's not true.

20    I also noted -- and I also found this a troubling

21 statement he made to Special Agent Moran, that when he began to

22 suspect Mr. Forka of committing fraud, he trimmed Mr. Forka's

23 salary, which is -- he was, you know, continuing to allow Holy

24 Health to steal money from the government, but then keeping it

25 for himself or the owners or someone else and not giving it to

 1   Mr. Forka rather than reporting it to the government or giving

 2   it back.

 3        Lastly, briefly turning to unwanted sentencing

 4   disparities, because I know Mr. Robbins raised that there's

 5   been one codefendant sentenced in this case.  That codefendant

 6   received 20 months.  That -- which I think was slightly below

 7   what the guidelines were in that case.  There was a lot of

 8   other issues.  I don't think that's --

 9             **THE COURT:**  Yes.

10             **MR. SARMA:**  -- a good comparator in this case, and so

11   I would not base -- I don't think that should be a

12   consideration here.

13             **THE COURT:**  Yep.

14             **MR. SARMA:**  Unless Your Honor has additional

15   questions?

16             **THE COURT:**  Thank you.

17             **MR. SARMA:**  Thank you.

18             **THE COURT:**  Mr. Robbins?

19             **MR. ROBBINS:**  Thank you, Your Honor.

20        This is a difficult case in many ways.  Every case has its

21   own difficulties.  But the difficulty in this case is that

22   Lambert Mbom is in a very different place today than he was the

23   day before the jury returned its verdict.  And he is not here

24   to deny the criminality of the conduct of Holy Health.

25             **THE COURT:**  Just so I'm clear, I mean, this is an

1  effective appeal waiver of conviction, right?

2          **MR. ROBBINS:**  It's an effective -- and Mr. Mbom and I

3  have talked extensively about that.

4          **THE COURT:**  Okay.

5          **MR. ROBBINS:**  And that decision was made at some

6  level when he made the decision not to seek a new trial.  He

7  was prepared to accept the conviction of the jury.

8      In fact, had we not done any of this in open court but the

9  government only sought to rely on the statements that he made

10  in public after his conviction where he -- where he

11  acknowledged being convicted for activity for which he was

12  responsible, that -- that is a watershed moment in a lot of

13  ways.

14      It is also ultimately clear that the program in which this

15  fraud occurred is fraught with problems.  There is a huge range

16  of issues there, and the losses to this program impact the

17  population that can least afford the impacts.  And that weighs

18  on Lambert Mbom.

19      Those people are the reason that he got involved in this

20  work -- this line of work, or one of the important reasons that

21  he got involved.  He has had to deal with that as well.

22      So much of what the government says, we don't argue with.

23  We may quibble with details with who was the leading cause of

24  something.  Was Senesie a friend of Bakari's first, and is that

25  how he got involved?  And does that whole range of activity,

1    did we fight that?

2        But that's not important.  It is not important to what we

3    are here today to talk about.

4        And that is, what is the -- what is the right answer, from

5    a societal perspective, to address an individual like Lambert

6    Mbom who got involved in the criminality that he got involved

7    in, that committed the offenses that he committed?  And that's

8    a hard question to answer.

9        And we do talk about proportionality, and we do talk -- it

10   is in our memo, and we do talk about it here.  Because

11   historically, across the United States, when you look at fraud

12   cases, the sentencing guidelines typically overstate what the

13   courts find to be appropriate.

14       So how does the Court figure out what is appropriate?  And

15   there are two touchstones that are important here.

16       One is to look at the overall character and life history

17   of the individual.  That's important not in a direct -- you can

18   find it in a guideline way.  It's the guideline that's -- the

19   background of the individual is not important.  But it's

20   important because it tells you what his pattern of conduct is,

21   and it lets you see that beyond this being just a no-offense

22   situation, this is an individual who has dedicated his life to

23   helping others.  And that becomes important because it helps

24   explain how he got involved with Holy Health in the first

25   place.

1        It doesn't explain his acceptance and involvement in the

2   criminal activity other than the -- the seduction of getting

3   along, other than --

4        **THE COURT:**  Would you agree, though, Mr. Robbins --

5   let me just sort of say this because it's been rattling around

6   in my brain.  I don't have any evidence before me right now

7   that there was a whole lot of therapy given or treatment given

8   at Holy Health.  I have a whole lot of fraud, but -- but, you

9   know -- and I totally credit that Mr. Mbom has done so much for

10  other people in other places at other times throughout his

11  life.  Those letters are clear to me.

12       But it doesn't seem to have been a place of really any --

13  any true therapy that was given.

14       Am I -- am I missing something?

15       **MR. ROBBINS:**  There were -- I believe that that is a

16  more -- it's a harsher assessment of what was happening than

17  reality.  I think that it was, like many agencies where the

18  government has farmed out its functions to private entities and

19  created a system of payment --

20       **THE COURT:**  Of what?  I'm sorry, I didn't catch that.

21       **MR. ROBBINS:**  Of payment and structure that perhaps

22  doesn't address the problem.  There was an under-deliverance of

23  service.

24       If -- if you think back to the snippets of video that we

25  saw in trial, Holy Health had a lot of consumers coming and

1   going.  Something was happening there.  Was it effective?  We

2   don't have evidence of that, no.

3        But was it an attempt to do something?  Was there an

4   attempt on the part of the counselors to do something?  Was,

5   even for that matter, the government's witness, the manager of

6   the other site, was her whole point "We're supposed to be

7   trying to do things, I'm trying to do things, I'm setting up

8   phones"?

9        There were things happening.  Were they less than

10  effective and overclaimed?  That is -- that's where the fraud

11  comes in.

12       But there were things happening, and the reason to get

13  involved was to try to do good.

14       Now, the other part of it, the Bakari-Senesie scheme, I

15  don't think there was any evidence of anything happening with

16  those claims.

17       And, remember, those were approved by Wendy Soh because

18  Betty Gatewood and Lambert Mbom wouldn't approve the CSW

19  reports coming from the Senesie writers because they -- so

20  there -- that was part of the fight.  Again, not -- not a

21  question on guilt/innocence, but part of are they really trying

22  to do something.

23       Lambert was trying to do something.

24            **THE COURT:**  Okay.

25            **MR. ROBBINS:**  And while I'm on that topic, back in

1   the late '70s, early '80s, in this country, as we looked at our

2   business and industry, there was a panic that the Japanese

3   model was overtaking and would supplant U.S. industry.  Even

4   though it was a smaller country, they were creating better

5   products.  And there was a scramble to find out what was going

6   on.

7       And if you remember from your management courses back in

8   school, there was the Deming method, and the total quality

9   management and continuous improvement.  And all of those

10  methodologies were embraced at both the industrial level and

11  the government level.  A lot of that language has been

12  transferred into a lot of things we talk about.  Stakeholders,

13  all of that stuff has come forward for 30 or 40 years.

14      The problem is that all of that stuff only works if you've

15  got a commitment to improvement at the top.  And it doesn't

16  work if the problem you're trying to resolve is illegality.

17      So it's a -- it's a -- when I talked about the seduction,

18  part of it is the seduction of, well, I'm trying to make things

19  better.  And it just doesn't work.  You can't just make things

20  better if you --

21          THE COURT:  But you could leave.  I mean, you could

22  leave.

23          MR. ROBBINS:  Well, that is the point.

24          THE COURT:  Like I said, the theme of this is, if you

25  can't beat them, join them.  And that's a problematic thing.

1          **MR. ROBBINS:**   And that is exactly the problem of why

2   he has accepted his criminal responsibility.

3      His answer was, leave and make a report.  That's what his

4   answer should have been.

5          **THE COURT:**  Uh-huh.

6          **MR. ROBBINS:**   And it was not.  He failed.  And he

7   knows that.

8      But the question now is, how does he put himself back on

9   track, as a 50-year-old man, with a history of contribution to

10  the community, of leadership and helping others, who has

11  committed this massive event?  This hurt a lot of people.

12     He's written a statement to the Court.  He has put

13  together a plan of how he hopes to use his time in confinement,

14  because he, frankly, expects to spend time in confinement.

15     He's not here asking the Court to look the other

16  direction.  He doesn't.  He wants to find a way, as a

17  50-year-old man, with his personal responsibilities, with his

18  sense of wanting to help -- continue to help his community that

19  he's leaving a hole in, and help society at large, how is he

20  going to do that?

21     We had argued for a sentence much lower than where the

22  guidelines come in, even lower than what the United States says

23  is an appropriate sentence.  And the reason that we've chosen

24  that range is that that range gives the Court a chance to say

25  this type of action is not something that we, as a nation of

1  laws, can look away from.  But we also have the wisdom and the

2  ability to say here's an individual who can do something to

3  make it better in the future.  And warehousing him for an

4  extending period of time achieves nothing for our societal

5  purpose.

6       We need -- we need a serious punishment.  And a sentence

7  of between 20 and 30 months is a huge sentence for a man at 50

8  years old with children at home, one of them with special

9  needs.  And he's going to be missing a big chunk of their life.

10  It's a huge sentence for a man who has dedicated his life to

11  supporting organizations and a community that's making its way

12  in the United States.

13       That's a -- that is a significant and serious sentence.

14  It expresses the view of the United States that this was a

15  serious offense.

16       But the next part of it is, how does he get to the point

17  where he's becoming a productive member of society again, where

18  he's doing something for the good of all of those different

19  constituencies that he has?  And how do we do that with the

20  least negative impact on the United States, frankly?  Because

21  the question is, what does the United States gain from an

22  extended sentence?

23       We suggest that the 20 to 30-month sentence gives an

24  opportunity to express displeasure, to express criminal

25  culpability and criminal liability, but then with an extended

1    period of supervised release, and with the plan that Mr. Mbom

2    has put together for his time incarcerated, and that will

3    continue after he's released.

4        We could put him in a position where he can start to

5    return to the society some of the loss and the damage that he

6    has caused.

7        Thank you.

8            **THE COURT:**  Thank you, Mr. Robbins.

9        Anything else before I turn to Mr. Mbom?

10           **MR. SARMA:**  I think there was some slight factual

11   inaccuracies.  I just want to make the record clear, if I may

12   just very briefly, Your Honor.

13           **THE COURT:**  Sure.

14           **MR. SARMA:**  First, I do believe there is -- I think

15   there was some suggestion that there is a separate scheme

16   involving the Bakaris and Mr. Senesie.  I think there were a

17   lot of texts between the two.  I think there were some notes

18   approved by Mr. Senesie.  I would have to go back into the

19   record for that.

20       Second, I would point out there was a question about the

21   services provided, were there actual services being provided.

22   I think the best record evidence you could look to would be

23   Exhibits S1 through S3.  Those were the summary exhibits that

24   Ms. O'Neil, I believe, or maybe Mr. Moran -- Agent Moran

25   testified at trial, where you essentially have all this billing

1   related to our CHSs, where the CHSs had not shown up for

2   months.  So there's clearly billing going on.

3       So you could also -- I reference this, but from the

4   videos, there's -- there is a crowded waiting room, and no one

5   is doing anything.

6       Mr. Robbins suggested well, they must have been doing

7   something because everyone was there.

8       The reason why everyone was there was because they were

9   getting a free ride and getting paid, and then going back.  So

10  it was a way for these folks to make money.

11      So those are the -- I just wanted to make the record clear

12  as to the idea there.

13          **THE COURT:**  Yeah.

14      **MR. SARMA:**  I will rep -- the government did not

15  see -- we would have, potentially as Brady, or, you know,

16  something, would have to disclose if --

17          **THE COURT:**  Well, did you seize all Holy Health

18  records?  Like, all treatment records and all -- or was the

19  sort of seizure more targeted than that?

20      **MR. SARMA:**  I was not the AUSA at the time.  Can I

21  just briefly ask Special Agent Moran to confer?

22          **THE COURT:**  Okay.  Sure.

23      **MR. SARMA:**  Thank you, Your Honor.

24      Special Agent Moran was there at the execution of the

25  search warrant at North Capitol, the main location.  They said

1   that they did not seize any patient records at the time.  He

2   also says he doesn't recall even seeing patient records, which

3   would -- yeah.

4           **THE COURT:**  Right.  So --

5           **MR. SARMA:**  And maybe one other -- one other thing to

6   add.  I think there was a discussion of just going along.  I

7   would also cite in the record the recording of Ms. Margolis

8   that was played at trial.

9       Mr. Bakari briefly speaks in that recording, but Mr. Mbom

10  is the one who says, "I've created the budget.  We need" -- I

11  think it was 400 -- "We had 200 services last year, we need 400

12  services a week this year, and it needs to be across nursing,

13  therapy," et cetera, et cetera.

14      And the government argument was that was a call that "we

15  need to bill for 400 services," it was not that "we need to

16  actually provide 400 services."

17          **THE COURT:**  I.e., "I created the budget."  Okay.  I

18  get it.

19      All right.  Thank you.

20      Okay.  Mr. Mbom, it's now -- I have read your letter and

21  all the letters of your supporters.  But it's now your

22  opportunity if there's anything you wish to say before I impose

23  sentence.

24      You do not have to speak.  You have the absolute right to

25  remain silent, and I will not hold your silence against you.

1    But if there is anything you wish to say, now would be the

2    time.

3              **THE DEFENDANT:**  Your Honor, thank you very much.  I

4    really want to appreciate the opportunity to be able to address

5    the Court.  And I want to just start off -- and I pray, just

6    give me some more time than is normally allotted because I know

7    I promised to make it under four minutes, but I'll try.

8              **THE COURT:**  Okay.

9              **THE DEFENDANT:**  I stand before you today filled with

10   a lot of remorse for the crimes that I have committed.  Last

11   August, I was here, six days, with you all, and the jury found

12   me guilty to a fraudulent Medicaid scheme.

13        Ever since that criminal conviction, I have been

14   meditating on the path forward, how to amend.

15        But while I was doing this, I was reminded by philosopher

16   Søren Kierkegaard who said life can only be understood

17   backwards, but life must be lived forward; life can only be

18   understood backwards, but must be lived forward.

19        But at the same time, looking backwards, in order to live

20   forward is the best way to do it.

21        And because I'm a Catholic, I had to go back again to look

22   at my Catholic faith.  And one of the gifts the Catholic faith

23   has given me is a sacrament called the sacrament of confession.

24   It is what is called a sacrament of penance and reconciliation.

25   It's, I think, one of those few sacraments that has to be --

1   but I want to focus with that, because with sacrament, it ties

2   in all that I want to say in here today.

3        Confession, you have to, first of all, acknowledge guilt;

4   you confess it; you do restitution; and then you plan to go

5   forward.

6        And that is why I decided to say -- all that I'm going to

7   say here today is contained in the letter R.  The letter R is

8   the eighteenth letter in the alphabet.  And, for me, that

9   letter R contains four things:

10       The first is remorse; the second is rehabilitation; the

11  third is restitution; and the fourth is responsibility.

12       And I want to start it off with that remorse, again, like

13  I said, my action and inactions.  Because generally the

14  tendency is to look at what was done, but also I want to

15  include what was not done and say that the fraudulent

16  enterprise that Holy Health turned out to be, I don't want to

17  make any excuses for those.  I don't stand here to make any

18  excuses, but I stand here to take responsibility.

19       I have come to fully understand that my actions and

20  inactions have caused harm.  It is important -- I was excited

21  when I heard you asked the government for a victim, because it

22  would have been nice -- nice is not a good term, but I think in

23  expressing remorse, the people you really have to express

24  remorse to are the victims.  And in this case, the victims in

25  this particular instance are homeless persons in D.C. who have

1  mental health challenges.

2      And because the government is trying to provide limited

3  resources to assist these people, we tried to do that, and

4  failed woefully, and it's important that I take responsibility

5  for that action as a member of that team.

6      To say, you know, I should have done better with that, and

7  to those people who because of this fraud, some must have lost

8  services.  And I'm looking at it and wondering, the government

9  put it properly, Medicaid is for low-income people.

10     I have been on Medicaid myself.  My children are currently

11 on Medicaid.  And I just imagine, with the loss amount, if this

12 were to impact these people, my kids and the kids of others who

13 are going to lose Medicaid because of my action, and it feels

14 really terrible to feel that way.

15     I really wanted to say sorry.  I wanted to apologize, to

16 say this is not -- this healthcare fraud is not something that

17 should be tolerated.

18     I wanted to register that.

19     It is unforgivable for me to have engaged in Medicare

20 fraud that deprived others of similar benefits and these acts

21 by me accepting my punishment.  I am ready.  I deserve to know

22 better.  I should have known that it is harder for patients to

23 benefit from these services based on the fraudulent activities.

24     And, again, my actions did not only impact directly the

25 victims, it also impacted my community.  And I would like to

1  crave your indulgence and turn and say a few words to my

2  community, if you so --

3            **THE COURT:**  Sure.

4            **THE DEFENDANT:**  And the reason I do this is because I

5  have built up a community here since 2016.  It's a Catholic

6  community, and it's a community that's supposed to be a

7  faith-based community.  In the faith-based community, you

8  should not be having -- call it criminals, in that sense.

9  Well, the church is a welcoming place.  Right?

10       The impact on my community is so huge.  And I just wanted

11  to turn around to you all and say, I am sorry.  I mean, we'll

12  all get through this, but I know that I'm going to be a better

13  person.  And I just want you to accept my apology.  Bring that

14  apology to the community.

15       And it's not just this community, because the danger here

16  is to look at just my immediate community.  It's also the

17  American public.

18       I left Cameroon in 2004, I was running away from political

19  incidents in Cameroon.

20       The American community welcomed me.  They gave me

21  protection and refuge and gave me opportunities and made me to

22  be able to thrive.

23       This is not a good way to be able to say thank you to the

24  American public by going to commit crimes.  And I also wanted

25  to take the opportunity to say to the American public I am

1    sorry.

2        Now, my children are not here today.  It is one of the

3    biggest failures that I consider.  I have three beautiful kids.

4    And anybody who knows me knows that I'm always around my kids.

5    In fact, I always went to work late every morning.  I call it

6    late, because I always get to work at between 10:00 and 11:00,

7    because I had to take care of my kids, drop them off at school

8    and do all of that.  I'm always with my kids.

9        And this, you know, is most gut wrenching for me because

10    I've had to deprive them now of my time, my talent and treasure

11    because of a crime that I've committed.  My children are going

12    to grow up, I'm going to miss a couple of things with them

13    because I'm going to be spending time for something -- a crime

14    that I've committed.

15        It's not so much about making an excuse for them, but I

16    also have taught them that they need to be responsible kids and

17    they need to be accountable.

18        And one way of showing them how to be accountable is also

19    taking responsibility for my actions.  I have been able to

20    explain to them, they don't understand it, but they are bound

21    to live with that for a while, understanding that Dad made

22    mistakes, and in life, when you make mistakes, your crime,

23    you're involved in a crime, you're going to be accountable and

24    you're going to be responsible.

25        And so I am not -- again, it is my prayer that they will

1    forgive me for putting them through this ordeal.  I hope to

2    show them that taking responsibility is a Christ-like thing to

3    do.  I want to be a positive role model for them going forward.

4         And I've been talking about remorse.  I want to talk about

5    a second one, rehabilitation.

6         I submitted to the Court the release plan.  I thought

7    through that well.  Whatever time I'm going to serve, I'm going

8    to put it into rehabilitation.  It is important that -- the

9    time that I have had to work over the last ten years, I've been

10   in mental health.  I've had opportunities whereby I could have

11   been more circumspect because of my background.

12        I was engaged -- you know, I always wanted to be a

13   clinical psychologist.  I actually studied clinical psychology.

14   I started a Ph.D program in clinical psychology.  But then

15   because I was having a family now, I could not continue.

16        But I believe, now since I have this, I enrolled in the

17   DeVry University in Virginia.  They have an online program of

18   pre-Ph.D clinical psychology.

19        So this time, I'm going to have the time to be able to

20   complete that as a way of also being able to give back to the

21   community.  Serving as a clinical psychologist helps me because

22   it helps me to become a better person and I'm also going to be

23   able to help the community, especially this community that I've

24   harmed by my actions and inactions.

25        I am hoping that the people that have been victimized

1   through my fraudulent activities over the last six months, I

2   will be giving back to them by the hours of volunteer.

3       After I left court on the 15th of August, I enrolled -- I

4   had to look around, and I devoted time to providing services at

5   the Father McKenna Center in D.C. which serves homeless men.

6   I've also done some little things with the D.C. government.

7   But I believe this way a Ph.D process that has been in place,

8   is going to continue through the time I am going to serve, and

9   become a better person.  I'm hoping by the time I come out

10  already with a Ph.D in clinical psychology.

11      Having been rehabilitated, I think the most difficult part

12  is the restitution.  I heard the discussion about restitution

13  and the amounts.  Your Honor, I have 20 years in this country.

14  I've not made up to what the government is claiming, I can say

15  that.  To be able to pay 4.4 million, that's -- that's a

16  stretch because you can see I'm 50.

17      But because of where I am, I have to start making that

18  reparation.  I have to.  And I'm committing that at least

19  coming out, rehabilitated, finding a good job to be able to

20  start making those payments to make sure -- to show that I'm

21  remorseful of my actions.  And I promise I'll do my utmost to

22  be able to make a dent.  I intend to log also considerable

23  hours of volunteer work into the community as a way of that

24  remorse.

25      Lastly, having come full circle, my redemption has to

1  shine through with me becoming a responsible man, a responsible

2  father, a responsible citizen.  It is not just that I will

3  never have occasion to come back to this court for criminal

4  activity, that's a low standard for me to hold myself to, but

5  that I will become a better person who tries to be the best

6  version of himself going forward.

7      I have used this time to reflect, to seek forgiveness, and

8  volunteer in the service of those less fortunate.  Though my

9  actions in this case do not reflect it, I love this country, I

10  love my community.  I will find ways to make positive

11  contributions and live up to the trusts that will be placed

12  once again in me.

13      Regardless of my sentence, I will continue to become an

14  asset to my family and community again.  I know I have a long

15  journey ahead to atone for my crimes, but I am prepared to

16  begin that process with humility.  I am deeply sorry for all I

17  have done, and I hope this statement makes clear what I accept

18  as responsibility, remorse for my crimes, and community

19  reconciliation.

20      I thank you.

21          **THE COURT:**  Thank you, Mr. Mbom.

22      Mr. Mbom, I'm going to start with your statement.  I have

23  to say there aren't many people I see who give as much thought

24  and consideration and sort of a depth of understanding,

25  especially after you decided to go to trial, about the degree

1    of the harm you've caused and the kind of harm you've caused.

2        You're obviously an incredibly intelligent and well-read

3    man who I think will use your time really well.  And one thing

4    I encourage you to do is don't necessarily think about prison

5    as a break between the work you've started and the work you're

6    going to do when you get out.  What I mean by that is, all of

7    these talents that you have, you're going to be in a population

8    that desperately needs them.

9        And there is -- because you are an intellectually curious

10   and sort of man steeped in religion, philosophy, I really do

11   encourage you to read and think about a concept called

12   restorative justice, because a lot of what you're talking about

13   now is that.  It would have been, I think, better for all of

14   us, probably you, if you were able to have done that a bit ago.

15       But the -- the steps that you're taking now really do

16   speak to that deep understanding of how much damage your crime

17   caused to the community, and it -- it is at least heartening to

18   me that you're thinking about ways in which you can make amends

19   that go beyond just saying you're sorry today.  Because it's a

20   lot often what I here, and it's often sincere, but it's

21   surface.  You know, it doesn't really get deep into the work.

22   So I encourage you to keep doing that.

23       And I encourage everyone who is here to keep supporting

24   your -- your friend and your brother because he's going to need

25   it.  Regardless of what my sentence is, whether it's six months

1   or six hundred months, people who have to pay that time in

2   prison, certainly everyone wishes it to be shorter, but it's

3   hard, and it's made harder without a community.

4        A community can build the bridge between Mr. Mbom and his

5   children and his other loved ones and each other.  And so I --

6   and it helps.  It helps in the long run, it helps when Mr. Mbom

7   gets home, and it helps him to do the work that he promises to

8   do, which is make amends and to repair as best as he can.

9        So I really do thank you all for being here today, and I

10  hope you stay with him through this process.  So those were my

11  words of hope.

12       I do need to turn to the law.  And the law says that I

13  must impose a sentence that's sufficient but not greater than

14  necessary to achieve all the purposes of sentencing.

15       The guidelines are one aspect of that, and so the record

16  does need to be clear that the guidelines recommend for this

17  case that I impose a sentence of 135 months on the low end to

18  188 months, and that's 11 years.

19       Am I getting that right, Counsel?  Am I at the right

20  place?

21            **MR. SARMA:**  I think it's 135 to 168.

22            **THE COURT:**  I'm sorry, 135 to 168.  Sorry about that.

23  That's still 11 years and change on the low end, and 13-ish on

24  the high end.

25       You can tell I'm not imposing that sentence.  I'm not

1   going anywhere near that sentence for Mr. Mbom.  I don't -- I

2   think that's overly punitive.  I don't agree that the

3   guidelines always get it right, especially when you have, as

4   both sides have acknowledged, many, many more facts about the

5   seriousness of the offense and the type of offense, but also

6   the man who stands before me.

7        So I use it as a benchmark, sort of a -- you know, a

8   community based or how the guidelines have seen these kinds of

9   financial crimes.  But it's just that, it's one point.

10       With regard to the seriousness of the offense, Mr. Mbom, I

11  think you know this, like, this is among the most serious.  You

12  acknowledged what the government has said over and over again,

13  that there's the -- the government is the victim, but the real

14  victims here are the unseen and the unheard and the

15  unsupported.  And there's just no vulnerable -- more vulnerable

16  population than them.  They needed you and the other

17  codefendants more than anything, and they got -- they were

18  used, right?

19       So -- and it went on for years.  It went on between

20  June 2018 to August 2021 was your participation.  It resulted

21  in $4.5 million of loss.  That's just the dollars.  But that

22  also means that all those services were not given.

23       So the sentence does need to be substantial to reflect

24  that seriousness of the offense and to promote respect for the

25  law.  Because if not -- if not us, then who sends that message

1    that the law must be followed over personal avarice?

2         Deterrence is a tricky one.  I hope that since you have

3    spent the last several months really drilling down on your

4    acceptance for your part in this, that my sentence will deter

5    you further.

6         As to general deterrence, I do think it is important to

7    send a message that in a -- the kind of fraud that this is, the

8    complexity of it, the vastness of it, and the population that

9    needed it the most, that the sentence does help people to pick

10   their heads up and realize that you need to leave, not join, in

11   the future.

12        To protect the public, I think that the things that we've

13   talked about just resonate with protecting the public.  It does

14   need to be a substantial sentence.  But then I do have to look

15   at you, and you are 50 years old.  Apart from your role in

16   this, there is no evidence that you have ever committed a crime

17   like this in the past.

18        I do think that two truths can live in the same space,

19   which is that you are very much in the thick of it.  It went

20   forward because of you.  You took the reigns of this fraud.

21   You made it happen with your co-conspirators.  But you also

22   have served your community and your family quite admirably.

23   And there's -- there's no moving away from that.

24        Your acceptance of responsibility is an interesting one to

25   me.  You know, the guidelines are not giving you any credit for

1   acceptance because you went to trial, and you put the

2   government through its test, and the government had to bring

3   all of its resources and its energy to bear on a jury.  And

4   you're entitled to that under the Fifth Amendment.

5       But at the same time, you're not getting the benefit under

6   the guidelines.

7       I do see some benefit, though, and I think it should be

8   noted, that you have accepted responsibility.  One, you are

9   conserving at least resources with respect to the conviction

10  and many pretrial issues.  I'll be very surprised if an

11  appellate court sees your acceptance as anything short of a

12  waiver, and so you've saved the government resources in that

13  respect.

14      But more importantly to me, or equally important,

15  you've -- you've done what a lot of folks have -- in your shoes

16  have been discouraged from doing, like, you can't stand up and

17  take responsibility, you went to trial.

18      But you've actually run toward the responsibility, and

19  you've acknowledged that maybe it was your pride, or your

20  hubris stopped you before.  I do credit that.  And I think it

21  is an important development for you and tells me that I can --

22  it's at least one piece of evidence that perhaps you're quite

23  serious about not only not never being back here but actually

24  using this opportunity to do good.

25      You do have a very difficult financial and family

1    situation, and I credit that as well.

2         But I simply cannot go as low as what your counsel has

3    asked for or what the codefendant in this case has been given,

4    because she had a constellation of issues that really you don't

5    have.

6         But I take that into account, because in the end, there

7    comes a point at which I have to ask myself what is too much

8    punishment?  What goes the other way and actually causes more

9    harm than good by incarcerating you?

10        And when I look at all of those things, it is, in my view,

11   based on the evidence, and with a heavy heart, that I impose a

12   sentence of 60 months custody of the Bureau of Prisons; that's

13   five years.  You will receive credit for time served or good

14   time as well.

15        My understanding, and I don't weigh in on this, but there

16   are additional programming options that could reduce that as

17   well.  That's totally up to the Bureau of Prisons.  But it

18   involves education and programming, and I think things that

19   would be very much of interest and aligned with what you're

20   telling me today.

21        You'll be then placed on three years of supervised

22   release.  And let me make clear what the -- the breakdown is in

23   the counts.

24        It's five years as to Count One, 60 months concurrent; 60

25   months, Count Two; three years of supervised release as to

1    Count One; two years supervised release as to Count Two

2    concurrent with Count One.

3         And in addition to the standard and mandatory conditions

4    of supervision, there are the following special conditions:

5         The first is that you pay your financial penalties, which

6    is a $200 special assessment and restitution.  I will award

7    restitution in the amount of $4,450,588.66.  It will be made

8    jointly and severally with the codefendants.  Only one has been

9    sentenced so far, so as of now, that's how the judgment will

10   read.

11        But as the other judgments come in, it will be, in the

12   end, clear that it's joint and several as to Mr. Bakari,

13   Ms. Kabiwa, Mr. Forka, and Mr. Senesie.

14        As part of your criminal monetary penalty, I have to

15   decide how much you can pay while you're on supervision.  We're

16   going to start with $300 per month.

17        In the end, the government will also be given, and this is

18   the last special condition, access.  So you must provide access

19   to the probation officer of any requested financial information

20   and authorize the release of any financial information.  And

21   that's in part so we can keep track of where you are with

22   respect to your finances.  And if it becomes easier or harder

23   for you to pay that amount, then we will adjust accordingly.

24   But I do want probation to have access to those records.

25        There will not be a fine.  I recognize that you've got a

1   long service ahead of you, and you have serious financial

2   obligations, so the fine is waived.

3        Is there any -- or I'm not going to impose it.

4        Is there any aspect of the sentence I've neglected to

5   address, Mr. Sarma?

6        **MR. SARMA:**  Not the sentence, but there is the

7   preliminary order of forfeiture in this matter.

8        **THE COURT:**  Do I have that?  Here it is.  Okay.

9        Mr. Robbins, any issue with respect to the preliminary

10  order of forfeiture, which is for the lesser amount, the amount

11  that the government has put forward as what Mr. Mbom received,

12  which is $245,070.75?

13       **MR. ROBBINS:**  No objection, Your Honor.

14       **THE COURT:**  Okay.  So I'm going to sign that order.

15       And, Mr. Mbom, what this means is that there's two kinds

16  of financial penalties:  Restitution and forfeiture.

17       Restitution is the way in which the government can obtain,

18  for the victims, their losses, the money that they have been

19  out.  And so the victim here really directly is Medicaid.

20       But then forfeiture is the government's ability to get or

21  keep property or proceeds involved directly with you and your

22  involvement in the offense, not the larger conspiracy.  So that

23  means that the funds that you received personally are

24  forfeitable.  A preliminary order of forfeiture begins that

25  process, so I've signed that as well.

1        Mr. Robbins, any aspect of the sentence from your

2   perspective that I've neglected to address?

3           **MR. ROBBINS:**  Not on the sentence, Your Honor, but we

4   do have other issues to address, of course.

5           **THE COURT:**  Not on the sentence, though?

6           **MR. ROBBINS:**  Not the sentence.

7           **THE COURT:**  Okay.  Any recommendations for

8   designation or programming?

9           **MR. ROBBINS:**  Yes, Your Honor.

10          **THE COURT:**  Okay.

11          **MR. ROBBINS:**  We would like a designation or a

12  request for Cumberland or Morgantown.

13          **THE COURT:**  Cumberland?

14          **MR. ROBBINS:**  Cumberland or Morgantown.

15          **THE COURT:**  Okay.  And the camps?

16          **MR. ROBBINS:**  That's correct, Your Honor.

17          **THE COURT:**  Any programming, or is Mr. Mbom --

18          **MR. ROBBINS:**  No, we're going to see how we can do at

19  the institution we're at.

20      Also, on reporting day, I think that pretrial services has

21  said that he's eligible to stay on release pending self-report.

22      Is there any potential of delaying his reporting date so

23  that he can get his kids to the end of the school year?

24          **THE COURT:**  So we currently have a March 25th, 2024.

25  When does school end?

1          MR. ROBBINS:  The date is -- the 1st of June?

2          THE DEFENDANT:  No, it's June 5th.

3          MR. ROBBINS:  June 5th is the last day of school.  So

4   if we could make it the end of June.

5          THE COURT:  So you're asking for a three-month

6   extension?

7          MR. ROBBINS:  A slight delay.  That's correct, Your

8   Honor.

9          THE COURT:  Government, your position on that?

10         MR. SARMA:  Assuming that probation doesn't have any

11  issue with that, there's no objection from the government.

12         THE COURT:  So, Mr. Mbom, you'll stay on pretrial for

13  that time, which means none of that time counts towards service

14  of your service.  But you have done well on pretrial service.

15  You've never -- you have always been here when you're supposed

16  to, sometimes before any of us, so I don't see any problem with

17  that.  I would much rather you get your kids settled.

18      But, that said, you've got to be a Boy Scout on pretrial.

19  There can't be any issue.  And if I learn of any issues, and I

20  find that to be the case, then I will revoke your pretrial and

21  that can affect your security level.

22      Does that make sense?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Okay.  So we will make -- is that a four

25  that I see there?  June 24?

1          **DEPUTY CLERK:**  Correct.

2          **THE COURT:**  Okay.  Then I'm going to do July 1 will

3  be your report date.  So what that means, Mr. Mbom, is between

4  now and then, you should receive your designation from the

5  Bureau of Prisons.  Plenty of time.

6      If you don't, you are to report to this courthouse by

7  2:00 p.m. on July 1.

8      The likelihood is through Mr. Robbins you'll learn where

9  you're supposed to self-report on that day, and you'll go right

10  to the facility.

11      Mr. Robbins, if there's any issues in that regard, just

12  let me know and we'll deal with it.

13          **MR. ROBBINS:**  Understood, Your Honor.

14          **THE COURT:**  Okay.  Anything that we need to address

15  from the sentence perspective?

16          **MR. ROBBINS:**  No, Your Honor.

17          **THE COURT:**  Okay.  So, Mr. Mbom, you do retain the

18  right to appeal.  You can appeal -- you can appeal anything and

19  everything that happened in this case.  You don't have a plea

20  agreement.  And I would advise you to speak to Mr. Robbins

21  about your right to appeal as quickly as possible because you

22  have to note your appeal within 14 days.

23      Do you understand that?

24          **THE DEFENDANT:**  Yes, Your Honor.

25          **THE COURT:**  And with that, is there anything else?

1        **MR. SARMA:**  At this point, Your Honor, the government

2  would ask Mr. Mbom to dismiss the counts in the original

3  indictment, as well as in the first superseding indictment.

4        **THE COURT:**  So I have written here count to dismiss,

5  Counts One and Two of the superseding indictment, and Count

6  Three of the second superseding indictment.

7        **MR. SARMA:**  Oh, sorry, I apologize.  Yes, he was not

8  in the first.  Yes, that is correct, Your Honor.

9        **THE COURT:**  Okay.  All right.  So --

10        **MR. SARMA:**  Thank you, Mr. Ulander, for correcting

11  me.

12        **THE COURT:**  Dismissal of Counts One and Two of the

13  superceding indictment, Count Three of the second superceding

14  indictment, and I grant that motion.

15        **MR. SARMA:**  Thank you, Your Honor.

16        **THE COURT:**  Anything else?

17        **MR. ROBBINS:**  No, Your Honor.

18        **THE COURT:**  All right.  Thank you all.  And good luck

19  to you, Mr. Mbom.

20        **MR. ROBBINS:**  Thank you, Your Honor.

21        **THE DEFENDANT:**  Thank you, Your Honor.

22        **DEPUTY CLERK:**  All rise.  This Honorable Court now

23  stands adjourned.

24    (Proceedings concluded at 12:57 p.m.)

25

CERTIFICATE OF OFFICIAL REPORTER

    I, Paula J. Leeper, Federal Official Court Reporter, in
and for the United States District Court for the District of
Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that
the foregoing is a true and correct transcript of the
stenographically-reported proceedings held in the
above-entitled matter and the transcript page format is in
conformance with the regulations of the Judicial Conference of
the United States.

                                Dated this 15th day of March 2024.


                                    */S/ Paula J. Leeper*

                                    _____

                                    Paula J. Leeper
                                    Federal Official Reporter