```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
                           GREENBELT DIVISION
```

```
_____
                                )
UNITED STATES OF AMERICA,        )
                                )
         Plaintiff,              )
                                )Docket Number
             vs.                 )8:22-cr-109
                                )
LAMBERT MBOM,                    )
                                )
         Defendant.              )
_____)
```

```
                    TRANSCRIPT OF JURY TRIAL - DAY 1
                    BEFORE THE HONORABLE PAULA XINIS
                    UNITED STATES DISTRICT COURT JUDGE
                     TUESDAY, AUGUST 8, 2023 AT 9 A.M.
```

APPEARANCES:

On Behalf of the Plaintiff:

        CHRISTOPHER M. SARMA, ESQ.
        U.S. Attorneys' Office
        6406 Ivy Lane, 8th Floor
        Greenbelt, MD 20770
        301-344-4431
and
        JESSICA CAROLINE COLLINS, ESQ.
        MEGAN SAMANTHA McKOY, ESQ.
        U.S. Attorneys' Office
        6500 Cherrywood Lane, Suite 200
        Greenbelt, MD 20770
        301-344-4516


On Behalf of the Defendant:

        G. ARTHUR ROBBINS, ESQ.
        Chesapeake Meridian
        1997 Annapolis Exchange Pkwy, Suite 300
        Annapolis, MD 21401
        443-454-7675

     KATHY CORTOPASSI, RDR, CRR, CRC - Official Court Reporter
         United States District Court, Greenbelt, Maryland

<pre>
1                        I N D E X

2                 * * * * * * * * * *

3     PLAINTIFF'S OPENING STATEMENT               4

4     DEFENDANT'S OPENING STATEMENT              15

5

6  GOVERNMENT'S CASE IN CHIEF ----------------------------

7  WITNESS:                                   PAGE

8  GLORIA MENSAH

9    Direct Examination by Ms. Collins         22

10   Cross-Examination by Mr. Robbins          35

11

12 FRU NICHOLAS NDE

13   Direct Examination by Mr. Sarma           43

14   Cross-Examination by Mr. Robbins          82

15   Redirect Examination by Mr. Sarma         88

16

17 JAMES MORAN

18 Direct Examination by Ms. McKoy             92

19

20 AMANDA CDEBACA

21   Direct Examination by Mr. Sarma          163

22   Cross-Examination by Mr. Robbins         170

23   Redirect Examination by Mr. Sarma        171

24     ****PLEASE NOTE:  PLEASE CHECK THE COURT DOCKET FOR THE

25          OFFICIAL RECORD OF ALL EXHIBITS RECEIVED.***
</pre>

1          THE COURT:  Good morning, everyone.  You can have a
2     seat.  Would the Government call the case.
3          MR. SARMA:  Good morning, Your Honor.  The case is
4     United States versus Lambert Mbom PX-229.  We are here for
5     the second day of trial.  Christopher Sarma for the United
6     States.  I'm joined at the counsel table by Jessica Collins,
7     Megan McCoy and FBI Special Agent.
8          MR. ROBBINS:  Good morning, Your Honor.  Gar
9     Robbin.
10          THE COURT:  Good morning to both of you.  You can
11     have a seat.  All right.  I understand we have a jury and we
12     are ready to go.  Okay.
13          MR. SARMA:  That's correct, Your Honor.
14          THE COURT:  Very good.
15          And so, Mr. Robbins, do you expect to use the
16     podium, as well?  I just want to make sure so we --
17          MR. ROBBINS:  Yes.  But I do not expect to use the
18     video.  I have no slide deck this morning.
19          THE COURT:  All right.  Sounds good.
20          We did not double-check that your remotes are
21     working.  So maybe we'll do that right after openings?
22          (The jury came back into the courtroom at 8:51 a.m.,
23          and the following proceedings were had in the
24          presence of the jury.).
25          THE COURT:  All right.  Good morning, everyone.

PLAINTIFF'S OPENING STATEMENT                    4

 1   Have a seat. Thank you so much for being prompt.  Really
 2   appreciate it.  Let me ask you something before we begin.
 3   The podium, this podium right here, won't be the whole time.
 4   But can you see everybody from where you're sitting?  You can
 5   see everyone?  Who has trouble seeing?
 6              JUROR:  1 can't see.
 7              THE COURT:  You can see Mr. Robbins?
 8              JUROR:  I cannot.
 9              THE COURT:  Okay.  So that is a problem in this
10   courtroom.  What I think we might have to do, before we start
11   the witness presentation, is just move that podium back.
12              Is the podium that has the Elmo on it and the
13   filter, is that the thing that's blocking you?
14              JUROR 1:  Yes.
15              THE COURT:  Okay.  Then I think what we'll do is
16   put the filter on the floor and move the podium back about a
17   foot and that hopefully will fix the problem; okay?
18              All right.  With that, is the Government ready to
19   begin?
20              MR. SARMA:  Yes, your Honor.
21              THE COURT:  Okay.
22                   PLAINTIFF'S OPENING STATEMENT
23              MR. SHARMA:  Thank you, Your Honor.  May it please
24   the Court, Ladies and Gentlemen of the Jury.
25              This is a case about lies.  The defendant,

1  Mr. Lambert Mbom, and his criminal partners ran a
2  multi-million dollar, multi-year Medicaid fraud scheme.

3          The defendant and his partners were supposed to be
4  treating Medicaid patients and providing mental health
5  services; but in reality, the defendant and his partners were
6  writing fake notes about patients that they did not see.
7  They were claiming to provide mental health services; and in,
8  fact, they were not.  And they did so in order to steal as
9  much money as they could from Medicaid.  They were defrauding
10 Medicaid.

11         Ladies and Gentlemen of the Jury, my name is
12 Christopher Sarma.  Together with my co-counsel, Jessica
13 Collins and Megan McCoy, we represent the United States of
14 America.

15         We are joined at counsel's table by FBI Special
16 Agent Jim Moran.  Special Agent Moran was the one who
17 investigated this crime.  And what I want to do with you
18 today is three things.  First, I want to give you an overview
19 of the fraud scheme of this case.  Second, I want to preview
20 for you just some of the types of evidence that you will see
21 and hear at this trial.  And, third, I want to briefly go
22 over the types of charges, or the charges that the defendant
23 is facing at this trial.

24         Now, to understand the defendant's fraud scheme,
25 you have to know a little bit about Medicaid.  Medicaid is a

1    Federal Government program.  It is designed to insure and to

2    provide health insurance to low income individuals.  These

3    are some of the most vulnerable folks in our communities, and

4    the government wants to ensure they receive health care.  And

5    so Medicaid will pay -- if someone's insured, they will pay

6    for health care treatment, including mental health services.

7         But it is important to remember that Medicaid will

8    not pay bills if the health care provider, one, is billing

9    for services that they didn't actually provide or if they

10   don't accurately describe the services they're providing or,

11   two, if the services were obtained either through kickbacks

12   or bribe scams.

13        A little bit more background.

14        You will hear these terms a lot during this case.

15   First, you will hear that in this particular industry, for

16   these particular individuals that we'll discuss were supposed

17   to be receiving mental health treatment, those patients, who

18   were Medicaid beneficiaries, were referred to as consumers.

19   You will hear a lot of people referred to as consumers.

20   Those are the patients we're discussing about.

21        Second, you will hear about a variety of mental

22   health services.  But in particular you will hear about a

23   mental health service called "community support services."

24   And the individuals who are supposed to be providing those

25   community support services are known as CSWs.  That's the

1    term.  CSWs stands for community support.  And throughout

2    this trial, you will get to meet some of the CSWs who support

3    these community support services for these consumers.

4           That is a picture of the front part of the main

5    office of Holy Health.  It's right on the D.C./Maryland

6    border.  Holy Health was owned by Julius and Eugenie Bacardi.

7    And the defendant had a leadership role at that company.

8           Now, for years, Holy Health claimed that it was

9    providing mental health services including community support

10   services to Medicaid beneficiaries.  But in reality, the

11   defendant and his co-conspirators were lying about the

12   treatment they were providing to consumers.

13          As you will learn at this trial, for years the

14   defendant and his co-conspirators lied to the government in

15   order to defraud Medicaid.  The scheme, the fraud scheme, had

16   many components to it.  The evidence will show at trial that

17   they lied about the services that they were providing to

18   Medicaid consumers.

19          For example, Holy Health Community Support Workers

20   lied and wrote notes about consumers' visits that simply did

21   not happen.  They made it up out of thin air and wrote a note

22   about a visit where no such visit occurred.

23          CSWs and other Holy Health employees wrote notes

24   claiming to see a consumer for an hour when in reality they

25   saw them for just a couple of minutes.

1          Holy Health also used fake CSWs.  These are CSWs
2     who were employed who saw zero consumers but whose names were
3     used to enter notes about consumer visits.  The purpose of
4     this fraud again, Ladies and Gentlemen of the Jury, was to
5     defraud Medicaid.  Because Holy Health used those fake notes
6     to bill Medicaid.  And based on those bills, millions of
7     dollars flowed to Holy Health bank account.
8          The evidence will also show in this case that Holy
9     Health bribed consumers to come to these offices.
10          The defendant was a knowing and willing participant
11     in this conspiracy.  He helped to direct the conspiracy.
12          You will learn at this trial that his formal title
13     at the company was Program Administrator.  But as you will
14     learn, he was the man on the ground running the fraud
15     day-to-day.  He was in charge of the CSW program.  He was the
16     one who trained all the CSWs when they came to work for Holy
17     Health.  He was their supervisor.  The evidence will show
18     that he then directed CSWs to double and triple the time that
19     they saw Medicaid consumers.  And the purpose was to maximize
20     Medicaid billing.  He trained the CSWs on how to write false
21     notes in the system.
22          As you will see at trial, he wrote group texts to
23     the CSWs where he told them to pump more notes in the system.
24          You will hear testimony from former employees who
25     will say he held group meetings where he demanded they write

1    more notes.

2              Now, as you will learn at trial, community support

3    services are billed in 15-minute increments.  So, one unit is

4    15 minutes and an hour is four units.  And you will learn

5    that the defendant told the CSWs to say that they always saw

6    a consumer for an hour.  Bill four units.  If the CSW saw

7    someone for five minutes, they were instructed to lie and say

8    they saw the consumer for an hour.  If the CSWs saw someone

9    for 10 minutes, they were instructed to lie and say that they

10   had saw the consumer for an hour.

11             Now, the defendant knew that if someone did a

12   service for five minutes and documented in the notes that it

13   took 20 minutes, that was fraud.  But that is exactly what

14   the CSWs were doing.  You will see and learn at this trial

15   that the vast majority of claims billed to Medicaid for

16   community support services were for an hour.

17             Now, the defendant did not just tell the CSWs to

18   expand the time that they were seeing consumers.  He also

19   told the Holy Health employees to make notes up about the

20   services they were providing to consumers.  These were folks

21   that the CSWs never actually saw, but the CSWs were putting

22   notes in the system on them anyways.

23             They were supposed to lie and say they saw a

24   consumer for an hour even though they didn't see him for a

25   single second.  The defendant wanted these notes in the

1    system so that Holy Health could bill Medicaid.

2              You will also learn at this trial that as a

3    supervisor, the defendant was approving thousands of fake

4    notes.  And at times -- and you will see the evidence on

5    this -- he went into the system and edited notes to try to

6    conceal the fraud from the government.

7              Indeed, the defendant was careful to hide the

8    fraud.  You will see that he told his co-conspirators to make

9    changes in the notes when the fraud was just too obvious.

10   The reason?  The defendant did not want to get caught.

11             For example, he told CSWs to change the dates or

12   times that they supposedly saw consumers when it was clear

13   that the CSWs couldn't have been doing what they were

14   claiming and at times he went in himself and edited and

15   concealed notes.

16             The defendant also knew that Holy Health was making

17   illegal payments to get consumers.  But he also knew that by

18   paying consumers these illegal cash bribes, Holy Health got

19   more consumers to come visit their offices.  And once the

20   consumer was in the office, Holy Health could take their

21   Medicaid information.  And once they had that Medicaid

22   information, they could write more fake notes on those

23   consumers.  And once they had more fake notes, they could

24   bill, bill, bill more to Medicaid.

25             Now at this trial, you will see in here a lot --

1  lots of different types of evidence.  You're going to hear a

2  lot of testimony.  You will hear from the government

3  employees who work at agencies who are supposed to be

4  overseeing and regulating Holy Health.  They will talk to you

5  about how the Medicaid system is supposed to work so that

6  these folks get the mental health services that they need.

7          You will hear from law enforcement, such as Special

8  Agent Moran, about how they investigated the fraud.  You will

9  hear from some of the defendants' co-conspirators, people who

10 participated in these crimes with the defendant, including

11 those who put fake notes into the system.  Some of these

12 co-conspirators have pled guilty in this court, and they're

13 testifying here to try to get a lighter sentence.

14         These co-conspirators will admit to you that they

15 wrote notes about visits that did not happen or that they

16 said they wrote a bill for an hour even though they only saw

17 a consumer for a couple minutes.

18         They will tell you about how they wrote a lot of

19 these notes from their homes in Maryland.

20         And they will tell you about the defendant's part

21 in this scheme:  How he trained the CSWs, directed them to

22 enter fake notes, approved notes for things that didn't

23 happen, and tried to hide it all from the agencies who were

24 there to try to see -- or try to protect against fraud.

25         You will see with your own eyes the fake notes that

 1  were submitted by employees, CSWs, at Holy Health, many of
 2  which the defendant approved.  And you will see the lies on
 3  those notes.
 4          You will also learn that confidential sources,
 5  individuals at the direction of law enforcement, went into
 6  Holy Health facilities wearing secret video cameras.  And
 7  they recorded their interactions with Holy Health staff.  And
 8  those videos will show that time and time again, the
 9  consumers were seen for just a couple of minutes and then a
10  bill would appear claiming that a consumer had been seen for
11  an hour.
12          On those videos you will also see Holy Health
13  employees giving cash payments to consumers.  Those are the
14  cash bribes that were being paid.
15          You will see text messages and emails where the
16  defendant wrote -- that the defendant wrote and received.
17  And you will see how he was encouraging employees to put in
18  more make notes.
19          And you will hear recordings from the defendant,
20  the defendant's own words, where he admits that he knew about
21  the fraud and the bribes going on at Holy Health.
22          And as a result of the defendant's conduct, he has
23  been charged with three counts.  Count One, conspiracy to
24  commit health care fraud and wire fraud.
25          Count Two, conspiracy to make false statements

1  relating to health care matters.

2              Count three, conspiracy to violate the

3  Anti-Kickback Statute.

4              Now, at the end of this trial, Judge Xinis and the

5  court will instruct you in greater detail on these charges.

6  But for now remember:  A conspiracy is merely an agreement to

7  commit an unlawful act.  That agreement doesn't need to be

8  formal.  That agreement doesn't need to be written.  It's

9  merely a mutual understanding, spoken or unspoken, to commit

10 a crime.

11             During the course of this trial, you will see how

12 the defendant conspired with others to steal money.  The

13 defendant directed and encouraged his underlings to lie.  He

14 told them to lie about seeing customers or consumers who they

15 never saw.  He told them to lie about how long they saw

16 consumers.  He told them to lie about when they saw

17 consumers.  He told them to lie about where they saw

18 consumers.  And the purpose of these lies was to steal money

19 from Medicaid.

20             And after you see and hear all the evidence at this

21 trial, we will come back before you and ask you to return the

22 only true and just verdict consistent with the evidence:

23 Guilty on all counts.

24             THE COURT:  Mr. Robbins?

25

DEFENDANT'S OPENING STATEMENT

MR. ROBBINS:  Thank you, Your Honor.

May it please the Court, Members of the Jury.  Good morning.

Why do we have a jury?

THE COURT:  Mr. Robbins, before you get going?

MR. ROBBINS:  I need to get louder.  Sorry about that.

THE COURT:  You can also use the remote, the lavalier.

MR. ROBBINS:  I'll speak up.  I forgot how far back the back was.

Why do we have a jury?  You all spent yesterday a big chunk of time with the questions you were asked, the instructions the judge gave you.  You've now thought about juries, far more than most of our fellow citizens ever think about juries.

Why do I ask that question?  The Government has just laid out a vision of what they believe the evidence will show.

Now, much of that vision is going to be based upon objective facts.  But some of that we're going to need to talk about.

I'm here representing Lambert Mbom because there is more to almost every set of events than might be immediately

1    apparent.

2              Lambert came to this country when he had to leave

3    Cameroon.  He had decided in Cameroon, he was the oldest

4    child of civil servants, went to school there, went to

5    seminary, thought he was going to be a priest, wrote articles

6    in the student newspaper that drew the attention of the

7    government.  He had to leave because it was bringing too much

8    trouble for the church.  He stayed in Cameroon for a couple

9    of years as a teacher, but then he had an opportunity to come

10   to the United States on a scholarship to study family and

11   marriage, get a master's in that.  While he was here, he

12   applied for asylum.  The asylum eventually became an

13   opportunity to stay and seek citizenship and he eventually

14   became a citizen.

15             He also brought, in addition to his master's in

16   family and marriage, he got an additional master's in

17   journalism.  He had hopes of being a journalist.  Didn't work

18   out.  He had to find other jobs.  He became a CSW and worked

19   in the field as a community service worker.

20             His training was kind of on the fly.  And he came

21   to Holy Health -- Holy Health was already in existence.

22             A lot of what the Government has told you about

23   Holy Health we're probably not going to contest because a lot

24   of what the Government has told you about Holy Health we've

25   seen the evidence and there's no argument.

1        What matters is what Mr. Mbom thought he was doing

2   while he was there.  What was his intent?  And that's part of

3   what the jury is going to have to decide.

4        You're going to hear a lot of evidence about things

5   that happened.  You're going to see documents.  You're going

6   to hear lots of different things.  But the question is:  What

7   was his intent as he went through this process?  Was he

8   either in the dark about some of these things?  Or was he

9   trying to stop something that he thought was -- needed

10  correction?  And did he think that he could save an

11  organization that was going to be doing some good for the

12  community, doing outreach, could he save them and put them on

13  the right track?  And did he do it the right way?  Was he an

14  effective manager?

15        Well, that's actually not the bottom line here.

16  You're going to hear a lot of folks, I suspect, that did not

17  like his management style and did not like some of the things

18  that he did.  He was trying, as he discovered a system in

19  place at Holy Health that he could see had problems and was

20  likely to lead people into legal issues as kind of changing.

21        Did he succeed?  Well, we wouldn't be here if he

22  had been successful.  The question is:  Did he have criminal

23  intent at the time he was engaged in that activity?

24        We believe that when you've seen all the evidence,

25  when you've heard from everybody involved, that you will be

DEFENDANT'S OPENING STATEMENT                    17

1  able to look at that evidence and come back in what we

2  believe to be the correct verdict in this case:  That the

3  jury should find that he is not guilty of the crimes charged.

4  He may well be a very poor manager.  He may well have

5  alienated people.  He may well have been blind to things that

6  he wishes now that he would have seen at the time.  But he

7  wasn't guilty of fraud.  And that's what we're going to ask

8  the jury to determine at the end of the case.  Thank you for

9  your attention.

10              THE COURT:  All right.  Thank you, Mr. Robbins.  If

11  we could move the podium back now and this podium over while

12  the Government gets the first witness ready to go.

13              MR. SARMA:  Yes, Your Honor, I think we're going to

14  first admit a series of evidence of business records.

15              THE COURT:  Okay.  We'll do that in a second.

16  Let's get the courtroom so everyone can see.  We're going to

17  check to make sure that our headsets work.  And then we'll be

18  ready to go.

19              Ladies and Gentlemen, are you doing okay?  Does

20  anybody need a quick restroom break?

21              JUROR:  This monitor does not work.

22              THE COURT:  The monitor is not working?  So we need

23  to get that --

24              It's not working?  Okay.  I'm going to ask

25  Ms. Brown to get IT in if we could move this stuff and we

1    could check.  Great, thanks.

2            MR. ROBBINS:  I can see everyone but Jurors 1 and

3    6.

4            THE COURT:  Can you see Mr. Robbins?

5            MR. ROBBINS:  If I lean forward, I can find

6    Juror 1.  So every now and then, I'm going to have to peek

7    around the corner.

8            THE COURT:  All right.  Can you move it back a

9    little bit more?  I think that moves back a bit because it

10   still has some wire on it.  Yeah.  Good?

11           MR. ROBBINS:  Now it's perfect.  Thank you, Your

12   Honor.

13           THE COURT:  Great.  All right.  Okay.  Then let's

14   check our headsets and then we'll be ready to go.

15           (A bench conference was held on the record but out

16   of the hearing of the jury as detailed below beginning at

17   9:18 a.m.)

18           THE COURT:  Okay.  Counsel, can you hear me?

19   Counsel, can you hear?

20           MS. COLLINS:  I can hear.

21           THE COURT:  Who can hear on the Government's side?

22   Mr. Sarma.

23           MR. SHARMA:  I can now hear you, yes.

24           THE COURT:  Okay.  And remember you speak into

25   this.

1          MR. SARMA:  I apologize, Your Honor.

2          THE COURT:  Perfect.

3          Mr. Robbins, can you hear?  I don't think

4  Mr. Robbins can hear.  I can hear him.  Can you hear?

5          MR. ROBBINS:  Yes.

6          THE COURT:  You have to speak into the microphone.

7  The microphone, this one.

8          MR. ROBBINS:  Okay.  Does that work?

9          THE COURT:  Yes.  Mr. Mbom, can you hear?

10         DEFENDANT:  Yes, Your Honor.

11         (The bench conference concluded at 9:19 a.m., and

12  proceedings resumed within the hearing of the jury.)

13         THE COURT:  Great.  So we're good.

14         All right.  Ladies and Gentlemen, while we were

15  talking with the husher on, could any of you hear us?

16         We are ready to go.

17         And thank you.  I'm sorry about the husher.  Maybe

18  one day they'll follow my request and give you nice jazz

19  music or something, but they haven't done it.

20         [Laughter.]

21         So, okay.  Government, your first witness.

22         Or I'm sorry, you're going to admit.

23         MR. SARMA:  Yes.  Your Honor, may we first move

24  some exhibits in before we call the first witness?

25         THE COURT:  Yes.

1          MR. SARMA:  Okay.

2          THE COURT:  And what -- are these coming in by

3    stipulation?  Or how are you doing this?

4          MR. SARMA:  They are business records.  We provided

5    the exhibit numbers to Mr. Robbins.  Mr. Robbins said that he

6    was not objecting to them.  He said we could just put them

7    into the record.

8          THE COURT:  Are you going to use them with

9    witnesses?

10         MR. SARMA:  We do expect to use these with the

11   witnesses, yeah.

12         THE COURT:  Okay.

13         MR. ROBBINS:  All right.  That also is correct,

14   Your Honor.

15         THE COURT:  All right.  Not a problem.

16         Okay.  Do you want to announce which exhibits they

17   are?

18         MR. SARMA:  Yes, Your Honor.

19         The Government now moves as business records

20   Exhibits D1 through D5, F1 through F47, F60 through F62, F65

21   through --

22         THE COURT:  And these are -- I'm sorry.  This is

23   F as in Frank.

24         MR. SARMA:  F as in Frank.

25         THE COURT:  Okay.  Great.  Thanks.

 1           MR. SARMA:  I think I just said F, as in Frank, 65
 2  followed by F68 through F70, F73 through F75, F80, F82
 3  through F84, F87 through F88, F90, F92 through F93.
 4           G1 through G5.
 5           I1 through I17; I21 through I56, including I39A.
 6  I60 through I133, including I100A and I100B; I140 through
 7  I177; I180 through I213, including I197A, I197B, I211A.
 8  I211B.   I212A and I212B; I214 through I216A, including
 9  I214A and I215A; I220 through I224; I230 through I236; I240
10  through I245; I250 through I254; I260; I271 through I277.
11           J1 through J4.
12           O2 and O3.
13           P1, P2, P4.
14           THE COURT:  Okay.
15           Mr. Robbins?  Any objection?
16           MR. ROBBINS:  No objection, Your Honor.
17           THE COURT:  Okay.  All right.  They're admitted.
18           Okay.  Government?
19           MS. COLLINS:  The Government calls Gloria Mensah.
20           THE CLERK:  Counsel, do you need me to switch the
21  laptop to you?
22           MS. COLLINS:  Yes, I can do that.
23           THE WITNESS:  Right here?
24           THE CLERK:  I'm sorry.  If you could just please
25  stand and raise your right hand for me.

1                    GLORIA MENSAH,

2   having been called as a witness and having been duly sworn,

3   was examined and testified as follows:

4             THE CLERK:  You can have a seat.  While speaking

5   clearly into the microphone, can you please state your full

6   name for the record.

7             THE WITNESS:  Gloria Mensah.

8             THE COURT:  And could you spell your last name?

9             THE WITNESS:  M-E-N-S-A-H.

10            THE CLERK:  Thank you.

11            THE COURT:  And before you all begin, I think what

12  we're going to do for now is have Jurors 10 and 11 move back

13  one, yeah, because that screen is working.

14            And so at the break, we can try to get the other

15  screen going.  But for now, we do have a spare, which is

16  nice.  Okay.  Very good.

17            And you can see all right?  Okay.  Good.  Okay.

18  Thanks, Ms. Collins.

19                    DIRECT EXAMINATION

20  BY MS. COLLINS:

21  Q.   Good morning, Ms. Mensah.

22  A.   Good morning.

23  Q.   Where do you work?

24  A.   At the Department of Behavioral Health.

25  Q.   Okay.  And what is the Department of Behavioral Health?

1  A.    The Department of Behavioral Health is a government

2  entity that works to manage mental health and substance use

3  issues in the community, so that's the work we do.

4  Q.    And particularly for which state or government entity?

5  A.    Yes, for D.C., yeah.

6  Q.    And is that also called DBH?

7  A.    Yes.

8  Q.    What is your position at DBH?

9  A.    I'm the provider relations specialist at DBH.

10 Q.    How long have you worked for DBH?

11 A.    I've worked with DBH -- or for DBH, since 2014.

12 Q.    And how long have you been a provider relations

13 specialist?

14 A.    About six, seven years.

15 Q.    And what positions did you hold at DBH prior to becoming

16 a provider relations specialist?

17 A.    Yes, before I was the district-wide CAFAS coordinator.

18 CAFAS is an assessment tool that we use to assess children

19 with behavioral health issues.

20 Q.    And what did you do before you joined DBH?

21 A.    I lived in New York and I also worked with the mental

22 health and hygiene center there.

23 Q.    Now, you mentioned you were a provider relations

24 specialist.

25        What are your responsibilities as a provider relations

1   specialist?

2   A.   Yes.   So, I am the liaison between the agency and our

3   community-based organizations in the community.   So, I

4   provide information -- basically, I funnel information from

5   our agency to our providers.   So, anything around policy,

6   regulations, bulletins.   It's just really a transfer of

7   information to the community.

8   Q.   And approximately how many providers are you -- are

9   assigned to you at any one time?

10  A.   Anywhere from 10 to 12.

11  Q.   Now, are you familiar with the term "consumers" as it's

12  used by DBH?

13  A.   Yes.

14  Q.   And what does consumers refer to?

15  A.   Consumers are, basically, our clients or individuals

16  receiving services through our certified agency.   So, the

17  certified agencies in the community that are partnered with

18  us at DBH, those are our clients that work with our

19  consumers.

20  Q.   Now, from your work, are you familiar with an agency

21  called Holy Health Care Services?

22  A.   Yes.

23  Q.   And how are you familiar with Holy Health?

24  A.   Holy Health was one of my providers.

25  Q.   What type of agency was Holy Health?

1  A.   It was an MHRS, a Mental Health Rehabilitation Service

2  agency, or what we call a core service agency that provides

3  multiple services.  So, therapy, diagnostic assessments,

4  medication management, and community support.

5  Q.   Now, as a provider relations specialist, what was your

6  role with respect to Holy Health?

7  A.   My role was to get information in terms of, like, their

8  staffing, their staff licenses.  So, basically anything that

9  makes up their agency, we collect that information for our

10 documentation purposes.

11 Q.   And did you have any role with respect to providing

12 information to Holy Health about DBH policies and procedures?

13 A.   Yes, yes.

14 Q.   Can you explain that?

15 A.   Yes.  So, my role is to share any new regulations,

16 updated regulations or policies that they need to be familiar

17 with that has to do with anything from their staffing to

18 billing to clinical issues.  That's pretty much.

19 Q.   And when did you first become the provider relations

20 specialist for Holy Health?

21 A.   Since the beginning of them being certified with us as

22 an agency.  I believe that was 2018.

23 Q.   And approximately when did your work with Holy Health

24 end?

25 A.   2021.

1   Q.   Why did it end?

2   A.   They were decertified as an agency, as a partner agency.

3   Q.   What does it mean to be decertified?

4   A.   Decertified means that they're no longer contracted with

5   us to provide services.

6   Q.   Now, who was your primary contact at Holy Health?

7   A.   Lambert Mbom.

8   Q.   And what was Mr. Mbom's position at Holy Health?

9   A.   He was the program director.

10  Q.   And what did you understand were his duties as the

11  program director?

12  A.   To make sure that the agency ran efficiently and to

13  track anything that had to do with, you know, staffing,

14  billing, clinical matters.  He was kind of the lead on those

15  things.

16  Q.   How did you predominantly communicate with Mr. Mbom?

17  A.   Predominantly, it's a mix.  It was emails, sometimes

18  phone calls, in-person meetings.

19  Q.   And so approximately how frequently on average were you

20  communicating with him by email?

21  A.   I would say maybe three times a week, yeah.

22  Q.   Would it generally have been multiple times a week?

23  A.   Yeah.  It could be multiple times a week depending on if

24  there was an issue that we were trying to rectify.  So,

25  whether they came to us -- I mean, whether he came to me with

1   an issue or we had an issue that we wanted to follow up on,

2   it would require multiple communications.

3   Q.   And you also mentioned in-person meetings.

4   Approximately how frequently were you typically meeting in

5   person?

6   A.   About once a month prior to the pandemic.

7   Q.   And what sorts of topics were you generally

8   communicating with Mr. Mbom about?

9   A.   Yes.  So, we'd talk about the usual stuff of like

10  training, any staff training that need to take place, any

11  billing issues, any changes in staff, any ongoing clinical

12  issues that they need support with.  Yeah, that was pretty

13  much the general.

14  Q.   Now, other than Mr. Mbom, was there anyone else at Holy

15  Health that you regularly communicated with?

16  A.   No, not regularly.  But every once in a while, the

17  CEO would come to the meeting to kind of greet us.

18  Q.   And what was the CEO's name?

19  A.   Mr. Bakari.

20  Q.   At some point, did you learn that the FBI had conducted

21  a search of Holy Health?

22  A.   Yes.

23  Q.   Now, prior to the FBI's search of Holy Health, were you

24  aware that Holy Health was making cash payments to consumers?

25  A.   No.

1   Q.   Did Mr. Mbom ever discuss with you Holy Health making

2   cash payments to consumers?

3   A.   No.

4   Q.   Would it have been significant to you if Mr. Mbom had

5   discussed to you cash payments to consumers?

6   A.   Yes.

7   Q.   Why is that?

8   A.   Because it's illegal and it's against our regulations to

9   do so.

10  Q.   Are you familiar with the term "inducements" as it's

11  used by DBH?

12  A.   Yes.

13  Q.   And what does inducements refer to?

14  A.   Inducements is anything that's -- any gift or

15  monetary -- yeah.  Any gifts or monetary things that are

16  given to consumers in exchange for services.

17  Q.   And does DBH have policies with respect to inducements?

18  A.   Yes, we do.

19  Q.   And what are those?

20  A.   Well, the regulations and the policies that we have are

21  usually -- they were updated when -- I think after learning

22  about the inducements were happening.

23  Q.   Sorry.  But at the time of 2018 to 2021, generally, what

24  were DBH's policies with respect to inducements?

25  A.   Yes.  To not -- for them to not take place.  They were

1  illegal.

2  Q.   And does DBH provide information to providers about the

3  prohibition against inducements?

4  A.   Yes.

5  Q.   How does it generally provide that information?

6  A.   It's sent through email.  It's also -- they're also

7  announced in our provider meetings that we have monthly,

8  yeah.

9  Q.   Are you familiar with an entity called the Agatha

10 Foundation?

11 A.   No.

12 Q.   Were you aware of any payments by the Agatha Foundation

13 to Holy Health consumers?

14 A.   No.

15 Q.   And did Mr. Mbom ever discuss with you any payments by

16 the Agatha Foundation to Holy Health consumers?

17 A.   No.

18 Q.   Now, you mentioned you would have in-person meetings at

19 times.  Where did those in-person meetings typically occur?

20 A.   At their main office.

21 Q.   And where was the main Holy Health office?

22 A.   In northwest off of Chillum Road.  I can't remember the

23 exact number, but...

24 Q.   And about how long did these monthly meetings take?

25 A.   About an hour.

1    Q.   Where within the office did the meetings take place?

2    A.   In their conference room.

3    Q.   And who did you meet with during these meetings?

4    A.   Mr. Mbom and one other, I guess, staff member that I

5    can't remember his name.  But, yeah.

6    Q.   While you were at the office, did you observe anything

7    about payments to consumers?

8    A.   No.

9    Q.   Now, as an employee of DBH, is it important to you that

10   a provider's documentation of services that are being

11   performed is accurate?

12   A.   Yes.

13   Q.   Why is that?

14   A.   Especially for these services that are being paid, that

15   are being paid for -- or claims are being paid, it's

16   important that the documentation reflects what kind of

17   services are being put in place, what's happening with the

18   consumer, any interventions that are being done, what the

19   consumer's response was.  So, documentation is very important

20   for us.

21   Q.   Now, you mentioned claims that are being paid for.  Is

22   there a particular insurer that typically pays for claims for

23   DBH consumers?

24   A.   So, there's local dollars and then there's Medicaid

25   dollars.

1     The local dollars are given to agencies that are

2 contracted with us, are certified with us.  That's the local

3 dollars.

4     And then Medicaid, which is through DHCF, is kind of a

5 separate entity from ours.  But those are the two ways claims

6 could be paid.

7 Q.   And what proportion of DBH's consumers have Medicaid?

8 A.   A good number of them, actually, yeah.  A good number.

9 I can't tell the percentage, but...

10 Q.   Now, returning to documentation, is it important that

11 the provider's documentation accurately reflect the time

12 that's spent with a consumer?

13 A.   Yes.

14 Q.   Why is that?

15 A.   Because the time reflects how much a provider gets paid.

16 So, they're in, like, 15-minute intervals.  So, each -- the

17 time has to reflect -- well, the documentation has to reflect

18 the time spent with the consumer.  And usually you can tell

19 based on what is written.  If there's an intervention, if you

20 guys talked about coping skills, if you talked about going

21 over their treatment plans, if you helped them go to the

22 grocery store to pick up groceries because they couldn't get

23 it themselves.

24     Yes, it's important that the documentation reflects the

25 time that is being claimed.

1  Q.   Now, you also mentioned interventions.  Is it also
2  important that the documentation reflect what was actually
3  done during a particular encounter?
4  A.   Yes.
5  Q.   Why is that?
6  A.   Because it lets us know what took place during that time
7  of the encounter.  And, you know, the work itself is to
8  support our consumers who are severely -- most of them are
9  severely mentally ill.  So, it's really important that the
10 interventions or what was discussed with the consumers is
11 shared in the documentation.
12 Q.   Now, is it important that the documentation accurately
13 reflect the person who actually provided those services?
14 A.   Yes.
15 Q.   Why is that?
16 A.   It's important for us to know who, what, when, and how
17 it's happening.  So, that information, again, helps us
18 determine that.
19 Q.   Did Mr. Mbom ever discuss with you any concerns about
20 the accuracy of Holy Health's documentation?
21 A.   No.
22 Q.   Did he ever disclose to you any concerns that
23 consumer -- excuse me -- Community Support Workers at Holy
24 Health were not actually seeing the consumers that they were
25 documenting on?

1   A.   No.

2   Q.   Did he ever disclose to you he believed any provider at

3   Holy Health was not seeing the consumers they were

4   documenting on?

5   A.   No.

6   Q.   What expectation, if any, do you have about whether a

7   provider would disclose concerns about false documentation?

8   A.   Yeah, the expectation was that they -- that the provider

9   would complete an MUI.   It's called a Major Unusual Incident

10  form.   And so, basically, that form is used to indicate any

11  false claims.   Even if you are not sure if there's any, you

12  know, suspicion of it, at the very least, that form is

13  completed and sent to us by email.

14  Q.   And would you typically receive copies of an MUI for

15  providers that are assigned to you?

16  A.   Yes.

17       So, they will go to -- they're assigned -- they're sent

18  to the accountability division at DBH, and then I'm usually

19  copied on that.

20  Q.   And did you ever see any MUIs submitted by Mr. Mbom

21  reporting concerns about false billing or false

22  documentation?

23  A.   No.

24  Q.   Did Mr. Mbom ever tell you that anyone at Holy Health

25  was documenting for services that had been done by other

1   people?

2   A.   No.

3   Q.   Would that have been of concern to you?

4   A.   A huge concern, yes.

5   Q.   Why?

6   A.   Because the only people that should be documenting on

7   consumers are those that work at Holy Health and that we've

8   actually received a staff listing for.

9   Q.   Before the search by the FBI, did Mr. Mbom disclose to

10  you any concerns that he had about the accuracy of Holy

11  Health's documentation?

12  A.   No.

13  Q.   Any concerns about whether Holy Health's billing was

14  improper?

15  A.   No.

16  Q.   And then after the search by the FBI, did Mr. Mbom

17  disclose to you any concerns he had about the accuracy of

18  Holy Health's documentation?

19  A.   No.

20  Q.   Or about whether Holy Health's billing was improper?

21  A.   No.

22          MR. SARMA:   Your Honor, we pass the witness.

23          MR. ROBBINS:   Thank you, Your Honor.

24

25

1                              CROSS-EXAMINATION

2    BY MR. ROBBINS:

3    Q.    Good morning, Ms. Mensah.

4    A.    Good morning.

5    Q.    How are you today?

6    A.    I'm okay, thank you.

7    Q.    My name's Gar Robbins.  I represent Lambert Mbom.  I

8    have a few questions.

9          One, I guess, I'll start at the very end of what you

10   were talking about, about whether he had made any reports to

11   you of any unusual incidents in which the agency in which he

12   was a manager, and you said he had not.

13         Do you find that there are many managers who bring you

14   reports rather than trying to clean up activity in their own

15   agency?

16   A.    Oftentimes, yes.

17   Q.    So, the manager of an agency will come and say, "I've

18   got people doing something that they shouldn't be"?

19   A.    So, not necessarily a manager, but I guess from the

20   context you're saying, yes, they could share that information

21   with me and say, "Hey, I think this is happening."

22   Q.    I understand that they could.

23   A.    Mm-hmm.

24   Q.    How many times does it happen during your seven years?

25   Where the manager came in and said, "Some of my people are

1  doing something wrong"?

2  A.   So, we've had people that maybe no longer -- staff that

3  no longer work there, like former clinical directors that

4  have the same kind of managerial positions at work that have

5  shared similar information.

6  Q.   After they've left?

7            THE COURT:  Mr. Robbins, can I ask you-all to get

8  on this for a moment.

9            MR. ROBBINS:  I'm sorry.

10           (The following bench conference was held out of the

11  hearing of the jury from 9:43 a.m to 9:44 a.m.)

12           THE COURT:  Thanks.  Can you hear me?

13           MR. ROBBINS:  Yes.

14           THE COURT:  Can you hear me?

15           MR. ROBBINS:  Yes.

16           THE COURT:  I didn't expressly invoke the rule on

17  witnesses.  And individuals are coming in.  I'm going to

18  invoke it now.

19           Can you-all look and make sure that no one here is

20  a witness?  Or a potential witness?  Government?

21           MR. SARMA:  We don't see anyone, Your Honor.

22           MR. ROBBINS:  And I don't anticipate any.

23           THE COURT:  Okay.  All right.  Great.  Thank you so

24  much.  Sorry to interrupt.

25

1   BY MR. ROBBINS:

2   Q.   Sorry.

3        So, the only occasions you've seen are people who have

4   left an agency and they came back and made a report after the

5   fact?

6   A.   Yes.

7   Q.   You mentioned that DBH had somewhat changed its -- some

8   of its regulations more recently.  Is that kind of

9   post-pandemic?

10  A.   Yeah.  Most of the regulation that have changes is

11  really around clinical staffing.

12  Q.   Right.

13  A.   Yeah, and so who's allowed to provide therapy or conduct

14  diagnostic assessments, those are the changes.

15  Q.   And that's all happened really since the time, close in

16  time with the close of Holy Health and maybe after that?

17  A.   No.  Really, during the time, the pandemic, since a lot

18  of us went to teleworking.

19  Q.   Got it.

20  A.   Yeah.

21  Q.   Now, the beginning of your testimony, you were asked a

22  lot of questions about what the regulations are and the

23  policies are of DBH with respect to certain activities.

24       Are those -- you said they're provided sometimes in

25  meetings.  Are there also publications?  Is there a list of

1   "these are the things that are allowed" that are provided to

2   service providers?

3   A.   Yes.   The policies and regulations are available online.

4   So, anyone from the public can access them.   And then we also

5   send them directly to our providers through email.

6   Q.   So, how would that work if you sent it?   Would you send

7   Page 32 of the rules and then another time do Page 35, or

8   you'd hear something is going on in the community and you'd

9   remind everybody of it?   So, how does that work?

10  A.   No.   So, in general, we send out the -- if there's any

11  corrections made, at all, there's -- everything is compacted

12  into a full, you know, policy or regulation.   There aren't

13  specific pages pulled out.   It's just the whole policy gets

14  sent out again.   The expectation is that all of our providers

15  stay abreast of what's indicated in the policy and

16  regulations.

17  Q.   Now, Holy Health was certified about 2018?

18  A.   Yes.

19  Q.   Was there somebody there before Lambert was there to

20  talk to?

21  A.   No.   Lambert has always been my point of contact.

22  Q.   He was your first point of contact.

23  A.   Yes.

24  Q.   You supervise a number of client agencies.

25  A.   Yes.   Oversight.

1   Q.   And have an opportunity to see a lot of different

2   practice managers.

3   A.   Yes.

4   Q.   Did you have an impression about Lambert's ability to be

5   responsive when you needed things from him?

6   A.   So, initially I think -- I believe the first year, year

7   and a half, me and Lambert had pretty good communication.

8   Because that first year is really kind of, like, still

9   onboarding, kind of figuring things out, working out

10  staffing, you know, tracking staff -- clinicians and their

11  licenses.  So, there was a lot of communication, I would say,

12  in the first year, year and a half.  And then a little --

13  sometime after that, our communication kind of dwindled a

14  bit.

15  Q.   And by "dwindled," do you mean you would make a query

16  and maybe not hear back?

17  A.   Sometimes it will take a while to get back.  I would

18  have to maybe call to kind of nudge him or maybe send an

19  email about rescheduling, you know, having a meeting so we

20  can meet in person.  Or -- well, since the pandemic, you

21  know, virtually.  And sometimes we'd have to reschedule.

22  Oftentimes we'd have to reschedule.

23  Q.   For those types of meetings, was Julius Bakari typically

24  at the meetings, or typically not?

25  A.   Typically not.  It was more of, like, a come in, greet,

1    maybe, you know, just say hi type of thing, check in and then

2    maybe go on to do some, whatever else he was doing before.

3    Q.   Okay.

4    A.   But it was mainly Lambert.

5    Q.   So, you didn't really have a sense of Julius Bakari's

6    role at Holy Health?

7    A.   I did.   It was clear that he was the CEO.   And -- yeah,

8    he supported in managing, I guess, executive-level things.

9    Q.   And in the course of your meetings with the staff of

10   Holy Health, did you ever meet with Eugenie Bakari?

11   A.   I've met her a couple of times, yes.

12   Q.   In the context of a meeting --

13   A.   Not in the context.

14   Q.   -- at Holy Health, or she just happened to be present?

15   A.   Just happened to be present.

16   Q.   What did you understand her role was?

17   A.   I kind of saw her as kind of like an office manager, in

18   a way, kind of making sure things were okay in the front

19   desk.   Those were the times where I would run into her if we

20   would come into the office, greet, say hi, go into the

21   conference room.   But it seemed like it was more of like an

22   office management.

23   Q.   And did you ever have any contact with Ms. Betty?

24   A.   Ms. Betty Gatewood?

25   Q.   Correct.

1   A.   Yes.   More of my communication with her was maybe the

2   last couple of years, especially during the time where Holy

3   Health was decertified as an agency.   My work with her became

4   a bit constant because we had to make sure that we

5   transitioned all of our -- the consumers at Holy Health to

6   another agency.   So, we would need her to help support and

7   wrap that up.

8   Q.   What did you understand Ms. Gatewood's role to be?

9   A.   She was a clinical manager to support the clinical

10  director.   Sometimes I believe she offered therapy, from time

11  to time.

12  Q.   Did you understand her to be -- have a role with respect

13  to quality improvement, quality assurance?

14  A.   Yes.   That was also part of her role, yes.

15  Q.   So, she was an important part of determining what notes

16  were appropriate to come to DBH and which notes were not?

17  A.   I wouldn't say her -- I can't speak to exactly what all

18  of her role entails.   But I do know that she was part of the

19  quality team and was supposed to, you know, check in on the

20  documentation, yes.

21  Q.   Now, you had the interface with Holy Health.   What was

22  your level of involvement with looking at the notes that

23  would come from Holy Health to DBH?   Did you have any

24  overview there with respect to are these notes coming in an

25  appropriate form?   Are there too many that problems?   What

1  was your role then?

2  A.   So, mainly that role is for our accountability team and

3  our audit team.   Every once in a while I'll maybe look at

4  some notes.   But it wasn't something that I was tasked with,

5  yeah.

6  Q.   So, we'll talk to someone else about that?

7  A.   Uh-huh.

8          MR. ROBBINS:  All right.   I have no further

9  questions for you, Ma'am.   Thank you.

10          THE COURT:  Any Redirect, Ms. Collins?

11          MS. COLLINS:  Nothing, Your Honor.

12          THE COURT:  All right.

13          Okay.   Ma'am, that concludes your testimony.   You

14  are free to leave.   Have a great day.   Thank you so much.

15          Government?

16          MR. SARMA:  The Government calls Mr. Fru Nde as the

17  next witness.

18          THE COURT:  Hi, sir.   Do you want to come forward?

19  Okay, yeah, you just want to come around this way and just

20  come toward the bench.   There you go.

21          THE CLERK:  Please remain standing and raise your

22  right hand, please.

23                    FRU NICHOLAS NDE,

24  having been called as a witness and having been duly sworn,

25  was examined and testified as follows:

1          THE CLERK:  While talking clearly into the

2    microphone, can you please state your full name and spell

3    your last name for the record.

4          THE WITNESS:  The name is Fru Nicholas Nde.  The

5    first name is, F-R-U.  The middle name -- the first name is

6    spelled, F-R-U.  The middle name is Nicholas.  It's spelled

7    N-I-C-H-O-L-A-S.  And the last name is spelled -- the last

8    name is Nde, and it's spelled N-D-E.

9          THE CLERK:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. SARMA:

12   Q.   Good morning, Mr. Nde.

13   A.   Good morning.

14   Q.   Could you tell the Ladies and Gentlemen of the Jury how

15   old are you?

16   A.   I'm 50 years old.

17   Q.   Where were you born?

18   A.   I was born in Cameroon.

19   Q.   And at some point, did you come to the United States?

20   A.   Could you take that all over?

21   Q.   Yes.

22        At some point, did you come to live in the United

23   States?

24   A.   Yes.

25   Q.   Sir, how many languages do you speak?

1   A.   Between four to seven.

2   Q.   And is English your first language?

3   A.   No.

4   Q.   Currently, what city and state do you live in?

5   A.   I live in Jessup, Maryland.

6   Q.   And, sir, are you testifying here today under a

7   subpoena?

8   A.   Yes.

9   Q.   And has anyone made any promises to you in connection

10  with your testimony today?

11  A.   No.

12  Q.   Are you familiar with a company called Holy Health?

13  A.   Yes.

14  Q.   And did you personally work at Holy Health?

15  A.   Yes.

16  Q.   Approximately what month and year did you start working

17  at Holy Health?

18  A.   December of 2020.

19  Q.   And where were you living at that time?  Just the city

20  and state.

21  A.   Laurel, Maryland.

22  Q.   And what title, if any, did you have at Holy Health?

23  A.   CSW, Community Support Worker.

24  Q.   Now, before working at Holy Health, had you ever worked

25  as a CSW?

1   A.    No.

2   Q.    And what training, if any, did you have to be a CSW

3   prior to coming to Holy Health?

4   A.    None.

5   Q.    And what education, if any, did you have?

6   A.    None.

7   Q.    And was your job at Holy Health as a CSW in the office

8   or was it remote?

9   A.    In the office and at times at home, remote.

10  Q.    And just to -- sometimes you worked at home?

11  A.    Yes.

12  Q.    Now, just at a very general level, what did you exactly

13  do at Holy Health?

14  A.    When I was hired at Holy Health, the owner, Mr. Julius

15  Bakari, told me in front of Mr. Mbom that Mr. Mbom would give

16  me a list to put notes for patients.  So, along the line, I

17  later realized that the date that were given -- the list that

18  was given to me carried dates that had -- that patients had,

19  you know, it carried dates that were behind.

20        So I went back to them and said, "This list has

21  patients' names that are not -- this list has patients' names

22  that were not there when I was hired.  That's -- it's a

23  list -- it's a backdated list."

24        So I told them that this list has backdated list.  So I

25  was told that the nurse has seen this patient.  It's okay for

1   me to put these notes.  I did not do my due diligence, dear

2   Members of the Jury, to actually go and find out if actually

3   the nurse have already seen those patients.

4        So, in the summary, when I was hired at Holy Health

5   Care, Mr. Julius Bakari and Mr. Mbom authorized me to put

6   notes for patients I have not seen.

7   Q.   Just to follow up on some of those responses, sir.

8        Did you know what title Mr. Bakari had at the company?

9   A.   Mr. Bakari was the owner.

10  Q.   And I believe you mentioned an individual named

11  Mr. Mbom; is that correct?

12  A.   Yes.

13  Q.   Do you see that individual in the courtroom today?

14  A.   Yes.

15  Q.   Would you mind saying where you see that person and

16  identify him by an article of clothing?

17            MR. ROBBINS:  We'll stipulate.

18            THE COURT:  Okay.  So stipulated that Mr. Nde has

19  identified Mr. Mbom.

20  BY MR. SARMA:

21  Q.   And did you understand what Mr. Mbom's role at the

22  company was?

23  A.   Mr. Mbom's role at the company was like the director or

24  I will put it the clinical director.

25  Q.   And I believe you mentioned that you were writing notes;

1   is that correct?

2   A.    That's correct.

3   Q.    Do you recall what system were you putting notes into?

4   A.    I was putting it in a system called ICMS or Credible.

5   Q.    And I believe you mentioned receiving patient lists; is

6   that correct?

7   A.    Yes.

8   Q.    Did you ever personally see those patients?

9   A.    No, I did not.

10  Q.    And were you told that those patients were seen?

11  A.    Yes.

12  Q.    Who told you that?

13  A.    Mr. Bakari and Mr. Mbom.

14  Q.    And did they tell you what person had seen those

15  patients?

16  A.    I was just told the nurse had seen those patients.

17  Q.    Were you given the name of that nurse?

18  A.    No.

19  Q.    Did you ever speak to anyone who had actually seen those

20  patients?

21  A.    No.

22  Q.    Now, before beginning your job at Holy Health, did you

23  have to submit a job application?

24  A.    Yes, I did.

25  Q.    Who did you give that application to?

1  A.   I was given the application at the office.  I brought to

2  it the office.  I gave it to Mr. Lambert -- Mr. Mbom, of

3  which he send it, he gave to it the lady at the front desk.

4  Q.   Now, Mr. Nde, you mentioned Mr. Mbom.  Since leaving

5  Holy Health, have you seen Mr. Mbom?

6  A.   Yes.

7  Q.   How often have you seen him since leaving Holy Health?

8  A.   Occasionally I meet him in our Cameroon community

9  events.

10  Q.   And do you ever talk to him when you see him at these

11  events?

12  A.   Yes.

13  Q.   And when was the last time you saw him?

14  A.   Sometime in June.  Sometime in June.

15  Q.   Of what year, sir?

16  A.   2023.

17  Q.   Turning back to your time at Holy Health, after you

18  submitted the job application, did you receive any training?

19  A.   Yes.

20  Q.   Who provided that training?

21  A.   Mr. Mbom.

22  Q.   And can you explain to the jury what type of training

23  you received?

24  A.   When I was hired, Mr. Mbom and myself sat in one of the

25  office rooms.  And he directed me on how to use ICMS.  He

1  directed me on how to put the notes into ICMS.  He directed

2  me on the patients, depending on their treatment on how to

3  put the notes.

4  Q.    And did you receive any sample notes during that

5  training?

6  A.    Yes.

7  Q.    And who provided you those sample notes?

8  A.    Mr. Mbom.

9  Q.    Did he tell you what to do with those sample notes?

10 A.    Yes.

11 Q.    What did he tell you to do?

12 A.    He told me on using ICMS, I have to put the notes.  With

13 regards to the patient's information, like the treatment plan

14 and the goals.  So those were things that were stipulated in

15 the notes, so that was what I entered into ICMS.

16 Q.    And when you were working at Holy Health, did you have a

17 supervisor?

18 A.    Yes.

19 Q.    Who was that supervisor?

20 A.    Mr. Mbom.

21 Q.    Now, while working at Holy Health, did you talk on the

22 phone with Mr. Mbom?

23 A.    Yes, I did.

24 Q.    How often did you speak with him on the phone?

25 A.    I cannot recollect, but I spoke with him many times.

1    Q.    And what types of subjects at a high level did you

2    discuss?

3    A.    We discuss about the list.  We discuss about how the

4    ICMS work.  We discuss about the patients that I need to put

5    in notes.  We discuss a lot of things with regards to Holy

6    Health and the patients that I put in notes for and how the

7    ICMS system works.

8    Q.    And were you ever in your house when you made these

9    phone calls?

10   A.    Yes.

11   Q.    And was that in Maryland?

12   A.    Yes; Laurel, Maryland.

13   Q.    Did you also exchange WhatsApp messages with Mr. Mbom?

14   A.    Yes.  We communicated through WhatsApp, as well.

15   Q.    And prior to your testimony today, did you provide

16   screenshots of some of those messages to the Government?

17   A.    Yes.

18   Q.    I am going to show you what the Government has marked as

19   Exhibit B41.

20         Do you recognize this document, sir?

21   A.    Yes, I do.

22   Q.    And at a high level, what is this document?

23   A.    It's a communication between Mr. Mbom and myself through

24   WhatsApp.

25   Q.    And I apologize.  I am, in fact, colorblind.  But I

1    understand, I think these are green messages.  Do you see

2    those green messages?

3    A.    Yes, I do.

4    Q.    Who's sending the green messages?

5    A.    I am.  I am the one sending the messages.

6    Q.    And what date are these particular messages from?

7    A.    December 20th of 2020.

8    Q.    So, on December 20, 2020, why did you want Mr. Mbom to

9    call you?

10   A.    I wanted him to call me because I wanted to get

11   requirements to go do CPR and first aid.

12   Q.    Scrolling down, did you then send him a series of text

13   messages on December 2021?

14   A.    Yes.

15   Q.    And here, is this you're referring to one to go pick up

16   your CPR and first aid?

17   A.    That's correct.

18   Q.    And why did you need to go pick up your CPR and first

19   aid?

20   A.    Those were one of the requirements.  I was letting him

21   know that I want to go pick them up because I want to bring

22   them to the office to complete my application.

23   Q.    Scrolling a little bit further down, do you see who

24   wrote this message, "On my way to the office"?

25   A.    Yes.

1   Q.   Who wrote that?

2   A.   I wrote it.

3   Q.   Sir, I believe you said before that --

4   A.   "On my way" -- sorry.   "On my way to the office," that's

5   Mr. Mbom.

6   Q.   And do you know what office he was referring to?

7   A.   The Holy Health office in D.C.

8   Q.   Do you recall what street that was on?

9   A.   It's North Capitol Street Northeast.

10  Q.   And then do you see this message, "Please, for your WiFi

11  connection"?

12  A.   Yes.

13  Q.   Did you write that message?

14  A.   Yes.

15  Q.   Do you recall where you were when you wrote that

16  message?

17  A.   I was at the Holy Health Care office.

18  Q.   I believe you briefly mentioned ICMS.   Are you familiar

19  with the computer system known as ICMS?

20  A.   Yes.

21  Q.   Did you sometimes also refer to that system as Credible?

22  A.   Yes, sir.

23  Q.   At a high level, what was your understanding of what the

24  Credible or ICMS system was?

25  A.   Credible is the software that they used at Holy Health

 1  Care to enter patient's information, to enter patient's
 2  information.
 3  Q.   And while working at Holy Health, did you personally use
 4  ICMS?
 5  A.   Yes, I did.
 6  Q.   And did you enter information into ICMS?
 7  A.   Yes.
 8  Q.   Did you have an individual user name for ICMS?
 9  A.   Yes.
10  Q.   Within ICMS, did your name appear as Nicholas Nde?
11  A.   Yes.
12  Q.   Who gave you your credentials for ICMS?
13  A.   At the training, Mr. Mbom provided me with information
14  to log in.  So, Mr. Mbom told me either you are using your
15  first or last name to log in, then later, you know, you are
16  issued a password.
17  Q.   Who issued you that password?
18  A.   From my recollection, I believe -- from my recollection,
19  initially there is a password.  He issued a password.  Then
20  you log in now and put your own personal password.
21  Q.   I'm going to now direct your attention to Government's
22  Exhibit B41.  Do you recognize this document, sir?
23  A.   Yes.
24  Q.   What is this?
25  A.   It's a communication between myself and Mr. Mbom.

1    Q.    Sir, do you see this image I just zoomed in on?

2    A.    Yes.

3    Q.    Who wrote that series of messages?

4    A.    I was the person.

5    Q.    And do you see this screenshot at the bottom?

6    A.    Yes.

7    Q.    What is that screen shot?

8    A.    It is the screenshot of Credible.

9    Q.    And why are you sending a screen shot of Credible to

10   Mr. Mbom?

11   A.    I send it to him because I wanted to get the domain name

12   of Credible, the domain name that Holy Health Care used.

13   Q.    And why did you want that information?

14   A.    Because I wanted to log onto ICMS.

15   Q.    I'm now going to show you what's been marked as B42.  B,

16   as in bride.  Do you recognize this document?

17   A.    Yes.

18   Q.    Can you tell the jury what this is?

19   A.    It's a communication between myself and Mr. Mbom.

20   Q.    And what time period is this generally from?

21   A.    December 22nd of 2020.

22   Q.    I'm going to scroll down a little bit.  Do you see these

23   messages that I've just zoomed in on?

24   A.    Yes.

25   Q.    Who sent these messages?

1   A.   I was the one.

2   Q.   Who were you sending them to?

3   A.   I was sending them to Mr. Mbom.

4   Q.   And do you see that screenshot at the bottom?

5   A.   Yes.

6   Q.   What is that a screen shot of?

7   A.   That's a screenshot from ICMS.

8   Q.   And why are you sending that particular screenshot to

9   Mr. Mbom?

10  A.   This screenshot was sent because during the

11  orientation -- or during when Mr. Mbom was giving me the

12  training on how to schedule a patient, we did a training --

13  we did a training at Holy Health Care, so this was how to

14  navigate through the pages.  So I was -- when I went home, I

15  was trying to navigate through the pages to actually get

16  precise information on the patient.  So I was stuck.

17         So I had to screenshot -- I had to screenshot these

18  pages and send to him for him to actually explain what is the

19  next step on how to collapse or navigate through the ICMS.

20  Q.   And were there times when you would send Mr. Mbom a

21  message or a screenshot and then you would have discussion on

22  the phone?

23  A.   Yes.

24  Q.   Scrolling down to the next page, do you see the message,

25  the first message sent at 11:57 p.m.?

1   A.   Yes.

2   Q.   And are you the one who wrote, "Done with all the

3   patients to schedule"?

4   A.   Yes.

5   Q.   Who were the patients you were referring to here?

6   A.   It is the list that I got from Mr. Mbom.  So, I was done

7   scheduling the patients that I have to put notes -- that I

8   have to put notes into ICMS.  So, I had to let him know I was

9   done scheduling the patients that I need to put in notes.

10  Q.   And did you ever actually see any of these patients?

11  A.   No.

12  Q.   And then do you see where you say, "So call me for those

13  notes tomorrow"?

14  A.   Yes.

15  Q.   What notes are you referring to?

16  A.   It's the notes that I put -- it's the notes that I put

17  into ICMS for patients I did not see.

18  Q.   Scrolling down to the next page here, do you see this

19  message that says, "Good job"?

20  A.   Yes.

21  Q.   Who wrote that message?

22  A.   Mr. Mbom.

23  Q.   And what did you understand Mr. Mbom to mean by "good

24  job"?

25  A.   Good job was to -- good job from him was that I had

1    scheduled the patients well on the ICMS that he gave -- that

2    he give me training on on how to put the notes.

3    Q.   Were these patients that he had given to you in a list?

4    A.   Yes.

5    Q.   Scrolling further down, do you see this message sent at

6    10:56 a.m.?

7    A.   Yes.

8    Q.   And were you asking to see Mr. Mbom at the office?

9    A.   Yes.

10   Q.   And why were you asking to see Mr. Mbom at the office?

11   A.   I was asking to see him because it was the -- I just

12   started putting in notes.  And I was not really familiar.  I

13   was not really familiar on how to really navigate the system.

14   So I would call him, "Please, let's meet at the office so

15   that we can navigate -- you can see the notes, the scaling of

16   the notes and confirm if it's correct."

17   Q.   And did you ultimately meet with Mr. Mbom in the

18   office --

19   A.   Yes.

20   Q.   -- to discuss putting in notes --

21   A.   Yes.

22   Q.   Just a reminder, both for me and when other attorneys

23   are asking questions, please just wait until the end of the

24   question before you answer.

25   A.   Okay.

1    Q.   And I believe you addressed this briefly.

2         Working at Holy Health, did you enter notes about

3    supposed patient services into ICMS?

4    A.   Yes.

5    Q.   And did you partially perform all the services for which

6    you wrote notes?

7    A.   Could you take a look at that question?

8    Q.   Did you perform all the -- did you perform the services

9    for which you wrote notes on?

10   A.   No.

11   Q.   And did your notes say that you personally had seen

12   these consumers?

13   A.   Yes.

14   Q.   How did you come -- or sorry.

15        Why did you say that you saw the consumers in these

16   notes?

17   A.   Because based on the notes that I was given at the

18   orientation, I was instructed to put the notes depending on

19   the patient that I put the notes on.  So at the end of the

20   day, I will sign out that I put the notes for those patient.

21   Q.   And who instructed you to do that?

22   A.   Mr. Mbom.

23   Q.   Sir, did the FBI interview you in July of 2021?

24   A.   Yes.

25   Q.   And during that interview, did you lie to the FBI?

1  A.    Initially I was under pressure, so I give information

2  that were not correct.  But I later realized that it was

3  necessary for me to come forward and speak the truth.

4  Q.    Sir, a little bit more direct question.

5        Did you lie to the FBI?

6  A.    Yes.

7  Q.    Did you say during that interview that you actually saw

8  six to seven patients a day while working at Holy Health?

9  A.    Yes.

10  Q.    Was that a lie?

11  A.    It was incorrect, yes.

12  Q.    And did you say during that interview that you put in

13  notes only on patients that you actually saw?

14  A.    The interview with the FBI?

15  Q.    Yes.

16  A.    Yes.

17  Q.    Was that a lie, as well?

18  A.    Yes.

19  Q.    Why did you lie?

20  A.    Initially, like I said, during -- when I started

21  talking, I said I was under pressure.  Give information that

22  were in error, that were not correct.  But I later realized

23  that speaking the truth is necessary, so I had to actually

24  come out and actually tell the FBI precisely what happened.

25  Q.    When you say "under pressure," do you mean you were

1   worried about getting in trouble yourself?

2   A.    That's correct.

3   Q.    Later in that same interview, did you admit that you

4   never actually saw patients?

5   A.    Yes, I did.

6   Q.    On the same day as that FBI interview, did you also

7   testify in front of a grand jury?

8   A.    Yes, I did.

9   Q.    When you testified in front of the grand jury, did you

10   talk about everything that you knew about Holy Health?  Or

11   did you just answer the questions the prosecutor asked you?

12   A.    I answered the questions that the prosecutor asked me.

13   Q.    I'm now going to show you several exhibits.

14         And just for the court reporter, these are all N as in

15   Nancy.

16         So, the first one is N1.  Do you recognize this?

17   A.    Yes.

18   Q.    And what is this?

19   A.    It's a list of patients that Mr. Mbom give to me.

20   Q.    And on the left side, are those the names of the

21   patients?

22   A.    Yes.

23   Q.    And what is the right side?

24   A.    They are the dates that the patients were seen.

25   Q.    Did you actually know if the patient was seen on that

1   day?

2   A.   Could you take over the question please?

3   Q.   Do you know, looking at the top, do you know personally

4   if William Jordan was seen on October 1, 2020?

5   A.   No.

6   Q.   This is N2.  Do you recognize this document?

7   A.   Yes.

8   Q.   What is this document?

9   A.   It's a list of patients that Lambert gave -- that

10  Mr. Mbom gave me.

11  Q.   And is this the same type of patient list as the one we

12  were looking at previously?

13  A.   Yes.

14  Q.   And when did the dates of service start for this list?

15  A.   November 30 of 2020.

16  Q.   And when do they end?

17  A.   December 2 of 2020.

18  Q.   This is N3.  Do you recognize this document?

19  A.   Yes.

20  Q.   What is it?

21  A.   It's a list of patients that Mr. Mbom gave to me.

22  Q.   And when do the dates of service start for this list?

23  A.   December 31 of 2020.

24  Q.   And when do they end?

25  A.   December 24 of 2020.

1    Q.    This is Exhibit N4.  Do you recognize this list?

2    A.    Yes.

3    Q.    When do the dates of service start for this list?

4    A.    January 4 of 2021.

5    Q.    And when do they end?

6    A.    January 15 of 2021.

7    Q.    This is N5.  What is this document?

8    A.    It's the name of the list of patients.

9    Q.    And who did you receive this from?

10   A.    From Mr. Mbom.

11   Q.    At times, did you also receive patient lists from

12   Ms. Foe?

13   A.    From Ms. who?

14   Q.    Ms. Foe.  Did you ever receive those from Ms. Foe, as

15   well?

16   A.    Ms. Foe?

17   Q.    Yeah.

18   A.    There was a lady at the front desk by name Jane.  I

19   don't know her last name.  Might be she's the one you're

20   referring to.

21        Yes, I did receive it from her, as well, with direction

22   from Mr. Mbom.

23   Q.    And what are the dates of service for being on this

24   list?

25   A.    January 22 -- January 22, 2021.

1  Q.   And when do they end?

2  A.   January 18, 2021.

3  Q.   This is N6.  What is this document?

4  A.   It's a list of patients that I received from Mr. Mbom.

5  Q.   And when do the dates of service begin?

6  A.   February 8, 2021.

7  Q.   And when do they end?

8  A.   February 17, 2021.

9  Q.   And do you recognize N7?

10 A.   Yes.

11 Q.   And what is this?

12 A.   It's a list of patients that I receive from Mr. Mbom.

13 Q.   And when do the dates of service begin?

14 A.   February 22 of 2021.

15 Q.   And when do they end?

16 A.   February 26 of 2021.

17 Q.   I want to turn your attention back now to N5.  Do you

18 recognize the names listed on this document?

19 A.   It's a list of patients that I got from Mr. Mbom.

20 Q.   Do you -- have you personally -- did you personally meet

21 with any of these patients?

22 A.   No.

23 Q.   Do you know if anyone else eventually met with these

24 patients?

25 A.   No.

1  Q.   Were you told anything about what treatment, if any,
2  these patients were provided?
3  A.   Yes.
4  Q.   What were you told about what treatment these patients
5  had been provided?
6  A.   I was told some of these patients they have depression.
7  Some of them, they have mental issue.  And other, I cannot
8  recollect all.
9  Q.   And who told you that?
10  A.   Mr. Mbom.
11  Q.   And did you independently verify if that was actually
12  true for these patients?
13  A.   Into ICMS you see some of those -- the patient plan of
14  care in ICMS.  So I had to go through some of them.
15          THE COURT:  And, Mr. Sarma, whenever it's a good
16  time, let's give the jury their first break.
17          MR. SARMA:  Yes.  A couple more questions on this
18  particular document.
19          THE COURT:  And then we'll move?
20          MR. SARMA:  Yeah.
21  BY MR. SARMA:
22  Q.   Did you ever speak with anyone who actually personally
23  saw any of these patients?
24  A.   No.
25          MR. SARMA:  I think we can take a break now, Your

1    Honor.

2              THE COURT:  Great.  So, Ladies and Gentlemen, let's

3    take our morning break.  Let's plan to be back in our seats

4    by 10 to 11.  So, 20 minutes; okay?  All right.  Thanks.

5              (The jury left the courtroom at 10:27 a.m., and the

6              following proceedings were had out of the presence of

7              the jury.)

8              THE COURT:  Okay.  Mr. Nde, you also get a break.

9    You are still under oath and do not speak to anyone about

10   your testimony.

11             Counsel, anything before we break?

12             MR. SARMA:  No.

13             THE COURT:  Very good.  Thank you.

14             THE CLERK:  Court stands in recess.

15             (Recess held from 10:28 to 10:49 a.m.)

16             (Whereupon, the following proceedings were held

17   outside the presence and hearing of the jury:)

18             THE COURT:  All right, everyone.  The jury is

19   ready?

20             THE CLERK:  Yes.

21             THE COURT:  Do we have a witness?

22             (The jury came back into the courtroom at 10:49 a.m.,

23             and the following proceedings were had in the

24             presence of the jury.)

25             THE COURT:  All right, everyone.  You can have a

1   seat.

2            Mr. Nde, you are still under oath.

3            Mr. Sarma, you may begin whenever it's good.

4            MR. SARMA:  Thank you, Your Honor.

5   BY MR. SARMA:

6   Q.   Mr. Nde, before the break, do you recall we were

7   discussing some lists?

8   A.   Yes.

9   Q.   Now, did you and Mr. Mbom ever discuss those lists on

10  the phone?

11  A.   Yes, we did.

12  Q.   And did you and Mr. Mbom ever discuss these lists on

13  WhatsApp messages?

14  A.   Yes, we did.

15  Q.   I'm going to show you what has been marked as B47.  Do

16  you recall -- or do you recognize this document?

17  A.   Yes.

18  Q.   What is this document?

19  A.   It's a communication between myself and Mr. Mbom.

20  Q.   And what month and year are these communications from?

21  A.   January 17, 2021.

22  Q.   And, again, are the communications in green the ones

23  that you sent?

24  A.   Yes.

25  Q.   So, are these messages that you sent on January 18 of

1   2021?

2   A.   Yes.

3   Q.   At the bottom, you wrote, "What time should I stop by

4   tomorrow for the list?"  Is that correct?

5   A.   Yes.

6   Q.   What did you mean by "the list"?

7   A.   It was the list of the patients that I put in notes for.

8   Q.   And was that one of the lists we were looking at

9   previously?

10  A.   Yes.

11  Q.   And when you say "stop by," where were you going to stop

12  by?

13  A.   At North Capitol Street.

14  Q.   Was that in the Holy Health office?

15  A.   Yes.

16  Q.   I am now showing you what has been marked as B84 (sic).

17  Do you recognize this document?

18  A.   Yes.

19  Q.   And what is this document?

20  A.   It's a communication on WhatsApp between Lambert and

21  myself.

22         THE COURT:  Mr. Sarma, I'm sorry.  I think you said

23  B84.

24         MR. SARMA:  Oh, I apologize, Your Honor.

25         THE COURT:  It would be 48.

1          MR. SARMA:  48.  Sorry.  B48.  I apologize.

2    BY MR. SARMA:

3    Q.   And what month and year are these messages from?

4    A.   February 1, 2021.

5    Q.   And do you see where you say, "Please, can I stop by to

6    pick up my list?"

7    A.   Yes.

8    Q.   And what list are you referring to there?

9    A.   I'm referring to the list that Mr. Mbom has to give me.

10   Q.   And did Mr. Mbom reply to your message?

11   A.   Yes.

12   Q.   Now, once you obtained these lists, what did you do with

13   them?

14   A.   When I get the lists, I go to ICMS and I put in notes

15   for the patients that I did not actually see.  And that was

16   what I did when I got the list.

17   Q.   How did you know how long to say that a patient visit

18   had occurred?

19   A.   During the orientation, when Mr. Mbom told me how to do

20   the scheduling -- because the list, on the list you have, let

21   me say, if the date is December 24, there are about four, no

22   eight patients.  So, Mr. Mbom showed me how to schedule the

23   patients, you know, based on the list -- the names that are

24   on the list.  Mr. Mbom showed me how to schedule them from

25   morning, from 8 a.m. or from 9:30.  Then the next one 10:30,

1   the next one 11:30.  So, Mr. Mbom showed me how to schedule

2   the patients.

3   Q.   Did Mr. Mbom say a particular length that each patient

4   was supposed to be scheduled for?

5   A.   Yes.  During the scheduling period, he showed me the

6   maximum time to see a patient is an hour.  So that was what

7   he showed me on how to schedule it on the ICMS.

8   Q.   And then when you wrote the notes into ICMS, do you say

9   that the visits occurred for an hour?

10   A.   Yes.

11   Q.   But did you know if these patients actually were ever

12   seen for an hour?

13   A.   No.

14   Q.   Where do you write ICMS notes from?

15   A.   Could you take that all over?

16   Q.   Where do you write your ICMS notes?

17   A.   Where did I, inside ICMS.  That was where I put in the

18   notes.

19   Q.   Did you sometimes write them from your home?

20   A.   Oh, okay.

21        Yes.  I wrote them from my home.

22   Q.   I'm going to put back on the screen N5.  And this was

23   one of the -- was this one of the patient lists that you

24   received?

25   A.   Yes.

1  Q.    Do you see the section I've now highlighted?

2  A.    Yes.

3  Q.    Do you see these markings on the side?

4  A.    Yes.

5  Q.    Did you write those markings?

6  A.    Yes.

7  Q.    Can you describe to the jury what do those markings

8  mean?

9  A.    These markings are just like if I put in notes for

10 mailing the charts, I would take the ticket, if I put in for

11 Carrie, Damon, I could take it.  If I put in for Buchanan,

12 Mark, I would take it.  So, those were the reasons I put

13 those ticks.

14 Q.    After you wrote a note in ICMS, did someone have to

15 approve the note?

16 A.    Yes.

17 Q.    Was there a particular individual who approved the notes

18 that you wrote in ICMS?

19 A.    Yes.

20 Q.    Who was that person?

21 A.    Mr. Mbom.

22 Q.    During your time at Holy Health, do you recall

23 approximately how many notes you wrote?

24 A.    If I can recollect, it should be between 250 and 300.

25 Q.    And did you see any of the patients for which you wrote

1   those notes?

2   A.   No.

3   Q.   I'm now going to show you what has been marked as B43.

4   Do you recognize this document?

5   A.   Yes.

6   Q.   What is it?

7   A.   It's a communication between myself and Mr. Mbom.

8   Q.   And what day did these communications take place?

9   A.   December of 20- -- December 24 of 2020.

10  Q.   And what did you mean when you said, "I have done 15"?

11  A.   I was saying I had put in 15 of the notes.

12  Q.   And were these notes based off of the patient lists?

13  A.   Yes.

14  Q.   And what did you mean by "what's the latest time to

15  submit"?

16  A.   I was just finding out from him to let me know what is

17  the latest time that he, that I can submit the notes that

18  I've put in.

19  Q.   And did Mr. Mbom reply to your message?

20  A.   Yes.

21  Q.   What did he say?

22  A.   He said just go on and put the notes.

23  Q.   So you understood "just go on" to mean keep going?

24  A.   Correct.

25  Q.   I'm now going to show you what has been marked as B44.

1   Do you recognize this document?

2   A.    Yes.

3   Q.    What is it?

4   A.    It's a communication between myself and Mr. Mbom.

5   Q.    And what date are these communications from?

6   A.    December 24, 20- -- December 27, 2020.

7   Q.    Did you write the top message?

8   A.    Yes.

9   Q.    And so you said, "I need for get my patients this week

10  and dates so that I can start tomorrow."  What were the

11  patients you were referring to?

12  A.    I was referring to the list that Mr. Mbom give me.

13  Q.    And when you said, "so that I can start tomorrow," what

14  were you going to start?

15  A.    I was supposed to start putting the notes for the

16  patients the following day.

17  Q.    And did Mr. Mbom reply to your message?

18  A.    Yes, he replied.

19  Q.    And did he write, "I am still to build your caseload"?

20  A.    No, I did not write that.

21  Q.    Did he write that?

22  A.    Yes, Mr. Mbom wrote that.

23  Q.    And what did you understand him to mean by "caseload"?

24  A.    Caseload was that I'm going to build a caseload for you

25  for the patients that you're putting in notes.  So that was

1   my understanding of it.  And because he said, "I will send

2   you weekly names for notes," so that was my understanding of

3   it.

4   Q.   Are the weekly names for notes the same as the patient

5   lists that you were receiving?

6   A.   Yes.

7   Q.   This is B48.  Do you recognize this document?

8   A.   Yes.

9   Q.   What is it?

10  A.   It's a communication between myself and Mr. Mbom.

11  Q.   And what date -- or what month and year are these

12  communications from?

13  A.   February 1, 2021.

14  Q.   And also February 2, 2021?

15  A.   Also February 2nd.

16  Q.   And did you write, "Please, can I stop by to pick up my

17  list"?

18  A.   Yes.

19  Q.   And was that another patient list?

20  A.   Correct.  That's another patient list.

21  Q.   The following day you wrote a message that said, "Please

22  help me send my list through email."  What were you asking?

23  A.   It was the patient list that I was asking.

24  Q.   And did you sometimes receive those lists through email?

25  A.   I cannot recollect if I got it through email or I went

1   to the office and I got the list.  But I eventually got the

2   list.

3                              (Pause.)

4            MR. SARMA:  Sorry.  One second, Your Honor.

5   BY MR. SARMA:

6   Q.   This is B45.  Do you recognize this communication?

7   A.   Yes.

8   Q.   And who is this communication between?

9   A.   It was between myself and Mr. Mbom.

10  Q.   From what date?

11  A.   December 30th, 2020.

12  Q.   Did you write these two messages at 11 p.m.?

13  A.   Yes.

14  Q.   What did you mean by, "I got 10 left"?

15  A.   I meant on the list, I got -- it's just 10 left for me

16  to complete putting in the notes.

17  Q.   And what do you mean by, "it did 25 consumers already"?

18  A.   I had put in 25 consumers already.

19  Q.   And, again, were these from the lists you were

20  receiving?

21  A.   Yes.

22  Q.   Do you recognize what has been marked as B49?

23  A.   That's correct.

24  Q.   What is it?

25  A.   It's a communication between myself and Mr. Mbom.

1  Q.   And looking at this message from 8:41 a.m., what did you

2  mean when you wrote, "These last four patients can't fit on

3  2/17/21 because I already had 8 patients on 2/17/21"?

4  A.   Yes.  So, based on the orientation I had from Mr. Mbom

5  when scheduling the patient, the way it's supposed to be at

6  least eight patients a day.  So when the list came, the date

7  that is on the slice is February 2, 2021.

8       There were more than after eight patients scheduled on

9  those day.  So I had to, you know, go back to call Mr. Mbom

10 or send him a message to find out; A, we already have more

11 than eight patients scheduled on this day.  What other day

12 should I put these patients that are more than eight on the

13 list?  So this was the communication that I sent to him.

14 Q.   And when you say, "put in," are you referring to putting

15 in notes --

16 A.   Yes, --

17 Q.   -- into ICMS?

18 A.   -- putting notes in ICMS.

19 Q.   And you say, "Please, give me another day."  Do you mean

20 give me another day to say that a visit occurred?

21 A.   Yes.

22 Q.   Did Mr. Mbom ever explain to you why you could only put

23 in eight patients a day?

24 A.   At the orientation, I was just told by Mr. Mbom you can

25 schedule this number of patients a day.  So there was -- I

 1   just know that that was the number of patients I could

 2   schedule a day.

 3   Q.   And when you say, "schedule a day," do you mean put

 4   notes in on the patients?

 5   A.   Put notes on the patients that I was supposed to put

 6   notes on.

 7   Q.   I am now going to show you what has been marked as I6.

 8   Do you recognize this document?

 9   A.   Yes.

10   Q.   Can you describe for the jury what this document is?

11   A.   It's information from ICMS on patient's information that

12   I put notes on.

13   Q.   Was this a note that you wrote?

14   A.   Yes.

15   Q.   And how do you know that?

16   A.   Because my name is there.

17   Q.   And are you looking at the staff name?

18   A.   Yes.  Nicholas there.

19   Q.   Who is the consumer name?

20   A.   Jinniece Parker.

21   Q.   Before writing this note, did you see Jinniece Parker?

22   A.   No, I did not.

23   Q.   Had you spoken to anyone who had seen Jinniece Parker

24   before entering this note?

25   A.   No, no.

DIRECT OF FRU NICHOLAS NDE BY MR. SARMA        77

1   Q.   On what date did you write this note?

2   A.   On October 12, 2020.

3   Q.   Just for clarity, is that the date you wrote the note or

4   the date where you say you saw the patient?

5   A.   The date I put in the notes.

6   Q.   Did you work -- sorry.

7        Did you work at Holy Health on October 12, 2020?

8   A.   No.

9   Q.   Okay.  So did you write the note on October 12, 2020?

10  A.   No.

11  Q.   Let me scroll down.

12       Is that your signature?

13  A.   Yes.

14  Q.   Do you see the time -- the date and time below your

15  signature?

16  A.   Yes.

17  Q.   Is that the date and time where you wrote the note?

18  A.   Yes.

19  Q.   Is that date December 29, 2020?

20  A.   Yes.

21  Q.   Scrolling back up, when did this note say that

22  Jinniece Parker was seen?

23  A.   11:45 a.m. -- 10:45 a.m.

24  Q.   What date?

25  A.   October 12, 2020.

1   Q.   And what time did you say that she was seen?

2   A.   At 10:45 a.m.

3   Q.   Do you actually know she was seen at 10:45 a.m.?

4   A.   No.

5   Q.   Did you manually input that time?

6   A.   Yes.

7   Q.   And what did you say was the end of the session?

8   A.   11:45.

9   Q.   Did you know if the session had actually ended at 11:45?

10  A.   No.

11  Q.   How did you determine to make the duration 60 minutes?

12  A.   Because based on the orientation that I got and when

13  they were scheduling the patient, that was the way I was

14  supposed to enter the notes for that patient.

15  Q.   And did that orientation occur after October 12, 2020?

16  A.   Could you take a look at that question?

17  Q.   Yes.   When did your orientation with Mr. Mbom happen?

18  A.   Sometime in December, around December 21, 2020.

19  Q.   And were you writing notes on patients or seeing

20  patients before that orientation?

21  A.   Please take over the question.

22  Q.   Yeah.

23       Before your orientation, did you have the ability to see

24  patients?

25  A.   No.

1  Q.   Scrolling down to the bottom here on Page 3, did you
2  write this text that I've now highlighted or blown up?
3  A.   Yes.
4  Q.   And why did you write that Mr. PC was, quote, "taking my
5  medications and finding some sleep"?
6  A.   Yes, because based on the orientation and the notes that
7  I got from Lambert, each and every time you see a patient and
8  you have to do a followup visit, so those are the things that
9  you need to put in.
10 Q.   But do you know if Mr. PC had actually said that he was
11 taking his medications and finding some sleep?
12 A.   No.
13 Q.   Do you see the section that says, "Plan?"
14 A.   Yes.
15 Q.   Did you write that?
16 A.   Yes.
17 Q.   Why did you write that Mr. PC was going to have his next
18 session on Thursdays?
19 A.   Yes.  Because based on the orientation, whenever you put
20 notes, then the next thing is to plan the next visit for the
21 patient.
22 Q.   Do you know if Mr. PC was actually seen the following
23 Thursday?
24 A.   No.
25 Q.   And based on this note, who approved the note?

1   A.   Mr. Mbom.

2   Q.   I am now showing you what's marked as I10.  Do you

3   recognize this document?

4   A.   Yes.

5   Q.   What is it?

6   A.   It's a patient list from ICMS.

7   Q.   Is it a note in ICMS?

8   A.   Yes.

9   Q.   Who wrote the note?

10  A.   I did.

11  Q.   And when -- according to the note, when was the patient

12  seen?

13  A.   The patient was seen on 10/13/2020.

14  Q.   Did you work at Holy Health on 10/13/2020?

15  A.   No.

16  Q.   Scrolling to the bottom here, is that your signature?

17  A.   Yes.

18  Q.   And when did you sign the note?

19  A.   On 12 -- on December 30, 2020.

20  Q.   And scrolling back up, how long did you claim the length

21  of the session was?

22  A.   An hour.

23  Q.   Did you know if the patient had actually been seen for

24  an hour?

25  A.   No.

1    Q.    And who approved this note?

2    A.    Mr. Mbom.

3    Q.    Did you write this section of the note?

4    A.    Yes.

5    Q.    Do you see where it says, "Plan"?

6    A.    Yes.

7    Q.    And did you write, "CSW and Mr. BS will work on managing

8    his angry feelings while continue assisting Mr. BS on all his

9    issues, will meet with Mr. BS again on Friday."

10          Did you write that?

11   A.    Yes.

12   Q.    Did you actually meet with Mr. BS to manage his angry

13   feelings?

14   A.    No.

15   Q.    Did you meet with Mr. BS again on Friday?

16   A.    No.

17          MR. SARMA:  Just a minute, Your Honor.

18          THE COURT:  Okay.

19   BY MR. SARMA:

20   Q.    Very briefly, sir.

21          When you wrote "Mr. BS," is that the name of the patient

22   on the patient list?

23   A.    I believe so, yes.

24   Q.    Do you know if the consumer, Shelley Baltimore, is a man

25   or a woman?

 1  A.   I cannot recollect if it's a man or woman, but the name
 2  sounds a woman.
 3           MR. SARMA:   Thank you.   Pass the witness.
 4           THE COURT:   Mr. Robbins?
 5           MR. ROBBINS:   Thank you, your Honor.
 6                       CROSS-EXAMINATION
 7  BY MR. ROBBINS:
 8  Q.   Good morning, Mr. Nde.
 9       Maybe I'm not loud enough.
10       Good morning, Mr. Nde.
11  A.   Good morning.
12  Q.   My name is Gar Robbins.   I represent Lambert here.
13       I have a few questions, but I want to start with one
14  that was probably very important in your life.   It must have
15  been terribly frightening in that first interview with the
16  FBI; is that true?
17  A.   That's correct.
18  Q.   It created a great deal of concern for you.
19  A.   That's correct.
20  Q.   They interviewed you once in June and then again in
21  July; correct?
22  A.   Yes.
23  Q.   After the interview in July, that's when you went before
24  the grand jury?
25  A.   Yes.

1   Q.   And you've met with the Government since you went before

2   the grand jury, as well; correct?  You've been interviewed?

3   A.   Could you take that all over?

4   Q.   Sure.

5        You have been interviewed again by the Government since

6   you went before the grand jury?

7   A.   Yes.

8   Q.   In the course of those meetings, the Government asked

9   you questions about all of the events to which you've

10  testified today; correct?

11  A.   You said because of the meeting with the Government they

12  asked me questions?

13  Q.   Yes, during the meetings did they ask questions?

14  A.   Yes.

15  Q.   About a lot of the same things they asked today?

16  A.   That's correct.

17  Q.   Maybe some more things, too?

18  A.   Yes.

19  Q.   They confronted you about the actions you had taken when

20  you worked at Holy Health; correct?

21  A.   Yes.

22  Q.   And during the course of those meetings, you learned

23  that you might have criminal exposure for what you had done

24  at Holy Health.

25       The Government could prosecute you.

1   A.   I was just -- they called me to be a witness, so I

2   didn't have the feelings of being prosecuted.

3   Q.   Your original testimony was that initially you denied

4   that you had entered notes without seeing your consumers;

5   correct?

6   A.   I was under pressure of -- yeah, I gave incorrect

7   statements.

8   Q.   All right.  What was the pressure that you were under?

9   A.   I have never been confronted by the FBI before.  And

10  that pressure, at that moment, pushed me to fear.  Then I had

11  to give them incorrect answers.

12  Q.   What motivated you to change that?

13  A.   Nothing motivated me.  I just had to come out and say

14  the truth.

15  Q.   Did they confront you with the fact that you could not

16  identify pictures of the consumers that you said you had

17  seen?

18  A.   Did they confront me with the?

19  Q.   Did they say -- did they show you pictures in one of

20  those meetings?

21  A.   Yes.

22  Q.   For instance, there was a picture of Julius Bakari;

23  right?

24  A.   Yes.

25  Q.   And there was another picture of Lambert Mbom?

1   A.    Yes.

2   Q.    And then they showed you a bunch of other pictures.

3   A.    Yes.

4   Q.    And a bunch of those people you didn't know who they

5   were.

6   A.    Somewhat, putting on the mask, so I cannot identify

7   them.

8   Q.    And it turned out that they were people upon whom you

9   had entered notes into ICMS; correct?

10  A.    The ones they showed me, yes.

11  Q.    And that caused concern for you.

12  A.    Yes.

13  Q.    And since then, you have done your best to not put

14  yourself in any further danger with the Government.

15  A.    I just was trying to explain to the Government what

16  actually happened.

17  Q.    Very fair.

18      Now, when you were entering the notes after you had

19  first been onboarded -- actually, let me withdraw that and

20  loop back.

21      You joined Holy Health shortly after Julius Bakari had

22  come back from a trip to Cameroon; correct?

23  A.    No, I cannot recollect that.

24  Q.    You don't remember.  Okay.

25      You've known Julius Bakari for a fairly long time now?

1   A.   Yes, I've known him for a while.

2   Q.   You would consider him a friend?

3   A.   I would consider him -- it just depend upon your

4   definition of a friend.

5   Q.   Fair enough.

6        Social?

7   A.   Social, right.

8   Q.   Social friend?

9   A.   Right.

10  Q.   Not like someone you would have move into your house?

11  A.   I cannot say that, but a social -- social friend,

12  everything.

13  Q.   Okay.  When you came to Holy Health, what was your

14  understanding of what it was that you were going to be doing?

15  A.   My understanding was that I was supposed to work as a

16  CSW worker.

17  Q.   And working as a CSW, what exactly was your task going

18  to be?

19  A.   Based on the orientation I got, my task was to put notes

20  for patients.

21  Q.   When you put those notes for patients, did you think

22  that you were doing anything illegal?

23  A.   At that moment, no.

24  Q.   Why did you think you were putting those notes in?

25  A.   Because the owner -- when I start putting in the notes,

1    I realized it was backdated notes from the day I started

2    working.  So that was when I went back to the owner,

3    Mr. Julius Bakari and Mr. Mbom, and told them, "I start

4    working here December 23rd.  And you're giving me a list that

5    says December -- I meant October 1st, I believe.  And you

6    want me to put notes.  I'm putting in these notes.  Is it

7    okay?"

8          And they confirmed those patients had been seen by a

9    nurse, I can go ahead and put those notes.

10         I was working with what they told me.  I'm sorry, Dear

11   Members of the Jury, I did not do my due diligence to

12   actually ask around, to actually know if those patients had

13   been seen by a nurse.

14   Q.   So, in one way of looking at it is that you were

15   capturing information of something that had happened in the

16   past?

17   A.   Based on the orientation I got, I was told to put in

18   these notes for this and this patient.

19         So, since they told me these patients had been seen, let

20   me put the notes, I went ahead and I put the notes.

21   Q.   And at the time you did it, you believed that service

22   had been rendered.

23   A.   Yes.

24         MR. ROBBINS:  Thank you, your Honor.  No further

25   questions.

1        THE COURT:  Anything?  Any Redirect?

2        MR. SARMA:  Very briefly, Your Honor.

3                    REDIRECT EXAMINATION

4   BY MR. SARMA:

5   Q.    Did you tell Mr. Robbins that you were instructed that

6   these patients had actually received services?

7   A.    Yes.

8   Q.    Is that when Mr. Bakari and Mr. Mbom told you?

9   A.    Correct.

10  Q.    Did they tell you the actual services that had been

11  provided?

12  A.    No, they did not.

13  Q.    And what you wrote was that -- do you know if this was

14  actually what they were providing?

15  A.    I was just writing based on the notes that I got.

16  Q.    And were those notes that you got about the patients who

17  you actually were writing?

18  A.    Yes.

19  Q.    Well, were those sample notes you received, or were they

20  about the actual patients you had seen?

21  A.    Could you take that all over, please?

22  Q.    Maybe I can show you an example.  I'm going to show you

23  what we previously looked at, which is Government Exhibit I6.

24  And this was the note that you wrote; correct?

25  A.    That's correct.

1   Q.   Do you see where it says interventions?

2   A.   Yes.

3   Q.   Did Mr. Bakari or Mr. Mbom tell you that the patient had

4   actually had an encounter session at the office and that he

5   had been reminded to stay within the guidelines of COVID-19?

6   A.   Based on the sample notes, that's -- I used for the

7   sample notes to enter this information.

8   Q.   I'm sorry.  I apologize, sir.  I'm asking you a slightly

9   different question.

10       Did you have any information that Jinniece Parker had

11  had an encounter session in October of 2020 at the office?

12  A.   No.

13  Q.   So where -- how did you come to write that?

14  A.   I wrote that based on the orientation that I had and

15  with regards to the patient's care plan.  Then on the notes

16  that I got, I had to fit in this information that I have

17  here.

18  Q.   So you don't actually know if Mr. Parker had received

19  this treatment?

20  A.   Correct.

21  Q.   Did you also tell Mr. Robbins that you were informed

22  that a nurse had seen these patients?

23  A.   Yes.

24  Q.   Did you say that a CSW had had this encounter session?

25  A.   Yes.

1   Q.   Why didn't you write "nurse" there?

2   A.   Because I was placed -- I was in the position then --

3   those, this information, based on the list that I got, I

4   would actually either call Lambert or communicate with him.

5   And I would talk to him about a particular patient based on

6   the diagnosis.  Lambert would tell me, "You have the notes.

7   Look at the" -- Mr. Mbom would tell me, "You have the notes.

8   Look at the sample.  Put in this information.  If you want,

9   you can do more research online to actually know precisely or

10  go to Google, go online.  If a patient is having depression,

11  you know, read more about it.  Then you will know how to fill

12  in those notes."

13  Q.   When you say "sample notes," were those sample notes you

14  received particular to Jinniece Parker?

15  A.   Those sample notes were based on the diagnosis.  Because

16  there were three levels or four levels of notes based on each

17  diagnosis you put in those notes following for those samples

18  based on the patient's diagnosis.

19  Q.   Do you recall how many sample notes you received at the

20  training?

21  A.   At the training, if I may recollect, Lambert gave me a

22  couple of, like, four sample notes of which he developed them

23  based on the diagnosis.  And he told me to do more research

24  on those diagnosis, can go online or can find out myself what

25  actually those patients go through.

REDIRECT OF FRU NICHOLAS NDE BY MR. SARMA     91

1   Q.   And I believe you previously testified that you wrote

2   approximately 250 to 300 notes between your time and earlier?

3   A.   Correct.

4   Q.   And so did you rely on those four sample notes when you

5   wrote those 250 to 300?

6   A.   That's correct.

7              MR. SARMA:  Just one second, Your Honor.

8              THE COURT:  Okay.

9              MR. SARMA:  Nothing further for this witness, Your

10  Honor, from the Government.

11             THE COURT:  Any Recross, Mr. Robbins?

12             MR. ROBBINS:  No, thank you, Your Honor.

13             THE COURT:  All right.  Mr. Nde, that concludes

14  your testimony.  You are free to step down and be on your

15  way.  Have a great day.

16             THE WITNESS:  Thank you.

17             THE COURT:  Thank you.  Government, your next

18  witness?

19             MS. McKOY:  The Government calls Special Agent Jim

20  Moran.

21             THE CLERK:  Please remain standing.  Raise your

22  right hand for me, please.

23                        JAMES MORAN,

24  having been called as a witness and having been duly sworn,

25  was examined and testified as follows:

1          THE CLERK:  Please be seated.  While speaking

2     clearly into the microphone, can you please state your full

3     name and spell your last name for the record.

4          THE WITNESS:  James Moran, J-A-M-E-S, last name,

5     M-O-R-A-N.

6          THE CLERK:  Thank you.

7                    DIRECT EXAMINATION

8     BY MS. McKOY:

9     Q.   Good morning, Special Agent Moran.

10    A.   Good morning.

11    Q.   Where do you currently work?

12    A.   The FBI.

13    Q.   What did you do before joining the FBI?

14    A.   I was a naval officer.

15    Q.   What is your education background?

16    A.   I have a Bachelor of Arts from College of the Holy

17    Cross, and then I have an MBA from University of

18    North Carolina Chapel Hill.

19    Q.   And what is your position within the FBI?

20    A.   I am a Special Agent.

21    Q.   How long have you been a Special Agent in the FBI?

22    A.   A little over six years.

23    Q.   What sort of training have you received in connection

24    with your work for the FBI?

25    A.   I went to the FBI Academy in Quantico, Virginia, where I

1   received formal law enforcement training.  And then

2   subsequently I've received both formal and informal

3   investigative training, including training on search

4   warrants, seizures, arrests, and specific to what I

5   investigated, health care fraud, drug diversion, Medicaid.

6   Q.    Which office of the FBI do you work in?

7   A.    Washington field office in Washington, D.C.

8   Q.    During the period of 2017 to 2021, did you work at a

9   particular unit in the FBI?

10  A.    Yes.  Health care fraud unit.

11  Q.    And how long did you work for the health care fraud

12  unit?

13  A.    Five years.

14  Q.    In your role with the FBI, were you assigned to work on

15  a case involving the investigation of a company called Holy

16  Health?

17  A.    Yes.

18  Q.    What is Holy Health?

19  A.    Holy Health was a Mental Health and Rehabilitation

20  Services company, a mental health company that was in

21  Washington, D.C. working under the auspices of the D.C.

22  Department of Behavioral Health.

23  Q.    Who owned Holy Health?

24  A.    Julius and Eugenie Bakari.

25  Q.    And did Holy Health have multiple locations?

DIRECT OF JAMES MORAN BY MS. MCKOY          94

1  A.   Yes.  It had approximately three locations.  Their main

2  and first location was on 6210 North Capitol Street NW,

3  Washington, D.C.  They then opened a location down in

4  southeast D.C. near the big chair, if you're familiar with

5  D.C.  But 2041 Martin Luther King, Jr. Avenue.  And then they

6  briefly had a location off of Benning Road in southeast D.C.

7  that was closed shortly after it opened.

8  Q.   I'm now showing you what's been marked as Government

9  Exhibit A, as in apple, 17.  Do you recognize what's shown in

10 this photograph, Special Agent Moran?

11 A.   Yes.  That's Holy Health.

12 Q.   Can you indicate where on this photograph Holy Health is

13 located?

14 A.   Sure.

15 Q.   Special Agent Moran has circled the red building in the

16 center of this photograph.

17      Approximately when did you start investigating Holy

18 Health?

19 A.   June 2018.

20 Q.   Did you open an investigation with the FBI?

21 A.   Yes, I did.

22 Q.   Did you receive a specific referral that led you to open

23 the investigation?

24 A.   Yes.  I received a referral from D.C.'s Office of

25 Inspector General, their Medicaid fraud control unit.  The

1  referral included allegations of paying patients, billing for
2  services not rendered.
3  Q.   What was your role in the investigation?
4  A.   I was the case agent and lead investigator.
5  Q.   What does it mean to be a case agent?
6  A.   It means you're the lead investigator of the case.
7  You're in charge of it.
8  Q.   As a part of your investigation, did you identify an
9  individual named Lambert Mbom?
10  A.   Yes.
11  Q.   And ultimately as a part of this investigation, have you
12  spoken directly with Mr. Mbom?
13  A.   Yes, on multiple occasions.
14  Q.   Where did Mr. Mbom live?
15  A.   Mr. Mbom lived in Riverdale, Maryland.
16  Q.   What was Mr. Mbom's position at Holy Health?
17  A.   He was the program administrator.
18  Q.   As the case agent in the investigation, can you
19  generally describe some of the investigative steps you took?
20  A.   Yes.  Initially we did some interviews.  And then we
21  used confidential sources to act as patients and make
22  undercover recordings.
23  Q.   You mentioned undercover recordings.  How did you carry
24  out those?
25  A.   We would put a recorder on a confidential source.  And

1    then we would instruct the confidential source to go into

2    Holy Health and act as a patient.  And we would direct them

3    to act as a patient, who maybe to interact with.  We gave

4    them different direction at different times.

5    Q.   We'll get back to that later.

6         In the course of your investigation of Holy Health, did

7    law enforcement execute a search warrant on Holy Health's

8    premises?

9    A.   Yes.  We executed search warrants at three different

10   locations.

11   Q.   Can you list for the jury what those locations were?

12   A.   Yes.  The first office that we spoke about, 46210 North

13   Capitol Street.  Then the other location was the one down off

14   Martin Luther King, Jr. Avenue.  And also the Bakari

15   residence in Silver Spring, Maryland, on Carol Lane.

16   Q.   When was Holy Health's North Capitol NW office searched?

17   A.   All three searches were done on April 2, 2021.

18   Q.   I'm now showing you what's been marked as Government

19   Exhibit M, as in Mary, 1.  What is this map of, Special Agent

20   Moran?

21   A.   This is a map of northwest D.C. bordering on Maryland.

22   Q.   Can you indicate on the map approximately where Holy

23   Health's North Capitol office is located here?

24   A.   Yeah.  The best nearest landmark would probably be this

25   post office right here, so...

1  Q.   Do you mind circling that for the jury?

2  A.   Yeah.   (Witness complied.)

3  Q.   And where in relation to the office is the Maryland/D.C.

4  border?

5  A.   It's less than a five-minute drive.

6  Q.   As the case agent in the investigation, what was your

7  role in the execution of the search warrant at the North

8  Capitol office?

9  A.   I was the team leader.

10  Q.   And can you generally describe the North Capitol

11  premises that were searched?

12  A.   Yes.

13       So, Holy Health had a very large suite that was a subset

14  of a larger building.   It was one storey.   It was a fairly

15  big suite.   So, you had two waiting rooms up front and then

16  in back a multitude of private offices and conference rooms.

17  Q.   I'm showing you again Government Exhibit A17.   Can you

18  indicate where the main entrance to Holy Health's North

19  Capitol office is here?

20  A.   Sure.   The entrance I am circling there is actually on

21  the left side of the building as you're looking at it.   And

22  that was primarily the entrance used.

23  Q.   And so there are two doors here, and you've circled the

24  one on the left?

25  A.   Yes.

1  Q.   Looking at the door on the right, what, if anything, is

2  above that door?

3  A.   It's a sign that says, "Holy Health and Agatha

4  Foundation" on it.

5  Q.   And where does that second door on the right lead to?

6  A.   That leads to -- so, in the building, you had two

7  waiting rooms.  There was kind of a primary waiting room with

8  a front desk in it, and then there was a secondary waiting

9  room, which maybe you could call overflow.  But it was

10 another waiting room down a small hallway.  And so that

11 second door would go to that secondary waiting room.

12 Q.   I'm now showing you what's been marked as Government

13 Exhibit A18.  There are again two doors shown here.  Can you

14 indicate where the main doors to Holy Health is located?

15 A.   Yes.  It's the one on the left.

16 Q.   And is the door on the right where the signage is?

17 A.   Yes.

18 Q.   I'm now showing you Government's Exhibit A1.  What is

19 this photograph of?

20 A.   It's the photograph of the entrance I have circled

21 before.

22 Q.   And that's the main entrance?

23 A.   That was the main entrance.

24 Q.   And when you enter this main entrance, what rooms does

25 that lead into?

1    A.   When you enter the main entrance, there's going to be

2    the front desk right there and then kind of a waiting room

3    reception area.

4    Q.   Government Exhibit A4.   What is this photo of?

5    A.   That is the front desk and the waiting room next to it.

6    Q.   Can you describe what other rooms are located by this

7    waiting room?

8    A.   Sure.   There are offices.

9    Q.   Is there another waiting area that's near this waiting

10   room?

11   A.   Yes.   So if you're looking at the desk, let's say you

12   were looking at it, to your right if you went down a hallway

13   to the right, so out of frame here, if you went down a

14   hallway to your right, you would be in this secondary waiting

15   room.

16   Q.   Showing you Government Exhibit A13.   Is this the second

17   waiting area?

18   A.   Yes.

19   Q.   And what other rooms are located by this second waiting

20   area?

21   A.   More private offices and conference rooms.

22   Q.   Earlier you noted that as part of your investigation,

23   the FBI used confidential sources.   Can you explain to the

24   jury what that term means?

25   A.   Sure.   A confidential source is somebody, just a regular

1   person, who for whatever reason either is in position or can

2   put themselves in position to gain information on a subject

3   of investigation.

4   Q.   And what were the names of the confidential sources that

5   law enforcement directed to make recordings at Holy Health in

6   this investigation?

7   A.   Omar Murdoch, Darlene Williams, and Arif Ahmed.

8   Q.   And what, if anything, did these individuals receive for

9   their work as confidential sources?

10  A.   Omar Murdoch was a paid source, but he also did receive

11  a stay on deportation for his cooperation.  Darlene Williams

12  was also paid.  And Arif Ahmed received consideration for

13  criminal charges he was facing in a separate jurisdiction.

14  Q.   Prior to the recordings at Holy Health, were these

15  confidential sources patients of Holy Health?

16  A.   No, they weren't.

17  Q.   And what were these individuals asked to do by law

18  enforcement in regards to Holy Health?

19  A.   They were asked to go in and pose as patients, provide

20  Medicaid information to Holy Health, and make recordings of

21  their interactions with Holy Health providers.

22  Q.   Were they asked to record their visits at a particular

23  Holy Health location?

24  A.   The majority of them made their recordings in the --

25  majority of the recordings were made in the North Capitol

1  location.  There were a handful of recordings made in the

2  Martin Luther King, Jr. Avenue location.

3  Q.   And have you reviewed all of the recordings that were

4  created from their visits?

5  A.   Yes.

6  Q.   Were the recordings maintained in a secure FBI system?

7  A.   Yes, they were.

8  Q.   Starting with Ms. Williams' recordings, I'm directing

9  your attention to the box of documents I put next to you,

10  specifically a flash drive that is marked as Government

11  Exhibits C1 through C96.

12      Do you recognize that flash drive, Special Agent Moran?

13  A.   Yes, I do.

14  Q.   How do you recognize it?

15  A.   It has my signature on it.

16  Q.   And did you review the contents of the flash drive

17  before coming to court today?

18  A.   Yes, I did.

19  Q.   Does this flash drive contain a true and accurate copy

20  of the recordings by Ms. Williams?

21  A.   Yes.

22  Q.   Did you instruct Ms. Williams to make multiple

23  recordings at Holy Health?

24  A.   Yes, I did.

25  Q.   Approximately how many times did law enforcement

DIRECT OF JAMES MORAN BY MS. MCKOY          102

1   instruct Ms. Williams to record at Holy Health?

2   A.    Approximately 15 times.

3   Q.    When there was a lengthy recording, was that recording

4   split into multiple files by the recording device?

5   A.    Yes.

6          MS. McKOY:  Your Honor, I'd move to admit C1

7   through C96.

8          MR. ROBBINS:  No objection.

9          THE COURT:  Admitted.

10  BY MS. McKOY:

11  Q.    Turning to Mr. Omar Murdoch's recordings.  I'm directing

12  your attention to the flash drive, which is marked as

13  Government C97 through C134.  Do you recognize that flash

14  drive?

15  A.    I do.

16  Q.    How do you recognize it?

17  A.    It has my signature.

18  Q.    And did you review the contents of that flash drive

19  before coming in to testify today?

20  A.    Yes, I did.

21  Q.    Does this flash drive contain a true and accurate copy

22  of the recordings by Mr. Murdoch?

23  A.    Yes.

24  Q.    Did you instruct Mr. Murdoch to make multiple recordings

25  at Holy Health?

1  A.   Yes.

2  Q.   Approximately how many times did law enforcement direct

3  Mr. Murdoch to make a recording at Holy Health?

4  A.   Approximately eight times.

5  Q.   And when there was a lengthy recording, was that

6  recording split into multiple files by the recording device?

7  A.   Yes.

8          MS. McKOY:  Your Honor, I move to admit

9  Government's Exhibit C97 through C134.

10         MR. ROBBINS:  No objection.

11         THE COURT:  It's in.

12 BY MS. McKOY:

13 Q.   Special Agent Moran, you just mentioned that law

14 enforcement directed Mr. Murdoch to record multiple visits at

15 Holy Health.  When Mr. Murdoch went to the Holy Health office

16 for the first time, how did he get there?

17 A.   He took a Holy Health van.

18 Q.   Where did he get picked up by the van?

19 A.   He got picked up at a small park near the Government

20 Printing Office located in northwest D.C.  Specifically, it's

21 located off of North Capitol Street and G Street NW, in that

22 general vicinity.  And there's a small park there.

23 Q.   And when Mr. Murdoch was riding in the van to Holy

24 Health, what were you doing?

25 A.   We were following him.

DIRECT OF JAMES MORAN BY MS. MCKOY          104

1   Q.   And when he got to the office, what did you then do?

2   A.   We stayed in the vicinity.

3   Q.   How did Mr. Murdoch, then, leave the office?

4   A.   He left on the van.

5   Q.   And what did you do when he left the office?

6   A.   We followed the van.

7   Q.   I'm now showing you what's been marked as Government's

8   Exhibit E19.  Do you recognize what's shown in this

9   photograph here?

10  A.   Yes.  It's the front of Holy Health.

11  Q.   And do you recognize any of the vehicles shown in this

12  photograph?

13  A.   Yes.  I recognize the van right here.  It's underneath

14  the sign.

15  Q.   Special Agent Moran has circled the van at the center of

16  this photograph.

17       Finally, during Mr. Arif Ahmed's recordings, I'm

18  directing your attention to what's been marked as Government

19  Exhibit C135 through C141.  It's a CD.

20       Do you recognize the CD?

21  A.   Yes, I do.

22  Q.   How do you recognize it?

23  A.   It has my signature.

24  Q.   Did you review the contents of the CD before coming to

25  court today?

1   A.   Yes, I did.

2   Q.   And does this CD contain a true and accurate copy of the

3   recordings by Mr. Ahmed?

4   A.   It does.

5   Q.   Did you instruct Mr. Ahmed to make multiple recordings

6   at Holy Health?

7   A.   Yes.

8   Q.   Approximately how many times did law enforcement

9   instruct Mr. Ahmed to make a recording at Holy Health?

10  A.   Five.

11  Q.   And when there was a lengthy recording, was that

12  recording then split into multiple files by the recording

13  device?

14  A.   Yes.

15       MS. McKOY:  Your Honor, I'd move to admit

16  Government's C145 through 141.

17       MR. ROBBINS:  No objection.

18       THE COURT:  We'll do it the local rule way, where

19  if you refer to the exhibit and there's no immediate

20  objection, it's already in.  So you don't have to --

21       MS. McKOY:  Fantastic.  Thank you.

22       THE COURT:  Okay.  Great, thanks.

23  BY MS. McKOY:

24  Q.   Special Agent Moran, was a transcript prepared for some

25  of these recordings?

1   A.   Yes.

2   Q.   I'm now directing your attention to Government Exhibits

3   T11 through T131.  Did you review these transcripts before

4   coming into court today?

5   A.   I did.

6   Q.   And did you review the transcripts for accuracy?

7   A.   Yes, I did.

8        MS. McKOY:  Your Honor, we have transcripts for

9   some of the recordings for Government's Exhibits C1 through

10  C141 that are marked as Government Exhibits T11 through T131,

11  and we'd like to distribute copies of certain transcripts for

12  recordings that I'll be shortly playing for Special Agent

13  Moran.

14       THE COURT:  Okay.  No issue with that.

11:56:46AM15       Oh, do you need to go on -- oh, let's go on the

11:56:49AM16  husher.

11:56:50AM17       (A bench conference was held on the record but out

11:56:50AM18  of the hearing of the jury as detailed below beginning at

11:56:50AM19  11:56 a.m.)

11:56:54AM20       MS. McKOY:  Your Honor, this is where we would like

11:56:56AM21  the instruction to the jury:  The transcripts are for

11:56:58AM22  convenience only.

11:56:59AM23       THE COURT:  Sure.  Yep, I can do that.

11:57:01AM24       (The bench conference concluded at 11:57 a.m., and

11:57:01AM25  proceedings resumed within the hearing of the jury.)

11:57:01AM 1          All right.  Okay.  So, Ladies and Gentlemen, you're

11:57:07AM 2     going to have transcripts for your guidance only.  The

11:57:11AM 3     recordings themselves are the evidence.  So when you go back

11:57:15AM 4     to deliberate, you'll have the recordings, not the

11:57:18AM 5     transcripts.  So, as you're listening, if you want to make

11:57:20AM 6     notes on anything, make it in your notebook, not on the

11:57:23AM 7     transcripts because those will be collected at the end.

11:57:25AM 8     Okay?

11:57:25AM 9          All right.  And with that?

11:58:49AM 10          MS. McKOY:  The Court's indulgence, Your Honor.

11:58:50AM 11          THE COURT:  Sure.

11:59:03AM 12     BY MS. McKOY:

11:59:03AM 13     Q.   Let's look at a couple of example recordings.

11:59:08AM 14          I'm about to play for you what can be marked as

11:59:22AM 15     Government Exhibit C130.  There is no transcript for this

11:59:25AM 16     file.

11:59:25AM 17          Playing from the beginning.

11:59:26AM 18          Oh, hold on.  I'm so sorry.

11:59:48AM 19          THE CLERK:  Did you disconnect the HDMI?  Click on

11:59:51AM 20     the screen.

11:59:54AM 21          MS. McKOY:  There you go.  Got it.

11:59:57AM 22     BY MS. McKOY:

11:59:57AM 23     Q.   Now, playing for you what's been marked as Government

12:00:00PM 24     Exhibit C130.  Let's play from the beginning.

12:00:02PM 25                    (Video played.)

DIRECT OF JAMES MORAN BY MS. MCKOY          108

12:00:07PM 1    Pausing at 15 seconds.  I think the first couple of
12:00:21PM 2  seconds cut off there.  But, Special Agent Moran, do you
12:00:24PM 3  recognize that person on the screen?
12:00:26PM 4  A.    It's me.
12:00:28PM 5  Q.    And what is the date of this recording?
12:00:31PM 6      I can play it from the beginning.
12:00:35PM 7          MS. McKOY:  Apologies, Your Honor.
12:00:36PM 8          THE COURT:  That's okay.
12:00:37PM 9                  (Video played.)
12:00:39PM10  BY MS. McKOY:
12:00:44PM11  Q.    What is the date of this recording?
12:00:46PM12  A.    April 24, 2019.
12:01:01PM13  Q.    I've now fast forwarded to 7 minutes, 35 seconds.
12:01:06PM14  Playing here.
12:01:07PM15                  (Video played.)
12:01:09PM16      Pausing at 8 minutes.  Who is now recording this video?
12:01:37PM17  A.    Omar Murdoch.
12:01:38PM18  Q.    And do you recognize the door that was just shown in
12:01:41PM19  this clip?
12:01:42PM20  A.    Yes.  So it's the main entrance we viewed earlier.
12:01:46PM21  Q.    Let's fast forward again.
12:01:48PM22      Playing at 11 minutes, 11 seconds.
12:02:02PM23                  (Video played.)
12:02:26PM24      Stopping 11 minutes, 30 seconds.  We just heard a voice
12:02:28PM25  in that clip.  Whose voice is that?

DIRECT OF JAMES MORAN BY MS. MCKOY          109

12:02:30PM 1   A.   Omar Murdoch.

12:02:31PM 2   Q.   Earlier you discussed the general layout at the Holy

12:02:36PM 3   Health North Capitol office.  Can you describe the layout in

12:02:41PM 4   relation to the room that we just saw?

12:02:46PM 5   A.   I mean, we are in the -- we saw the front desk and the

12:02:51PM 6   waiting room, front waiting room area.

12:02:55PM 7   Q.   And there was an individual behind the desk area.  Do

12:02:58PM 8   you recognize that individual?

12:02:59PM 9   A.   Yes.  That was the receptionist, and her name is Jeanne

12:03:04PM10   Foe.

12:03:05PM11   Q.   Does Ms. Foe go by any other first names sometimes?

12:03:11PM12   A.   She is also sometimes called Jane.

12:03:18PM13   Q.   And you said she was an employee at Holy Health.  What

12:03:21PM14   was her specific job there?

12:03:23PM15   A.   She was the receptionist.

12:03:29PM16   Q.   Fast forwarding again.

12:03:30PM17        Fast forwarding to 38 seconds.  Let's play it towards

12:04:04PM18   the end here.

12:04:05PM19                      (Video played.)

12:04:05PM20        Pausing at the end of this file, is Mr. Murdoch still in

12:05:24PM21   the waiting area here?

12:05:25PM22   A.   Yes, he is.

12:05:26PM23   Q.   Based on your review of Mr. Murdoch's recordings at Holy

12:05:29PM24   Health, how would you generally describe the time he spent in

12:05:32PM25   the waiting area?

DIRECT OF JAMES MORAN BY MS. MCKOY          110

12:05:33PM 1   A.   I mean, he was waiting and he waited for many, many,

12:05:38PM 2   many hours.

12:05:53PM 3   Q.   Were there multiple recordings for multiple files,

12:05:56PM 4   rather, for Mr. Murdoch's recordings on April 24, 2019?

12:06:01PM 5   A.   Yes.

12:06:02PM 6   Q.   Let's go to the next file.

12:06:37PM 7        I pulled up what's been marked as Government's Exhibit

12:06:40PM 8   C131.  Let's just play the first 10 seconds here.

12:06:44PM 9                     (Video played.)

12:06:45PM10        Is this a continuation of the prior file that we just

12:06:56PM11   looked at?

12:06:57PM12   A.   Yes.

12:06:57PM13   Q.   And are Government Exhibits C130 through C133 all

12:07:02PM14   recordings from the same day?

12:07:04PM15   A.   Yes.

12:07:05PM16   Q.   Let's fast forward.  Playing here at 1 minutes 21

12:07:15PM17   seconds.

12:07:15PM18                     (Video played.)

12:07:22PM19        I paused at 1 minute, 48 seconds.  Where does

12:07:47PM20   Mr. Murdoch appear to be moving about now?

12:07:50PM21   A.   He went from the front waiting room all the way down the

12:07:53PM22   hallway.

12:07:53PM23        I had talked about just past through the secondary

12:07:57PM24   waiting room by the secondary entrance.  And now he appears

12:08:02PM25   to be going into back private offices used for like

12:08:07PM 1    counseling or community support, something of that nature.

12:08:12PM 2    Q.    Let's continue playing here.

12:08:13PM 3                     (Video played.)

12:09:07PM 4         Pause it 2 minutes, 40 seconds.  Do you recognize where

12:09:12PM 5    Mr. Murdoch is now?

12:09:13PM 6    A.    He is in a private office.

12:09:15PM 7    Q.    And there's an individual behind the desk area.  Do you

12:09:18PM 8    recognize that person?

12:09:19PM 9    A.    Yes.  That is Evelyn Chung.

12:09:24PM10    Q.    And who is Ms. Chung?

12:09:26PM11    A.    Ms. Chung was a Community Support Worker.

12:09:29PM12    Q.    How do you know that she was employed -- that she was a

12:09:31PM13    CSW at Holy Health?

12:09:35PM14    A.    I mean, through the course of my investigation, I

12:09:37PM15    reviewed many of the ICMS notes, including the ones for Omar,

12:09:43PM16    and her name was written on those notes.

12:09:48PM17    Q.    And at this point in this file, is Mr. Murdoch now

12:09:52PM18    meeting with Ms. Chung?

12:09:53PM19    A.    Yes, he is.

12:09:57PM20    Q.    Let's fast forward.  Playing at 7 minutes 28 seconds.

12:10:18PM21                     (Video played.)

12:11:30PM22         Pausing at 8 minutes, 39 seconds.  Is Mr. Murdoch

12:11:33PM23    meeting with Ms. Chung here still?

12:11:35PM24    A.    Yes.

12:11:37PM25    Q.    Let's fast forward.  Playing at 13 minutes, 36 seconds.

DIRECT OF JAMES MORAN BY MS. MCKOY       112

12:11:54PM 1        (Video played.)

12:11:54PM 2        Pausing at 14 minutes.  At this point, is Mr. Murdoch

12:12:21PM 3    still meeting with Ms. Chung?

12:12:23PM 4    A.    No.

12:12:24PM 5    Q.    Do you recognize where Mr. Murdoch is now moving about?

12:12:28PM 6    A.    We're back in the second waiting room.

12:12:31PM 7    Q.    Approximately how long did Mr. Murdoch meet with

12:12:34PM 8    Ms. Chung?

12:12:36PM 9    A.    Appears to have met with her about 12 minutes.

12:12:40PM10    Q.    Let's fast forward again.

12:13:00PM11            MS. McKOY:  The Court's indulgence.

12:13:06PM12            Here we go.

12:13:07PM13    BY MS. McKOY:

12:13:07PM14    Q.    Playing at 25 minutes, 37 seconds.

12:13:26PM15                    (Video played.)

12:13:26PM16        Pausing at 27 minutes, 1 second.  Is Mr. Murdoch now

12:14:55PM17    back in that second waiting area?

12:14:58PM18    A.    Yes, he is.

12:14:59PM19    Q.    And is he now meeting with Ms. Chung again?

12:15:02PM20    A.    Yes, he is.

12:15:05PM21    Q.    Let's fast forward.  Playing at 29 minutes, 13 seconds.

12:15:18PM22                    (Video played.)

12:15:18PM23        Pausing here at 29 minutes, 40 seconds.  Do you

12:15:50PM24    recognize where Mr. Murdoch is now?

12:15:52PM25    A.    He is in the waiting room next to the front desk.

DIRECT OF JAMES MORAN BY MS. MCKOY          113

12:15:55PM 1    Q.   And is he still meeting with Ms. Chung for a second

12:15:58PM 2    time?

12:15:58PM 3    A.   Does not appear so.

12:16:00PM 4    Q.   How long, approximately, did Mr. Murdoch's second

12:16:03PM 5    meeting last with Ms. Chung?

12:16:05PM 6    A.   Three to four minutes.

12:16:07PM 7    Q.   In total, how long did Mr. Murdoch meet with Ms. Chung

12:16:10PM 8    on April 24, 2019?

12:16:12PM 9    A.   Approximately 16 minutes.

12:16:15PM10    Q.   Outside of the time that Mr. Murdoch was meeting with

12:16:18PM11    Ms. Chung, what was he generally doing at Holy Health?

12:16:23PM12    A.   Waiting.

12:16:25PM13    Q.   Let's go to the next file from this day.

12:16:28PM14         I pulled up Government Exhibit C132.  Again, there's no

12:17:10PM15    transcript for this file.  Let's fast forward.  Playing at 11

12:17:42PM16    minutes, 58 seconds.

12:17:45PM17                         (Video played.)

12:17:45PM18         Pausing at 12 minutes, 32 seconds.  Do you recognize

12:18:23PM19    where Mr. Murdoch is now?

12:18:25PM20    A.   Front desk.

12:18:26PM21    Q.   And there was an individual behind that front desk.  Do

12:18:29PM22    you recognize that person?

12:18:31PM23    A.   That's Jean Foe.

12:18:32PM24    Q.   Let's continue playing.

12:18:34PM25                         (Video played.)

DIRECT OF JAMES MORAN BY MS. MCKOY          114

12:18:34PM 1       Pausing at 13 minutes, 6 seconds.  Where is Mr. Murdoch

12:19:12PM 2  now?

12:19:14PM 3  A.    Mr. Murdoch is outside.

12:19:16PM 4  Q.    After this, did he leave Holy Health that day?

12:19:19PM 5  A.    Yes.

12:19:23PM 6  Q.    Earlier you discussed that law enforcement directed

12:19:26PM 7  Mr. Murdoch to make multiple recordings at Holy Health.

12:19:31PM 8       Prior to Mr. Murdoch's visits at Holy Health, did law

12:19:38PM 9  enforcement search him?

12:19:39PM10  A.    Yes.

12:19:39PM11  Q.    What, if anything, did law enforcement collect from him

12:19:41PM12  after he visited Holy Health?

12:19:45PM13  A.    $10.

12:19:47PM14  Q.    Was that after each visit?

12:19:49PM15  A.    Yes.

12:19:53PM16  Q.    You also discussed earlier that Mr. Murdoch sometimes

12:19:59PM17  got to the premises by van.  On the days that he went to Holy

12:20:02PM18  Health by van, did law enforcement receive $10 from him?

12:20:06PM19  A.    Yes.

12:20:16PM20  Q.    Are you familiar with the term ICMS, Special Agent

12:20:18PM21  Moran?

12:20:20PM22  A.    I am.

12:20:20PM23  Q.    What is ICMS?

12:20:22PM24  A.    ICMS is the Integrated Care Management System.  It was

12:20:25PM25  the electronic health record used by Holy Health, as well as

12:20:30PM 1   multiple other behavioral health agencies.  It was a system

12:20:35PM 2   that was centrally funded and provided by the D.C. Department

12:20:42PM 3   of Behavioral Health.  And it was hosted by the company

12:20:48PM 4   called Credible.

12:20:49PM 5   Q.   Is Credible sometimes interchangeably used with ICMS?

12:20:52PM 6   A.   Yes.  It's very common for people to say they're

12:20:55PM 7   entering something in ICMS or something in Credible.

12:21:00PM 8   Q.   As a part of your investigation, did you execute a

12:21:02PM 9   search warrant for Holy Health's electronic medical records

12:21:05PM10   on ICMS?

12:21:06PM11   A.   Yes, I did.

12:21:10PM12   Q.   And did you review records entered by Holy Health on

12:21:13PM13   ICMS for Mr. Murdoch?

12:21:15PM14   A.   Yes.

12:21:18PM15   Q.   Directing your attention to what's been marked as

12:21:20PM16   Government Exhibits I21 through I55, which have already been

12:21:24PM17   admitted, did you review those documents before coming into

12:21:30PM18   court today?

12:21:30PM19   A.   I did.

12:21:31PM20   Q.   And are those documents the ICMS notes for Mr. Murdoch?

12:21:34PM21   A.   They are.

12:21:35PM22   Q.   And when you reviewed those notes, did you identify a

12:21:39PM23   note from Mr. Murdoch's visit on Holy Health on April 24,

12:21:45PM24   2019?

12:21:46PM25   A.   Yes, I did.

DIRECT OF JAMES MORAN BY MS. MCKOY          116

12:21:54PM 1    Q.   I'm showing you what's been marked as Government Exhibit

12:21:58PM 2    I28.  On a high level, what is this document, Special Agent

12:22:03PM 3    Moran?

12:22:05PM 4    A.   There's nothing showing.

12:22:07PM 5    Q.   Oh, so sorry.

12:22:08PM 6         THE COURT:  Making sure you're paying attention,

12:22:11PM 7    Agent Moran.

12:22:12PM 8    BY MS. McKOY:

12:22:12PM 9    Q.   Keeping you on your toes.

12:22:14PM10         I'm now showing you what's been marked as Government

12:22:16PM11    Exhibit I28.  At a high level, what is this document?

12:22:19PM12    A.   This is a community support note for Omar Murdoch.

12:22:23PM13    Q.   And what is the staff name listed here that I've

12:22:32PM14    highlighted?

12:22:34PM15    A.   Evelyn Chung.

12:22:35PM16    Q.   And do you see the date, April 24, 2019?

12:22:38PM17    A.   Yes, I do.

12:22:40PM18    Q.   Is that the same date of the record that I just showed

12:22:42PM19    you?

12:22:43PM20    A.   Yep.

12:22:43PM21    Q.   What does the term "units" refer to here?

12:22:47PM22    A.   So, units of service specifically in instance -- in this

12:22:52PM23    instance, refers to the number of units of service provided.

12:22:59PM24    And in this case, a unit equals 15 minutes.

12:23:04PM25         So, for example, if you were to say, "I provided 4 units

DIRECT OF JAMES MORAN BY MS. MCKOY          117

12:23:10PM 1    of service," That would be approximately 60 minutes of

12:23:13PM 2    service.

12:23:16PM 3    Q.    And for this date of service, how many units did Holy

12:23:19PM 4    Health bill Medicaid for services allegedly rendered to

12:23:23PM 5    Mr. Murdoch?

12:23:24PM 6    A.    Four units.

12:23:28PM 7    Q.    Based on your review of your recordings of Mr. Murdoch

12:23:31PM 8    on April 24, 2019, approximately how long did he meet with

12:23:34PM 9    Ms. Chung?

12:23:35PM10    A.    16 minutes.

12:23:43PM11    Q.    So we've discussed one recording with Mr. Murdoch, but

12:23:46PM12    did law enforcement direct him to make multiple recordings?

12:23:49PM13    A.    Yes, we did.

12:23:50PM14    Q.    And were those recordings voluminous?

12:23:53PM15    A.    Yes, they were.

12:23:56PM16    Q.    And as a part of your investigation, did you also review

12:24:00PM17    the ICMS notes for Mr. Murdoch?

12:24:03PM18    A.    Yes, I did.

12:24:04PM19    Q.    Did you review the Medicaid claims data that Holy Health

12:24:07PM20    submitted for services allegedly rendered to Mr. Murdoch?

12:24:10PM21    A.    Yes, I did.

12:24:11PM22    Q.    Is that the Medicaid claims data that is marked as

12:24:14PM23    Government Exhibit G, as in girl, 1?

12:24:17PM24    A.    Yes.

12:24:21PM25    Q.    And did you prepare a summary based on that review?

DIRECT OF JAMES MORAN BY MS. MCKOY          118

12:24:24PM 1    A.    Yes.

12:24:30PM 2    Q.    I am showing you what has been marked as Government

12:24:31PM 3    Exhibit S1.  Do you recognize this chart?

12:24:39PM 4    A.    Yes, I do.

12:24:40PM 5    Q.    How are you familiar with this chart?

12:24:41PM 6    A.    I made it.

12:24:44PM 7    Q.    Can you briefly describe what you did to make this

12:24:46PM 8    chart.

12:24:47PM 9    A.    We compared the billing for Omar Murdoch and the

12:24:55PM 10   associated dates of service with recordings, or lack thereof.

12:25:02PM 11   And then we would put the time and minutes and the units

12:25:06PM 12   billed and paid.

12:25:10PM 13   Q.    And did you review this chart for its accuracy?

12:25:13PM 14   A.    Yes, I did.

12:25:15PM 15   Q.    Generally, what did you find when comparing Holy

12:25:17PM 16   Health's Medicaid claims for Mr. Murdoch and his recorded

12:25:21PM 17   visits at Holy Health?

12:25:23PM 18   A.    The recorded visits did not match up with the billing.

12:25:29PM 19   The billing grossly overstated the amount of time that was

12:25:35PM 20   met with Mr. Murdoch.  As you could see, in many cases, it

12:25:41PM 21   was just a few minutes.  And yet they purportedly -- provider

12:25:47PM 22   purportedly met with him for an hour.

12:25:49PM 23        And then if you scroll down, you can see approximately

12:25:54PM 24   four months where they said they were continuously meeting

12:25:58PM 25   with Mr. Murdoch for an hour, and yet Mr. Murdoch met with no

12:26:04PM  1  one.

12:26:06PM  2  Q.   Let's just briefly discuss the columns here so that we

12:26:10PM  3  can orient the jury.  "Date of service," what does that refer

12:26:14PM  4  to?

12:26:15PM  5  A.   The date a service was purportedly provided.

12:26:20PM  6  Q.   And what's under the column Units of Service Billed and

12:26:23PM  7  Paid?

12:26:28PM  8  A.   These are the CPT codes, H.  And what that tells us is

12:26:32PM  9  what service was provided and how many units of each service

12:26:39PM 10  was provided -- or specifically -- I'm sorry -- really it

12:26:44PM 11  tells us what was billed to Medicaid and what was paid to

12:26:49PM 12  Holy Health.

12:26:50PM 13  Q.   And what does Exhibit Number refer to?

12:26:54PM 14  A.   That is the Exhibit Number of the recording we were

12:26:56PM 15  comparing against.

12:26:57PM 16  Q.   And the final column here, Actual Time and Minutes

12:27:00PM 17  Approximately?

12:27:02PM 18  A.   Actual time met with a provider at Holy Health, or -- or

12:27:09PM 19  a Holy Health provider.

12:27:14PM 20  Q.   And what are the three procedure codes focused on?

12:27:18PM 21  A.   H0002, behavioral health screening to determine

12:27:23PM 22  eligibility for admission to treatment program.

12:27:26PM 23       H0034, medication training and support, per 15 minutes.

12:27:32PM 24       H0036, community psychiatric supportive treatment,

12:27:39PM 25  face-to-face, per 15 minutes.

DIRECT OF JAMES MORAN BY MS. MCKOY        120

12:27:44PM 1    Q.    Is community psychiatric supportive treatment another

12:27:48PM 2    term for community support services?

12:27:50PM 3    A.    Yes.

12:27:53PM 4    Q.    And why did you focus on these three procedure codes

12:27:55PM 5    when making this chart?

12:27:57PM 6    A.    Those were the codes that were billed to Medicaid for

12:28:02PM 7    Omar Murdoch.

12:28:09PM 8    Q.    Let's discuss a couple of dates of service on this

12:28:14PM 9    chart.

12:28:14PM10          I've zoomed in here on the date of service, April 24,

12:28:24PM11    2019.

12:28:25PM12          Is that the same date of the recordings that we just

12:28:29PM13    watched earlier?

12:28:30PM14    A.    Yes.

12:28:31PM15    Q.    And did Mr. Murdoch meet with a Holy Health provider

12:28:34PM16    that day?

12:28:36PM17    A.    Yes.  Ms. Chung.

12:28:39PM18    Q.    Approximately how long did he meet with Ms. Chung that

12:28:42PM19    day?

12:28:43PM20    A.    16 minutes.

12:28:43PM21    Q.    Did Holy Health --

12:28:43PM22          THE COURT:  Counsel, I'm sorry to interrupt you,

12:28:48PM23    but it's just about 12:30.  I'm going to give the jury their

12:28:51PM24    second break of the day.

12:28:52PM25          All right.  So, we're going to take 20 and be back

12:28:55PM 1    here in 20 minutes; all right?

12:28:59PM 2            (The jury left the courtroom at 12:28 p.m., and the

12:28:59PM 3            following proceedings were had out of the presence of

12:28:59PM 4            the jury.)

12:29:47PM 5            THE COURT:  All right.  Agent, you get a break.  We

12:29:49PM 6    all do.  Let me just ask you-all:  How is this system working

12:29:52PM 7    for you?  Do you feel like, Government, we're still on track

12:29:55PM 8    giving the breaks that we're giving?

12:29:57PM 9            MS. McKOY:  Yes, Your Honor.

12:29:58PM10            THE COURT:  Okay.  All right.  And then I'm going

12:29:59PM11    to make the last break of the day 15, just because we'll be

12:30:03PM12    wrapping up at 3:00.

12:30:05PM13            So you-all do make sure, though, you let me know if

12:30:09PM14    we're getting behind.  I don't want to get behind.  But our

12:30:11PM15    jury's really attentive.  And so I'd rather you keep this

12:30:16PM16    compressed schedule.  They seem motivated.

12:30:19PM17            MS. McKOY:  When should we return, Your Honor?  I

12:30:21PM18    missed that time.

12:30:22PM19            THE COURT:  So, 10 to 1 exactly we'll start, okay.

12:30:28PM20    Thanks so much.

12:30:29PM21            (Recess held from 12:30-12:55 p.m.)

12:30:29PM22            (The jury came back into the courtroom at 12:55 p.m.,

12:30:29PM23            and the following proceedings were had in the

12:30:29PM24            presence of the jury.)

12:55:40PM25            THE COURT:  All right, everyone, you can have a

DIRECT OF JAMES MORAN BY MS. MCKOY          122

1       seat.

12:55:43PM  2            Agent Moran is on the stand.  Whenever you're

12:55:45PM  3       ready, Ms. McCoy.

12:55:48PM  4            MS. McKOY:  Thank you, Your Honor.

12:55:49PM  5       BY MS. McKOY:

12:55:52PM  6       Q.   Special Agent Moran, before the break, we were

12:55:54PM  7       discussing Government Exhibit S1.  Directing your attention

12:55:59PM  8       to the date of service April 24, 2019, is that the same date

12:56:05PM  9       of the files that we were discussing before the break?

12:56:10PM 10       A.   Regarding the recordings?

12:56:12PM 11       Q.   Yes.

12:56:14PM 12       A.   Yes, it is.

12:56:17PM 13       Q.   And based on your review of those recordings, did

12:56:20PM 14       Mr. Murdoch meet with Ms. Chung that day?

12:56:23PM 15       A.   Yes, he did.

12:56:24PM 16       Q.   Approximately how many minutes -- for how many minutes

12:56:27PM 17       did he meet with Ms. Chung?

12:56:29PM 18       A.   16 minutes.

12:56:30PM 19       Q.   And did Holy Health bill Medicaid for services allegedly

12:56:33PM 20       rendered to Mr. Murdoch that day?

12:56:35PM 21       A.   Yes, they did.

12:56:37PM 22       Q.   How many units?

12:56:39PM 23       A.   Four units, or approximately 60 minutes, one hour.

12:56:46PM 24       Q.   Let's take a look at another date of service.  Going to

12:57:03PM 25       April 17, 2019, did Mr. Murdoch meet with a provider at Holy

12:57:07PM 1    Health that day?

12:57:09PM 2    A.   He did.

12:57:10PM 3    Q.   For approximately how long did he meet with a provider?

12:57:12PM 4    A.   10 minutes.

12:57:15PM 5    Q.   And how many units did Holy Health bill Medicaid for

12:57:17PM 6    services allegedly rendered to Mr. Murdoch that day?

12:57:19PM 7    A.   Four units.

12:57:34PM 8    Q.   Going to May 8, 2019, did Mr. Murdoch meet with a Holy

12:57:40PM 9    Health provider that day?

12:57:42PM10    A.   No.

12:57:43PM11    Q.   Did Holy Health bill Medicaid for services allegedly

12:57:46PM12    rendered to Mr. Murdoch that day?

12:57:49PM13    A.   Yes, Holy Health did.

12:57:50PM14    Q.   How many units?

12:57:51PM15    A.   Four units.

12:57:57PM16    Q.   Were there any other days where Mr. Murdoch didn't

12:58:00PM17    receive any services from a Holy Health provider, looking at

12:58:03PM18    this chart?

12:58:04PM19    A.   Approximately four months' worth of days.

12:58:14PM20    Q.   And did Holy Health bill Medicaid for services allegedly

12:58:18PM21    rendered to Mr. Murdoch for those days?

12:58:20PM22    A.   Yes.

12:58:23PM23    Q.   How many units?

12:58:27PM24    A.   In just about all instances, four units.

12:58:34PM25    Q.   Earlier before the break, you discussed that law

12:58:37PM 1    enforcement would search Mr. Murdoch before his visit at Holy
12:58:41PM 2    Health.  What did you search him for?
12:58:47PM 3    A.    Generally speaking, any contraband and additional
12:58:56PM 4    cat- -- I mean, his belongings, any contraband, cash, things
12:59:02PM 5    of that nature.  We typically wanted to make sure that if he
12:59:08PM 6    did have cash with him, we would maintain that, usually all
12:59:13PM 7    his belongings, before he went into Holy Health.
12:59:17PM 8    Q.    And so what, if anything, did he have on his person when
12:59:20PM 9    he would enter Holy Health?
12:59:23PM10    A.    Well, he spent so much time waiting, he oftentimes
12:59:27PM11    brought snacks and/or material to read.  But outside of that,
12:59:34PM12    his phone.  Usually he had his phone, as well.  But outside
12:59:39PM13    of that, generally nothing.
12:59:40PM14    Q.    Would he have any cash on him?
12:59:42PM15    A.    No.  No cash.
12:59:44PM16    Q.    And so after he would leave Holy Health, what, if
12:59:46PM17    anything, did law enforcement collect from him?
12:59:50PM18    A.    We would collect, in addition to the recording devices,
12:59:55PM19    $10 cash.
12:59:59PM20    Q.    When you would collect the $10 from him, where was those
1:00:03PM21     $10 from?
1:00:05PM22     A.    He had received them at Holy Health.
1:00:14PM23     Q.    Let's take a look at a couple of example recordings from
1:00:18PM24     Ms. Darlene Williams.  I pulled up Government Exhibit C40.
1:00:57PM25     There's no transcript for this file.

1:00:59PM 1          Let's play the first 10 seconds or so.

1:01:03PM 2                          (Video played.)

1:01:03PM 3          Pausing at 18 seconds.  Whose voice did we just hear?

1:01:27PM 4     A.   My voice again.

1:01:28PM 5     Q.   And what is the date of this recording?

1:01:31PM 6     A.   October 16, 2019.

1:01:34PM 7     Q.   Having previously reviewed Ms. Williams' recorded visits

1:01:37PM 8     at Holy Health, are Government's Exhibits C41 through C45 all

1:01:43PM 9     recordings from October 16, 2019?

1:01:45PM10     A.   Yes, they are.

1:01:52PM11     Q.   Pulling up the next recording from that date.  I'm

1:02:20PM12     showing you what's been marked as Government Exhibit C41, the

1:02:22PM13     transcript for this file is marked as Government Exhibit T41.

1:02:31PM14     And I'll be playing from approximately 3 minutes, 8 seconds,

1:02:36PM15     which corresponds to Page 2 of the transcript.  Playing here.

1:02:44PM16                          (Video played.)

1:03:18PM17          Pausing at 3 minutes, 41 seconds.  Who is now recording

1:03:22PM18     this video?

1:03:24PM19     A.   Darlene Williams.

1:03:25PM20     Q.   Is that the voice we just heard?

1:03:27PM21     A.   Yes, you heard her voice there.

1:03:29PM22     Q.   Do you recognize where Ms. Williams is now?

1:03:31PM23     A.   She's in one of the back private offices.

1:03:34PM24     Q.   Let's continue playing.

1:03:35PM25                          (Video played.)

DIRECT OF JAMES MORAN BY MS. MCKOY          126

1:04:55PM  1        Pausing at 5 minutes, 1 second.  There's an individual
1:04:59PM  2   sitting behind the desk here.  Do you recognize that
1:05:03PM  3   individual?
1:05:06PM  4   A.   That is the nurse for Holy Health.
1:05:09PM  5   Q.   Is that how he's referred to in the recordings?
1:05:12PM  6   A.   Yes.
1:05:15PM  7   Q.   And at this point, is he now meeting with Ms. Williams?
1:05:19PM  8   A.   Yes.
1:05:19PM  9   Q.   Let's continue playing here.
1:05:23PM 10                      (Video played.)
1:07:21PM 11        Pausing at 6 minutes, 59 seconds.  Is Ms. Williams still
1:07:25PM 12   meeting with the nurse here?
1:07:27PM 13   A.   Yes.
1:07:28PM 14   Q.   Let's jump ahead.
1:07:29PM 15        Let's play at 10 minutes, 57 seconds, which corresponds
1:07:54PM 16   to about the top of Page 11 of the transcript T41.
1:07:58PM 17        Let's continue playing here until the end of this file.
1:08:12PM 18             THE COURT:  Which page of the transcript?
1:08:16PM 19             MS. McKOY:  Page 11.
1:08:17PM 20             THE COURT:  Of the transcript, of C41?
1:08:19PM 21             MS. McKOY:  I'm so sorry.  C41, which is marked as
1:08:25PM 22   Government's Exhibit T41, yes, Your Honor.
1:08:28PM 23             THE COURT:  So we're not in C41 anymore?
1:08:29PM 24             MR. ROBBINS:  Your Honor, the label on the page
1:08:31PM 25   says C41 in large print, but at the bottom it says Exhibit

DIRECT OF JAMES MORAN BY MS. MCKOY          127

1:08:35PM 1   T41.

1:08:36PM 2         THE COURT:  Where's then -- the one I have is nine

1:08:38PM 3   pages?  Is that what you have?

1:08:42PM 4         JUROR:  Yes.

1:08:43PM 5         MS. McKOY:  Apologies.  Court's indulgence.

1:08:45PM 6         THE COURT:  Okay.

1:09:08PM 7         MS. McKOY:  Apologies, Your Honor.  I'm not exactly

1:09:10PM 8   sure where in the transcript I want to play.  I think it's

1:09:13PM 9   approximately at the top of Page 7.  Is it okay if I

1:09:16PM10   continue?

1:09:18PM11         THE COURT:  Yeah, go ahead.

1:09:19PM12         MS. McKOY:  Thank you.

1:09:21PM13                    (Video played.)

1:09:34PM14         THE COURT:  Middle of Page 7.

1:09:38PM15                    (Video played.)

1:09:38PM16   BY MS. McKOY:

1:11:26PM17   Q.   Pausing at the end of this file at 13 minutes, 4

1:11:28PM18   seconds.  Is the nurse still meeting with Ms. Williams here?

1:11:31PM19   A.   Yes, he is.

1:11:33PM20   Q.   We'll go to the next file.  I'm now showing you the next

1:12:20PM21   file, which has been marked as Government's Exhibit C42,

1:12:23PM22   which corresponds to the transcript marked Government's

1:12:28PM23   Exhibit T42.

1:12:29PM24         And I've fast forwarded it to approximately 10 minutes,

1:12:32PM25   57 seconds, which corresponds to about the middle of Page 10

DIRECT OF JAMES MORAN BY MS. MCKOY          128

1:12:36PM  1   of that transcript, C42.  We'll play here until the end of

1:12:47PM  2   this file.

1:12:52PM  3                    (Video played.)

1:14:31PM  4       Stopping at the end of this file.  In the clip that we

1:14:35PM  5   just watched, is Ms. Williams still meeting with the nurse?

1:14:39PM  6   A.   Yes.

1:14:41PM  7   Q.   Going into the next file from this day.  I'm now showing

1:15:02PM  8   you what's been marked as Government's Exhibit C43, which

1:15:06PM  9   corresponds to the transcript that's marked as Government's

1:15:08PM10   Exhibit T43.  And we'll play it from the beginning, which

1:15:11PM11   corresponds to the top of Page 2 of the transcript, at the

1:15:16PM12   beginning of the transcript.

1:15:25PM13                    (Video played.)

1:16:35PM14       I paused at 1 minute, 10 seconds.  At this point, is

1:16:40PM15   Ms. Williams still meeting with the nurse?

1:16:42PM16   A.   No.

1:16:43PM17   Q.   And do you recognize where Ms. Williams is moving about

1:16:46PM18   now?

1:16:46PM19   A.   The secondary waiting room.

1:16:48PM20   Q.   Approximately how long did Ms. Williams meet with the

1:16:50PM21   nurse on October 16, 2019?

1:16:53PM22   A.   It appears it was about 23, 24 minutes.

1:17:18PM23   Q.   I'm playing you another file from that day.  I'm now

1:18:01PM24   showing you what's been marked as Government Exhibit C45, and

1:18:08PM25   the transcript for this file is marked as Government's

DIRECT OF JAMES MORAN BY MS. MCKOY          129

1:18:11PM 1    Exhibit T45.

1:18:14PM 2          I've jumped ahead to about 6 minutes, 48 seconds, which

1:18:19PM 3    corresponds to Page 2 of the transcript.  Let's play here.

1:18:26PM 4                         (Video played.)

1:18:26PM 5          Pausing here at 7 minutes, 3 seconds.  There was an

1:18:46PM 6    individual behind the desk there.  Do you recognize that

1:18:48PM 7    person?

1:18:50PM 8    A.    That was Jean Foe.

1:18:53PM 9    Q.    Let's continue playing.

1:18:54PM10                         (Video played.)

1:18:54PM11          Pausing at 7 minutes, 15 seconds.  Do you recognize what

1:19:17PM12    item Ms. Foe put on the desk?

1:19:20PM13    A.    It was cash.

1:19:22PM14    Q.    After this, did Ms. Williams then leave Holy Health for

1:19:25PM15    the day?

1:19:26PM16    A.    Yes.

1:19:26PM17    Q.    Did you then meet up with Ms. Williams?

1:19:29PM18    A.    Yes.

1:19:30PM19    Q.    After she left Holy Health, what, if anything, did she

1:19:33PM20    give to law enforcement?

1:19:35PM21    A.    $10.

1:19:43PM22    Q.    As a part of your investigation, did you review records

1:19:46PM23    entered by Holy Health on ICMS for Ms. Williams?

1:19:49PM24    A.    Yes.

1:19:51PM25    Q.    I'm directing your attention to what's been identified

DIRECT OF JAMES MORAN BY MS. MCKOY          130

1:19:55PM 1    as Government's I60 through I132.  Did you review those

1:19:59PM 2    documents before coming to court today?

1:20:02PM 3    A.    Yes, I did.

1:20:03PM 4    Q.    And are those documents the ICMS notes for Ms. Williams?

1:20:06PM 5    A.    Yes, they are.

1:20:08PM 6    Q.    And did you identify an ICMS note that corresponded to

1:20:12PM 7    Ms. Williams' October 29 visit?

1:20:17PM 8    A.    Yes.

1:20:17PM 9    Q.    I'm now showing you what's been marked as Government

1:20:48PM10    Exhibit I70.  At a high level, what is this document, Special

1:20:56PM11    Agent Moran?

1:20:57PM12    A.    It's a note for Darlene Williams.

1:21:04PM13    Q.    And what is the date of service listed here?

1:21:08PM14    A.    October 16, 2019.

1:21:10PM15    Q.    And is that the same date of the recordings that we just

1:21:13PM16    watched?

1:21:13PM17    A.    Yes, it is.

1:21:15PM18    Q.    Who is the consumer name listed here?

1:21:18PM19    A.    Darlene Williams.

1:21:22PM20    Q.    And how many units did Holy Health bill Medicaid for

1:21:25PM21    services allegedly rendered to Ms. Williams on October 16,

1:21:28PM22    2019?

1:21:30PM23    A.    Four units.

1:21:36PM24    Q.    Let's go to another example recorded visit.

1:21:58PM25          Apologies.

DIRECT OF JAMES MORAN BY MS. MCKOY          131

1:21:59PM  1      I'm still showing you what's been marked as Government's

1:22:02PM  2  Exhibit I70.

1:22:03PM  3      Based on your review of Ms. Williams' recorded visit at

1:22:07PM  4  Holy Health on October 16, 2019, approximately how long did

1:22:10PM  5  she meet with the nurse that day?

1:22:13PM  6  A.    Approximately 20 minutes.

1:22:22PM  7  Q.    Let's go to another example recording from Ms. Williams.

1:22:48PM  8  I'm about to play for you what's been marked as Government

1:22:51PM  9  Exhibit C55.  There's no transcript for this file.  I'm just

1:22:56PM 10  going to play the first 10 seconds or so of this file.

1:23:12PM 11                      (Video played.)

1:23:12PM 12      Pausing at 14 seconds.  Whose voice is that?

1:23:17PM 13  A.    That's my voice.

1:23:18PM 14  Q.    And what is the date of this recording?

1:23:20PM 15  A.    October 22, 2019.

1:23:27PM 16  Q.    Let's fast forward.  Let's play 7 minutes, 24 seconds.

1:23:47PM 17                      (Video played.)

1:23:47PM 18      Pausing here at 7 minutes, 54 seconds.  Who's now

1:24:23PM 19  recording this video?

1:24:24PM 20  A.    Darlene Williams.

1:24:25PM 21  Q.    And do you recognize where Ms. Williams is?

1:24:29PM 22  A.    She is in the waiting room area adjacent to the front

1:24:32PM 23  desk.

1:24:33PM 24  Q.    And based on your review of Ms. Williams' recording at

1:24:37PM 25  Holy Health, how would you describe the time that

1:24:39PM  1   Ms. Williams spent in that waiting area?

1:24:44PM  2   A.    Can you rephrase the question?

1:24:45PM  3   Q.    Sure.

1:24:46PM  4         Based on your review of Ms. Williams' recorded visits at

1:24:51PM  5   Holy Health, how would you describe the time that

1:24:55PM  6   Ms. Williams spent in the room that she is in now?

1:25:00PM  7   A.    I mean, it was a waiting room.  And she sat in there and

1:25:03PM  8   waited for large amounts of time.  Hours.

1:25:09PM  9   Q.    And having previously recorded her recordings, are

1:25:11PM 10   Government's Exhibit C55 through C60 recordings from that

1:25:15PM 11   same day, October 22, 2019?

1:25:17PM 12   A.    Yes.

1:25:21PM 13   Q.    Let's go to the next file in this series.  I'm now

1:26:01PM 14   showing you what's been marked as Government's Exhibit C56.

1:26:04PM 15   There's no transcript for this file.  And I have fast

1:26:10PM 16   forwarded to about 10 minutes and 48 seconds.

1:26:19PM 17                          (Video played.)

1:27:01PM 18         Pausing at the end of this file here, is Ms. Williams

1:27:06PM 19   still at the waiting room?

1:27:08PM 20   A.    Yes, she is.

1:27:14PM 21   Q.    Let's go to the next file from this series.  I'm now

1:27:50PM 22   showing you Government Exhibit C57.  And I've fast forwarded

1:27:56PM 23   to 7 minutes, 24 seconds.  This corresponds to the transcript

1:28:01PM 24   marked as T57.  And this corresponds to about the middle of

1:28:11PM 25   Page 3 of that transcript.

1:28:18PM 1                    (Video played.)

1:29:24PM 2          Pausing at 8 minutes, 29 seconds.  Do you recognize

1:29:27PM 3   where Ms. Williams is now?

1:29:29PM 4   A.    She is in another private office in the back.

1:29:32PM 5   Q.    And there's an individual behind the desk here.  Do you

1:29:35PM 6   recognize that person?

1:29:37PM 7   A.    Yes.   That's Dominic Forka.

1:29:40PM 8   Q.    And what is his role at Holy Health?

1:29:42PM 9   A.    He was a Community Support Worker, CSW.

1:29:45PM10   Q.    How are you familiar with Mr. Forka?

1:29:47PM11   A.    I have spoken with Mr. Forka on multiple occasions.

1:29:51PM12   Q.    And at this point, is Mr. Forka meeting with

1:29:55PM13   Ms. Williams?

1:29:56PM14   A.    Yes, he is.

1:29:57PM15   Q.    Let's continue playing.

1:29:58PM16                    (Video played.)

1:29:58PM17          Pausing here at the end of this file, at this point, is

1:33:29PM18   Mr. Forka still meeting with Ms. Williams?

1:33:31PM19   A.    Yes, he is.

1:33:32PM20   Q.    Let's go to the next file from this day.

1:33:34PM21          I'm now showing you Government Exhibit C58, and I've

1:34:05PM22   fast forwarded to 3 minutes, 30 seconds.  The transcript for

1:34:11PM23   this file is marked as Government Exhibit T58.

1:34:15PM24          And the clip that I'm about to play corresponds to about

1:34:18PM25   the bottom of Page 2 of that transcript, around Line 24.

1:34:23PM 1      Let's play here.

1:34:29PM 2                     (Video played.)

1:34:29PM 3      I paused at 5 minutes, 50 seconds.  At this point, is

1:36:54PM 4  Ms. Williams still meeting with Mr. Forka?

1:36:56PM 5  A.   No.

1:36:57PM 6  Q.   Approximately how long was her meeting with Mr. Forka on

1:37:00PM 7  October 22, 2019?

1:37:03PM 8  A.   It was about 8 or 9 minutes.

1:37:10PM 9  Q.   Let's turn to the last file from the series.  I'm about

1:37:42PM10  to play what's been marked as Government's Exhibit C60.

1:37:46PM11  There's no transcript for the segments of the file I'm about

1:37:48PM12  to play.

1:37:49PM13      Let's play from the beginning.

1:37:53PM14                     (Video played.)

1:37:53PM15      Pausing at 20 seconds.  Is the individual behind the

1:38:19PM16  desk area Ms. Jeanne Foe again?  Wearing the brown headband?

1:38:24PM17  A.   Yes.

1:38:29PM18  Q.   Let's fast forward.  Playing at 2 minutes, 43 seconds.

1:38:45PM19                     (Video played.)

1:38:45PM20      Pausing at 3 minutes, 17 seconds.  Do you recognize

1:39:23PM21  where Ms. Williams is standing now?

1:39:25PM22  A.   She's at the front desk.

1:39:27PM23  Q.   Let's continue playing.

1:39:29PM24                     (Video played.)

1:39:29PM25  Q.   Pausing at 3 minutes, 45 seconds.  Where is Ms. Williams

1:40:02PM 1    now?

1:40:03PM 2    A.    She's outside the building.   She just went through the

1:40:09PM 3    exit.

1:40:09PM 4    Q.    And after this, did Ms. Williams leave Holy Health for

1:40:12PM 5    that day?

1:40:13PM 6    A.    Yes, she did.

1:40:14PM 7    Q.    And after she left Holy Health on October 22, 2019,

1:40:19PM 8    what, if anything, did she turn over to law enforcement?

1:40:21PM 9    A.    She turned over $10.

1:40:23PM10    Q.    And did Ms. Williams visit Holy Health on multiple days?

1:40:30PM11    A.    Yes, she did.

1:40:30PM12    Q.    And were there any days that Ms. Williams went to Holy

1:40:33PM13    Health and law enforcement didn't receive any money from her?

1:40:36PM14    A.    Yeah, there were a few.

1:40:38PM15    Q.    In total, for all of Ms. Williams' visits at Holy

1:40:43PM16    Health, how much money did law enforcement receive from her

1:40:46PM17    after her visits to Holy Health?

1:40:48PM18    A.    In total, it was about $90.

1:40:57PM19    Q.    After reviewing Ms. Williams' October 22, 2019, recorded

1:41:02PM20    visit, did you identify an ICMS note for that day?

1:41:05PM21    A.    Yes, I did.

1:41:31PM22    Q.    I'm now showing you Government's Exhibit I74.   At a high

1:41:36PM23    level, what is this document?

1:41:38PM24    A.    It's a community support note for Darlene Williams.

1:41:42PM25    Q.    And does this note have the same date of service of this

1:41:45PM 1  series of videos that we just watched?

1:41:48PM 2  A.    Yes.  10/22/19.

1:41:50PM 3  Q.    And what is the staff name listed here?

1:41:53PM 4  A.    Dominic Forka.

1:41:55PM 5  Q.    How many units did Holy Health bill Medicaid for

1:41:58PM 6  services allegedly rendered to Ms. Williams on that day?

1:42:02PM 7  A.    Four units for approximately 60 minutes.

1:42:06PM 8  Q.    And based on your review of her recorded visits from

1:42:09PM 9  that day, approximately how long did she meet with Mr. Forka?

1:42:12PM10  A.    It was about 8 or 9 minutes.

1:42:23PM11  Q.    We've discussed two recordings now with Ms. Williams.

1:42:26PM12  But did you have other recordings?

1:42:31PM13  A.    Yes, I did.

1:42:31PM14  Q.    Were those recordings voluminous?

1:42:33PM15  A.    Yes.

1:42:34PM16  Q.    And as a part of your investigation, did you also review

1:42:37PM17  the corresponding ICMS notes?

1:42:38PM18  A.    I did.

1:42:39PM19  Q.    And did you review the Medicaid claims that Holy Health

1:42:44PM20  submitted for services allegedly rendered to Ms. Williams?

1:42:47PM21  A.    Yes, I did.

1:42:48PM22  Q.    And is that Medicaid claims data marked as Government

1:42:52PM23  G1?

1:42:53PM24  A.    Yes, it is.

1:42:54PM25  Q.    Did you prepare a summary based on that review?

DIRECT OF JAMES MORAN BY MS. MCKOY          137

1:42:57PM 1   A.   Yes, I did.

1:43:06PM 2   Q.   I'm now showing you Government's Exhibit S2.  Do you

1:43:09PM 3   recognize this chart?

1:43:10PM 4   A.   Yes, I do.

1:43:13PM 5   Q.   And is this chart similar to the chart that you made for

1:43:17PM 6   Mr. Murdoch?

1:43:18PM 7   A.   Yes, it is.

1:43:20PM 8   Q.   Generally, what did you find when comparing Holy

1:43:23PM 9   Health's Medicaid claims for Ms. Williams and her recorded

1:43:28PM10   visits for Holy Health?

1:43:29PM11   A.   I generally found that what was billed and subsequently

1:43:34PM12   paid grossly overstated the amount of time that Ms. Williams

1:43:43PM13   met with the provider, in many cases billing her -- billing

1:43:47PM14   for services that never occurred.

1:43:54PM15   Q.   And briefly can you describe for the jury the procedure

1:43:57PM16   codes that you focused on here?

1:44:03PM17   A.   Yes.  So we have H0002, behavioral health screening to

1:44:07PM18   determine eligibility for admission to treatment program.

1:44:10PM19       H0004, behavioral health counseling and therapy, per 15

1:44:16PM20   minutes.

1:44:17PM21       H0034, medication training and support, per 15 minutes.

1:44:24PM22       H0036, community psychiatric supportive treatment,

1:44:29PM23   face-to-face, per 15 minutes.

1:44:31PM24       And H0039, assertive community treatment, face-to-face,

1:44:38PM25   per 15 minutes.

1:44:41PM 1    Q.    And why did you focus on these particular codes for

1:44:43PM 2    Ms. Williams?

1:44:45PM 3    A.    These were the codes that were billed to Medicaid for

1:44:48PM 4    Ms. Williams.

1:44:51PM 5    Q.    Looking at Page 1 of the date of service and now

1:44:55PM 6    scrolling to Page 3, the last page, of this chart.  What is

1:45:07PM 7    the range of dates of service on this chart?

1:45:12PM 8    A.    Range of dates of service was from September 2019 to

1:45:17PM 9    April 2021.

1:45:24PM10    Q.    Let's discuss one date of service on this chart.  Going

1:45:32PM11    to October 16, 2019, is that the same date of the files that

1:45:38PM12    we watched earlier where Ms. Williams met with the nurse?

1:45:41PM13    A.    Yes.

1:45:41PM14    Q.    Approximately how long did she meet with the nurse?

1:45:46PM15    A.    Thirteen minutes.

1:45:49PM16    Q.    How many units did Holy Health bill Medicaid for

1:45:54PM17    services allegedly rendered to Ms. Williams on that day?

1:45:57PM18    A.    Four units.

1:46:08PM19    Q.    Now, going to October 22nd, 2019, is that the same date

1:46:13PM20    of the files that we watched where Ms. Williams met with

1:46:16PM21    Mr. Forka?

1:46:17PM22    A.    Yes.

1:46:20PM23    Q.    Approximately, how long did she meet with Mr. Forka that

1:46:23PM24    day?

1:46:23PM25    A.    Nine minutes.

DIRECT OF JAMES MORAN BY MS. MCKOY          139

1:46:25PM 1    Q.   And how many units did Holy Health bill Medicaid for

1:46:29PM 2    services allegedly rendered to Ms. Williams on that day?

1:46:32PM 3    A.   They billed for four units.

1:46:41PM 4    Q.   Based on your review of Ms. Williams' ICMS notes, were

1:46:45PM 5    there any notes submitted for Ms. Williams under any other

1:46:50PM 6    Holy Health staff members aside from the nurse and Mr. Forka?

1:46:54PM 7    A.   Yes.

1:47:13PM 8    Q.   On the left here, I'm still showing you S2.  On the

1:47:17PM 9    right, I've pulled up Government Exhibit I71.  What is I71?

1:47:30PM10    A.   It's a note for Darlene Williams.

1:47:34PM11    Q.   And what is the date of service?

1:47:37PM12    A.   Date of service is October 17, 2019.

1:47:39PM13    Q.   What is the staff name listed here?

1:47:42PM14    A.   David Lubega.

1:47:45PM15    Q.   How many units did Medicaid -- did Holy Health, rather,

1:47:50PM16    bill Medicaid for services allegedly rendered to Ms. Williams

1:47:53PM17    by Mr. Lubega on October 17, 2019?

1:47:56PM18    A.   Four units.

1:48:02PM19    Q.   Have you reviewed Ms. Williams' recorded visit on

1:48:04PM20    October 17, 2019?

1:48:06PM21    A.   Yes, I have.

1:48:07PM22    Q.   And when you reviewed that recording, did you identify

1:48:10PM23    the person that she met with?

1:48:12PM24    A.   Yes, I did.

1:48:13PM25    Q.   Who was it?

DIRECT OF JAMES MORAN BY MS. MCKOY          140

1:48:14PM 1   A.   That was Linda Teghen.

1:48:26PM 2   Q.   How many units -- how many units did Holy Health bill

1:48:34PM 3   Medicaid for services allegedly rendered to Ms. Williams on

1:48:37PM 4   that day?

1:48:37PM 5   A.   Four units.

1:48:38PM 6   Q.   How long is four units?

1:48:40PM 7   A.   Sixty minutes or one hour.

1:48:41PM 8   Q.   Now, going back to the chart here.  And directing your

1:48:57PM 9   attention to October 17, 2019, approximately how long did

1:49:01PM10   Ms. Williams meet with Ms. Teghen on that day?

1:49:06PM11   A.   24 minutes.

1:49:07PM12   Q.   Now, just pulling up the chart by itself again, S2,

1:49:20PM13   let's go to another date of service, March 18, 2021.  Did

1:49:41PM14   Ms. Williams receive any services from a Holy Health provider

1:49:45PM15   that day?

1:49:46PM16   A.   No, she did not.

1:49:47PM17   Q.   Did Holy Health bill Medicaid for services allegedly

1:49:51PM18   rendered to Ms. Williams on that day?

1:49:52PM19   A.   Yes, Holy Health billed her for five units of service.

1:49:56PM20   Q.   Billed?

1:49:58PM21   A.   Billed Medicaid for five units of service.

1:50:01PM22   Q.   How long is five units?

1:50:03PM23   A.   75 minutes or an hour and 15 minutes.

1:50:05PM24   Q.   Now, I'm showing you Page 2 and scrolling down to Page

1:50:14PM25   3.  Were there any other days where Ms. Williams didn't

1:50:17PM 1   receive any service from a Holy Health provider?

1:50:20PM 2   A.   Yes, numerous.  Many months' worth.

1:50:27PM 3   Q.   And based on your review of ICMS notes entered for

1:50:30PM 4   Ms. Williams, did you identify a note from March 18, 2021?

1:50:34PM 5   A.   Yes.

1:50:46PM 6   Q.   I'm now showing you what's been marked as Government's

1:50:48PM 7   Exhibit Number I126.  What is the consumer name listed here?

1:50:57PM 8   A.   Darlene Williams.

1:50:59PM 9   Q.   And what is the staff name here?

1:51:03PM10   A.   Melanie Teche.

1:51:08PM11   Q.   What is the date of service listed?

1:51:10PM12   A.   March 18, 2021.

1:51:12PM13   Q.   How many units did Holy Health bill Medicaid for

1:51:15PM14   service?

1:51:16PM15   A.   Five units.

1:51:24PM16             MS. McKOY:  Your Honor, this might be a good time

1:51:26PM17   to take another break.

1:51:28PM18             THE COURT:  How much longer do you have?

1:51:30PM19             MS. McKOY:  I would say approximately another hour

1:51:32PM20   or so.

1:51:32PM21             THE COURT:  Okay.  Let's get on this.  Can we go on

1:51:34PM22   the husher, please.

1:51:34PM23             You need to go to your seat.

1:51:44PM24             (A bench conference was held on the record but out

1:51:44PM25   of the hearing of the jury as detailed below beginning at

1:51:44PM  1    1:51 p.m.)

1:51:44PM  2              THE COURT:  Okay.  Can you-all hear me?

1:51:49PM  3              MR. ROBBINS:  I can hear you.

1:51:49PM  4              THE COURT:  I need a proffer as to why this is

1:51:52PM  5    going to be another hour.  This is going extremely slowly,

1:51:55PM  6    and I don't know why.  I don't know why we have to go through

1:51:59PM  7    every unit.  Every time we talk about units, it's 15 minutes

1:52:04PM  8    equals 4 times, 60.  I mean, it's just taking a very long

1:52:08PM  9    time.

1:52:09PM 10              So what else is left?

1:52:14PM 11              MS. MCKOY:  Your Honor, we'd like to briefly

1:52:16PM 12    discuss one more chart for the last confidential source and

1:52:18PM 13    then we'll be moving on from this section.

1:52:21PM 14              THE COURT:  So, how is that going to take an hour?

1:52:24PM 15    It should take 10 minutes at this point, because these charts

1:52:29PM 16    are obvious.  So why do we need to do this for an hour?  For

1:52:35PM 17    which undercover is this?

1:52:38PM 18              MS. MCKOY:  This would be for Arif Ahmed.  And then

1:52:41PM 19    that won't take an hour.  We're then going to go through

1:52:44PM 20    other documents.

1:52:46PM 21              THE COURT:  Do you all have another witness?  You

1:52:47PM 22    do?  Okay.

1:52:49PM 23              I'm going to give them a break.  I really need to

1:52:52PM 24    understand why this is going to take an hour.  It is taking

1:52:55PM 25    way too long.  Okay?  All right.  We'll be back at 2:00.

1:52:58PM  1          (The bench conference concluded at 1:52 p.m., and

1:52:58PM  2   proceedings resumed within the hearing of the jury.)

1:53:03PM  3          THE COURT:  All right, everyone, we're going to

1:53:05PM  4   take a short break, so you can, you know, use the facilities.

1:53:08PM  5   And then we're going to go until 3 o'clock.  So, my promise

1:53:11PM  6   is you'll be out by 3:00.  All right.  Very good.

1:53:14PM  7          (The jury left the courtroom at 1:53 p.m., and the

1:53:14PM  8          following proceedings were had out of the presence of

1:53:14PM  9          the jury.)

1:54:06PM 10          THE COURT:  Okay.  I don't want to take your time

1:54:08PM 11   from the break.  Mr. Robbins hasn't objected once.  There is

1:54:12PM 12   no need for it to take as long as it's taking.  So, during

1:54:15PM 13   the break, figure out how to streamline this 'cause the jury

1:54:19PM 14   gets it.  Okay?  All right.

1:54:21PM 15          I'll be back -- let's take seven minutes is what I

1:54:26PM 16   pulled out of my hat.  I want to make sure that you-all get a

1:54:29PM 17   full hour in.  All right.  Thank you.

1:54:30PM 18          THE CLERK:  Court stands in recess.

1:54:30PM 19          (Recess held from 1:53 to 2 p.m.)

2:03:04PM 20          THE COURT:  All right.  Are you ready for the jury?

2:03:05PM 21          MS. McKOY:  Yes, Your Honor.

2:03:07PM 22          THE COURT:  Okay.

2:03:07PM 23          (The jury came back into the courtroom at 2:03 p.m.,

2:03:07PM 24          and the following proceedings were had in the

2:03:07PM 25          presence of the jury.)

DIRECT OF JAMES MORAN BY MS. MCKOY          144

2:05:06PM 1          THE COURT:  All right, everyone, you could have a

2          seat.

2:05:07PM 3          Whenever you're ready, Ms. McCoy.

2:05:10PM 4          MS. McKOY:  Thank you, Your Honor.

2:05:10PM 5   BY MS. McKOY:

2:05:10PM 6   Q.    Special Agent Moran, I'm going to show you one final

2:05:20PM 7   chart here.  What is this chart?  At a high level.

2:05:28PM 8   A.    Billing for -- billing versus time for services rendered

2:05:30PM 9   for Arif Ahmed.

2:05:32PM10          THE COURT:  And this is S3; is that right?

2:05:35PM11          MS. McKOY:  Sorry, yes, Your Honor.

2:05:36PM12          This is marked as Government's Exhibit S3.

2:05:39PM13          THE COURT:  Okay.

2:05:42PM14   BY MS. McKOY:

2:05:42PM15   Q.    And, generally, what did you find from Mr. Ahmed?

2:05:47PM16   A.    As -- generally, we found that the times he actually did

2:05:54PM17   see a provider, it grossly overstated the amount of time he

2:05:58PM18   met with the provider.

2:05:59PM19          And then subsequently it stated he met with a provider

2:06:02PM20   for an hour plus, when, in fact, he did not meet with a

2:06:07PM21   provider.

2:06:09PM22   Q.    And let's briefly look at a couple of dates of service

2:06:12PM23   here.  Looking at November 18, 2020, did Mr. Ahmed meet with

2:06:20PM24   the Holy Health provider that day?

2:06:22PM25   A.    Yes, for apparently 15 minutes.

DIRECT OF JAMES MORAN BY MS. MCKOY          145

2:06:26PM 1    Q.   And how many units did Holy Health bill Medicaid for

2:06:29PM 2    services allegedly rendered to Mr. Ahmed that day?

2:06:32PM 3    A.   Four units, or 60 minutes.

2:06:48PM 4    Q.   Going to February 26, 2021, did Mr. Ahmed meet with a

2:06:51PM 5    Holy Health provider that day?

2:06:55PM 6    A.   No.

2:06:56PM 7    Q.   How many units did Holy Health bill Medicaid for

2:06:59PM 8    services allegedly rendered to Mr. Ahmed for that day?

2:07:01PM 9    A.   Five units, or approximately one hour and 15 minutes.

2:07:05PM10    Q.   And were there any other days where Mr. Ahmed didn't

2:07:09PM11    receive services from a Holy Health provider?

2:07:12PM12    A.   Yeah, they did it continuously for about the next six

2:07:14PM13    months.

2:07:15PM14    Q.   And did Holy Health bill Medicaid for services allegedly

2:07:19PM15    rendered on those days?

2:07:20PM16    A.   Yes.

2:07:29PM17    Q.   As a part of your investigation, did you obtain ICMS

2:07:34PM18    data from accounts?

2:07:37PM19    A.   Yes, I did.

2:07:38PM20    Q.   How did you get that data?

2:07:39PM21    A.   I went into Credible and exported a spreadsheet with

2:07:42PM22    that information.

2:07:42PM23    Q.   And is that spreadsheet Government Exhibit I260?

2:07:47PM24    A.   Yes.

2:07:47PM25    Q.   And was a PDF version of that spreadsheet then created?

2:07:51PM 1   A.   Yes.

2:07:57PM 2   Q.   I'm showing you as a demonstrative Government Exhibit

2:08:01PM 3   I260A, which is a PDF version of that spreadsheet.  At a high

2:08:08PM 4   level, what is this chart?

2:08:11PM 5   A.   It is a chart from Credible that logs every time someone

2:08:18PM 6   inserts an employee record into ICMS.  And roughly what

2:08:25PM 7   that's telling us is every time somebody is given access to

2:08:30PM 8   ICMS for Holy Health.

2:08:33PM 9   Q.   In looking at the Entity column here, what does that

2:08:36PM10   column refer to?

2:08:37PM11   A.   The employee, or entity, that was given access.

2:08:41PM12   Q.   And what does the "Done By" column refer to?

2:08:43PM13   A.   It refers to the person who gave that access.

2:08:49PM14   Q.   And what name is listed here?

2:08:54PM15   A.   Mbom, L.

2:08:57PM16   Q.   Quickly scrolling to the last page of this spreadsheet

2:09:01PM17   and directing your attention to the last row, whose ICMS

2:09:08PM18   account does this row refer to?

2:09:10PM19   A.   Mbom, L.

2:09:11PM20   Q.   And who created this account?

2:09:13PM21   A.   Campbell-Smith, S.

2:09:17PM22   Q.   With the exception of this account, who created all of

2:09:21PM23   the ICMS accounts of Holy Health employees?

2:09:26PM24   A.   Mr. Mbom.

2:09:31PM25   Q.   Going back to the first page.

2:09:41PM 1      And looking at the row that lists N. Nde under the

2:09:46PM 2  "Entity" column, are you familiar with an individual that

2:09:49PM 3  worked at Holy Health named N. Nde?

2:09:53PM 4  A.   Yes.  Fru Nicholas Nde.  He testified shortly before I

2:09:56PM 5  did.

2:09:58PM 6  Q.   And do you know -- excuse me.

2:10:06PM 7      According to the data listed here, who created Mr. Nde's

2:10:10PM 8  account?

2:10:10PM 9  A.   Mr. Mbom.

2:10:12PM10  Q.   When did he do so?

2:10:13PM11  A.   He did so on December 21, 2020.

2:10:23PM12  Q.   As a part of your investigation, did you review ICMS

2:10:26PM13  notes entered by Mr. Nde?

2:10:28PM14  A.   Yes, I did.

2:10:30PM15  Q.   Let's pull up a couple of those.  I'm first showing you

2:10:41PM16  what's been marked as Government Exhibit I7.  What is this

2:10:47PM17  document?

2:10:48PM18  A.   It's a community support note for Lionell Butler.

2:10:53PM19  Q.   Is that the consumer name listed here?

2:10:55PM20  A.   Yes, it is.

2:10:56PM21  Q.   What is the staff name?

2:10:58PM22  A.   Staff name is Nicholas Nde.

2:10:59PM23  Q.   What is the original date of service provided here?

2:11:02PM24  A.   10/13/2020.

2:11:08PM25  Q.   And what is the original time in listed for this

2:11:11PM 1   session?

2:11:12PM 2   A.    10:15 a.m.

2:11:13PM 3   Q.    What is the original time out?

2:11:15PM 4   A.    11:15 a.m.

2:11:17PM 5   Q.    Were any of these values, then, subsequently revised?

2:11:22PM 6   A.    Yes.  As you can see, there's entries for revised time

2:11:27PM 7   in and revised time out.  Revised time in is 10/18/2020 at

2:11:33PM 8   5 p.m. and revised time out is 10/18/2020 at 6 p.m.

2:11:40PM 9   Q.    And does ICMS maintain a log that shows changes to a

2:11:44PM10   particular note?

2:11:45PM11   A.    Yes, it does.

2:11:55PM12   Q.    On the right I'm now showing you what's been marked as

2:11:57PM13   Government's Exhibit I13.  Does this document correspond to

2:12:02PM14   the note that we just looked at?

2:12:04PM15   A.    Yes, it does.

2:12:04PM16   Q.    How can you tell?

2:12:07PM17   A.    If you look in the upper right-hand corner of both

2:12:10PM18   exhibits, there is an ID number.  And the ID number on the

2:12:14PM19   note and the service log are matching.

2:12:16PM20   Q.    And if you look at the User column, there's a J. Moran

2:12:21PM21   that's listed here.  Why is that and who is that?

2:12:24PM22   A.    That is me.  Again, this is a universal log.  It keeps a

2:12:30PM23   log of everyone who accesses this, you know, specific service

2:12:36PM24   log.  And I accessed it for investigative purposes.

2:12:42PM25   Q.    Does this log show that any changes were made to the

2:12:45PM 1   note that we just looked at?

2:12:46PM 2   A.    Yes, it does.

2:12:49PM 3   Q.    Who made that change?

2:12:54PM 4   A.    Mbom, L.

2:12:55PM 5   Q.    When did he do so?

2:12:56PM 6   A.    He did it on January 28, 2021.

2:13:12PM 7   Q.    On the right, I'm showing you another ICMS note.  Is

2:13:16PM 8   this the same note or a different note than the one that we

2:13:21PM 9   just looked at?

2:13:23PM 10  A.    This is a different note.

2:13:25PM 11  Q.    What is the staff name listed here?

2:13:29PM 12  A.    Staff name is Nicholas Nde.

2:13:34PM 13  Q.    What is the original date of service provided here?

2:13:37PM 14  A.    Original date is 10/13/2020.

2:13:40PM 15  Q.    And what is the original time in and time out?

2:13:44PM 16  A.    4:30 p.m. and 5:30 p.m.

2:13:47PM 17  Q.    Were any of those values, then, subsequently revised?

2:13:50PM 18  A.    Yes.  The revised time in is 10/20/2020 at 4:30 p.m. and

2:14:00PM 19  then October 20, 2020 at 5 p.m.

2:14:11PM 20  Q.    On the left I'm showing you Government Exhibit I15.

2:14:14PM 21  What is this document?

2:14:16PM 22  A.    This is a service log for the note that we were just

2:14:20PM 23  looking at that's on the right side of the screen.

2:14:25PM 24  Q.    And does this document show that any changes were made

2:14:29PM 25  to that second ICMS note that we just looked at?

2:14:32PM 1    A.    Yes.

2:14:33PM 2    Q.    Who made those changes?

2:14:36PM 3    A.    Mbom, L.

2:14:37PM 4    Q.    When did he do so?

2:14:39PM 5    A.    He did so twice on January 28, 2021.

2:14:56PM 6    Q.    I'm now showing you, again, the two ICMS notes that we

2:14:59PM 7    just discussed for consumer Lionell Butler.

2:15:05PM 8          Looking at the note on the left and scrolling down to

2:15:09PM 9    the Documentation section of this note, generally, can you

2:15:19PM10    describe for the jury what the documentation section of an

2:15:22PM11    ICMS note provides?

2:15:24PM12    A.    It literally documents what allegedly happened during

2:15:29PM13    the service between the provider and -- or the CSW and the

2:15:34PM14    patient.

2:15:37PM15    Q.    And what plan is provided here for Mr. Butler?

2:15:44PM16    A.    The plan is, "CSW will educate Mr. BD on the effect of

2:15:51PM17    anger on his mental health in the next session on fir day."

2:15:58PM18    (sic.)

2:15:59PM19    Q.    Scrolling back up on this note, who approved this

2:16:06PM20    note -- excuse me.   Who created this note?

2:16:11PM21    A.    Nicholas Nde.

2:16:13PM22    Q.    When did he do so?

2:16:15PM23    A.    December 30, 2020.

2:16:18PM24    Q.    Now, looking at the second note here, who created this

2:16:28PM25    note, I8?

2:16:30PM 1    A.    Nicholas Nde on December 30, 2020.

2:16:35PM 2    Q.    And looking at the Documentation section of I8, and

2:16:48PM 3    looking at the Response section here, what does this

2:16:52PM 4    generally provide for Mr. Butler?

2:16:56PM 5    A.    The Response section is just kind of another part of the

2:17:00PM 6    documentation.  It's sort of a summary of what happened.

2:17:06PM 7    It's less specific.  In this instance, it says that

2:17:12PM 8    Mr. BL accepted an offer of treatment and completed intake at

2:17:19PM 9    Holy Health.

2:17:22PM 10   Q.    You mentioned intake.  As the intake note, is this the

2:17:26PM 11   first note that was entered for Mr. Butler on ICMS?

2:17:29PM 12   A.    No, it is not.

2:17:31PM 13   Q.    And just looking, again, at the two notes here, did you

2:17:38PM 14   find any notes on ICMS that were dated prior to these two

2:17:42PM 15   notes?

2:17:42PM 16   A.    Yes.  Several.

2:17:49PM 17   Q.    In the course of your investigation, did you execute a

2:17:53PM 18   search warrant on any electronic devices belonging to any

2:17:56PM 19   Holy Health employees?

2:17:57PM 20   A.    Yes.

2:17:59PM 21   Q.    In the execution of that search warrant, did you seize

2:18:03PM 22   any devices belonging to Mr. Julius Bakari?

2:18:06PM 23   A.    Yes, I did.

2:18:07PM 24   Q.    And were the contents of those devices forensically

2:18:10PM 25   extracted?

DIRECT OF JAMES MORAN BY MS. MCKOY          152

2:18:11PM 1    A.    Yes, they were.

2:18:13PM 2    Q.    I'm directing your attention to what's been marked as

2:18:16PM 3    Government's Exhibits B1 through B7.

2:18:18PM 4          MS. McKOY:   Defense counsel has not objected to its

2:18:21PM 5    submission.

2:18:21PM 6    BY MS. McKOY:

2:18:28PM 7    Q.    I'm now showing you what's been marked as Government

2:18:36PM 8    Exhibit B7.   Is this a message that was extracted from

2:18:44PM 9    Mr. Bakari's phone?

2:18:46PM10    A.    Yes, it is.

2:18:54PM11    Q.    Excuse me, I'm sorry.   I actually wanted to show you

2:19:01PM12    Government's Exhibit B2.   Was this message extracted from

2:19:04PM13    Mr. Bakari's phone?

2:19:05PM14    A.    Yes.

2:19:22PM15    Q.    Directing your attention to the first message of the

2:19:29PM16    second page here and looking at the number that ends in 3212,

2:19:35PM17    are you familiar with that number?

2:19:37PM18    A.    Yes.   It is associated with Lambert Mbom.

2:19:42PM19    Q.    And who received this message?

2:19:47PM20    A.    Julius Bakari.

2:19:49PM21    Q.    When did Mr. Bakari receive this message?

2:19:53PM22    A.    May 28, 2020, at 9:33 p.m.

2:20:11PM23    Q.    I'm next showing you what's been marked as Government

2:20:13PM24    Exhibit B3.   Looking at the photo here that's on Page 2, who

2:20:22PM25    is this individual?

DIRECT OF JAMES MORAN BY MS. MCKOY          153

2:20:23PM  1    A.   Mr. Mbom.

2:20:26PM  2    Q.   And then going to the bottom of Page 3 at the number

2:20:33PM  3    that ends in 3212, whose number is that?

2:20:37PM  4    A.   Mr. Mbom.

2:20:40PM  5    Q.   And scrolling down to the last page, which shows a

2:20:43PM  6    chart, who sent this chart?

2:20:51PM  7    A.   Mr. Mbom did.

2:20:51PM  8    Q.   Who received this chart?

2:20:52PM  9    A.   Mr. Bakari.

2:20:55PM 10    Q.   What is the date of this chart?

2:20:57PM 11    A.   12/24/2020.

2:21:07PM 12    Q.   And do you see the row that lists Mr. Mbom?

2:21:10PM 13    A.   Yes, I do.

2:21:12PM 14    Q.   What amount of money is listed for him?

2:21:16PM 15    A.   $2,500.

2:21:18PM 16    Q.   Is that for a particular period?

2:21:21PM 17    A.   It is for the pay period of December 7, 2020, to

2:21:25PM 18    December 18, 2020.

2:21:40PM 19    Q.   I'm now showing you Government Exhibit B4.  And looking

2:21:49PM 20    at Pages 1 to 2, is this another message from Mr. Mbom?

2:21:59PM 21    A.   Yes.

2:21:59PM 22    Q.   And who received this message?

2:22:05PM 23    A.   Mr. Bakari.

2:22:10PM 24    Q.   When did Mr. Bakari receive this message?

2:22:12PM 25    A.   He received it March 5, 2021 at 8:26 p.m.

DIRECT OF JAMES MORAN BY MS. MCKOY          154

2:22:21PM 1   Q.    This message references a Francis.  Are you familiar

2:22:24PM 2   with an individual named Francis who worked at Holy Health?

2:22:29PM 3   A.    Yes, I am.

2:22:30PM 4   Q.    Who is Francis?

2:22:32PM 5   A.    Francis Senesie worked at Holy Health for a period of

2:22:36PM 6   time.

2:22:37PM 7   Q.    And what was his role at Holy Health?

2:22:42PM 8   A.    He was generally regarded as a contractor to bring in

2:22:48PM 9   CSWs to do work, but really he wrote the notes for the CSWs.

2:23:04PM10   Q.    In the execution of your search warrant on the

2:23:06PM11   electronic devices, did you seize any devices belonging to

2:23:09PM12   Eugenie Bakari?

2:23:12PM13   A.    Yes.

2:23:12PM14   Q.    And were those devices forensically extracted?

2:23:16PM15   A.    Yes.

2:23:21PM16   Q.    Those communications can be found at Government Exhibits

2:23:23PM17   B11 through B15.

2:23:24PM18         MS. McKOY:  There's no objection from defense

2:23:26PM19   counsel to the admission of those exhibits.

2:23:28PM20   BY MS. McKOY:

2:23:28PM21   Q.    In the course of your investigation, did you obtain any

2:23:37PM22   devices belonging to Mr. Mbom?

2:23:42PM23   A.    Yes, I did.

2:23:42PM24   Q.    And were the contents of that device forensically

2:23:45PM25   extracted?

2:23:46PM 1    A.    Yes, they were.

2:23:50PM 2    Q.    And did you review those messages that were extracted?

2:23:52PM 3    A.    Yes, I did.

2:23:59PM 4    Q.    Are those messages marked as Government Exhibits B35

2:24:03PM 5    through B38(d)?

2:24:05PM 6    A.    Yes.

2:24:07PM 7    Q.    And are those messages communications between Mr. Mbom

2:24:11PM 8    and others at Holy Health?

2:24:12PM 9    A.    Yes, they are.

2:24:32PM10    Q.    I'm first showing you what's been marked as Government's

2:24:35PM11    Exhibit B25(b).  Looking at this first message here, who is

2:24:45PM12    this message from?

2:24:46PM13    A.    Lambert Mbom.

2:24:55PM14    Q.    And is this message to several individuals here?

2:24:58PM15    A.    Yes, it is.

2:25:15PM16    Q.    Scrolling down to the second page where there's a blue

2:25:21PM17    bubble.  Is this a response to Mr. Mbom's text on the first

2:25:26PM18    page?

2:25:26PM19    A.    Yes, it is.

2:25:29PM20    Q.    And who is this message from?

2:25:37PM21    A.    It's a phone number ending in 1619.  Elinore.

2:25:43PM22    Q.    Are you familiar with an Elinore who worked at Holy

2:25:47PM23    Health?

2:25:48PM24    A.    Yes.  Elinore Kabiwa, the sister of Eugenie Bakari.

2:25:58PM25    Q.    And is this Elinore's response to Mr. Mbom's response on

DIRECT OF JAMES MORAN BY MS. MCKOY          156

2:26:06PM 1    the first page?

2:26:09PM 2    A.    Yes.   Indeed that is her response.

2:26:12PM 3    Q.    And what is the date of this message?

2:26:15PM 4    A.    The date is March 26, 2020.

2:26:21PM 5    Q.    When was this message sent in relation to the COVID-19

2:26:25PM 6    pandemic lockdown?

2:26:28PM 7    A.    Pretty much as it was starting.

2:26:44PM 8    Q.    I'm now showing you what's been marked as Government

2:26:47PM 9    Exhibit B26 and looking at the participants here of this text

2:26:54PM10    read, is Mr. Mbom one of the participants listed here?

2:26:58PM11    A.    Yes, he is.

2:26:58PM12    Q.    And who is the other participant here?

2:27:02PM13    A.    Kahak Healthcare.

2:27:04PM14    Q.    Are you familiar with Kahak Healthcare?

2:27:07PM15    A.    Yes.   They are another behavioral health company in D.C.

2:27:17PM16    Q.    Looking at Page 3 of this same thread, at the bottom

2:27:26PM17    here, who is this message from?

2:27:30PM18    A.    It is from Mr. Mbom.

2:27:32PM19    Q.    And is it sent to Kahak Healthcare?

2:27:35PM20    A.    Yes, it is.

2:27:44PM21    Q.    Going to the next message on Page 4, is this also from

2:27:52PM22    Mr. Mbom to Kahak Healthcare?

2:27:54PM23    A.    Yes, it is.

2:28:03PM24    Q.    And is the message in blue, then, a response from Kahak

2:28:05PM25    Healthcare?

DIRECT OF JAMES MORAN BY MS. MCKOY          157

2:28:06PM 1   A.   Yes, it is.

2:28:10PM 2   Q.   And then looking at the last message here on Page 4, was

2:28:15PM 3   this sent again by Mr. Mbom?

2:28:19PM 4   A.   Yes, Mr. Mbom did send this message.

2:28:22PM 5   Q.   When did he send this message?

2:28:24PM 6   A.   Sent it on April 17, 2020.

2:28:43PM 7   Q.   I'm now showing you what's been marked as Government

2:28:47PM 8   Exhibit B28.  And first looking at this blue text on the

2:28:58PM 9   first page, is the number ending in 1619 belonging to

2:29:04PM10   Elinore?

2:29:06PM11   A.   Yes.

2:29:06PM12   Q.   So this message was sent from Elinore?

2:29:10PM13   A.   Yes, it was.

2:29:11PM14   Q.   And do you see where it says, "Status: Read"?

2:29:15PM15   A.   Yes, I do.

2:29:18PM16   Q.   When was this message read?

2:29:20PM17   A.   This message was read at -- on April 16, 2021 at

2:29:26PM18   7:54 p.m.

2:29:29PM19   Q.   And who wrote this message?

2:29:35PM20   A.   Lambert Mbom.

2:29:51PM21   Q.   Now, looking at Government Exhibit B29, and looking at

2:30:03PM22   the first message here, is this message from Mr. Mbom?

2:30:08PM23   A.   Yes, it is.

2:30:10PM24   Q.   And do you see the number listed by "to" that ends in

2:30:15PM25   0260.  Whose number is that?

DIRECT OF JAMES MORAN BY MS. MCKOY          158

2:30:19PM  1    A.    Jouvet Forbang.

2:30:21PM  2    Q.    Who is Mr. Forbang?

2:30:24PM  3    A.    Mr. Forbang -- Mr. Forbang worked at Holy Health for a

2:30:29PM  4    period of time doing something similar to Francis Senesie.

2:30:38PM  5    Q.    Going to the second message here, was this also sent by

2:30:45PM  6    Mr. Mbom?

2:30:46PM  7    A.    Yes, it was.

2:30:46PM  8    Q.    Was it sent to Mr. Forbang?

2:30:48PM  9    A.    Yes.

2:30:56PM 10    Q.    When did Mr. Forbang read this message?

2:30:58PM 11    A.    He read it on May 12, 2021, at 3:12 p.m.

2:31:14PM 12    Q.    Finally, I'm showing you Government Exhibit B30.

2:31:25PM 13    Looking at the first message here that begins with, "Pa, I

2:31:33PM 14    don't tell these guys dem for be careful." Who is it sent by?

2:31:39PM 15    A.    Lambert Mbom.

2:31:41PM 16    Q.    And who is it sent to?

2:31:43PM 17    A.    It is sent to Julius Bakari.

2:31:44PM 18    Q.    And is that the number ending in 1540 here?

2:31:48PM 19    A.    Yes, it is.

2:31:49PM 20    Q.    And looking at the read status, when was this message

2:31:52PM 21    read by Mr. Bakari?

2:31:54PM 22    A.    June 22, 2021 at 12:41 p.m.

2:32:00PM 23    Q.    Is that date after the FBI searched the Holy Health

2:32:05PM 24    facilities?

2:32:07PM 25    A.    Yes, it is.

DIRECT OF JAMES MORAN BY MS. MCKOY        159

2:32:08PM 1    Q.    Approximately how long after that search was this

2:32:13PM 2    message read?

2:32:13PM 3    A.    2-1/2 months.

2:32:19PM 4    Q.    Scrolling down to the next message in green that says,

2:32:23PM 5    "Dem just dey dump notes dem."

2:32:27PM 6          Is this message from Mr. Mbom?

2:32:29PM 7    A.    Yes, it is.

2:32:30PM 8    Q.    And who is this message to again?

2:32:33PM 9    A.    It's to Mr. Bakari.

2:32:35PM10    Q.    When was this message also read?

2:32:36PM11    A.    June 22, 2021, 12:41.

2:32:46PM12    Q.    In the course of your investigation, did you also

2:32:48PM13    execute a search warrant of email accounts associated with

2:32:51PM14    Holy Health employees?

2:32:53PM15    A.    Yes, I did.

2:32:54PM16    Q.    Can you describe for the jury the types of accounts that

2:32:57PM17    were searched.

2:32:58PM18    A.    It was -- the Gmail account belonged to Julius Bakari.

2:33:04PM19    And then we also served a search warrant for the emails

2:33:10PM20    belonging to the domain info -- or excuse me.  All the emails

2:33:15PM21    belonging to the domain HolyHealthservices.org.

2:33:20PM22    Q.    And are those emails marked as Government Exhibits E1,

2:33:23PM23    E2, E5, E6, and E8 through E14?

2:33:37PM24    A.    Yes.

2:33:38PM25          MR. ROBBINS:  No objection from defense counsel.

2:33:40PM 1   BY MS. McKAY:

2:33:40PM 2   Q.   And first showing you what's been marked as Government

2:33:46PM 3   Exhibit E1.  Zooming in here.  Who is this email from?

2:33:55PM 4   A.   Lambert@HolyHealthCareServices.org.

2:33:58PM 5   Q.   And who is this email to?

2:34:01PM 6   A.   Jmassawe@Kinarahcs.com.

2:34:08PM 7   Q.   Are you familiar with Kinara HCS?

2:34:11PM 8   A.   Yes, it is another behavioral health company in

2:34:14PM 9   Washington, D.C.

2:34:15PM10   Q.   And what is the subject provided here?

2:34:18PM11   A.   Subject says, "Sample note for consumers to whom food is

2:34:23PM12   provided."

2:34:25PM13   Q.   And what is the date of this email?

2:34:28PM14   A.   The date is Tuesday, January 15, 2019.

2:34:35PM15   Q.   And looking at the body of this email, do you see equal

2:34:41PM16   signs here?

2:34:42PM17   A.   Yes, I do.

2:34:44PM18   Q.   Why are they appearing in the body of this message?

2:34:47PM19   A.   That is how the software extracted this particular

2:34:50PM20   message.

2:34:51PM21   Q.   Now, showing you Government Exhibit E2, what's generally

2:35:06PM22   in the left-hand corner here on the first page?

2:35:08PM23   A.   This is metadata related to the email.  And it tells us

2:35:13PM24   it's from Lambert@HolyHealthCareServices.org to

2:35:18PM25   Andrew.Pollock@dc.gov.

DIRECT OF JAMES MORAN BY MS. MCKOY          161

2:35:22PM 1   Q.   Are you familiar with an Andrew Pollock?

2:35:24PM 2   A.   Yes, he was an employee of the Department of Behavioral

2:35:27PM 3   Health.

2:35:27PM 4   Q.   And what is the subject provided here?

2:35:30PM 5   A.   Subject is "Billing Outliers."

2:35:34PM 6   Q.   When did Mr. Mr. Mbom send this email?

2:35:39PM 7   A.   January 25, 2019.

2:35:45PM 8   Q.   Going to Page 2 of this email, is this the body of the

2:35:51PM 9   message that was sent by Mr. Mbom?

2:35:54PM10   A.   Yes.

2:35:55PM11   Q.   Why is the body of this email separate from the to/from

2:35:59PM12   information on the first page?

2:36:00PM13   A.   Again, that's how the software extracts it.  It keeps

2:36:05PM14   the metadata separate from the body.

2:36:26PM15   Q.   Finally, I'm directing your attention to Government's

2:36:29PM16   Exhibits K1 through K83.

2:36:32PM17        In the execution of your search warrant on Holy Health's

2:36:43PM18   North Capitol premises, were any items seized from that

2:36:47PM19   search?

2:36:48PM20   A.   Yes.

2:36:49PM21   Q.   Are those exhibits -- were those exhibits that you just

2:36:52PM22   looked at seized from Holy Health's North Capitol office?

2:36:57PM23   A.   Yes, they were.

2:36:58PM24   Q.   And are those exhibits sign-in sheets?

2:37:00PM25   A.   Yes, they are.

DIRECT OF JAMES MORAN BY MS. MCKOY          162

2:37:01PM 1   Q.   And where in Holy Health were those sign-in sheets

2:37:05PM 2   seized?

2:37:06PM 3   A.   From the front desk.

2:37:15PM 4   Q.   I'm showing you what's been marked as Government Exhibit

2:37:20PM 5   K10.  Do you recognize this document?

2:37:24PM 6   A.   Yes.  It's an Agatha Foundation sign-in sheet.

2:37:28PM 7   Q.   And what is the date listed here?

2:37:31PM 8   A.   January 4, 2021.

2:37:34PM 9            MS. McKOY:  Those are all my questions for now.

2:37:55PM10   The Government is passing the witness.

2:37:57PM11            THE COURT:  All right.  Mr. Robbins?

2:38:02PM12            MR. ROBBINS:  Your Honor, it's my understanding

2:38:05PM13   that the Government intends to re-call this witness later in

2:38:09PM14   the case?

2:38:11PM15            THE COURT:  Yes.

2:38:11PM16            MR. ROBBINS:  And with that understanding, I would

2:38:13PM17   pass a Cross for this point in time and come -- and just deal

2:38:16PM18   with it all at once at the end of this second.  That may move

2:38:19PM19   us faster.

2:38:20PM20            THE COURT:  Any objection to that?

2:38:21PM21            MS. McKOY:  No, Your Honor.

2:38:22PM22            THE COURT:  Okay.  All right, then, Mr. Robbins

2:38:25PM23   will have all of his questions for the agent at a later time.

2:38:29PM24            Okay.  You may step down.

2:38:30PM25            Government, your next witness.

DIRECT OF AMANDA CDEBACA BY MR. SARMA        163

2:38:34PM  1        MR. SARMA:  The Government calls Special Agent

2:38:36PM  2   Amanda Cdebaca.

2:38:48PM  3        THE CLERK:  Please remain standing.  Raise your

2:39:19PM  4   right hand for me, please.

2:39:20PM  5                    AMANDA CDEBACA,

2:39:20PM  6   having been called as a witness and having been duly sworn,

2:39:20PM  7   was examined and testified as follows:

2:39:27PM  8        THE CLERK:  Have a seat.  And while speaking

2:39:28PM  9   clearly into the microphone, please state your full name and

2:39:31PM 10   spell your last name for the record.

2:39:33PM 11        THE WITNESS:  Yes.  My name is Amanda Cdebaca.

2:39:36PM 12   First name, A-M-A-N-D-A.  Last name Cdebaca, C-D-E-B-A-C-A.

2:39:45PM 13        THE CLERK:  Thank you.

2:39:45PM 14                  DIRECT EXAMINATION

2:39:46PM 15   BY MR. SARMA:

2:39:47PM 16   Q.   Good afternoon.

2:39:48PM 17   A.   Good afternoon.

2:39:49PM 18   Q.   Special Agent Cdebaca, where do you work?

2:39:51PM 19   A.   The FBI.

2:39:52PM 20   Q.   And what unit do you work in?

2:39:55PM 21   A.   I currently work in the Health Care Fraud Unit.

2:39:59PM 22   Q.   And currently -- or have you been involved in

2:40:02PM 23   investigation into a company called Holy Health?

2:40:06PM 24   A.   Yes.

2:40:07PM 25   Q.   As part of that investigation, have you been

2:40:09PM 1   investigating an individual named Lambert Mbom?

2:40:13PM 2   A.   Yes.

2:40:14PM 3   Q.   And at some point, did the FBI obtain Mr. Mbom's cell

2:40:18PM 4   phone?

2:40:18PM 5   A.   Yes.

2:40:18PM 6   Q.   And was that cell phone forensically extracted?

2:40:22PM 7   A.   Yes, it was.

2:40:23PM 8   Q.   And is that extraction viewable on a program called

2:40:27PM 9   Cellebrite?

2:40:29PM10   A.   Yes.

2:40:29PM11   Q.   At a high level, could you explain what Cellebrite is?

2:40:32PM12   A.   Yes.  Cellebrite is a software that we use to extract --

2:40:39PM13   sorry -- Cellebrite is a software that we use to extract data

2:40:42PM14   from digital devices.

2:40:46PM15   Q.   And have you reviewed the contents of Mr. Mbom's phone

2:40:49PM16   within the Cellebrite program?

2:40:52PM17   A.   Yes.

2:40:52PM18   Q.   And as part of that review, have you reviewed

2:40:55PM19   communications on WhatsApp between Mr. Mbom and Mr. Francis

2:40:59PM20   Senesie?

2:41:00PM21   A.   Yes.

2:41:01PM22   Q.   I'm going to show you what's been marked as B24.  Can

2:41:08PM23   you describe what this document is?

2:41:10PM24        Oh, I apologize.

2:41:16PM25        Do you see it now?

DIRECT OF AMANDA CDEBACA BY MR. SARMA        165

2:41:18PM 1    A.    Yes.  So, that is a screen capture of the Cellebrite --

2:41:21PM 2    the text message between Mr. Senesie and Mr. Mbom.

2:41:25PM 3    Q.    So, if we were in the Cellebrite program, this is how it

2:41:28PM 4    would appear?

2:41:29PM 5    A.    Yes.

2:41:32PM 6    Q.    And who are the messages in blue from?

2:41:34PM 7    A.    Mr. Senesie.

2:41:36PM 8    Q.    And who are the message in green from?

2:41:39PM 9    A.    Mr. Mbom.

2:41:42PM 10   Q.    Do you see where it says -- I apologize.

2:41:49PM 11         Do you see where it says, "scrambled"?

2:41:57PM 12   A.    Yes.

2:42:03PM 13   Q.    What does "scrambled" mean when you see it within the

2:42:07PM 14   Cellebrite program?

2:42:08PM 15   A.    Scrambled means that the words within the text message

2:42:10PM 16   have been scrambled.  They're not in order.

2:42:14PM 17   Q.    And do you see the red X?

2:42:17PM 18   A.    I do.

2:42:19PM 19   Q.    And when -- in your review of messages in Cellebrite,

2:42:28PM 20   did you hover over the red X with your mouse?

2:42:31PM 21   A.    I did.

2:42:32PM 22   Q.    And what appeared when you hovered over the red X with

2:42:35PM 23   your mouse?

2:42:35PM 24   A.    So, when I hover over the red X with the mouse, it shows

2:42:39PM 25   that the message has been deleted.

2:42:42PM 1  Q.   And, for example, when you hit that red X, did this

2:42:45PM 2  message appear?

2:42:46PM 3  A.   Yes.

2:42:56PM 4  Q.   In addition to seeing the messages within the Cellebrite

2:42:58PM 5  program, was the FBI able to create PDF reports of

2:43:04PM 6  communications contained within the cell phone?

2:43:07PM 7  A.   Yes.

2:43:09PM 8  Q.   And how many PDF reports communications were there

2:43:12PM 9  between Mr. Mbom and Mr. Francis Senesie?

2:43:16PM10  A.   There were three reports.

2:43:17PM11  Q.   And of those three reports, how many of those were based

2:43:21PM12  on WhatsApp communications?

2:43:23PM13  A.   There were two reports.

2:43:26PM14  Q.   I'm now going to show you B36.  And is this one of the

2:43:36PM15  reports?

2:43:37PM16  A.   Yes.

2:43:41PM17  Q.   And according to this report, how many messages were

2:43:43PM18  exchanged?

2:43:44PM19  A.   373.

2:44:04PM20  Q.   Special Agent Cdebaca, do you have the date when the FBI

2:44:11PM21  searched Holy Health's offices?

2:44:13PM22  A.   Yes.

2:44:14PM23  Q.   When was that date?

2:44:15PM24  A.   The date was May 17, 2021 -- 2023, I apologize.

2:44:20PM25  Q.   Did you say May 17?

2:44:21PM 1   A.   Yes.

2:44:31PM 2   Q.   Are you referring to that date as the date the cell
2:44:35PM 3   phone search?

2:44:36PM 4   A.   Yes.  Sorry.

2:44:36PM 5        The date we searched Holy Health was April 2nd, 2021.  I
2:44:41PM 6   apologize.

2:44:51PM 7   Q.   I will highlight this message.

2:44:52PM 8        Who sent this message?

2:44:55PM 9   A.   Mr. Mbom.

2:44:56PM 10  Q.   And what date was this message sent?

2:44:59PM 11  A.   April 3, 2021.

2:45:01PM 12  Q.   Is this a day after the search?

2:45:05PM 13  A.   Yes.

2:45:06PM 14  Q.   And is this -- are the words in this message indicated
2:45:10PM 15  as scrambled?

2:45:11PM 16  A.   It does.

2:45:12PM 17  Q.   Now, do you see the red X here?

2:45:18PM 18  A.   Yes.

2:45:20PM 19  Q.   If I -- if you're in the PDF report, can you see that
2:45:25PM 20  deleted box that we saw when we were looking at the
2:45:27PM 21  Cellebrite screenshot?

2:45:29PM 22  A.   Yes.

2:45:30PM 23  Q.   Can you see -- on a PDF report, can you see the deleted
2:45:34PM 24  text box?

2:45:37PM 25  A.   Yes.

2:45:38PM 1   Q.   Can you see deleted text box?

2:45:40PM 2   A.   I'm sorry.  You can see the red X but you cannot see the

2:45:43PM 3   deleted box before.

2:45:53PM 4   Q.   I'm now going to show you what has been marked as B38.

2:46:01PM 5   Is this the second report between Mr. Mbom and Mr. Senesie

2:46:07PM 6   for WhatsApp messages that we were discussing?

2:46:10PM 7   A.   Yes.

2:46:11PM 8   Q.   And in reviewing this report, did you also see the

2:46:15PM 9   scrambled sign appear?  I'm sorry, communications.

2:46:19PM10   A.   No, you cannot.

2:46:20PM11   Q.   I'm now on Page 10.  On certain of these communications,

2:46:37PM12   can you see the scrambled?

2:46:39PM13   A.   Yes, I can.

2:46:49PM14   Q.   In your review within the Cellebrite program, how many

2:46:53PM15   WhatsApp communications did you identify between Mr. Senesie

2:46:58PM16   and Mr. Mbom, approximately?

2:47:01PM17   A.   Approximately I identified 435 messages.

2:47:03PM18   Q.   And what was the first -- what was the date of the first

2:47:06PM19   message that you identified?

2:47:08PM20   A.   The first message I identified was on February 3 of

2:47:12PM21   2021.

2:47:16PM22   Q.   And when was the date of the last message?

2:47:19PM23   A.   The date of the last message was July 15 of 2021.

2:47:29PM24   Q.   And in your review of the WhatsApp chats within the

2:47:32PM25   Cellebrite program, did you identify which messages were

2:47:37PM 1  reported as deleted?

2:47:38PM 2  A.   Yes, I did.

2:47:39PM 3  Q.   And in total, how many of the WhatsApp chats did

2:47:43PM 4  celebrate indicated were deleted?

2:47:45PM 5  A.   There were approximately 354 messages were deleted.

2:47:52PM 6  Q.   And during your review, did you review WhatsApp messages

2:47:58PM 7  of Cellebrite that Mr. Mbom had with other individuals?

2:48:04PM 8  A.   I did.

2:48:04PM 9  Q.   Can you describe for the jury whether you personally

2:48:07PM10  observed any pattern or practice of deleting messages with

2:48:11PM11  other individuals?

2:48:12PM12  A.   Yes, within Cellebrite's messages that I observed

2:48:14PM13  between Mr. Mbom and other individuals, there was a pattern.

2:48:18PM14  I didn't see nearly as many messages were deleted with other

2:48:23PM15  individuals compared to what I saw between Mr. Senesie and

2:48:28PM16  Mr. Mbom.

2:48:28PM17  Q.   And did you observe messages that were deleted with an

2:48:33PM18  individual named Ms. Jeanne Foe?

2:48:35PM19  A.   Yes.

2:48:36PM20  Q.   Other than Ms. Jeanne Foe, did you observe any messages

2:48:39PM21  that had been deleted with other -- in other communications?

2:48:43PM22  A.   No.

2:48:48PM23          MR. SARMA:  One minute, Your Honor.

2:48:49PM24          THE COURT:  Okay.

2:48:50PM25          MR. SARMA:  Thank you.  Pass the witness.

2:48:56PM 1          THE COURT:  Okay.  Mr. Robbins?

2:48:58PM 2          MR. ROBBINS:  Thank you.

2:48:58PM 3          (Witness stood to exit the witness box.)

2:48:58PM 4          THE COURT:  Oh, wait a minute.  We're not done yet.

2:49:04PM 5          THE WITNESS:  It's my first time, if you haven't

2:49:06PM 6   noticed.

2:49:09PM 7          MR. ROBBINS:  You're doing great.

2:49:10PM 8                      CROSS-EXAMINATION

2:49:11PM 9   BY MR. ROBBINS:

2:49:12PM 10  Q.   How did you get Mr. Mbom's phone?

2:49:14PM 11  A.   I received his consent.

2:49:17PM 12  Q.   He gave it to you?

2:49:18PM 13  A.   Yes, sir.

2:49:20PM 14  Q.   We called -- I think you and I actually talked on the

2:49:24PM 15  phone.  We set it up so you could get it; right?

2:49:25PM 16  A.   I believe there were some email exchanges between, yeah,

2:49:28PM 17  lawyers.

2:49:31PM 18  Q.   From a user's perspective, we see these extractions that

2:49:35PM 19  show messages being scrambled.  When you look on your phone

2:49:39PM 20  in WhatsApp, it's not scrambled there; right?

2:49:43PM 21  A.   Can you repeat that, please?

2:49:46PM 22  Q.   You just went through some screens with the Government

2:49:50PM 23  where it shows messages being scrambled.  And it's kind of --

2:49:53PM 24  you can kind of piece the words together.  It's like doing a

2:49:56PM 25  puzzle or something, where you put the words in order and

REDIRECT OF AMANDA CDEBACA BY MR. SARMA      171

2:49:58PM 1  figure out what a sentence might be.

2:50:00PM 2       But when a user looks at his own screen, he doesn't see

2:50:03PM 3  that; does he?

2:50:05PM 4  A.   Not to my knowledge.

2:50:06PM 5  Q.   So, there would be no way for the user to know that

2:50:09PM 6  messages were scrambled?

2:50:13PM 7  A.   I don't know.

2:50:23PM 8           MR. ROBBINS:  I have no other questions, Your

2:50:24PM 9  Honor.

2:50:25PM10           THE COURT:  Okay.

2:50:26PM11           MR. ROBBINS:  Thank you.

2:50:28PM12           MR. SARMA:  Just very -- I know we're at 2:50.  We

2:50:30PM13  promised the jury 3 o'clock.

2:50:32PM14           THE COURT:  And when a lawyer says one question,

2:50:34PM15  it's never one question.

2:50:35PM16           [Laughter.]

2:50:36PM17           MR. SARMA:  I'll try my best.

2:50:38PM18                    REDIRECT EXAMINATION

2:50:39PM19  BY MR. SARMA:

2:50:40PM20  Q.   When the message, in that report, when the message was

2:50:43PM21  scrambled, was it also marked as deleted?

2:50:46PM22  A.   It was.

2:50:48PM23  Q.   And did you observe the messages actually on the

2:50:53PM24  physical phone, or did you just review the extraction?

2:50:55PM25  A.   I reviewed the extraction.

REDIRECT OF AMANDA CDEBACA BY MR. SARMA      172

2:50:57PM  1   Q.    So you don't know how they appeared on the phone?
2:51:00PM  2   A.    I do not.
2:51:01PM  3               MR. SARMA:  More than one question.
2:51:02PM  4               THE COURT:  Anything else?
2:51:05PM  5               MR. ROBBINS:  I'll leave well enough alone, Your
2:51:07PM  6   Honor.
2:51:07PM  7               THE COURT:  Okay.  All right.  Very good.
2:51:08PM  8               Thank you so much, Special Agent, you may step
2:51:09PM  9   down.
2:51:13PM 10               THE WITNESS:  All right.  Thank you.
2:51:13PM 11               THE COURT:  You're done.  You're free to go.  Thank
2:51:16PM 12   you so much.
2:51:17PM 13               All right, Ladies and Gentlemen, it's that time.
2:51:18PM 14   You get nine extra minutes because the attorneys have been so
2:51:21PM 15   efficient.
2:51:23PM 16               So, we'll be back here to start promptly, yep.
2:51:26PM 17   Leave everything on your chairs.  You can put them in your
2:51:30PM 18   folders.  I would keep the -- do you all need the transcripts
2:51:33PM 19   anymore?
2:51:35PM 20               MS. McKOY:  No, Your Honor.
2:51:36PM 21               THE COURT:  Then why don't we collect them?
2:51:38PM 22               MS. McKOY:  Sounds good.
2:51:39PM 23               THE COURT:  That way you guys don't have lots and
2:51:41PM 24   lots of paper floating around that you don't need.
2:51:43PM 25               We will start up again, promptly, 8:45.  So if you

2:51:47PM 1    are here in the morning, bright and early ready to go, that

2:51:51PM 2    would be great.

2:51:51PM 3         Yep, if you just want to leave -- I would say the

2:51:56PM 4    two back rows, if you would just pass your transcripts down

2:51:59PM 5    and give them to Mr. Gurovich, that would be great.

2:52:15PM 6         Okay.  Really important.  In addition to getting

2:52:17PM 7    home safely is:  No talking, no texting, no Internetting, no

2:52:19PM 8    Facebooking, no communicating about the case at all.  Enjoy

2:52:22PM 9    your night.  And get some rest.  We'll see you in the

2:52:26PM10    morning.  Thank you so much.

2:52:29PM11         (The jury left the courtroom at 2:52 p.m., and the

2:52:29PM12         following proceedings were had out of the presence of

2:52:29PM13         the jury.)

2:53:06PM14         THE COURT:  All right.  Counsel, nice job moving it

2:53:07PM15    along in the afternoon.  I very much appreciate it.

2:53:09PM16    Ms. McCoy, you did a great job.

2:53:12PM17         And if you-all can have a seat.

2:53:14PM18         I asked Dennis if he would check with Juror Number

2:53:18PM19    6, I think it is who had the medical appointment to see if

2:53:21PM20    it's possible since we're going from 8:45 to 3:00, if she

2:53:25PM21    could move the appointment to an afternoon.  We'll see when

2:53:29PM22    he gets back if that will work.  That's all I had to tell you

2:53:34PM23    about.

2:53:36PM24         Hey, Dennis, did Juror Number 6 say anything about

2:53:39PM25    her appointment?

2:53:41PM 1          THE CLERK:  Yes.  She -- Juror Number 6 is going to

2:53:46PM 2    contact the doctor's office to try to change the appointment.

2:53:50PM 3    She said she was well aware that she might have to do it, and

2:53:53PM 4    she'll let me know tomorrow morning.

2:53:55PM 5          THE COURT:  Great.  Okay.  So we may get lucky and

2:53:56PM 6    be able to have a full day on Monday.

2:53:58PM 7          MR. ROBBINS:  And I did follow up yesterday, Your

2:53:59PM 8    Honor.  And there's too many people in the air.

2:54:02PM 9          THE COURT:  That's what I figured.  It's too many

2:54:04PM10    moving parts.  I appreciate you checking.

2:54:07PM11          MR. ROBBINS:  If you remember the way we ended up

2:54:09PM12    on that day is we had a tremendous problem coming up with a

2:54:12PM13    day that everybody --

2:54:13PM14          THE COURT:  Yes, I did.  And I made you all do it,

2:54:15PM15    so I'm not going to make you undo it.  That's for sure.

2:54:18PM16          Okay.  Anybody need anything before we break?

2:54:21PM17          MR. SARMA:  Just one other issue, Your Honor.

2:54:23PM18          I noticed that, I think it's Alternate Juror 1, in

2:54:27PM19    her right ear, it's harder for me to see.  It looks like she

2:54:31PM20    might have like an AirPod in there.  It might be a hearing

2:54:34PM21    aid, it might be an AirPod.  I'm just not sure.  I want to

2:54:36PM22    make sure that there's no...

2:54:37PM23          THE COURT:  Okay.  In the right ear of Alternate 1?

2:54:39PM24          MR. SARMA:  The ear away from us.

2:54:41PM25          MR. ROBBINS:  She was wearing that yesterday during

2:54:42PM 1  voir dire in the jury room.  I saw it, as well.  I just

2:54:46PM 2  assumed it was a hearing aid.

2:54:48PM 3          THE COURT:  Yeah, I didn't see anything that looked

2:54:50PM 4  like -- okay.  We will have Mr. Gurovich look in the morning.

2:54:53PM 5          If you would look and see if it is something that

2:55:00PM 6  is causing concern.  Thanks.

2:55:03PM 7          THE CLERK:  Yes, Your Honor.

2:55:04PM 8          THE COURT:  Thank you for bringing it to our

2:55:05PM 9  attention.  Okay.  Anything else?

2:55:07PM10          MR. SARMA:  Nothing from the Government.

2:55:08PM11          MR. ROBBINS:  Nothing from the defense, Your Honor.

2:55:10PM12          THE COURT:  All right.  See you bright and early.

2:55:11PM13  Thank you so much.

2:55:12PM14          THE CLERK:  All rise.  This honorable court now

2:55:12PM15  stands in recess.

2:55:12PM16          (Court recessed for the day at 2:55 p.m. and

2:55:12PM17  reconvened on August 9, 2024, at 8:47 a.m.)

2:55:12PM18                      End of Volume 1

2:55:12PM19          Transcript continues in Volume 2 at Page 176

2:55:12PM20

21

22

23

24

25