IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
        Plaintiff,               )
                                )
                                )Docket Number
            vs.                  )8:22-cr-109
                                )
LAMBERT MBOM,                    )
                                )
        Defendant.               )
_____)

TRANSCRIPT OF JURY TRIAL - VOLUME 2
BEFORE THE HONORABLE PAULA XINIS
UNITED STATES DISTRICT COURT JUDGE
WEDNESDAY, AUGUST 9, 2023 AT 8:47 A.M.

APPEARANCES:

On Behalf of the Plaintiff:

        CHRISTOPHER M. SARMA, ESQ.
        U.S. Attorneys' Office
        6406 Ivy Lane, 8th Floor
        Greenbelt, MD 20770
        301-344-4431
and
        JESSICA CAROLINE COLLINS, ESQ.
        MEGAN SAMANTHA McKOY, ESQ.
        U.S. Attorneys' Office
        6500 Cherrywood Lane, Suite 200
        Greenbelt, MD 20770
        301-344-4516


On Behalf of the Defendant:

        G. ARTHUR ROBBINS, ESQ.
        Chesapeake Meridian
        1997 Annapolis Exchange Pkwy, Suite 300
        Annapolis, MD 21401
        443-454-7675

    KATHY CORTOPASSI, RDR, CRR, CRC - Official Court Reporter
        United States District Court, Greenbelt, Maryland

I N D E X

GOVERNMENT'S CASE IN CHIEF ----------------------------

WITNESS:                                          PAGE

FRANCIS SENESIE

 Direct Examination by Ms. Collins                 180

 Cross-Examination by Mr. Robbins                  224

 Redirect Examination by Ms. Collins               235


DONALD SHEARER

 Direct Examination by Ms. McKoy                   243

 Cross-Examination by Mr. Robbins                  257

 Redirect Examination by Ms. McKoy                 262


DOMINIC FORKA

 Direct Examination by Mr. Sarma                   263

 Cross-Examination by Mr. Robbins                  292

 Redirect Examination by Mr. Sarma                 297


JOSHUA ROBINSON

 Direct Examination by Mr. Sarma                   303

 Cross-Examination by Mr. Robbins                  311

I N D E X (Continued)

GOVERNMENT'S CASE IN CHIEF ----------------------------

WITNESS:                                              PAGE

VICTORIA MARGOLIS

 Direct Examination by Ms. Collins                311

 Cross-Examination by Mr. Robbins                 362


JOHANNA YEE

 Direct Examination by Mr. Sarma                  366

    ****PLEASE NOTE:  PLEASE CHECK THE COURT DOCKET FOR THE

       OFFICIAL RECORD OF ALL EXHIBITS RECEIVED.***

THE COURT:  Good morning, everybody.  You-all can have a seat.

Call the case.

MR. SARMA:  The case is United States versus Lambert Mbom, PX22-109.  Christopher Sarma on behalf of the United States of America.  Joined at counsel's table by Jessica Collins, Megan McCoy, as well as FBI Special Agent Jim Moran.  We're here for the third day of jury trial.

THE COURT:  Okay.  Thank you.

Mr. Robbins?

MR. ROBBINS:  Good morning, Your Honor.  Gar Robbins on behalf of Mr. Mbom, who is here with me.

THE COURT:  Good morning to you all.  Are we ready for the jury?

MR. SARMA:  Yes.  We are.

THE COURT:  Okay.

(The jury came back into the courtroom at 8:49 a.m., and the following proceedings were had in the presence of the jury.)

THE COURT:  All right.  Good morning, everyone.

You-all can have a seat.  I really appreciate not only your promptness, but you're very sunny for this early in the morning.  So, thank you for all those nice good mornings and smiles.

1           Okay.  Jurors 10 and 11, are your -- is your

2    monitor working?

3           JUROR:  Yes, it is.

4           THE COURT:  All right.  Good.

5           Government, you can call your next witness.

6           MS. COLLINS:  Thank you, Your Honor.  The

7    Government calls Francis Senesie.

8           THE COURT:  Okay.

9           THE CLERK:  Remain standing and raise your right

10   hand for me, please.  Sir, if you will remain standing.

11                      FRANCIS SENESIE

12   having been called as a witness and having been duly sworn,

13   was examined and testified as follows:

14          THE CLERK:  You may be seated.

15          THE WITNESS:  Thank you.

16          THE CLERK:  And while speaking clearly into the

17   microphone, can you please state your name and spell your

18   last name for the record.

19          THE WITNESS:  Francis.  Last name is,

20   S-E-N-E-S-I-E.

21          THE CLERK:  Thank you.

22                     DIRECT EXAMINATION

23   BY MS. COLLINS:

24   Q.   Mr. Senesie, what city and state do you live in?

25   A.   Maryland, Prince George's County.

DIRECT OF FRANCIS SENESIE BY MS. COLLINS      181

1    Q.    How long have you lived in Maryland?

2    A.    The last 12 years.

3    Q.    How old are you?

4    A.    I'm 42.

5    Q.    Have you pled guilty to a federal crime?

6    A.    Yes.

7    Q.    What did you plead guilty to?

8    A.    Conspiracy to fraud, Medicaid.

9    Q.    And can you explain briefly in your own words what it is

10   that you did.

11   A.    We organized a scheme to commit Medicaid fraud.

12   Q.    And can you describe what it is that you did when you

13   executed that scheme?

14   A.    For a start, I was a patient finder with Holy Health.

15   And apparently it turned out I brought in some CSWs that

16   myself, the owner, who is Bakari, and every other parties

17   involved, including the chief administrator, which is

18   Mr. Lambert and wife, Eugenie Bakari, so the CSWs, myself,

19   and another guy named Jouvet Forbang, we're documenting

20   fraudulently for services that never occurred on clients.

21   Q.    And you mentioned the term CSW.  Is that short for

22   Community Support Worker?

23   A.    Yes, Ma'am.

24   Q.    What agency were you associated with when you did this?

25   A.    Holy Health.

1   Q.   And what courthouse did you plead guilty?

2   A.   Here.

3   Q.   Why did you plead guilty?

4   A.   Because I was part of it, because I was part of that

5   scheme that got revealed or we got caught.  And I was a part

6   of it, which I regret.  And that was the reason why.  And

7   with the overwhelming evidence that was present, so I had to

8   take responsibility for my own actions.

9   Q.   Have you been sentenced in that case?

10  A.   No, Ma'am.

11  Q.   As part of that plea, did you enter into an agreement to

12  cooperate with the Government?

13  A.   Yes.

14  Q.   What did that agreement require you to do?

15  A.   To speak the truth and nothing but the truth.

16  Q.   What do you hope will happen if you cooperate with the

17  Government?

18  A.   I'm not sure.  It is up to the judge.  My fate lies in

19  the high.

20  Q.   What do you hope will happen?

21  A.   That I get a less -- a lesser sentence or -- yeah.

22  Q.   What, if any, promises has the Government made to you

23  about what sentence you will receive?

24  A.   No promises.

25  Q.   And what is your understanding as to what would happen

1   if you did not tell the truth?

2   A.   That I would have a stiff or a harder sentence.

3   Q.   Ultimately who will decide your sentence in this case?

4   A.   Yes, Ma'am.

5   Q.   Sorry.

6        Ultimately who will decide your sentence in this case?

7   A.   No, no, but the judge.

8   Q.   Now, you mentioned Holy Health.  What type of agency was

9   Holy Health?

10  A.   It was a health care agency that provided mental health

11  services for clients dealing with psychosis or -- yeah,

12  generally mental health.

13  Q.   Who was the owner of Holy Health?

14  A.   Julius Bakari.

15  Q.   Approximately, when did you first begin working at Holy

16  Health?

17  A.   It was around February of 2021.

18  Q.   How did you first come to work there?

19  A.   It was a friend of mine that shared with me about Holy

20  Health.

21  Q.   What was that friend's name?

22  A.   Rawlings.  And what's the guy?  Yeah, Rawlings.

23  Q.   And what did you do after Rawlings shared with you about

24  Holy Health?

25  A.   So I walked in and we started -- I started the

DIRECT OF FRANCIS SENESIE BY MS. COLLINS      184

1   conversation with Mr. Mbom in his office.

2   Q.   What was Mr. Mbom's full name?

3   A.   Lambert, Lambert Mbom.

4   Q.   Do you see Mr. Mbom here in the courtroom today?

5   A.   Yes, Ma'am.

6   Q.   Can you identify him by an article of clothing?

7   A.   Yes, Ma'am.  He's sitting on my right-hand side.

8   Q.   Sorry.  Can you identify him by an article of clothing?

9          MR. ROBBINS:  We'll stipulate to identity, Your

10  Honor.

11         THE COURT:  All right.  Mr. Mbom is sitting next to

12  Mr. Robbins.  Go ahead.

13  BY MS. COLLINS:

14  Q.   What was your understanding of Mr. Mbom's role at Holy

15  Health?

16  A.   He was the chief administrator, oversee the day-to-day

17  operations of the agency.

18  Q.   Did you know Mr. Mbom before you began working at Holy

19  Health?

20  A.   Yes, but we -- I have heard about him, but we've never

21  met in person.

22  Q.   And how had you been familiar with him?

23  A.   It was through my wife's older sister.  I think they

24  were all friends back home in Cameroon.

25  Q.   Now, where was the Holy Health office that you walked

1   into?

2   A.    On North Capitol Street NW.

3   Q.    What did you discuss during this initial meeting with

4   Mr. Mbom at the North Capitol Street office?

5   A.    We discussed about me being a patient finder, you know,

6   go to the community and market the agency.

7   Q.    And when you say go to the community and market the

8   agency, can you explain what you mean by that?

9   A.    So, I go into the community, and those -- I visit

10  shelters, 7-Eleven locations, and other places where homeless

11  folks are hanging around.  I would talk to them about mental

12  health services and that Holy Health will provide medication

13  management, therapy, and what have you for them.

14  Q.    What, if anything, did you discuss with Mr. Mbom

15  regarding potential pay for this work as a patient finder?

16  A.    That one patient would be paid $50 up front and upon the

17  patient staying with the program, will be paid $30 monthly.

18  Q.    What happened after this initial discussion with

19  Mr. Mbom?

20  A.    The conversation got communicated with Mr. Bakari, who

21  was the owner of the agency.

22  Q.    When you say the conversation was communicated with

23  Mr. Bakari, what do you mean by that?

24  A.    So, yeah, the initial -- the initial conversation I had

25  with Mr. Mbom, you know, it cannot -- you know, he cannot

1   approve that since he's not the owner of the program.

2   However, Mr. Bakari needed to do a final approval on the

3   agreement.

4   Q.   And so after that initial meeting with Mr. Mbom, did you

5   then have a followup meeting with Mr. Bakari?

6   A.   Yes.

7   Q.   Approximately when was that?

8   A.   It was around the same period.

9   Q.   And who was present for that meeting?

10  A.   Myself, Mr. Bakari, and I think Jouvet Forbang, and the

11  wife.  The wife.

12  Q.   When you say "the wife," who are you talking about?

13  A.   Eugenie.

14  Q.   And whose wife is that?

15  A.   Bakari's.

16  Q.   What did you understand was Eugenie's role at Holy

17  Health?

18  A.   She was a co-owner of the program.

19  Q.   You also mentioned Jouvet Forbang.  Who was Jouvet

20  Forbang?

21  A.   Jouvet Forbang was my co-worker in that same manner.

22  Q.   And so can you explain what you mean by your co-worker?

23  A.   Yeah, he also was a patient finder.  So, both of us got

24  the same agreement, the same deal, if you like.

25  Q.   And what agreement was reached during that followup

1    meeting with Mr. Bakari, Mr. Mbom, Ms. Bakari, and

2    Mr. Forbang?

3    A.    That we go into the community and market the program,

4    bring in patients.

5    Q.    So did you then begin working at Holy Health as a

6    patient finder?

7    A.    Yes, Ma'am.

8    Q.    And where did you go to find patients?

9    A.    Into the communities out southwest, northeast, those

10   shelters.

11   Q.    And why were shelters and locations like that attractive

12   places to find clients?

13   A.    Because ideally those are the locations we could find

14   homeless patients that are dealing with mental health issues.

15   Q.    Now, had you previously worked for any other agencies

16   before Holy Health?

17   A.    Yes.

18   Q.    In what position?

19   A.    As a CSW, Community Support Worker.

20   Q.    So, when you were acting as a patient finder, were you

21   only finding new patients out in the community, or were you

22   also bringing people you had worked with before at other

23   agencies?

24   A.    I was bringing the previous patients I have worked with

25   and also new ones.

1   Q.   Now, were there any requirements as to the type of

2   insurance a person had to have in order to become a client at

3   Holy Health?

4   A.   Yes.  You have to have D.C. Medicaid.

5   Q.   So what did you offer to potential clients to convince

6   them to come to Holy Health?

7   A.   Sometimes we'll give them incentives like $5, $10, $20.

8   Sometimes we'll buy them food, McDonald's, yes.

9   Q.   And once you identify that particular client, how did

10  that person get to Holy Health?

11  A.   I would transport them in my car.

12  Q.   So when you brought the client to Holy Health's office,

13  what did you do while the client was in the office?

14  A.   I would hang around the lobby or the conference room,

15  you know, while they are being processed.  They would do

16  their intake.

17  Q.   Did you observe anything about payments to clients while

18  you were hanging around Holy Health's offices?

19  A.   Yes.  At some point.

20  Q.   What did you observe?

21  A.   When we -- when I got in -- somewhat down the line, I

22  started observing that every Friday's clients would line up

23  in the lobby and they will be given, they will be given

24  money, $15, $20 in the lobby, yes.

25  Q.   Who generally handed out that money?

1  A.   It was Jane, who was the front desk person, and also

2  sometimes I would see the wife, Ms. Bakari.

3  Q.   That's Eugenie Bakari?

4  A.   Yes.

5  Q.   Were you able to observe whether these people had met

6  with a provider before receiving payment?

7  A.   Sometimes no.  But just the fact that they attended

8  appointment that Friday, so they will be given those money.

9  Q.   Sorry.  When you say just because they attended an

10  appointment that Friday they will be given money, can you

11  explain what you mean?

12  A.   They come in on the pretext of attending therapy or

13  counseling sessions and oftentimes you don't see that

14  happening, but they will be issued $10 or $15.

15  Q.   Was Mr. Mbom in the office on some of the days that you

16  observed these payments?

17  A.   Yes.  Sometimes he's around.  But I never saw -- I never

18  saw him, you know, issue any money to the client.

19  Q.   You mean you never saw him issue that money directly?

20  A.   Yes.

21  Q.   Now, as part of your pitch to potential clients out in

22  the community, what, if anything, did you say regarding the

23  money that Holy Health was paying?

24  A.   Yeah.  So when I started observing that every Fridays,

25  you know, they would issue their money, so when I go into the

1  community, that would be part of my pitch, that, "Hey, Holy

2  Health, you know, is providing reimburses on Fridays.  You

3  could be beneficial to that, as well."  So that was part of

4  the pitch.

5  Q.   Now, after you brought a client to Holy Health's office,

6  how did that person get back to where they come from?

7  A.   Sometimes I would transport them back to their location

8  or the agency's van, there was a driver that would sometimes

9  transport them back.

10  Q.   What transportation, if any, was offered to clients for

11  later visits to the office?

12  A.   Repeat that again?

13  Q.   Did you always transport patients when they came back to

14  the office for subsequent visits?

15  A.   Sometimes.

16  Q.   And if you didn't transport them, was there

17  transportation offered by Holy Health?

18  A.   Yes, the driver.

19  Q.   Of the van?

20  A.   Yes.

21  Q.   Now, at some point after you started working as a

22  patient finder, did the type of work you were doing for Holy

23  Health change?

24  A.   Yes, it changed eventually, yes.

25  Q.   And approximately how long after you started did it

1   change?

2   A.   Probably like after three weeks.

3   Q.   What happened that led to it changing?

4   A.   What I was promised, you know, being a patient finder,

5   Mr. Bakari didn't come through on it in terms of my payment.

6   He didn't come through on it.

7   Q.   So, when Mr. Bakari didn't come through on the payment

8   as a patient finder, what happened after that?

9   A.   And so himself and the wife, Eugenie, asked that they

10  have quite a number of patients in the system, so we can

11  bring in more workers, or CSWs, or, rather, fake CSWs that

12  they would get hired and we will use their accounts to

13  document on the clients that were in the system, or that were

14  in the ICMS system.

15  Q.   Who was going to be bringing in these fake CSWs?

16  A.   Myself and Jouvet Forbang.

17  Q.   And when you call them "fake CSWs," can you explain what

18  you mean by that?

19  A.   What that means is they were not actually doing the

20  work; rather, we were documenting on their behalf for the

21  clients.

22  Q.   You said "we were documenting on their behalf."  Who was

23  it that was documenting on the fake CSWs?

24  A.   Myself and Jouvet.

25  Q.   Was there a particular conversation that took place

1    where you first discussed this new arrangement?

2    A.    Repeat that again.

3    Q.    Was there a particular conversation with Mr. Bakari and

4    Mrs. Bakari where you first discussed this new arrangement?

5    A.    Yes.

6    Q.    Where did that conversation take place?

7    A.    It wasn't in one location.  We were meeting somewhere in

8    Silver Spring around Hyattsville by pijimo (ph.).  There was

9    a spot there, you know, we were hanging out sometimes.

10   Q.    And who was present for those meetings?

11   A.    The beginning, it was myself, Bakari, and later on, the

12   information trickled down to Mr. Lambert, Mr. Mbom, him being

13   the administrator.  And he was part of the -- he was -- he

14   was part of the onboarding, bringing in -- the onboarding

15   process of the CSWs.

16   Q.    So after you had this initial discussion with Mr. Bakari

17   and Mrs. Bakari, did you have a subsequent meeting with

18   Mr. Mbom?

19   A.    Yes, we were meeting often in the office.

20   Q.    That's the North Capitol office?

21   A.    Yes, Ma'am.

22   Q.    And who was present for those meetings involving

23   Mr. Mbom?

24   A.    Mostly myself and Jouvet.

25   Q.    And what was discussed during those meetings?

DIRECT OF FRANCIS SENESIE BY MS. COLLINS     193

1   A.    The onboarding process of bringing in the CSWs and he

2   would get their paperwork and create their log-ins.

3   Q.    You said "create their long-ins."  Was there a

4   particular system in which you were going to be entering the

5   notes under the names of these fake CSWs?

6   A.    Yes.

7   Q.    What was that system?

8   A.    The ICMS system.

9   Q.    And so who created the log-ins for the fake CSWs in the

10  ICMS system?

11  A.    Mbom, Mr. -- yes.  Lambert Mbom.

12  Q.    Who had access to the accounts, the ICMS accounts of

13  these fake CSWs?

14  A.    We did.  Myself and Jouvet.

15  Q.    How did you get the log-in information?

16  A.    We get those log-ins from Mr. Lambert.

17  Q.    During these meetings with Mr. Mbom, what, if anything,

18  did you discuss regarding who would actually be putting in

19  the notes for -- under the names of these CSWs?

20  A.    Repeat that again.

21  Q.    During these meetings with Mr. Mbom, what, if anything,

22  did you discuss about who would actually be putting in the

23  notes under the names of these fake CSWs?

24  A.    Myself and Jouvet.

25  Q.    Now, since you were writing the notes under the names of

1  these CSWs, how did you know what to enter?

2  A.   Because we have done, you know, the job ourselves as

3  CSWs.  And we know what the notes should look like and what

4  should be put in.

5  Q.   Now, did the notes you were entering reflect services

6  that had actually occurred?

7  A.   No.

8  Q.   At some point, did you also have a meeting at a

9  restaurant regarding this work that you were doing for Holy

10  Health?

11  A.   Yes.

12  Q.   And specifically what restaurant did this take place in?

13  A.   It -- they call it Zuri's, Zuri's Bistro.  It's on

14  Georgia Avenue.

15  Q.   And who was at that meeting?

16  A.   Mr. Lambert was there, myself, Jouvet, and Bakari.

17  Q.   And what did you discuss during that meeting at Zuri

18  Bistro?

19  A.   Just the processes of, you know, what we were doing.

20  Q.   Can you explain what you mean by "the processes"?

21  A.   Just the day-to-day operations.  I mean, the CSWs, the

22  clients, the treatment plans, treatment plans that were

23  expiring.  And we discuss about, you know, the names of those

24  clients that need a treatment plan update.

25  Q.   What was the significance of treatment plan updates?

1  A.   So, the treatment plan drives the services.  And without
2  the treatment plan, you don't get authorization from DBH.
3  DBH is the Department of Health.  You don't get
4  authorization.  And without authorization, services that have
5  been put on a client will not be paid.
6  Q.   And once you began writing these fake CSW notes, how
7  were you paid?
8  A.   Through check.
9  Q.   And who were these checks written out to?
10 A.   Myself and Jouvet.
11 Q.   How was your pay determined?
12 A.   By the number of notes that were put in the system
13 biweekly.
14 Q.   And how much were you supposed to be paid per note?
15 A.   $35.
16 Q.   Now, where were you when you entered these fake notes?
17 A.   Different locations.  Sometimes at my house, sometimes
18 around D.C., yes.
19 Q.   And that was your house in Prince George's County,
20 Maryland?
21 A.   Yes, Ma'am.
22 Q.   What system were you entering these notes into?
23 A.   The ICMS system.
24 Q.   Now, once you began entering the fake notes into the
25 ICMS system, how did you know what consumers to enter notes

1    for?

2    A.    Those with updated treatment plans and with

3    authorizations.

4    Q.    So if a consumer had an updated treatment plan and

5    authorization, was there any limitation on your ability to

6    enter a note for them?

7    A.    No.

8    Q.    And how were you able to determine whether a consumer

9    had an updated treatment plan and authorization?

10   A.    By checking their profile.

11   Q.    And where is the profile located?

12   A.    It's on ICMS.  The ICMS system.

13   Q.    So I'm going to show you what's been marked as

14   Government's Exhibit I126.  And do you recognize what sort of

15   document this is?

16   A.    Yes.

17   Q.    What is it?

18   A.    It's a CSW note.

19   Q.    So just zooming in at the top, do you see that the

20   consumer name here is Darlene Williams?

21   A.    Yes, Ma'am.

22   Q.    And the date on this particular note is March 18, 2021?

23   A.    Yes, Ma'am.

24   Q.    The staff name is listed as Melanie Teche, do you see

25   that?

1   A.   Yes, Ma'am.

2   Q.   Who is Melanie Teche?

3   A.   She was one of the fake CSWs.

4   Q.   Do you see that the signed date here is March 19, 2021

5   at 2:19 a.m.?

6   A.   Yes, Ma'am.

7   Q.   Who actually wrote this note?

8   A.   Myself.

9   Q.   And did the services that are documented in this note

10  actually take place?

11  A.   No.

12  Q.   The number of units listed here is five.  Why did you

13  document this as five units?

14  A.   The units determine how much is paid.  And Bakari had --

15  you know, Bakari had asked us to be doing five units.

16  Q.   Let me now show you what's marked as Government's

17  Exhibit Number I129.  Is this another CSW note?

18  A.   Yes.  Yes, Ma'am.

19  Q.   Again -- zooming in at the top, again, is the consumer

20  name here, Darlene Williams?

21  A.   Yes, Ma'am.

22  Q.   And the staff name is Melanie Teche?

23  A.   Yes, Ma'am.

24  Q.   And this was signed -- and this is a note for March 25,

25  2021?

DIRECT OF FRANCIS SENESIE BY MS. COLLINS     198

1    A.    Yes.

2    Q.    And it was signed at March 26, 2021 at 4 a.m.?

3    A.    Yes.

4    Q.    Who actually entered this note?

5    A.    It was myself.

6    Q.    And did the services that are documented in this note

7    actually occur?

8    A.    No.

9    Q.    Now, showing you what's marked as Government's Exhibit

10   I146, and zooming in at the top here, is this another

11   CSW note from ICMS?

12   A.    Yes.

13   Q.    And is the consumer name that's listed here Arif Ahmed?

14   A.    Yes.

15   Q.    And the staff name is Zilefac Foretia?

16   A.    Yes.

17   Q.    Who is Zilefac Foretia?

18   A.    Also one of the CSWs, the fake CSWs.

19   Q.    The date of this note is February 26, 2021?

20   A.    Yes.

21   Q.    And who entered this note?

22   A.    It was my, me, myself.

23   Q.    Did the services that are documented in this note

24   actually take place?

25   A.    No.

DIRECT OF FRANCIS SENESIE BY MS. COLLINS      199

1   Q.   Now, showing you what's marked as Government's Exhibit
2   Number I152, is this another CSW note for Arif Ahmed?
3   A.   Yes.
4   Q.   And what's the staff name under which this note was
5   written?
6   A.   Shadrack Nakoba.
7   Q.   Who is Shadrack Nakoba?
8   A.   Another CSW.
9   Q.   And was Mr. Nakoba a real CSW or was he a fake CSW?
10  A.   A fakes CSW.
11  Q.   And was this note entered on March 30, 2021 at
12  1:12 a.m.?
13  A.   Yes.
14  Q.   Who actually entered this note?
15  A.   Myself.
16  Q.   And did the services that were documented in this note
17  actually occur?
18  A.   No.
19  Q.   Now, showing you Government's Exhibit Number I176.  Is
20  this another CSW note for the consumer Arif Ahmed?
21  A.   Yes.
22  Q.   And what is the staff name under which this note was
23  entered?
24  A.   Nanjeh, Etongwe.  Etongwe Nanjeh.
25  Q.   And who is Etongwe Nanjeh?

 1   A.   Was the other fake CSW.

 2   Q.   Do you see this was entered on August 25, 2021?

 3   A.   Yes.

 4   Q.   And the date of this note is August 24, 2021?

 5   A.   Yes.

 6   Q.   Who actually entered this note?

 7   A.   It was myself.

 8   Q.   And did the services that were documented in this note

 9   actually occur?

10   A.   No.

11   Q.   Now, if you look at the "Approved By" line, it refers to

12   a Wsoh1?

13   A.   Yes.

14   Q.   Who is Wsoh1?

15   A.   That's my wife.

16   Q.   What is your wife's name?

17   A.   Wendy Soh.

18   Q.   Why did your wife begin approving notes at Holy Health?

19   A.   Because Ms. Betty and Lambert, who were approving the

20   notes, Lambert was not sometimes frequent in the approving of

21   the notes.  So Mr. Bakari and Eugenie asked me to refer

22   people.  So I referred Ojong, who was also part of the

23   approving, and my wife.

24   Q.   You said that Mr. Mbom and Betty were not frequent in

25   approving notes.  What do you mean by "not frequent?"

1  A.   They were not -- yeah, that's what I mean.  They were

2  not -- sometimes the delay, yeah, sometimes they would delay

3  in their approving, like they were not frequent.  They were

4  not -- they were not with the schedule.  They were not

5  keeping up with the schedule.

6  Q.   It was delayed?

7  A.   Yes.  Yes.

8  Q.   Was your wife aware that you were actually the one who

9  was entering these notes?

10  A.   Yes.

11  Q.   Now, were there issues that arose when you began to

12  enter notes for consumers that were in the system but were

13  not actually being seen?

14  A.   Say that again.  Repeat that again.

15  Q.   Were there issues that arose when you began to enter

16  notes for consumers who weren't actually being seen?

17  A.   There were no issues, anyways.  There are no issues.

18  There are no issues.

19  Q.   Who were your primary contacts at Holy Health.

20  A.   Lambert.

21  Q.   Anyone else?

22  A.   Lambert.  It was really Lambert.  He was the chief

23  administrator, even though sometimes I would talk to Bakari

24  himself.  But he was primarily Lambert.

25  Q.   And you said you did sometimes speak with Mr. Bakari.

1  How did you typically communicate with Mr. Bakari?

2  A.   Sometimes on the phone, sometimes in person.

3  Q.   And when you communicated with him by phone, would you

4  text with him at times?

5  A.   Yeah, sometimes we text.

6  Q.   And was that using a particular program?

7  A.   No.

8  Q.   I'm going to show you what's marked as Government's

9  Exhibit B5.  Do you recognize the messages that are shown

10 here?

11 A.   Yes.

12 Q.   And just zooming in first at the top, there's a phone

13 number listed here that ends in 8558.  Do you recognize that

14 phone number?

15 A.   Yes.  That was the phone number I was using before.

16 Q.   Whose phone number is that?

17 A.   Myself.

18 Q.   Scrolling down, apologies, let me pull back up.

19      B5.   Zooming in at the bottom here, who are these

20 messages with?

21 A.   Julius Bakari.

22 Q.   So, looking in this message at the bottom that begins,

23 "Good evening, Julius," what is the date of this message?

24 A.   It is February 23, 2021.

25 Q.   And what sort of work were you doing for Holy Health at

1    the point where you were writing this message?

2    A.    That was the period when I was still -- that was the

3    period when I was a patient finder --

4    Q.    What --

5    A.    -- if I could recall.

6    Q.    Okay.  And what are you discussing during this message?

7    A.    That there were a bunch of treatment plans that needed

8    update.

9    Q.    Now, you referred to Treatment Plan Builders having been

10   completed in the system.  What system were you talking about

11   here?

12   A.    The ICMS system.

13   Q.    Why, as a patient finder, did you have access to the

14   ICMS system?

15   A.    What -- there was no -- there was no reason.  There was

16   no legitimate reason.  But I had it anyways because they

17   wanted me to be tracking patients that need treatment plan,

18   and also the patients that I was bringing in, to be able to

19   see their progress and also to determine my pay.

20   Q.    Now, were you ever an actual CSW at Holy Health?

21   A.    No.

22   Q.    So did you actually hold a position at Holy Health where

23   you were supposed to be entering notes into the ICMS system?

24   A.    No.

25   Q.    So, I'm now showing you what's marked as Exhibit B6.

1   And, again, do you see your phone number listed here?

2   A.    Yes.

3   Q.    And who are these messages with?

4   A.    Mr. Bakari.

5   Q.    Looking at this message that begins "Good afternoon

6   boss.  Julius" -- you write -- "wanted to share with Lambert

7   for help but he's busy."

8         Who is the Lambert you were referring to there?

9   A.    Mr. Mbom.

10  Q.    What was it that you wanted to share with Mr. Mbom?

11  A.    The same concern with treatment plans update.

12  Q.    And what was the importance of the treatment plans

13  update?

14  A.    Like I shared before, without the treatment plan, there

15  are no authorizations.  And without the authorizations, they

16  are not able to bill.

17  Q.    Sorry, to bill?

18  A.    Yes.

19  Q.    Now, scrolling to the next page in these messages and

20  looking near the bottom of the page, this message from you

21  refers to a Melanie Teche?

22  A.    Yes.

23  Q.    And is that the same fake CSW we just discussed?

24  A.    Yes.

25  Q.    So when it says, "Lambert opened her account two weeks

1  ago," what sort of account were you talking about?

2  A.    The ICMS account.

3  Q.    And above that it says, "Her account needs a password

4  reset so she can begin" -- "she can put notes on her

5  consumers."  And then it later says, "I was building her

6  caseload before starting to put notes," who was actually

7  putting notes on Ms. Teche's consumers?

8  A.    Myself.

9  Q.    What does it mean to build a caseload?

10  A.    Each CSW has to have, you know, a number of clients on

11  their caseload.  Roughly, 25, 30.

12  Q.    What's the importance of having clients on their

13  caseload?

14  A.    Because those -- those are the clients that you will be

15  documenting on.  You will be responsible for those clients.

16  Q.    Responsible for doing what for those clients?

17  A.    For documenting on them, putting fake notes on them.

18  Q.    Now, looking at the next message, is this from

19  Mr. Bakari?

20  A.    Yes.

21  Q.    And why was he sending you this information about

22  Melanie Teche and Amidu Kamara?

23  A.    That they were documenting on the clients, with Mr.

24  Jackson Ricardo.

25  Q.    Do you know why he was sending you this information?

1   A.    Because more than one CSW was documenting on one

2   patient.

3   Q.    What was the problem with more than one CSW documenting

4   on one patient?

5   A.    It was problematic for the Chapter 34 regulation of DBH.

6   Q.    Why would it be problematic under the regulations for

7   more than one CSW to be documented?

8   A.    Because that would -- that would be considered double

9   billing on one client.

10  Q.    Now, how frequently did this issue of double billing

11  arise when you were entering notes under the fake CSWs?

12  A.    Sometimes two or three times in the week.

13  Q.    And who would you typically communicate with about the

14  double billing issue?

15  A.    Sometimes Mr. Mbom.

16  Q.    And when you communicated with Mr. Mbom about double

17  billing, how was that issue typically resolved?

18  A.    It was never really resolved.  It kept going.  It kept

19  going.

20  Q.    So, scrolling down here, you write, "Melanie is my CSW,

21  I'll address it with her."  Why did you say you would address

22  it with her if you were the one entering the notes?

23  A.    Repeat the question again.

24  Q.    Why did you say you would address it with Melanie if you

25  were the one entering the notes?

1   A.   Well, yes.  So, to make it appear that -- to make it

2   appear that it was a legitimate business.

3   Q.   To make it appear to whom?

4   A.   Say that again.

5   Q.   To make it appear that it was a legitimate business to

6   who?

7   A.   To Bakari or Mr. Mbom, because we are all sending

8   messages, you know, and text messages back and forth.

9   Q.   And then below that it says, "Amidu is JSCSW."  Who is

10  J?

11  A.   It was Jouvet Forbang.

12  Q.   Now, at some point, did you know law enforcement had

13  taken some action with respect to Holy Health?

14  A.   Yes.

15  Q.   What did you learn had happened?

16  A.   It was raided by the FBI.

17  Q.   And how, if at all, did that change the work you were

18  doing at Holy Health?

19  A.   It didn't change.  Bakari and the other -- Bakari,

20  Mr. Mbom, myself, Jay, we didn't stop.  Mr. Bakari instructed

21  us to still continue the work, that nothing was going to

22  happen.  He got the situation.  Those were his encouragement.

23  Q.   And so after the FBI came in to Holy Health, who were

24  your primary contacts at Holy Health?

25  A.   Still Mr. Mbom.  Mr. Mbom, he was still the chief

1  administrator.  And sometimes I would still speak to

2  Mr. Bakari.

3  Q.    Now, once you began entering notes under the names of

4  the fake CSW, how frequently were you in communication with

5  Mr. Mbom?

6  A.    Every day.

7  Q.    How did you typically communicate with him?

8  A.    Sometimes with texts, through texts.  Sometimes we talk

9  on the phone.

10  Q.    So, I'm going to show you what's marked as Government's

11  Exhibit B37.  And zooming in at the top here, do you see your

12  phone number here again?

13  A.    Yes, Ma'am.

14  Q.    And who are these messages with?

15  A.    Mr. Lambert, Mr. Mbom.

16  Q.    And that's the number ending in 3212?

17  A.    Yes.

18  Q.    What's the date of the earliest message here?

19  A.    April 10, 2021.

20  Q.    So, scrolling down here in these messages, do you see

21  Mr. Mbom writes, "This case of Peaks Deavin and Nanje is

22  sending me nuts."?

23  A.    Yes.

24  Q.    What -- and who sent this message?

25  A.    To me?

1   Q.   And who sent it to you?

2   A.   Mr. Mbom.

3   Q.   Who is the Nanjeh who's referenced here?

4   A.   One of the fake CSW.

5   Q.   And who was Peaks Deavin?

6   A.   A client.

7   Q.   What was the issue with Peaks Deavin Anjeh?

8   A.   So Peaks Deavin, they were double billing on Peaks,

9   double billing on Peaks.

10  Q.   What do you mean "double billing"?

11  A.   More than one CSW were documenting on Peaks.

12  Q.   Now, Mr. Mbom writes, "All these lies Nanjeh puts and

13  they are approved do not make us serious.  I no want go to

14  prison."

15       What does this have to do with Mr. Mbom's concern about

16  going to prison?

17  A.   Rephrase that again?

18  Q.   What did you understand that the issue with Peaks Deavin

19  Anjeh had to do with Mr. Lambert being concerned about going

20  to prison?

21  A.   Yeah, because it was sending a red flag with DBH.

22  Q.   And then scrolling down, how do you respond?

23  A.   I asked him to check his WhatsApp.

24  Q.   So, now I'll show you what's marked as Government's

25  Exhibit B36.  And zooming in at the top here, who are these

1  messages between?

2  A.   Myself and Lambert.

3  Q.   What's the earliest date of the message listed here?

4  A.   It's February 3, 2021.

5  Q.   And just scrolling down, do you see the message that

6  says scrambled?

7  A.   Yes.

8  Q.   Are the words in this message in the same order as when

9  you initially wrote this message?

10  A.   No.

11  Q.   So, now just going to the last page of this exhibit,

12  page 125, what are the last messages from this particular

13  chain?

14  A.   Can you please zoom it?

15  Q.   Yeah.

16  A.   Excuse me.

17  Q.   When are the last messages from this chain?

18  A.   April 23, 2021.

19  Q.   Now, going to page 107 of this Exhibit, B36, we'll start

20  at the top of this page.  Do you see the message that's dated

21  April 18, 2021?

22  A.   Yes, Ma'am.

23  Q.   And who sent this message?

24  A.   Myself.

25  Q.   Why did you ask Mr. Mbom which consumer are you

1  switching for Deavin Peaks?

2  A.    So we can avoid the double billing on Deavin Peaks.

3  Q.    And what do you mean by which consumer are you

4  switching?

5  A.    So, he was going to replace Deavin Peaks with someone

6  else.

7  Q.    And was Deavin Peaks eventually switched with another

8  consumer?

9  A.    I really am not sure now.  I can't say.

10  Q.    So, scrolling down to the next message dated April 21,

11  2021, who sent this message?

12  A.    Lambert.

13  Q.    It refers to an MUI.  What is an MUI?

14  A.    It's a document that is prepared after an incident.

15  Q.    And this refers to a Romeo Ngassa.  Who is Romeo Ngassa?

16  A.    It was the other fake CSW.

17  Q.    So, who was actually entering the notes under Romeo

18  Ngassa's name?

19  A.    Myself.

20  Q.    Why do you understand that Mr. Mbom was telling you

21  about this issue with Romeo Ngassa?

22  A.    That this consumer was incarcerated.

23  Q.    And why did you understand Mr. Mbom was telling you

24  about this issue?

25  A.    Because the consumer would not be incarcerated and notes

1   or documentations occurring on.

2   Q.   So, scrolling down, does Mr. Mbom then send you the name

3   of the consumer this is occurring for?

4   A.   Yes, yes.

5   Q.   And he then writes, "Ms. Betty will call Romeo to

6   investigate how this happened."  Do you see that?

7   A.   Yes.

8   Q.   And why did you understand Mr. Mbom was telling you that

9   Ms. Betty was going to call Romeo?

10  A.   To give me a prior notice so I can talk to Romeo, the --

11  to fix the CSW question, to kind of prep him what to say or

12  how to deal with the situation with Ms. Betty.

13  Q.   So, continue scrolling down through these messages to

14  Page 114.  And do you see Mr. Mbom writes, "Let's concentrate

15  on that," at the top of this page?

16  A.   Yes.

17  Q.   And you, then, respond.  And in your response you say,

18  "I'll talk to Julius today.  I'm pulling all my CSWs from

19  that lion's den."  What did you mean by that?

20  A.   Because of Ms. Betty and the other -- yes, literally

21  because of Ms. Betty, the way her approach and, you know, the

22  way she was treating the issues, the issues around the CSWs.

23  Q.   What do you mean by that?

24  A.   She was not accommodating, if you like.

25  Q.   So, scrolling down, how did Mr. Mbom respond to your

1    threat to pull all of your CSW from Holy Health?

2    A.   That I will advise you not to.

3    Q.   And then looking at the next message from you, why did

4    you say, "They are the ones making the most income for Julius

5    and his family"?

6    A.   Yes.  Just as it is.  They were the one, we're using

7    their accounts, you know, to document so Julius Bakari can

8    get paid.

9    Q.   Scrolling down again, your next message refers to "J and

10   I team."  What is J and I team?

11   A.   It was Jouvet and myself.

12   Q.   And then at the next message you say, "They themselves

13   are not innocent, not even close."  Who are you talking

14   about?

15   A.   The rest of the CSWs that were initially working there,

16   that the Holy Health -- yes, the initial CSWs that were

17   working there themselves.

18   Q.   Why did you say that?

19   A.   Just because of what was happening.  Every Friday, you

20   know, clients would line up in the lobby for reimburses.  And

21   that in itself was not right.  But everybody was part of it.

22   Q.   And how did Mr. Mbom respond?

23   A.   "Well, Francis, I don't know what you are talking

24   about."

25   Q.   Why do you understand he responded that way?

1  A.   Because in one or two instances, he had cautioned, you

2  know, how to design your messages that you have to be careful

3  how to send text -- yeah, you know, how to communicate via

4  text messages because --

5  Q.   Were you --

6  A.   -- it can implicate you in the future.

7  Q.   Were you worried about someone reading your text

8  messages?

9  A.   Say that again.

10  Q.   Were you worried about someone reading your text

11  messages?

12  A.   Yes.

13  Q.   Who?

14  A.   Law enforcement.

15  Q.   So, then scrolling down to the top of Page 117, at the

16  message from Mr. Mbom, what did you understand he was

17  referring to when he said, "Why will your CSWs be putting

18  notes on other people's consumers?"

19  A.   My understanding is that some of the older CSWs that

20  were working there were bringing these issues, you know, to

21  him, that their consumers or their clients were being

22  documented on.

23  Q.   Documented on by whom?

24  A.   By the fake CSWs.

25  Q.   And then it says, "Why would they not attend meetings?"

DIRECT OF FRANCIS SENESIE BY MS. COLLINS          215

1  Were there -- were you aware that there were CSW meetings at
2  Holy Health?
3  A.    Yes, sometimes.
4  Q.    And did the fake CSWs always attend those meetings?
5  A.    Not always.
6  Q.    And then below that it says, "Why will they not sign on
7  to pick up their checks?"  Who were the checks addressed to
8  that were paying you for the fake notes?
9  A.    They were addressed to me.  Myself and J, or Jouvet.
10 Q.    In the next message you say, "You can go ahead and
11 disable all of their accounts."  Whose accounts were you
12 telling Mr. Mbom to disable?
13 A.    The fake CSWs.
14 Q.    And their accounts in what system?
15 A.    ICMS system.
16 Q.    So, scrolling down to the next page, how did Mr. Mbom
17 respond to your statement that he could disable the fake CSW
18 accounts?
19 A.    That I don't disable accounts while investigations are
20 ongoing.
21 Q.    And what investigations did you understand he was
22 referring to?
23 A.    The law enforcement, FBI.
24 Q.    Now, scrolling down again through these messages, the
25 bottom of Page 119, you say, "Can you please replace Romeo's

1  account with another CSW?"  Do you see that?

2  A.    Yes.

3  Q.    And then later you say, "When these kind of things

4  happen, DBH wants that CSW gone.  Do I understand?"

5  A.    Yes.

6  Q.    What kind of things were you talking about?

7  A.    When, you know, a client -- like just the one we shared

8  with Mr. Staton, Jesse Staton that was incarcerated, and

9  documentations were occurring, with those instances, yes, the

10 CSW has to be gone.

11 Q.    Now, going to the next page, Page 121, you ask, "Is

12 there another meeting today?"  And Mr. Mbom says, "Meeting is

13 on."  Do you see that?

14 A.    Yes.

15 Q.    What sort of meeting were you referring to?

16 A.    The weekly meeting about the day-to-day operations of

17 the program.

18 Q.    And who was supposed to be part of that meeting?

19 A.    The CSWs.

20 Q.    I'm now going to show you what's marked as Government's

21 Exhibit B38.  And zooming in at the top here, who were the

22 participants in this chain?

23 A.    Mr. Lambert Mbom and myself.

24 Q.    Going to Page 17 of these messages.  What is the date of

25 these messages?

1   A.   July 9, 2021.

2   Q.   And were you still entering fake notes for Holy Health

3   in July of 2021?

4   A.   Yes.

5   Q.   You ask or you say, "Reset Wendy's credentials."  Who is

6   Wendy?

7   A.   That's my wife.

8   Q.   Why were you asking Mr. Mbom to reset Wendy's

9   credentials?

10  A.   So, she'll prove -- she will be approving the notes.

11  She was part of the approval, her and Mr. Ojong.

12  Q.   And what sort of credentials were you asking Mr. Mbom to

13  reset?

14  A.   Log-in.

15  Q.   The log-in to what system?

16  A.   ICMS.

17  Q.   What role did Mr. Mbom have in resetting credentials?

18  A.   Again, he was the chief administrator.  He does the

19  log-ins.

20  Q.   Now, going to Page 19 of these messages.  And what is

21  the date of this message at the bottom from Mr. Mbom?

22  A.   July 15, 2021.

23  Q.   Scrolling down, do you write to Mr. Mbom about a

24  Lancelot Pajouo?

25  A.   Yes.

1   Q.   And who was Lancelot Pajouo?

2   A.   Was the other fake CSW.

3   Q.   What were you asking or what were you telling Mr. Mbom

4   about Lancelot Pajouo?

5   A.   That his name or information has been updated in the

6   system.

7   Q.   What system?

8   A.   The ICMS system.

9   Q.   Why were you telling Mr. Mbom this?

10  A.   That I can't recall.

11  Q.   And then scrolling down, Mr. Mbom responds, "No, I don't

12  want that done"?

13  A.   Yes.

14  Q.   And then you respond to him and you say, "Just wanted to

15  bring it to your attention.  He has about 260 services in the

16  system."  Do you see that?

17  A.   Yes.

18  Q.   And what do you mean by "260 services"?

19  A.   So, Mr. Mbom would prepare his invoice.  He also was --

20  him and Ms. -- I can't recall her name -- but him and the

21  lady, I'm trying to figure her name, were in charge of --

22  well, he would prepare the invoice and then Ms. Eugenie would

23  write the checks.  And then the lady at the HR, the HR's

24  office, she would issue out the checks.

25  Q.   What sort of invoice are you talking about?

1    A.   The invoice of the fake CSWs.

2    Q.   And what sort of information did the invoice reflect?

3    A.   The notes.  The notes that were put in the system.  The

4    fake note that were put in the system.

5    Q.   And what is the date of this message where you're

6    talking to Mr. Mbom about Lancelot Pajouo's notes in the ICMS

7    system?

8    A.   July 15 of 2021.

9    Q.   Now, you previously testified you were paid by check; is

10   that right?

11   A.   Yes, Ma'am.

12   Q.   Where did you pick up those checks?

13   A.   At the Holy Health office on North Capitol Street.

14   Q.   What did you do with those checks after you received

15   them?

16   A.   I took it to the bank, Bank of America that was down the

17   street on New Hampshire Avenue.

18   Q.   And what did you do with the checks at the Bank of

19   America at New Hampshire Avenue?

20   A.   I cash it.

21   Q.   Was there a reason you went to that particular Bank of

22   America location?

23   A.   Yes.  Because Mr. Bakari would tell us on Friday,

24   payday, that you have to quickly rush to the bank and cash

25   your check, otherwise it will be returned.  The check will be

1   returned.  It won't be paid.

2   Q.   And so was that the closest --

3   A.   Yes.

4   Q.   -- Bank of America?

5   A.   Yes.

6   Q.   I'm showing you what's marked as Government's Exhibit

7   M6.  Do you recognize the area that's shown in this map?

8   A.   Yes.

9   Q.   And generally what area is this?

10  A.   This is on New Hampshire Avenue.  It's on the borderline

11  D.C. and Maryland.

12  Q.   Can you indicate on this map where the Holy Health

13  office, North Capitol office, was?

14  A.   I can see it.

15  Q.   Do you see on the left side of the map where it

16  indicates North Capitol Street NW?

17  A.   Yes.

18  Q.   Can you indicate where the Holy Health office was?

19  A.   It was by -- it was very close to the U.S. Postal

20  Services.

21  Q.   This U.S. -- United States Postal Service there?

22  A.   Yes, yes.

23  Q.   Okay.

24  A.   They were neighbors.

25  Q.   And does this map also show the location of the Bank of

1  America where you would cash the checks?

2  A.    Yes.

3  Q.    And where is that?

4  A.    It's -- the Bank of America, you know, against the bold

5  yellow line.

6  Q.    And what street is that?

7  A.    On New Hampshire Avenue.

8  Q.    And was this Bank of America in Maryland or D.C.?

9  A.    In Maryland.  It's on the border, Maryland, Prince

10  George.

11  Q.    But on the Maryland side of the border?

12  A.    Yes.

13  Q.    Now, showing you what's marked as Government's Exhibit

14  F7a.  Do you recognize this check?

15  A.    Yes, Ma'am.

16  Q.    Who is this check written out to?

17  A.    Myself.

18  Q.    It's for $1,194.55?

19  A.    Yes, Ma'am.

20  Q.    And it's dated April 23, 2021?

21  A.    Yes, Ma'am.

22  Q.    What was this check for?

23  A.    For the fake services that were being put into the

24  system, the ICMS system.

25  Q.    Going to the next page, this is the back of the check?

1   A.   Yes, Ma'am.

2   Q.   And who signed the back of this check?

3   A.   Myself.

4   Q.   Do you see the street that's listed on the back of

5   this -- that's stamped on the back of this check?

6   A.   Yes.

7   Q.   What is that?

8   A.   On New Hampshire Avenue.

9   Q.   Where did you -- did you cash this check?

10  A.   Yes.

11  Q.   Where did you cash it?

12  A.   On that location, the Bank of America.

13  Q.   And then scrolling down to the next page in this

14  exhibit, is this another check to you from Holy Health?

15  A.   Yes.

16  Q.   And what is this check for?

17  A.   It was also the same services, the fake services put in

18  ICMS system.

19  Q.   What did you do with this check once you got it?

20  A.   I took it to the bank and cashed it.

21  Q.   And then looking at the back of the check, is that your

22  signature on the back?

23  A.   Yes.

24  Q.   And where -- what bank did you cash this at?

25  A.   The same bank.

1   Q.   That's the New Hampshire Avenue Bank of America?

2   A.   Yes.

3   Q.   Now, showing you what's marked as Government's Exhibit

4   F7b.  Is this another check to you from Holy Health?

5   A.   Yes.

6   Q.   For $1,518.30?

7   A.   Correct.

8   Q.   And what is the date of this check?

9   A.   April 23, 2021.

10   Q.   What was this check for?

11   A.   It was the same, for the same services.

12   Q.   What do you mean for the same services?

13   A.   The same fake services that were put in the system.

14   Q.   And looking at the back of this check, what did you do

15   with this check once you received it?

16   A.   I took it to the bank and cashed it.

17   Q.   Which bank?

18   A.   Bank of America of the same location.

19   Q.   And then showing you what's marked as Exhibit F8a, is

20   this another check to you from Holy Health?

21   A.   Yes.

22   Q.   For $3500?

23   A.   Yes, that's correct.

24   Q.   And what's the date of this check?

25   A.   July 30, 2021.

1   Q.   And what was this check for?

2   A.   For the same fake services put in the system.

3   Q.   And looking at the back of this check, did you sign the

4   back of this check?

5   A.   Yes.

6   Q.   And what did you do with this check?

7   A.   I took to it the same bank, to the same bank on New

8   Hampshire Avenue and cash it.

9   Q.   Now, scrolling to Page 3, is this another check to you

10  from Holy Health on July 30, 2021?

11  A.   Yes.

12  Q.   How much is this check for?

13  A.   2500.

14  Q.   What did you do with this check?

15  A.   The same manner.  I took it to the bank and I cash it.

16  Q.   And what was this check for?

17  A.   It was for the same fake services put in the system.

18          MS. COLLINS:  We pass the witness, Your Honor.

19          THE COURT:  Okay.  Mr. Robbins?

20          MR. ROBBINS:  Thank you.

21                  CROSS-EXAMINATION

22  BY MR. ROBBINS:

23  Q.   Good morning, Mr. Senesie.

24  A.   Good morning.

25  Q.   My name's Gar Robbins.  I represent Lambert Mbom.  I'm

1   going to ask about a couple of different areas and I'll try
2   to make it clear when I jump from one spot to another; okay?
3   A.    Okay.
4              THE COURT:  Mr. Robbins, can you move your --
5              MR. ROBBINS:  Sorry about that.
6              THE COURT:  Yep.  Thank you.
7              MR. ROBBINS:  And I'll try to be loud enough you
8   can hear me, as well.
9   BY MR. ROBBINS:
10  Q.    Before you became a patient finder at Holy Health, at
11  some point in your career you were a CSW yourself; right?
12  A.    Yes.
13  Q.    When you were a CSW, was it your observation that many
14  of the people who are homeless might not recognize their need
15  for services?
16  A.    Reflect that -- say that again?
17  Q.    Many of the people who are homeless may not know that
18  they need the services that an agency might provide; correct?
19  A.    Yes.
20  Q.    And some of them, even if they recognize that, they
21  might be reluctant to go to an agency to get services just
22  because of the nature of the troubles they have.
23  A.    Sometimes.
24  Q.    And one of the challenges that you face as a CSW is to
25  try to help as many people as possible; correct?

1  A.   Yes.

2  Q.   One of the challenges that CSWs also face is that in

3  many agencies, it's fairly chaotic, meaning that there's a

4  lot of stuff going on in their space?

5  A.   That's correct, sometimes, yes.

6  Q.   Sometimes CSWs actually have to go out into the field to

7  meet with people?

8  A.   Yes.

9  Q.   And sometimes there might be need to be some form of

10  community outreach by an agency so that their patients know

11  they exist?

12  A.   Yes.

13  Q.   If you are a homeless person living in a park or hanging

14  out by a 7-Eleven, you might not know about an agency that's

15  available to help you; correct?

16  A.   Yes.

17  Q.   When you first became involved in what you're now

18  calling a patient finder, was that more of a community

19  outreach effort to try to bring people in?

20  A.   Yes.

21  Q.   Did you believe that you were doing something good for

22  some of those people?

23  A.   Yes, absolutely.

24  Q.   And that's the way you really got started with it?

25  A.   Yes.

1  Q.   When you started bringing people to Holy Health, you had

2  already had a meeting with Julius Bakari?

3  A.   No.

4  Q.   You brought people to Holy Health before you ever met

5  with Julius Bakari?

6  A.   Yes, I had -- the initial conversation was between

7  Lambert and myself.   Then to Julius Bakari.

8  Q.   Because when you talked to Lambert, Lambert said, "I

9  understand what you're telling me but I don't get to make any

10 decisions like that, you're going to have to talk to Julius.

11 He's the owner?"

12 A.   He passed the message to Julius Bakari.

13 Q.   Because he couldn't make a decision like that?

14 A.   Yeah.   He was the chief administrator.

15 Q.   But not the boss.   Not the owner.

16 A.   Not the owner, yes.

17 Q.   As you worked at Holy Health, there were times where you

18 and Lambert had disagreements.

19 A.   Yes.

20 Q.   There were times where you were -- you had disagreements

21 because either Lambert or Ms. Betty were red Xing some of the

22 notes being submitted by your CSWs.

23 A.   That was the, you know, the tail end of when the FBI

24 raided -- yes, sometimes.   Rarely.

25 Q.   You also had disagreements about whether your CSWs

1   needed to participate in the training and meetings that the

2   other CSWs were participating in.

3   A.   Sometimes.

4   Q.   And you guys, frankly, butted heads about that, didn't

5   you?  You argued about it sometimes?

6   A.   Yes, sometimes we will.

7   Q.   And when that kind of issue came up, you knew that

8   Mr. Bakari was on your side; correct?

9   A.   I'm not sure.  I can't say definitively whether

10  Mr. Bakari was on my side or who was on my side.

11  Q.   But if you weren't satisfied with what Lambert was

12  saying, Julius Bakari was the place to go?

13  A.   Yes.

14  Q.   You said that sometimes your CSWs did attend the

15  meeting, the training meetings.  How did that happen?  If you

16  were writing these notes, who were your CSWs?

17  A.   The CSWs that were highlighted in the D.A.'s

18  cross-examination.

19  Q.   Right.  So, sometimes they would attend the CSW meetings

20  either by Zoom or by -- or in person?

21  A.   Yes.

22  Q.   And in those meetings, did you sometimes attend those,

23  as well?

24  A.   Sometimes, yes.  Sometimes I will attend, yes.

25  Q.   And what was the general subject matter covered in those

1    meetings?

2    A.   Mostly about treatment plans.  And it was required of

3    DBH for CSWs to attend supervision.

4    Q.   Would you say that a fairly frequent subject that came

5    up in the CSW meetings was the failure of CSWs to record what

6    they were doing for their consumers?

7    A.   I cannot recall that.

8    Q.   You don't remember Lambert, I guess, lecturing would be

9    the best term, or talking to CSWs about "you've got to

10   document what you're doing"?

11   A.   I cannot remember that.

12   Q.   All right.  Do you ever remember hearing Lambert talking

13   about "you've got to provide service and I've got to document

14   or else this business is going to fail"?

15   A.   I cannot remember that.

16   Q.   Okay.  The prosecutor showed you checks that were paid

17   to you.

18   A.   Yes.

19   Q.   You received checks, basically all of the CSWs at Holy

20   Health received checks like that; correct?  Not the same

21   amount, but everybody got paid with a check.

22   A.   Yeah.  Well, I'm not sure exactly.  I was only

23   responsible for the CSWs and Jouvet was responsible for his.

24   Whatever the structure was with the other CSWs, I was not

25   privy to that.

1    Q.   Do you know whether they were 1099?

2    A.   I wasn't privy to that, either, that information.

3    Q.   So you don't know whether they were --

4    A.   No.

5    Q.   -- employees getting withholdings and everything else?

6    A.   I know what 1099 is.  But in reference to Holy Health, I

7    didn't know what the structure was.

8    Q.   All right.  So you don't know how the other people were

9    paid.

10   A.   Yes.

11   Q.   Got you.

12        You mentioned that after the raid, Mr. Bakari said the

13   people should keep working?

14   A.   Yes.

15   Q.   That the agency was going to be fine?

16   A.   Yes.

17   Q.   And that meant that people should still meet with

18   consumers?

19   A.   Yes.

20   Q.   There should still be new consumers encouraged to come

21   to Holy Health?  You weren't supposed to stop encouraging

22   people to come to Holy Health?

23   A.   Well, after the raid, yes, so clients were still showing

24   up at the program.

25   Q.   When you said that the issue about your CSWs billing

1   over top of the existing CSWs was never really resolved, how

2   did that happen?  Did you just have arguments with Lambert

3   every week about who was supposed to be billing?

4   A.   I'm not sure.  I can't recall that.

5   Q.   Didn't even Mr. Bakari say that you couldn't have more

6   than one CSW billing on the same consumer?

7   A.   In one of the text messages the D.A.'s office

8   highlighted, that was communicated.

9   Q.   How was it communicated?

10  A.   I guess it was through text.

11  Q.   All right.  So you didn't have a discussion with

12  Mr. Bakari about this?

13  A.   About?

14  Q.   About the problems that your CSWs were putting notes on

15  consumers who were already being treated by CSWs at the Holy

16  Health practice.

17  A.   Say that again.

18  Q.   Sure.

19  A.   Could you say that again?  Rephrase that.

20  Q.   I'll wind it back a couple of steps.

21  A.   Uh-huh.

22  Q.   There was a problem when your CSWs made notes about

23  consumers who were already being treated by CSWs who were at

24  Holy Health; correct?  Because that would be double billing?

25  A.   Double billing, yes.

1   Q.   And when that happened, it eventually rose to the

2   attention of Mr. Bakari; correct?

3   A.   From the onset, Mr. Bakari knew -- again, let me state

4   this.  All of us knew what was going on.  And we participated

5   anyway, which I regret my action.  And that is why I'm trying

6   to do better.  I put myself back to school to do my

7   PhD program so I can get another job somewhere.  But we all

8   knew what exactly was going on at this, at this -- at Holy

9   Health.

10  Q.   I understand what you're telling me about what you knew.

11  And I understand that you're telling me that you reached an

12  agreement with Mr. Bakari.  What I'm asking is:  Were there

13  points of disagreement where Mr. Bakari had to sort it out?

14  A.   There were pockets of that, yes.

15  Q.   And when that happened, did that get resolved in ways

16  that left your CSWs able to continue what they were doing?

17  Or did they have to stop when they were double billing over

18  top of CSWs who were already working at Holy Health?

19  A.   It was never really resolved because Eugenie, Eugenie,

20  Bakari's wife, had issued a list to myself and Jouvet

21  Forbang.  And names that were on those lists should be

22  documented on regardless of the previous CSWs were on that or

23  were working with that client or not.

24  Q.   Okay.  Now I think I understand.

25       So if there was an overlap, it was because of Eugenie

1  Bakari's providing you a list with somebody on it who should

2  not have been there?

3  A.   Yes.

4  Q.   Got it.

5       Was there any issue with getting Ms. Soh onto the

6  approval part of the program for Holy Health?

7  A.   Rephrase that again?

8  Q.   Was it difficult to have Ms. Soh identified as someone

9  who could approve notes?

10 A.   I can't recall that.

11 Q.   Because that was actually something that she was

12 qualified to do; correct?

13 A.   Yes.

14 Q.   She had done that for another agency.  She was a note

15 approver for another agency before she was an approver for

16 Holy Health.

17 A.   I can't recall that, no.

18 Q.   How was it that she was a person qualified to approve

19 notes?

20 A.   Because of her academic credentials.

21 Q.   What were those?

22 A.   She's a registered nurse.

23 Q.   And that was the way that she could appear in the

24 organizational structure of Holy Health as an individual

25 authorized to approve notes?

1    A.    Yes.

2    Q.    Sorry, computer is misbehaving.

3          One final thing.  You are here under an agreement with

4    the Government; correct?

5    A.    Yes.

6    Q.    It's part of your plea agreement.  You've got to be

7    here?

8    A.    Yes.

9    Q.    And you told the Members of the Jury that part of that

10   is that you have to promise to tell the truth; correct?

11   A.    Yes.

12   Q.    And whether or not you tell the truth would eventually

13   be decided by a judge; would --

14   A.    That's correct.

15   Q.    But in the first instance, who's the one who brings that

16   issue to the judge?  Who's the one who says whether or not

17   you're telling the truth?

18   A.    I guess with the Cross-Examination, the evidence

19   presented would --

20   Q.    I'll back it up and make it easier.

21   A.    Yeah.  Let me -- let me -- it would -- the evidence, the

22   evidence presented and my participation and what I'm

23   testifying today, all of the above would corroborate whether

24   I've been truthful or not.

25   Q.    Right.  That's what's going to be tested?

1  A.   Yes.

2  Q.   Who goes to the judge and says -- either asks the

3  question either way to say:  Did this witness tell the truth?

4  Who goes to the judge and says, "We either think he told the

5  truth or we think he didn't tell the truth"?

6  A.   Well, I'm not sure.  Maybe the D.A.'s office or my

7  attorney.

8  Q.   Okay.  Fair enough.

9          MR. ROBBINS:  I have no further questions, Your

10 Honor.

11         THE COURT:  Okay.

12         MR. ROBBINS:  Thank you, sir.  Appreciate it.

13         THE WITNESS:  Thank you.

14         THE COURT:  Ms. Collins, any Redirect?

15         MS. COLLINS:  Just very briefly, Your Honor.

16                  REDIRECT EXAMINATION

17 BY MS. COLLINS:

18 Q.   Mr. Senesie, you were asked questions about the double

19 billing issues?

20 A.   Yes.

21 Q.   And we reviewed some issues where you discussed

22 switching the consumer Deavin Peaks to another consumer to

23 resolve a billing issue?

24 A.   Yes.

25 Q.   And who did you talk to about switching consumers to

1   resolve the double billing issue?

2   A.   Mr. Lambert.

3   Q.   And, in general, if you needed to try to resolve a

4   double billing issue for a specific consumer, who did you

5   talk to?

6   A.   Mr. Lambert.

7            MS. COLLINS:  Nothing further.

8            THE COURT:  All right.  Mr. Senesie, this concludes

9   your testimony.  You can step down.  You're free to leave.

10           THE WITNESS:  Thank you.

11           THE COURT:  Thank you.

12           Okay, Ladies and Gentlemen, it's time for our

13   morning break.  Let's take 20.  See you back here in 20

14   minutes.

15           THE CLERK:  All rise for the jury.

16           (The jury left the courtroom at 10:19 a.m., and the

17           following proceedings were had out of the presence of

18           the jury.)

19           THE COURT:  Okay.  Counsel, need anything from me?

20           All right.  When the jury comes back, I am going to

21   let them know about Friday, that Friday we will be ending at

22   1 o'clock, so that they should be prepared to have a -- we

23   will have a full morning and then be done by 1:00?

24           Okay, great.  Thanks so much.  See you in a bit.

25           THE CLERK:  The court stands in recess.

1        (Recess was held from 10:20 to 10:41 a.m.)

2            (The following proceedings were held in open court

3    out of the presence and hearing of the jury:)

4            THE COURT:  All right, everyone. Are we ready for

5    the jury?

6            MR. ROBBINS:  Could I raise an administrative

7    matter?

8            THE COURT:  Sure.

9            MR. ROBBINS:  We were just talking about

10    scheduling.

11            THE COURT:  Yeah, you all can have a seat.

12            MR. ROBBINS:  The Government believes they may

13    finish their case-in-chief on Thursday.

14            THE COURT:  This Thursday?

15            MR. SARMA:  We have taken your wisdom, Your Honor,

16    and slimmed down a lot.  We think we could be able to rest by

17    tomorrow afternoon is our hope.  I mean, depending on,

18    honestly, what Mr. Robbins does in his Cross-Examinations,

19    which we don't know about.

20            THE COURT:  Okay.  All right.  So with that, --

21            MR. ROBBINS:  Given that, Your Honor, that puts me

22    in a very bad spot.  As you know, I'm in front of this Court

23    in another matter Friday afternoon.

24            THE COURT:  Yeah.

25            MR. ROBBINS:  I need time to meet with my client in

REDIRECT OF FRANCIS SENESIE BY MS. COLLINS    238

1    this case, decide whether or not he's going to testify.  If

2    he is going to testify, we need another hearing.

3        THE COURT:  Well, we also need to do jury

4    instructions.

5        MR. ROBBINS:  And it's going to leave me

6    ineffective in one or both cases to try to have -- to try to

7    forward this case at that particular stage.

8        THE COURT:  Well, let me ask you this:  If the

9    Government closes tomorrow and we're dark on Friday, --

10        MR. ROBBINS:  That works.

11        THE COURT:  -- because the jury can -- you know,

12    they can do all of their personal stuff on Friday.  And then

13    we come back, because we're going to have to also convene

14    about instructions.

15        MR. ROBBINS:  We could do that Monday morning

16    before we do my case, if I have one.  And then that would

17    allow our medical appointment person to do their medical

18    appointment?  Or was that Monday afternoon?  All I'm thinking

19    is that might create breathing space for the medical

20    appointment.

21        THE COURT:  Yeah.  That's true.  Although she's

22    trying --

23        THE CLERK:  She's trying to get it.  Nothing is set

24    in stone, yet.

25        THE COURT:  Okay.  Let's say you're done by

REDIRECT OF FRANCIS SENESIE BY MS. COLLINS    239

1  tomorrow.  We are dark on Friday.  Are there any big disputes

2  on instructions?  I mean, I haven't seen any that I recall.

3  But there were other defendants in at the time.

4         MR. ROBBINS:  I don't remember any other than the

5  Government not wanting to give my instruction on reasonable

6  doubt.

7         THE COURT:  Don't like it, anyway.

8         MS. COLLINS:  The only other things I would

9  recall -- and I don't think they would be big disputes -- is

10 there were specific issues about willful blind instruction.

11 And then, I believe, exactly what to include from the

12 indictment.

13        MR. ROBBINS:  That was the one, how the offenses

14 are explained to the jury.

15        THE COURT:  Got it.

16        MS. COLLINS:  Nothing that I think will take a lot

17 of time.

18        THE COURT:  Okay.  So the other question is:  At

19 this point, Mr. Robbins, other than Mr. Mbom, you need time

20 to discuss with him his right to testify.  Are you

21 anticipating any other witnesses?

22        MR. ROBBINS:  No, Your Honor.  If there is a

23 defense case, it will be a one-witness case.

24        THE COURT:  Okay.  Yes.

25        MR. SARMA:  There will be, if Mr. Mbom decides to

REDIRECT OF FRANCIS SENESIE BY MS. COLLINS      240

1  testify, there's two potential motions the Government has

2  filed.

3          THE COURT:  Right.  I've seen them.

4          MR. SARMA:  We have to adjudicate those, as well.

5          THE COURT:  Yeah, and they're relatively

6  straightforward.  I know they're important to both sides, but

7  they're not horribly complex.  So, okay.

8          So, then it sounds like it makes sense -- I'm not

9  going to say anything to the jury right now.  Let's see where

10  we are at the end of the day.  You give me the green light.

11          What I'm proposing we say is that moving along at a

12  nice clip, we'll be dark on Friday, dark on Monday morning,

13  especially if the -- Juror 6 can't move her appointment.  And

14  then we'll do jury instructions Monday morning.  And then

15  Monday afternoon we'll either hear from the defense case or

16  close.

17          Am I getting it right?

18          MR. SARMA:  Yes, Your Honor.

19          MR. ROBBINS:  That's correct.

20          THE COURT:  Okay.  All right.  Let's see where we

21  are before I discharge the jury for the day.  Let's get into

22  the next couple hours.  It sounds good.

23          All right.  Thank you.

24          MR. ROBBINS:  Thank you, Your Honor.

25          THE COURT:  Oh, wait a minute.  I am sorry.  I am

1    sorry.

2              I have a very lengthy appointment on Monday that I

3    can either do in the morning or in the afternoon, but I have

4    to do it on Monday.  I just remembered.  And so I can't do

5    jury instructions Monday.  We could do them, if they're not

6    complicated, we could do them tomorrow at the end of the day;

7    right?  We could let the jury go and talk jury instructions

8    tomorrow.

9              MR. ROBBINS:  That would depend, really.  The

10   Government may need the whole day, but...

11             THE COURT:  Well, if we end at 3 is my point;

12   right?  We'd end at 3.  Could we do instructions tomorrow?

13   Take a look at them tonight?  I don't see them as being -- I

14   mean, listen, if you haven't already preserved a ton of

15   objections or additions other than your reasonable doubt

16   instruction which jumps to mind, it sounds like we might be

17   able to do this tomorrow.  That's my only -- I just

18   remembered, it's my only impediment on Monday.  I'd rather do

19   that than keep the jury out for a very long weekend.

20             MR. SARMA:  Your Honor, the Government's ready to

21   proceed, could do it afternoon.  We could also do it Friday

22   morning.

23             THE COURT:  I'm open.

24             MR. SARMA:  Whatever works best for Mr. Robbins?

25             MR. ROBBINS:  I would ask that we not do it Friday

REDIRECT OF FRANCIS SENESIE BY MS. COLLINS    242

1   morning.

2           THE COURT:  Well, then Thursday.

3           MR. ROBBINS:  Then it would have to be, yeah,

4   Thursday afternoon would be better.  But that will allow me

5   to brain dump one case.

6           THE COURT:  Sure.  That makes sense.

7           MR. ROBBINS:  Move to the other one and be

8   reasonable in both cases.

9           THE COURT:  All right.  Then let's plan to talk

10  jury instructions tomorrow afternoon.  Perfect.

11          All right.  Let's get the jury.  Thank you.

12          That's one juror who needs a quick comfort break.

13  You-all get settled.  And as soon as our juror is back, we'll

14  get started.  Okay?  All right.

15          You get us all standing for you.

16          [Laughter.]

17      (The jury came back into the courtroom at 10:50 a.m.,

18          and the following proceedings were had in the

19          presence of the jury.)

20          THE COURT:  All right.  You-all can have a seat.

21  Government, your next witness?

22          MS. McKOY:  The Government calls Donald Shearer.

23          THE CLERK:  If you could stay standing and raise

24  your hand for me, please.

25

DONALD SHEARER

2  having been called as a witness and having been duly sworn,

3  was examined and testified as follows:

4          THE CLERK:  Please be seated.  And while speaking

5  clearly into the microphone, can you please state your full

6  name and then spell your last name.

7          THE WITNESS:  Donald Shearer, S-H-E-A-R-E-R.

8          THE CLERK:  Thank you.

9                    DIRECT EXAMINATION

10 BY MS. McKOY

11 Q.   Good morning, Mr. Shearer.

12 A.   Good morning.

13 Q.   Where do you currently work?

14 A.   I work with the Department of Health Care Finance in the

15 District.

16 Q.   Is that department sometimes referred to as DHCF for

17 short?

18 A.   Yes.

19 Q.   What is the Department of Health Care Finance?

20 A.   So, DHCF, or Department of Health Care Finance, is a

21 State Medicaid agency for the District of Columbia.

22 Q.   And what is your position at DHCF?

23 A.   I'm the director of the Health Care Operations

24 Administration.

25 Q.   What are your duties as the director of Health Care

1    Operations Administration for DHCF?

2    A.    So, I'm primarily responsible for managing the provider

3    enrollment process for D.C. Medicaid providers, as well as

4    managing the District's Medicaid Management Information

5    System, which is a system that's used to process claims for

6    the D.C. Medicaid beneficiaries.

7    Q.    You mentioned process claims.  What does that mean?

8    A.    So, when a provider like a physician or dentist,

9    provides services to a Medicaid beneficiary, they submit a

10   claim to us.  And so we're responsible for processing that

11   claim and paying the provider for the services that were

12   rendered to the beneficiary.

13   Q.    You also mention that you're responsible for provider

14   enrollment.  What -- can you tell us more about those

15   responsibilities?

16   A.    Sure.  So, before a physician, a provider, again, a

17   dentist, a physician, can be paid for services that are

18   rendered to a Medicaid beneficiary, they must be enrolled

19   with the D.C. Medicaid program before we're able to process

20   them.

21        So, providers have to go -- today, providers go online

22   to complete an application, so that we know who they are when

23   they're providing services.

24   Q.    You also mentioned the Medicaid Management Information

25   System.  Can you expand on that a little bit?

1  A.    Sure.  So, every State Medicaid agency's required to

2  have a Medicaid Management Information System, or an MMIS.

3  And so the MMIS is for the District, and I can only speak of

4  the one for the District, is configured in such a way that we

5  know which beneficiaries are eligible to receive services

6  based on their eligibility.  We know which providers are

7  enrolled and authorized to provide services.

8       The system also houses prior authorizations.  Some

9  services have to be approved by the agency before they can be

10 provided.  We house fee schedules and then a number of what

11 we call adjudication rules that we apply when we're

12 processing claims to ensure an accurate payment of claims.

13 Q.    How long have you worked for DHCF?

14 A.    So, I've had two tours of duty with the Department of

15 Health Care Finance.  So the first one was for two years,

16 from 2009 to the end of 2010.  And then I came back in 2011.

17 So, on this tour of duty, I've been there for almost 12 years

18 in the same role.

19 Q.    So, for how much of that time have you served as the

20 Director of Health Care Operations and Administration?

21 A.    All of it, all 12 years for this last tour of duty, plus

22 the two before.

23 Q.    Are you familiar with the Department of Behavioral

24 Health?

25 A.    Yes.

1   Q.   What is that department?

2   A.   So, the Department of Behavioral Health is the agency

3   within D.C. government that's responsible for setting

4   policies and procedures related to coverage for behavioral

5   health services.

6   Q.   And what role, if any, does DBH have in the enrollment

7   of medical providers with DHCF?

8   A.   So, there are certain -- there are certain provider

9   types that require -- and one of them is mental health

10  rehabilitative services.  Another one is Free Standing Mental

11  Health Clinics.  And a third one is substance use disorder

12  providers.  Those providers, in some cases, are certified by

13  the Department of Behavioral Health to provide those

14  services.

15  Q.   Can you generally describe what Medicaid is?

16  A.   So, Medicaid is medical insurance for residents of the

17  District of Columbia who are at a certain economic level.

18  And so we basically provide health insurance for the more

19  vulnerable residents of the District.  It's funded, in part,

20  by the Federal Government.  On average, they pay for 70

21  percent of the costs and the other 30 percent is paid for

22  using District dollars.

23  Q.   Are there any financial requirements for participating

24  in Medicaid?

25  A.   A beneficiary, you have to be -- there are different

1  levels, but it's, on average, it's income not to exceed 100

2  percent of the federal poverty level.  But we do have some

3  programs that allow beneficiaries with up to, I think it's

4  300 percent of the federal poverty level to enroll in the

5  program in one of our waivers.

6  Q.   You mentioned the term "beneficiary."  What does that

7  term refer to?

8  A.   Beneficiary is any -- is used to refer to a resident of

9  the District who's qualified or entitled to receive services.

10  So, beneficiary/recipient are interchangeable.

11  Q.   Does Medicaid cover transportation services for

12  beneficiaries?

13  A.   Yes.

14  Q.   You also mentioned the term "provider" within the

15  context of Medicaid.  What is a provider?

16  A.   A provider -- so each Medicaid program has a state plan,

17  which defines the rules of that state's Medicaid program.

18  And the state plan usually lists the different types of

19  providers that the Medicaid program would cover.

20       A provider is any person or entity that would render

21  services to a Medicaid beneficiary.  That could include a

22  physician, a dentist, a pharmacy, a hospital, freestanding

23  mental health clinic.  There are several different provider

24  types.

25  Q.   Does an individual or entity have to enroll in order to

1   become a provider with Medicaid?

2   A.   So, the provider types that I just described, like a

3   physician, a dentist, anybody can provide the service to the

4   Medicaid beneficiary; but for you to get paid, you must be

5   enrolled with the Medicaid program.

6   Q.   If a provider is not enrolled with Medicaid, can they

7   bill Medicaid for providing services to beneficiaries?

8   A.   They can, but they're not going to get paid.  So, they

9   must be enrolled to be able -- for us to be able to pay them

10  for the service.

11  Q.   Directing your attention to the 2015 to 2021 time

12  period, generally speaking, how did the enrollment process

13  work during that time?

14  A.   So, if we look at the 2015 to 2021 time period, in 2015,

15  the agency was at a point where we were processing paper

16  applications.  So, the providers would complete an

17  application on paper.  That would then be submitted to DHCF.

18  It would be screened, reviewed.  And if the provider met all

19  the requirements for being a provider with the program, they

20  would be approved.

21       In on or about September of 2017, we implemented what we

22  call the DC Provider Data Management System, which is an

23  online system that providers now use to do their enrollment

24  and re-enrollment for the D.C. Medicaid program.

25  Q.   Are you familiar with an entity called Holy Health Care

1   Services, LLC?

2   A.    Yes.

3   Q.    Was it a provider enrolled in the Medicaid program?

4   A.    Yes.

5   Q.    I'm now showing you what's been marked as Government

6   Exhibit G1.  Are you familiar with this spreadsheet,

7   Mr. Shearer?

8   A.    Yes.

9   Q.    What is it generally?

10  A.    So, this spreadsheet represents data from the MMIS about

11  claims that were processed in the MMIS.

12  Q.    And looking at the Column BB here, what does this refer

13  to?

14  A.    So, based on the header description, that is the name of

15  the rendering provider on the claim.

16  Q.    And what is the rendering provider in this case?

17  A.    Holy Health Care Services, LLC.

18  Q.    Looking at Column C here, what does this column refer

19  to?

20  A.    So, Column C, based on the column header, it's the

21  status code of the claim.

22        So when a claim -- well, it's the statutes code of a

23  claim.

24  Q.    And what does P refer to here?

25  A.    Paid.

1    Q.    Looking at Column BL, what does this column refer to?

2    A.    That is the first date of service from the claim.

3    Q.    And what does Column BM refer to?

4    A.    That's the last date of service on the claim.

5    Q.    Who provides the date of service data?

6    A.    Providers are the ones that would put that information

7    in the claim that's submitted to the program.

8    Q.    And is it important that the date of service data be

9    accurate?

10   A.    Definitely.

11   Q.    Why is that?

12   A.    So, the date of service is the date that we use when we

13   do things like verify:  Is the beneficiary or recipient

14   enrolled on that date of service?  Because if a person's not

15   enrolled in that date of service, then we would not pay the

16   claim.

17         If the provider is not enrolled on that date of service,

18   we would not pay the claim.

19         We also use that date of service to determine that

20   correct fee schedule amount that we should use when we are

21   adjudicating the claim.

22   Q.    So, if Medicaid determined that the date of service that

23   was submitted was falsified, would Medicaid pay that claim?

24   A.    If we knew ahead of time, no, we would not.

25   Q.    What does Column BO refer to?

1  A.   So that is the description of the place of service where
2  the service was provided.
3  Q.   And does the provider also provide that data to
4  Medicaid?
5  A.   So, the provider submits a code on the claim.  And I
6  think that's a code that would be -- I'm just looking at the
7  report, and I can tell you that what's in Column BN.  So, in
8  this case, a Code 11 on a claim would tell us that it's a
9  place of service -- that the place of service -- that the
10 service was rendered in the provider's office.
11 Q.   Is it important that the place of service be accurate?
12 A.   Yes.
13 Q.   Why is that?
14 A.   It could impact the rate that we calculate to pay on a
15 claim.
16 Q.   If Medicaid determined that the place of service was
17 falsified, would Medicaid pay that claim?
18 A.   No.
19 Q.   Looking at Column BR, what does this column refer to?
20 A.   So, when -- that column is called the procedure code.
21 And the procedure code on a claim tells us what service was
22 provided during that beneficiary's encounter with the
23 provider.
24 Q.   And what does the procedure Code H0036 refer to?
25 A.   I think that's community support services.

1   Q.   Is that provided in the Column BS?

2   A.   That is the description, yes.

3   Q.   Is community psychiatric supportive treatment the same

4   as community support services?

5   A.   I think that the H0036 represents that service, yes.

6   Q.   And just looking briefly up to Row 183 here, what does

7   the Code 90834 refer to?

8   A.   90834, based on the description in Column BS, is the

9   code that represents 45 minutes of psychotherapy.

10  Q.   And going back down to Row 87, H0036, and looking at the

11  BS column, community psychiatric supportive treatment, does

12  this description also provide the number of minutes per unit?

13  A.   Right.  It does.

14       So, when -- if I were to look at a claim for Procedure

15  Code 80036 and I saw that that claim had, let's say, two

16  units of service, I would assume from that, that the provider

17  spent 30 minutes, or thereabout, with the beneficiary during

18  that visit.  So, one unit on a claim represents 15 minutes of

19  service.

20  Q.   Can a provider bill Medicaid for the time that

21  beneficiaries spend waiting in the reception area of an

22  office?

23  A.   No.

24       So, we describe our program as a fee-for-service

25  program.  So, you can only bill us while you're providing the

1    service.  Waiting in the office is not considered time in

2    treatment.

3    Q.   Is it important that the number of minutes billed to

4    Medicaid be accurate?

5    A.   Yes.

6    Q.   Why is that?

7    A.   Because in an audit, we could come out and if you said

8    you spent an hour with the beneficiary or the patient, but

9    your notes only supported 30 minutes, then that would be an

10   audit finding and we would recoup that money.

11        So, the time on the claim should match the time in the

12   provider's records just in case there's an audit.  Plus the

13   claim is supposed to represent the services as they were

14   provided to the beneficiary.

15   Q.   If Medicaid determined the number of minutes was

16   falsified, would it pay that claim?

17   A.   If we knew at the time, no.  But then if we found out

18   during an audit, then we would recoup that money during an

19   audit.

20   Q.   What, if anything, does a provider attest to when it

21   submits a claim to Medicaid?

22   A.   That the information provided on the claim is true and

23   accurate.

24   Q.   How does it make that attestation?

25   A.   So, if the claims are submitted on paper, there's

1  actually an attestation listed on the back of the HCFA 1500

2  form, if I remember correctly.  But then, as a part for

3  providers who submit claims to us electronically, there's an

4  attestation that the providers sign as a part of their EDI,

5  their electronic -- so, for providers to submit claims to us

6  electronically, they have to complete what we call a trading

7  partner agreement.

8        And as a part of that agreement, the providers agree

9  that the claims that they submit to us will be accurate and

10 reflect the services that they provided to the beneficiary.

11 Q.   When a provider bills Medicaid what, if anything, does

12 Medicaid understand about whether those services were

13 actually provided?

14 A.   That -- if the provider submitted a claim for the

15 service, the provider is saying that the services were indeed

16 provided.

17 Q.   And when a provider submits a claim to Medicaid, what,

18 if anything, does Medicaid do to determine whether the

19 services were actually delivered?

20 A.   So, during the actual adjudication of the claim, there

21 is no way for us to be able to verify if the service

22 actually -- if the services were actually provided.  We

23 typically find out that a service was not provided in a

24 post- -- during audits after we've paid the claims.

25 Q.   Why is Medicaid not able to determine whether the

1    services were actually delivered prior to paying the claims?

2    A.    Just the sheer volume of claims that we get.  We get

3    about 300,000 claims a month.  And the idea that -- and the

4    claims are adjudicated by a system.  And so we would have no

5    way of being able to stop each of those claims, to call

6    somebody to say, "Was this service provided?"

7         We also send out samples -- sample surveys to

8    beneficiaries where we ask.  We say, "Hey, we got this claim

9    for you.  Can you confirm that you did receive these

10   services?"  That's another way of trying to figure out if

11   services were actually provided.  So, we sample our claims,

12   not check every single one as we are adjudicating them.

13   Q.    Does Medicaid have any rules with respect to the payment

14   of kickbacks to patients?

15   A.    Yep.

16   Q.    What are those?

17   A.    It's not allowed.

18   Q.    Why is it not allowed?

19   A.    Because you don't -- you know, patients have a choice of

20   which providers they get services from.  And so that should

21   be a choice that's made without interference or influence

22   from somebody else.

23   Q.    In the course of your work, if Medicaid received

24   information that a provider is paying kickbacks to patients,

25   what would Medicaid do?

1  A.    So, DHCF has a program integrity unit.  I can never get

2  that out right.  That is responsible for investigating

3  allegations of fraud, waste, or abuse.

4      And so if there -- if the agency received a tip or a

5  complaint about a provider who was paying kickbacks, we would

6  initiate an investigation, a preliminary -- what we call a

7  preliminary investigation.

8      And after we determine that there is sufficient evidence

9  to suggest that there could be something untoward going on,

10 then we make a referral to our law enforcement partners, and

11 it's up to our law enforcement partners to complete -- to do

12 a full and complete investigation.

13 Q.    If Medicaid knew that a provider was paying kickbacks to

14 patients, would it pay those claims?

15 A.    No.

16 Q.    What restrictions, if any, does Medicaid have as to

17 whether kickbacks may be paid for patient referrals?

18 A.    We don't allow any kind of kickbacks.  So, if somebody

19 can't -- you can't refer somebody to me and then I pay you

20 that.  We would not approve that.

21 Q.    Why is that?

22 A.    It's illegal, 'cause you just can't pay kickbacks to

23 solicit patients.

24 Q.    Who are providers prohibited from paying in exchange for

25 patients?

1  A.   Everybody.

2  Q.   What, if any, limitation is there on paying people to

3  recruit patients off the street?

4  A.   There -- it's just -- it's not allowed.  We would not

5  allow that.  We frown on it.  Yeah.

6          MS. McKOY:  The Government passes the witnesses,

7  your Honor.

8          THE COURT:  Okay.  Mr. Robbins?

9          MR. ROBBINS:  Thank you.

10                 CROSS-EXAMINATION

11 BY MR. ROBBINS:

12 Q.   Good morning, sir.

13 A.   Good morning.

14 Q.   My name is Gar Robbins.  I'm representing Lambert Mbom

15 in this case.

16      You said something about 300,000 claims per month.

17 That's a lot of claims?

18 A.   It is, yep.

19 Q.   So, your agency deals with a fairly significant number

20 of providers and beneficiaries.

21 A.   Yes.

22 Q.   When you talked about providers, you talked about

23 doctors, dentists, hospitals, and other types of entities.

24 If you were looking at a hospital, would everybody who worked

25 at that hospital be a provider?

1   A.   No.

2   Q.   At a hospital, the provider's the hospital itself?

3   A.   Correct.

4   Q.   In the case of a hospital, they have billing codes, for

5   instance, for things that are done; correct?

6   A.   Yes.

7   Q.   And as the actual people on the floor, if you will, the

8   nurses, the health assistants and whatnot, as they do things

9   for patients, they make notes in a chart, whether it be paper

10  or electronic; correct?

11  A.   I think that's how the process works.  I've never worked

12  for a hospital, so I don't -- I'm not sure how they --

13  Q.   And they probably, maybe not you personally because

14  you're at the top of the pyramid, but your organization has

15  reviewed claims that come from hospitals.

16  A.   Yes.

17  Q.   And in those claims, there are probably billing codes

18  and lines for things that are done like checking blood

19  pressure or checking on a patient in a room or all manner of

20  things that need to be done in order to complete proper care

21  for a patient?

22  A.   No.  Not on a hospital claim.

23  Q.   No?

24  A.   No.  It doesn't go to that level of detail.

25  Q.   It doesn't go that level of detail?

1   A.    No, sir.

2   Q.    But it would go down to just the level of an actual

3   procedure being performed.

4   A.    Correct.

5   Q.    And if a procedure was performed, the provider might

6   still be the hospital?

7   A.    So, the hospital would bill for, let's say it was an

8   appendectomy, the person was admitted to the hospital for an

9   appendectomy.  The hospital would bill us to let us know that

10  the operating theater was used to provide -- to perform an

11  appendectomy.  And then the physician would bill separately

12  for actually doing that appendectomy.

13  Q.    And the anesthesiologist.

14        How about the provision of -- there are a bunch of

15  nurses involved in something like that, I suspect.  Do they

16  get billed, too?

17  A.    No, they wouldn't.  So, nursing care is included in the

18  room and board rate that's paid to the hospital.  The nurses

19  wouldn't bill us separately for the care they provided in the

20  hospital.

21  Q.    Okay.  Got it.  It's a fairly complex system.

22        When you do integrity checks, do you do those

23  independently with your own agency people?  Or do you have an

24  outside contractor who does that?

25  A.    So, we have our own program integrity department that

1   does the initial, what we call the preliminary investigation.

2   That's DHCF staff.  We don't have a contractor that does

3   investigations.

4   Q.    You talked for a moment about attestation of claims.

5   And you said at one time it was done on the back of the

6   claim, a paper claim that was submitted.  Who is actually

7   signing that attestation?

8   A.    A representative of the provider agency who's authorized

9   to sign the claim form, if it comes in on paper, or the

10  attestation is signed by the agency's representative.

11  Q.    And then electronically that would be the same?

12  A.    Correct.

13  Q.    But the representative who is providing the attestation

14  is identified somewhere in your documentation?

15  A.    It typically is, yes.

16  Q.    Where would that be identified?

17  A.    On the trading partner agreement.

18  Q.    So, we should be able to see a trading partner agreement

19  to find out for Holy Health, for instance, who it is that's

20  attesting that their records are being submitted accurately?

21  A.    Yes.

22  Q.    You talked a little bit about units of time.  You gave

23  the example of if there were four units claimed but there

24  were only 30 minutes provided, that should have been two

25  units.

1    A.   Correct.

2    Q.   How about if there were 50 minutes provided?  How many

3    units would that be?

4    A.   So, you said 50 minutes?  15?

5    Q.   No, that would be 5-0.

6    A.   Yeah, 50, so I'm doing the math.

7         So, 15 into 50 is 3 with 5 minutes left over.  So that

8    would be 3 units of service because you have to have at least

9    8 minutes of service for a unit to be counted.

10   Q.   So, you have to have more than half of the unit before

11   it counts?

12   A.   Right.

13   Q.   And that regulation is written somewhere?

14   A.   I'm pretty sure it is.  It's somewhere.  It's the

15   8-minute rule, and it's used throughout the industry, not

16   just for D.C. Medicaid.

17   Q.   You call that the state minute rule?

18   A.   No.  I didn't say state.  I think it's called the

19   8-minute rule.

20   Q.   Oh, the 8-minute rule.

21   A.   Yeah.

22   Q.   I'm sorry.

23   A.   That's okay.

24   Q.   I've got old ears.

25   A.   That's okay.  I have a Jamaican accent, so that might

1    contribute, as well.

2    Q.    Is there any consideration either by DBH or by your

3    agency about the need for community outreach and the

4    necessity of getting homeless people to come in for the

5    treatment that they need?

6    A.    I'm not aware of any program for that.

7    Q.    So, if there's a provider agency who's concerned that

8    there are people on the street in need of community service

9    workers providing community support to get them into a status

10   where they can maybe qualify for housing or a status where

11   they can apply for a job or any of the other things that

12   community service workers do, what is the system-prescribed

13   approach that an agency should be taking to encourage those

14   people to seek the help that they need?

15   A.    I can't speak to -- I can't speak to what that would

16   look like.  That's more of a policy question.  And I've

17   always described my job as implementing policy, not writing

18   it or developing it, so I'm not sure how the system works in

19   that regard.

20              MR. ROBBINS:  Thank you, Your Honor.  I have no

21   further questions.  Thank you, sir.

22              THE COURT:  Any Redirect?

23                     REDIRECT EXAMINATION

24   BY MS. McKOY:

25   Q.    Mr. Shearer, Mr. Robbins just asked you about outreach.

1  Does Medicaid's prohibition against kickbacks prohibit other

2  types of outreach that are not kickbacks?

3  A.    It depends on how you're defining outreach.  Do you have

4  an example of that or?

5  Q.    Let me rephrase.

6  A.    Okay.

7  Q.    Does Medicaid's prohibition against cash incentives

8  prohibit a provider from providing other types of outreach to

9  beneficiaries in the community?

10  A.    I don't think so.

11         MS. McKOY:  Thank you.

12         THE COURT:  All right, sir, that concludes your

13  testimony.

14         THE WITNESS:  All right.

15         THE COURT:  You may step down.  You are free to

16  leave.

17         THE WITNESS:  Thank you.

18         THE COURT:  Thank you so much.

19         Government?

20         MR. SARMA:  The Government calls Dominic Forka.

21         THE CLERK:  Sir, if you could just remain standing

22  and raise your right hand for me, please.

23                      DOMINIC FORKA

24  having been called as a witness and having been duly sworn,

25  was examined and testified as follows:

DIRECT OF DOMINIC FORKA BY MR. SARMA          264

1          THE CLERK:  You may have a seat.

2          While speaking clearly into the microphone, can you

3    please state your full name and spell your last name for the

4    record.

5          THE WITNESS:  My name is Dominic Forka.  F-O-R-K-A,

6    Dominic, F- -- okay.  Sorry.

7          THE CLERK:  Thank you.

8                    DIRECT EXAMINATION

9    BY MR. SARMA:

10   Q.   Good morning, sir.

11   A.   Good morning.

12   Q.   Can you tell me the city and state where you currently

13   live.

14   A.   Lanham, Maryland.

15   Q.   Did you previously work at a company called Holy Health?

16   A.   Yes, sir.

17   Q.   And were you a CSW at Holy Health?

18   A.   Yeah, I was a CSW.

19   Q.   When did you start working there?

20   A.   I start working there sometime in 2018.

21   Q.   At some point, did you stop working there?

22   A.   Pardon?

23   Q.   At some point, did you stop working there?

24   A.   Yeah, I stopped working there.

25   Q.   When was that?

1  A.   That was around towards the end of 2020.

2  Q.   While you were working at Holy Health, were you -- can

3  you describe how you were paid?

4  A.   Can I describe?

5  Q.   How you were paid.

6  A.   Yeah, I was paid by check.  And I was paid by the notes

7  that I bill, I put in and submit.

8  Q.   When you say "notes," were those notes in ICMS?

9  A.   Yeah, notes in ICMS that I submit.

10 Q.   And did you have to see a patient before you wrote the

11 note in ICMS?

12 A.   Yeah, we have to see the patient.

13 Q.   Were you paid even when you didn't see the patient but

14 you put a note in ICMS?

15 A.   Yeah.

16 Q.   What location of Holy Health did you work?

17 A.   North Capitol.

18 Q.   How often were you in the office?

19 A.   Weekly, every morning I'm in the office.

20 Q.   Did you say every morning?

21 A.   Yeah.

22 Q.   Every day?

23 A.   Every day; Monday to Friday.

24 Q.   Now, sir, have you pled guilty to a crime based on your

25 work at Holy Health?

1    A.    Yes.

2    Q.    What crime did you plead guilty to?

3    A.    Putting in notes that -- putting in notes on consumer

4    that I have not seen.

5    Q.    Did you commit fraud?

6    A.    Yes.

7    Q.    Where did you plead guilty?

8    A.    In court here.

9    Q.    Were you in this court?

10   A.    Yeah, when I was in this court.

11   Q.    And did you admit to writing approximately 3,000 fake

12   notes?

13   A.    Yes.

14   Q.    And did you admit that based on those 3,000 fake notes,

15   Holy Health was paid a little over $356,000?

16   A.    Yes.

17   Q.    And did you admit that Holy Health paid you personally

18   $26 per note that you submitted into ICMS?

19   A.    That's correct.

20   Q.    Now, did you enter into a plea agreement with the

21   Government?  Or a cooperation agreement with the Government?

22   A.    I did.

23   Q.    What are you required to do under that cooperation

24   agreement?

25   A.    To speak nothing but the truth as far as I know what is

1  going on in Holy Health.

2  Q.   What do you hope to achieve today by testifying?

3  A.   I hope that when I testified, I should be acquitted

4  and -- from what I did.

5  Q.   Sorry, sir.  Could you speak up a little bit.

6  A.   Yeah, what I feel is that what I've done, that I feel

7  that this court should pardon me as to -- liberate me from

8  the fraud that I did.

9  Q.   So, are you hoping to get a lighter sentence if you

10  testify today?

11  A.   Yes.

12  Q.   What obligations, if any, do you have to testify -- when

13  you're testifying here?

14  A.   Yeah, my -- well, I'm testifying to bring out why I

15  wrote the false notes, what happened, and what was my main

16  reason why I wrote the false notes.

17  Q.   Sir, did you take an oath just now to tell the truth?

18  A.   Yes, I took an oath to tell the truth.

19  Q.   And what happens if you don't tell the truth today?

20  A.   I should be prosecuted.

21  Q.   Have you been sentenced yet in your case?

22  A.   Sentenced?

23  Q.   Have you received your sentence, your punishment in your

24  case?

25  A.   In my case, I have not yet received the punishment.

DIRECT OF DOMINIC FORKA BY MR. SARMA          268

1   Q.   Do you know who is going to decide your punishment?

2   A.   The judge.

3   Q.   And has anyone made any promises to you about what that

4   punishment might be based on your testimony today?

5   A.   No.

6   Q.   While you were working at Holy Health, if you had an

7   issue at work, who, if anyone, did you go talk to?

8   A.   I talked to the program director.

9   Q.   Who was the program director?

10  A.   Lambert Mbom.

11  Q.   Do you see Mr. Mbom in the courtroom today?

12  A.   Yes.

13          MR. ROBBINS:  We concede that Mr. Mbom is sitting

14  next to me.

15          THE COURT:  Okay.  Very good.

16          Next question.

17  BY MR. SARMA:

18  Q.   While you were working at Holy Health, how often --

19  sorry.  Rephrase.

20      Did you previously say that you were in the office every

21  day?

22  A.   Yes.

23  Q.   How often would you see Mr. Mbom in the office?

24  A.   In the morning when we would come in, he's in the

25  office.

1   Q.   And was that every day?

2   A.   Yeah.

3   Q.   Since you left Holy Health, have you ever seen Mr. Mbom?

4   A.   Yes, we've met.  I've seen him.

5   Q.   How often have you seen him?

6   A.   Yeah, we are in the same organization in church.  So we

7   meet once every month in Burtonsville, Greencastle, the

8   Resurrection Church, Catholic Resurrection Church.

9   Q.   And --

10  A.   So, meet there once a month.

11       And we're on the same organization.

12  Q.   And when you see each other at church, have you ever

13  talked to him?

14  A.   Yeah, we greet.

15  Q.   When is the last time you saw Mr. Mbom?

16  A.   That was towards the end of July, when one of our member

17  in church, they had had an accident in West Virginia, so went

18  there.

19  Q.   When you say "July," is that July of 2023?

20  A.   July 2023; that's correct.

21  Q.   Are you familiar with the ICMS system?

22  A.   Yes, I'm familiar.

23  Q.   While working at Holy Health, did you use ICMS?

24  A.   Yes, we used ICMS.

25  Q.   Did you have your own account?

1   A.   Yes, I had my own account.

2   Q.   Who gave you that account?

3   A.   Mr. Lambert.

4   Q.   And did you write notes in ICMS using that account?

5   A.   That's correct.

6   Q.   Did you ever receive any instruction about how to write

7   notes in ICMS?

8   A.   Yes.

9   Q.   Who gave you that instruction?

10  A.   Mr. Lambert.

11  Q.   And can you describe for the jury what type of

12  instruction he provided you.

13  A.   Yeah, that when we see the consumer, we have to document

14  what we see the consumer and how we saw the consumer.

15  Q.   Did you ever receive instructions on how long to say you

16  saw a consumer?

17  A.   Yeah.  Normally just one hour.  ICMS state one hour to

18  see the consumers.

19  Q.   And after you wrote a note in ICMS, did someone have to

20  approve that note?

21  A.   Yes.

22  Q.   Were there certain individuals at Holy Health who

23  approved your notes?

24  A.   Yes.

25  Q.   Who do you recall approving your notes?

1   A.   Mr. Lambert.

2   Q.   Other than you, were there other CSWs working at Holy

3   Health?

4   A.   That's correct, there were other CSWs.

5   Q.   Who supervised the CSWs?

6   A.   Mr. Lambert supervised all the CSWs.

7   Q.   And did the CSWs ever meet?

8   A.   Yeah, we meet.

9   Q.   How often?

10  A.   We meet weekly.  Every Tuesday by 12 noon we'll meet.

11  12 to 1, an hour.

12  Q.   Was there someone who led those meetings?

13  A.   Yes.

14  Q.   Who led those meetings?

15  A.   Mr. Lambert.

16  Q.   Did you ever hear anyone at Holy Health use the term

17  "productivity"?

18  A.   Yes.

19  Q.   Who did you hear use that term?

20  A.   Mr. Lambert and Mr. Julius.

21  Q.   Who is Mr. Julius?

22  A.   Bakari, Julius.  Bakari is the owner of the company.

23  Q.   When Mr. Bakari and Mr. Mbom used the term productivity,

24  what did you understand them to mean?

25  A.   Productivity, what they mean is the amount -- what we

1  put an amount of documentation we put -- we bill for ICMS,

2  the amount the consumer would see and bill for ICMS, the

3  notes that were put in ICMS.

4  Q.   And did Mr. Mbom ever talk to you about the productivity

5  at Holy Health?

6  A.   Yeah.

7  Q.   At a general level, what did he say?

8  A.   At a general level, he was talking about the number of

9  notes we are putting into ICMS.  He wants the productivity to

10  be high.  We have a quota on productivity.  He said that we

11  are supposed to -- I was supposed to put 40 notes.  And

12  there's some CSWs who put, each quota for people to put

13  numbers.  So, in terms of productivity, talking about the

14  number of notes that were put in ICMS.

15  Q.   40 notes over how long?  I'll rephrase.

16       Was that 40 notes a week?

17  A.   Yeah, 40 notes a week is what I'm saying.

18  Q.   And how long was each note supposed to be for?

19  A.   An hour.

20  Q.   Who told you about that quota?

21  A.   Mr. Lambert.

22  Q.   And what did you do if you did not see 40 consumers in a

23  week each for an hour?

24  A.   Yes, if I did not see a consumer, I didn't meet -- we

25  always have a WhatsApp text, he would talk about

1  productivity.  And Julius come on and talk about

2  productivity, if we don't meet the productivity that are sent

3  to all the CSWs defining our quotas.

4  Q.   And if you weren't meeting that quota, what did you do?

5  A.   If you do not meet the quota, you have a warning.  And

6  obviously might (sic) in nature.

7  Q.   And do you know if anyone at Holy Health was ever fired

8  for not meeting the quota?

9  A.   Yes, we have a consumer who was -- I mean, a CSW who was

10  fired.  First of all, his check was held because of

11  productivity and, finally, he left the company.  They didn't

12  pay him.

13  Q.   Now, while working at Holy Health, did you enter false

14  notes into ICMS?

15  A.   I did.

16  Q.   Did you write notes saying that you saw a consumer for

17  an hour even though you had seen that consumer for a few

18  minutes?

19  A.   I did.

20  Q.   Why did you write that?

21  A.   Yeah, I wrote it because we have to meet.  If you put in

22  less than an hour, you don't meet your productivity.  You

23  don't meet the billing cycle for the week.

24  Q.   Did you ever write notes saying that you'd met someone

25  at their home or even -- or in the community even though you

1  had actually seen them in the Holy Health offices?

2  A.   Yes, I wrote that I saw them in the home, but actually I

3  saw them in the office.

4  Q.   And why did you do that?

5  A.   Yeah.  That particular came when from Mr. Julius telling

6  us that if we put, if we say we are writing a note, we should

7  put we are writing at home.  We should not put that we write

8  them in the office because it will create red flags for DBH.

9  And he insisted on that.

10      There was a time I was called by Mr. Lambert telling me

11  that I should put my notes -- a note in the office.  I should

12  not say I write my notes in the office.  That person --

13  sorry.

14  Q.   Maybe as a followup:  Did you initially have a

15  conversation with Mr. Bakari about this issue?

16  A.   Yeah.

17  Q.   And what did Mr. Bakari tell you about where to say you

18  were seeing consumers?

19  A.   Yeah.  He said we should not write that we have seen

20  consumers in the office, that we should put that we seen them

21  at home or outside of the office.

22  Q.   And did you -- go ahead, sir.

23  A.   Because we are Community Support Worker.

24  Q.   And did you have a separate conversation, then, with Mr.

25  Mbom?

1   A.   Yes.

2   Q.   Was that after your conversation with Mr. Bakari?

3   A.   Yes.  After my conversation with Mr. Bakari.

4   Q.   And was anyone else there other than you and Mr. Mbom

5   for that conversation?

6   A.   No, I was with him.

7   Q.   And what did Mr. Mbom tell you during that conversation?

8   A.   Yeah, he reiterated the fact that we should not put

9   notes in the office.  We should not state that we put notes

10  in the office.  We put notes out of the office.  Even though

11  the consumers are all in the office.

12  Q.   And did he -- did Mr. Mbom explain why he wanted you to

13  do that?

14  A.   The same as Mr. Bakari, that it will be a red flag for

15  DBH that we are putting notes in the office.

16  Q.   What did you understand him to mean by "red flag"?

17  A.   By red flag means that DBH required the company while

18  we -- while they are seeing consumers in the office on a --

19  yeah.

20  Q.   I believe you previously testified that you wrote -- did

21  you write notes on patients that you never saw?

22  A.   Yes.

23  Q.   And in 2019, did Mr. Mbom tell the CSWs not to bill for

24  patients that they did not see?

25  A.   Not to my knowledge.

1  Q.   Before testifying here today, sir, did you meet with the
2  Government and watch videos where you had meetings with the
3  consumer named Darlene Williams?
4  A.   That's correct.
5  Q.   And did you also meet with the Government to look at
6  notes associated with those recorded visits?
7  A.   That's correct.
8  Q.   And did you make up things in the notes you wrote about
9  those visits?
10 A.   That's correct.
11 Q.   Did you lie about the time that you saw Ms. Williams?
12 A.   I do.
13 Q.   Did you lie about seeing her at her daughter's home?
14 A.   I do.
15 Q.   In reality, where did you actually meet with
16 Ms. Williams?
17 A.   In the office.  It was in my office.
18 Q.   Other than in the office, where, if anywhere else, did
19 you meet with Ms. Williams?
20 A.   I've never met him (sic) anywhere apart from the office.
21        MR. SARMA:  Just one minute, Your Honor.
22 BY MR. SARMA:
23 Q.   I am going to show you what has previously been marked
24 as -- sorry, wrong one.
25        I will show you first what has been marked as I67.  And

DIRECT OF DOMINIC FORKA BY MR. SARMA          277

1   is this a note that you wrote?

2   A.   Yeah, that's a note I wrote.

3   Q.   And was the consumer Darlene Williams?

4   A.   Yeah, that is Darlene Williams.

5   Q.   And did you write in the note that you had seen her on

6   October 12, 2019?

7   A.   That's correct.

8   Q.   And how long did you say you had met with her?

9   A.   For 61 minutes.

10  Q.   Did you actually provide services for 61 minutes?

11  A.   No.

12  Q.   And where did you say you met with her?

13  A.   In the office.

14       Oh, at home.  Yeah, it's at home.

15  Q.   And where did you actually meet with her?

16  A.   In the office.

17  Q.   What time did you write this note at?

18  A.   At 11:27 p.m.

19  Q.   And where did you write this note?

20  A.   In my house.

21  Q.   And where was your house at this time?

22  A.   Lanham, Maryland.

23  Q.   Is this another note you wrote for Ms. Williams?

24  A.   Yeah, it is a note I wrote for her.

25  Q.   And where do you say you met her?

DIRECT OF DOMINIC FORKA BY MR. SARMA          278

1   A.   The home.

2   Q.   Where did you actually meet with her?

3   A.   In the office.

4   Q.   How long did you say the meeting lasted?

5   A.   61 minutes.

6   Q.   Did it actually last 61 minutes?

7   A.   No.

8   Q.   And at what time did you write the note?

9   A.   9:13 p.m.

10  Q.   And where did you write the note from?

11  A.   My house.

12  Q.   I73.  Is this another note you wrote for Ms. Darlene

13  Williams?

14  A.   That's right.

15  Q.   And according to the note, where did you see her?

16  A.   At home.

17  Q.   How long did you say -- and did you actually see her at

18  home?

19  A.   No.  I saw her in the office.

20  Q.   And how long did you say the meeting lasted?

21  A.   59 minutes.

22  Q.   Did it actually last 59 minutes?

23  A.   No.

24  Q.   And what time did you write the note?

25  A.   10:48 p.m.

1   Q.   And where did you write this note?

2   A.   Lanham, Maryland.

3   Q.   Now showing you I74.  Is this another note you wrote for

4   Darlene Williams?

5   A.   That's correct.

6   Q.   And according to the note, where did you say you met

7   her?

8   A.   That I met her at home, at her home.

9   Q.   And where'd you actually meet her?

10  A.   At the office.

11  Q.   And how long did you say the meeting lasted?

12  A.   61 minutes.

13  Q.   And how -- did it actually last 61 minutes?

14  A.   No.

15  Q.   What time did you write this note?

16  A.   5:19 a.m.

17  Q.   Where did you write this note?

18  A.   At home, in my house.

19  Q.   Now, showing you I76.  Is this another note that you

20  wrote for Ms. Williams?

21  A.   That's correct.

22  Q.   Where did you say the meeting occurred?

23  A.   At home, in her house.

24  Q.   Where did you actually meet her?

25  A.   In the office.

1    Q.   How long did you say the meeting lasted?

2    A.   59 minutes.

3    Q.   Did it actually last 59 minutes?

4    A.   No.

5    Q.   And what time did you write the note?

6    A.   11:17 p.m.

7    Q.   And where did you write this note?

8    A.   In my house.

9    Q.   Last one.

10        Is this another note you wrote for Ms. Williams?

11   A.   Yes.

12   Q.   Where did you say you met her?

13   A.   In the house.

14   Q.   Where did you actually meet her?

15   A.   In the office.

16   Q.   How long did you say the meeting lasted?

17   A.   59 minutes.

18   Q.   Did it actually last 59 minutes?

19   A.   No.

20   Q.   What time did you write the note?

21   A.   8:55 p.m.

22   Q.   Where did you write this note?

23   A.   In my house.

24   Q.   And who approved this note?

25   A.   Mr. Lambert.

1  Q.   Beyond your meetings at the office, did the CSWs also

2  communicate on WhatsApp?

3  A.   Yeah.  All of us communicate on WhatsApp.

4  Q.   Was Mr. Mbom part of that WhatsApp?

5  A.   He was the administrator.

6  Q.   Was he the administrator of the WhatsApp?

7  A.   Of the WhatsApp, yeah, of the WhatsApp.

8  Q.   Showing you what has been marked as B11.  Do you

9  recognize this WhatsApp chat?

10 A.   Yeah, I recognized it.

11 Q.   I will highlight first this message.  Do you know who

12 wrote this message?

13 A.   Yes, it's Mr. Lambert.

14 Q.   When did he write this message?

15 A.   4/11/2019.

16 Q.   And do you see where he wrote, "Productivity was at its

17 lowest this week."  What did you understand him to mean by

18 that sentence?

19 A.   That we have not submitted enough documentation for

20 billing.

21 Q.   Pointing to B11 again.  I'm going to show you the

22 message -- sorry.

23      Turn to the message directly below.  Who wrote this

24 message?

25 A.   Mr. Lambert.

1    Q.   And do you see where he says, "Each CSW is expected to

2    submit a minimum of 40 hours per week"?

3    A.   Yes.

4    Q.   What was he referring to there?

5    A.   That what we have to document in notes that we have to

6    put in for billing, at least 40 hours a week.  That's 40

7    notes a week.

8    Q.   And was each note supposed to be for an hour?

9    A.   Yes, each note is an hour.

10   Q.   And did you actually have to see the patient or consumer

11   before you put in the note?

12   A.   No.

13   Q.   Were there times you would see a patient in the office

14   and then not write a note?

15   A.   (No audible response.)

16   Q.   Do you recall watching a video where you met with

17   Ms. Williams where you did not write a note?

18   A.   Yeah.

19   Q.   Why would you see a patient or a consumer in the office

20   and then not write a note?

21   A.   Yeah, because -- normally Mr. Lambert told us not more

22   than seven notes a week.  So if we see -- sometimes you have

23   a consumer, you have about nine of them who come in the

24   office.  And you go through them.  But you have to put but

25   seven notes on that day.  So carry over the next day.  So we

1  don't put notes.  So you see the consumer, but you just carry

2  it forward.

3  Q.   So you would -- as an example, you might see a patient

4  or a consumer on a Monday, but because you had already

5  written seven notes for the Monday, what would you do?

6  A.   Yeah, no, you'd take that -- when that person you saw to

7  Tuesday.

8  Q.   I'm now showing you what has been marked as B12.  Do you

9  recognize this message?

10  A.   Yes.  I recognize it.

11  Q.   Who sent this message?

12  A.   Mr. Lambert.

13  Q.   And who is Evelyn?

14  A.   Evelyn is one of the CSWs.

15  Q.   And are you Dominic?

16  A.   Yeah.

17  Q.   Who's Pa Atanga?

18  A.   He's a CSW.

19  Q.   And who is Rita?

20  A.   A CSW.

21  Q.   And then do you see he says, "I need 40 notes each

22  before the close of day"?

23  A.   Yes.

24  Q.   What did you understand him to mean by that?

25  A.   Yeah, before the close of the day, that was towards the

1  billing -- the cycle -- billing cycle.  So if we have not met

2  with the quota of 40, that's why this note came to us, that

3  he needs 40 notes from us for the billing cycle to come with

4  enough productivity to bill.

5       By sending this note means most have not met our quota

6  for the billing cycle.

7  Q.   And what date was this message sent?

8  A.   It's fifth seven 2019.

9  Q.   And is 5/7/2019 the same as May 7th, --

10 A.   Yeah.

11 Q.   -- 2019?

12 A.   Yeah, it's May 2019.

13 Q.   I'm now showing you what has been marked as B14.  Do you

14 recognize -- do you recognize this message?

15 A.   Yes, I recognize the message.

16 Q.   Who wrote this message?

17 A.   I'm the one.

18 Q.   And when did you write it?

19 A.   May 23, 2019.

20 Q.   Do you see the time when you wrote it?

21 A.   Yes.  12:09 a.m.

22 Q.   So, a little bit after midnight?

23 A.   Uh-huh.

24 Q.   Where were you writing this message from?

25 A.   In my house.

DIRECT OF DOMINIC FORKA BY MR. SARMA          285

1   Q.   And where, what state was that in?

2   A.   Lanham, Maryland.

3   Q.   And then you wrote, "I have added 7 more."  What did you

4   mean by that?

5   A.   Yeah.  That I've added -- I was short of 7.  So I said

6   I've added 7 more notes on the -- on my billing, to round off

7   my 40 notes for the week.

8   Q.   And then you wrote, "Hope you will have a hundred before

9   10 p.m."  What did you mean by that?

10  A.   Yeah, because a hundred would be, that was for the whole

11  cycle, the two weeks, 100 notes that I put in two weeks.

12  Q.   And who are you writing this message to?

13  A.   To Mr. Lambert.

14  Q.   And then did Mr. Mbom respond to you?

15  A.   Yes.

16  Q.   Do you see where he wrote, "If each person just did 20

17  more, we would be fine"?

18  A.   Yes, I see.

19  Q.   What did you understand him to mean by that?

20  A.   20 more we'll be fine means the productivity for the

21  billing cycle would be good.

22  Q.   I'm now showing you what has been marked as B25a.  Let

23  me start.  Do you recognize this message?

24  A.   Can you --

25  Q.   Sorry.  Give me one second.

1       Do you recognize this message?

2   A.   Yes, I recognize it.

3   Q.   And who sent the message?

4   A.   That's Mr. Lambert.

5   Q.   And did you receive this message?

6   A.   Yes, I did.

7   Q.   I won't go through all them, but who are the other -- in

8   general are these other CSWs?

9   A.   Yes.  CSW.  We have Eugenie, who is the co-owner of the

10  company.  You have Dave Diskiwan (ph.) who is the clinical

11  director.  Gerald is CSW.  Connor, I don't know.  Eleanor,

12  CSW.  Evelyn Akumsi was a CSW.

13  Q.   And was -- did Mr. Mbom send this message on March 24,

14  2020?

15  A.   That's correct.

16  Q.   I want to now -- sorry.

17       I want to now focus in on this message.  Do you see

18  where Mr. Mbom says, "At the same time, it cannot be business

19  as usual.  We cannot continue billing as though things are

20  normal."  What did you understand him to mean?

21  A.   Yeah.  This note came during the COVID period.  And he

22  was telling us that we should not be billing that the same as

23  normal, meaning we are not seeing the consumers, we are not

24  going to the consumers' home because of COVID.  So we should

25  put --

1        THE COURT:  Sorry, Sir.  I didn't hear that.

2    BY MR. SARMA:

3    Q.    Would you mind speaking --

4    A.    I'm sorry about that.

5         So, he was telling us that we should know that this is

6    COVID, so we should not be putting billing as usual.  So we

7    have to change the way we bill.  And that is when he told us

8    about telemeds.

9    Q.    And then he says, "We cannot continue describing

10   services that are not taking place."  What did you understand

11   him to mean by that?

12   A.    Yeah, that means we cannot be putting in services that

13   we are not seeing the consumer directly.

14   Q.    Do you understand why he was telling you that?

15   A.    Yeah, because of COVID.  And that we should use telemed.

16   Telephone.  That is telemed.  Not all can be using.  So we

17   cannot put in services that we see consumers at home of which

18   we are supposed to talk over the phone with the consumers.

19   Q.    And then do you see where it says, "Nobody can bill for

20   a telephone service for more than 30 minutes except the

21   consumer is in crisis."  What was he instructing you to do

22   there?

23   A.    Yeah, that we should not bill for more than 30 minutes

24   because it's through the phone.  Except the consumer is in

25   crisis, then we can bill for 30 minutes.

1   Q.   After this instruction, did you stop billing for four

2   units of service?

3   A.   No, we are not doing that.

4   Q.   I'm not sure why this message is so small.  All right.

5        Who sent this message?

6   A.   Yeah, Mr. Lambert.

7   Q.   And did you receive this message?

8   A.   Yes, I did.

9   Q.   And was this to the same group of individuals who we

10  were talking about on the last message?

11  A.   That's correct, they're the same individuals.

12  Q.   And were these folks CSWs?

13  A.   Some were CSWs, some were director of nurses, yeah.

14  Q.   Were these all people working at Holy Health?

15  A.   Yeah, all of us were at Holy Health.

16           MR. SARMA:  One minute, Your Honor.

17           (Pause.)

18  BY MR. SARMA:

19  Q.   When did Mr. Mbom send this message?

20  A.   March 25, 2020?

21  Q.   And do you see where he says, "Please do not jeopardize

22  everybody.  You cannot continue the same billing practices.

23  While we are not closed, you cannot be documenting that you

24  saw seven people in a day.  That is not practicable."  What

25  did he mean by that?  What did you understand him to mean by

DIRECT OF DOMINIC FORKA BY MR. SARMA          289

1  that?

2  A.    Yeah.  What he is talking, saying is we close at 5.  So,

3  it is not possible that before 5 o'clock you've already seen

4  seven consumers and you are documenting that you've seen

5  seven consumers.  That is not feasible.

6  Q.    And then he -- so what did he want you to do?

7  A.    That we must put -- if we are documenting for seven

8  consumers, we should document after the office has closed,

9  which means we've seen -- we've worked up to -- more than

10 five, then we can put that, that stretch.  Because if you

11 start from 8:30, it comes down.

12 Q.    And do you see where he says, "You either adjust the

13 time or you move to another day"?

14 A.    Yeah.

15 Q.    What did you understand him to be directing you to do?

16 A.    Yeah, for me, what I understood by moving to next day is

17 because in the office sometimes you see about nine consumers

18 who come in the office, of which you have to document for

19 seven.  So you'd move the next -- those you have not seen to

20 the next day.

21 Q.    Now, showing you what's previously been marked as E2.

22 And I'm going to the third page.  Do you recognize this

23 document, sir?

24 A.    Yes, I do.

25 Q.    Did you write it?

DIRECT OF DOMINIC FORKA BY MR. SARMA        290

1   A.   I did write it.

2   Q.   Did you previously meet with the Government and the

3   Government showed you this document?

4   A.   Yeah, the Government showed me the document.

5   Q.   And did you initially think that you had not written it?

6   A.   Yeah.  At first I didn't think I wrote it because I had

7   forgotten.

8   Q.   But testifying under oath today, do you believe you

9   wrote this document?

10  A.   Yeah, I wrote the document.  I wrote it.

11  Q.   And why did you write this document?

12  A.   Yeah.  First, when I was in the office, when Mr. Julius

13  came first, I said "Oh."  That they have the sequela and --

14  from DBH that we are putting notes, a lot of notes, too many

15  notes.  So Lambert came and told me that I should send -- I

16  should write a letter.  I didn't know what to write.  So I

17  said, "What am I writing?"

18       That I should explain why I'm having so many consumers,

19  that I'm putting so many consumers.  So I did this.  Then

20  Julius came in and said, "Has Lambert told me what I am

21  supposed to write?"  I said, "Yeah.  He said I should give my

22  explanation why I'm putting -- I have so many consumers that

23  I put in."

24       That's why I wrote the letter.  But I didn't see the

25  letter in the center.  This is what I saw.

1   Q.   I would like to break that down a little bit for the

2   jury.

3        So, did you initially have a conversation with Mr.

4   Bakari?

5   A.   That's right.

6   Q.   And what did Mr. Bakari tell you in that first

7   conversation?

8   A.   He said they have received a query from DBH that was

9   concerning me, us putting too many consumers at one time,

10  seeing too many consumers.  So he said I should write a

11  letter.  I didn't know what to write.

12       So, when Mr. Lambert came and we talked, and then he

13  explained that I should explain how many consumers and why

14  I'm putting so many notes for consumers.  So that's what I

15  did, I wrote it like this.

16  Q.   And in this letter, you discuss being that most of your

17  consumers, or many of them, are located Good Hope Road,

18  Alabama Avenue and Minnesota Avenue SE.  Did you see your

19  consumers there?  Or did you see them in the office?

20  A.   No, in the office.

21  Q.   And then at the end of the letter you say, "That is why

22  I am able to see a maximum of eight consumers and average

23  seven a day."  Is that an accurate statement?

24  A.   That's what I see.

25  Q.   That's what you wrote; correct?

CROSS OF DOMINIC FORKA BY MR. ROBBINS        292

1   A.   That's what I wrote, yeah.

2   Q.   Did you see these folks each for an hour a day?

3   A.   No.

4   Q.   Once you wrote this letter, who, if anyone, did you give

5   it to?

6   A.   I gave it to Mr. Lambert.

7   Q.   And do you know what Mr. Mbom did with that letter?

8   A.   I don't know.  I'm just seeing it when you showed me in

9   the office.  I forgot it.

10  Q.   Did he ever tell you what he was going to do with the

11  letter?

12  A.   No.

13            MR. SARMA:  A minute, Your Honor.

14            THE COURT:  Okay.

15  BY MR. SARMA:

16  Q.   On Page 1 of the same document, do you recognize this

17  email address?

18  A.   Yeah, that is Mr. Lambert's email address.

19            MR. SARMA:  Thank you, sir.

20            No further questions.

21            THE COURT:  Mr. Robbins?

22            MR. ROBBINS:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. ROBBINS:

25  Q.   Good afternoon, Mr. Forka.

CROSS OF DOMINIC FORKA BY MR. ROBBINS          293

1    A.    Yeah.

2    Q.    I'm not loud enough.  You know that keeps happening to

3    me.

4          Good afternoon.  My name is Gar Robbins.  I'm

5    representing Lambert Mbom.

6    A.    Good afternoon, sir.

7    Q.    I have a few questions.

8          But first, I'd like to start with the video that we saw

9    snippets of the other day, with you meeting with Darlene

10   Williams.

11         It seemed like you established a pretty good rapport

12   with her.  Did you feel like you had connected with her?

13   A.    With who?

14   Q.    Did you feel like you had connected with Ms. Williams

15   when you were meeting with her in your office?

16   A.    She was my consumer.  That's why I'm meeting with her.

17   She comes when she has problems.

18   Q.    You were trying to help her?

19   A.    That's correct.

20   Q.    Was your interaction with her kind of similar to the way

21   you interacted with consumers in general?

22   A.    Yeah.

23   Q.    Do you think that your reputation was such that you were

24   pretty popular with consumers?

25   A.    Not popular except my consumers not all that popular.

1  Q.   You think you were run-of-the-mill same as everybody

2  else?

3  A.   I was just average as a normal CSW.

4  Q.   All right.  Holy Health was a pretty busy place based on

5  the video that we saw that she was there; is that fair?

6  A.   Yes, it's busy because we have so many consumers coming

7  in.

8  Q.   A lot of people coming through?

9  A.   Yeah.

10 Q.   And for the ones that you saw, you were trying to help

11 each of them?

12 A.   Yeah.  The ones I saw is the one that were allocated to

13 me by Mr. Mbom.

14 Q.   Okay.

15      Now, you were asked about a bunch of notes you had

16 written.  You wrote those notes at night?

17 A.   Yep.

18 Q.   Did anybody ever tell you you weren't allowed to write

19 your notes at night?

20 A.   For me to write the notes at night?

21 Q.   Yeah.  Did anyone say you weren't allowed to do that?

22 A.   Yeah, Mr. Mbom said we cannot write it in the office, so

23 go home and write it.

24 Q.   And why could you not write them at the office?

25 A.   We can't write it in the office because there are a lot

CROSS OF DOMINIC FORKA BY MR. ROBBINS          295

1    of people coming in the office for us.  So most of the time

2    you see them, we don't see them.  And he said -- Julius even

3    said we don't really need to write at home.  That is the

4    advice they give us.  We don't need to write in the office.

5         We can write at home because I can't give 24-hour

6    spreads to put in your notes.  So it is not the most that you

7    must put your notes in the office.  You can go home and still

8    write the notes.

9    Q.   So the usual practice after seeing the consumer is you

10   wouldn't write your note right away.

11   A.   No -- yes.  I wouldn't write the note right away.

12   Q.   You'd write it sometime within the next day or so?

13   A.   Yeah, within the next.  We have 24 hours to put the

14   notes.

15   Q.   Was it your understanding from going to the CSW meetings

16   that there was a problem at Holy Health of not all of the

17   CSWs were getting around to writing their notes?  That they

18   would meet with consumers and not get their notes turned in

19   in time?

20   A.   Yeah.  Normally, even myself, sometimes the immediacy,

21   we don't turn your note in at that particular time, you turn

22   it later on.

23   Q.   And Lambert Mbom was giving CSWs guidance, I guess would

24   be the generous term, but he was kind of tough on CSWs about

25   you've got to get your notes in.

1   A.   That is why I was talking on productivity.

2   Q.   That's what he was talking about on productivity.  After

3   you see your consumers, get your notes in.

4   A.   That's correct.

5   Q.   When the Government was showing you those specific

6   notes, they asked you about who approved one of them.  And

7   that was Lambert Mbom.

8   A.   Yeah.

9   Q.   Did you happen to notice who approved all the rest of

10  them?

11  A.   You have Ms. Betty approved some of the notes.  I mean,

12  that's Ms. Betty.

13  Q.   So, a lot of times she was the one who was keeping an

14  eye on your notes; correct?  She would be the one to approve

15  them?

16  A.   It depends on the truth, I don't know.  Because I don't

17  see when they approve it.  It's the two of them.

18  Q.   Got it.

19       Was it your impression that Holy Health maybe had

20  trouble with money?

21  A.   Obviously they had trouble with payment, to pay our

22  wages.

23  Q.   And did either Mr. Bakari or Lambert say that part of

24  the problem is that people are not turning in their notes?

25  A.   That was not the problem.

1   Q.   What was the problem?

2   A.   I don't know.

3   Q.   But there was a lot of pressure on CSWs and a lot of

4   pressure on Lambert?

5   A.   Yeah.  Both of them were giving us pressures.  Lambert

6   and Bakari, they were giving us pressure.

7        And that's why you see right before the meeting he write

8   this -- he sent us a memo telling us our productivity.

9   Q.   And was it your impression that maybe Lambert was under

10  pressure from Bakari, since Bakari is the boss and owned the

11  place?

12  A.   Yeah, he was aggressive.  Aggressive.  So that can be

13  done.  I don't know.

14  Q.   For the consumers with whom you met, did you feel like

15  you were accomplishing positive things in their lives?

16  A.   Yeah, I do because I know I have given them houses, they

17  had no houses; I'm helping them go into houses.  Helps them

18  that they were not going to school; finally, they went to

19  school.  So I did something good for them.

20            MR. ROBBINS:  Thank you, sir.

21            I have no further questions, Your Honor.

22            THE COURT:  Mr. Sarma?

23                    REDIRECT EXAMINATION

24  BY MR. SARMA:

25  Q.   Did you testify previously that you and other CSWs got

REDIRECT OF DOMINIC FORKA BY MR. SARMA          298

1  paid based on actually entering notes into the system?

2  A.    Yes.

3  Q.    Did that motivate you to put your notes into the system?

4  A.    Yeah.  If you don't put your notes, it motivated us.

5  Q.    I think Mr. Robbins talked to you a little bit about

6  that video with Ms. Williams.  Do you remember watching that

7  video?

8  A.    I watched the video.

9  Q.    At the end of that video, did you give Ms. Williams a

10 sticky note?

11 A.    Yeah, I give her a sticky note.

12 Q.    What -- can you explain for the jury, what is that

13 sticky note?

14 A.    Yeah, the sticky note is you sign that you have seen

15 her.  And you give her that sticky note for her to go to the

16 front desk and get some money.

17       And that's where it started by Bakari to be doing --

18 each consumer that we see will give money, they will go to

19 the counter to get money.

20 Q.    I believe you told Mr. Robbins that Holy Health, there

21 were a lot of consumers in the office when you went in; is

22 that right?

23 A.    No.  The one consumers would abuse it, yeah.

24 Q.    Yeah.  Was it your practice to give those sticky notes

25 to all the consumers?

1  A.    All the consumers must.   Because most of the -- that's

2  why we didn't see them in the office, because they come to

3  the office because of the money.   So that's why we give them

4  the sticky notes, all the consumers we would give them the

5  sticky notes.

6  Q.    So you understood that they were coming to the office

7  and they would get paid?

8  A.    They would get paid, that's correct.

9  Q.    And did you say that a lot of your consumers were

10  homeless?

11  A.    Yeah, they were homeless.

12  Q.    Were a lot of them without jobs?

13  A.    Yeah, some without jobs.

14  Q.    So, was $5 to $10 a lot of money for them?

15  A.    Yeah, because I personally asked in the meeting, "What

16  is the essence of the $10?"   They told us that the $10 is for

17  them to pay their transport fare back, for their bus fare.

18  That's what we're told.

19  Q.    Who told you that?

20  A.    Julius.

21  Q.    And were -- did you know if there was a Holy Health van?

22  A.    Yeah, we have a -- there was a Holy Health van.

23  Q.    Can you describe for the jury what did that van do?

24  A.    Yeah, the van goes Downtown D.C., brings consumers up to

25  the office, and it takes them back to their various places.

1   Q.   Do you know if it cost any money to ride that van?

2   A.   No.  The van is free, free of charge.

3   Q.   Did you -- would you give a consumer the sticky note if

4   you knew that consumer came on the van?

5   A.   You still give.  It has been instructed in the office by

6   them that we should give sticky notes for them as you sign

7   that they have been in the office.

8   Q.   So, could you ride the van for free and also get paid

9   your $10?

10  A.   That's correct.

11  Q.   I think you told Mr. Robbins that you thought you were

12  helping your consumers; correct?

13  A.   That's correct.

14  Q.   And during your visits with consumers, you felt like you

15  were helping them?

16  A.   Yes.

17  Q.   Did you also say that you wrote notes when you didn't

18  see the patient at all?

19  A.   That's correct.

20  Q.   Were you helping those patients when you didn't see them

21  at all?

22  A.   No.

23          MR. SARMA:  No further questions.

24          THE COURT:  All right.  Mr. Forka, this concludes

25  your testimony.  You may step down.  And you are free to

1    leave.   Thank you so much.

2               All right, Ladies and Gentlemen, let's take our

3    second break of the day.   All right.

4               THE CLERK:   All rise for the jury.

5          (The jury left the courtroom at 12:20 p.m., and the

6               following proceedings were had out of the presence of

7               the jury.)

8               THE COURT:   All right, Counsel, really briefly.   I

9    have been looking at the jury instructions.   And,

10   unfortunately, they're kind of a mess because you only have

11   Mr. Mbom now, we don't have the others.   So I just wanted to

12   warn you.   I took out everything on Count Four.   I took out

13   the substantive instructions on Count Four.

14              I'm incorporating into the conspiracy just a very

15   brief statement on wire fraud and health care fraud.

16              And I hear your objection as to the indictment.   It

17   would be great if we could find a way to streamline that

18   indictment language because it is so long.   But for now I'm

19   going to leave it in.

20              My hope is that I'll get you-all a redlined version

21   of the instructions, as best as I can clean them up, so that

22   you have them between now and tomorrow to take a look at.

23              And I'm just -- if I'm resolving something that

24   Mr. Bakari seems to be the one to object to everything and

25   Mr. Mbom sort of riding, you know, sidecar, is my word, but

REDIRECT OF DOMINIC FORKA BY MR. SARMA          302

1  you basically adopted them.  If you see it and it seems

2  relevant, I'm addressing it; otherwise, -- and you'll know

3  I've addressed it because I've taken out the comment and made

4  the change or not -- otherwise, if it's still in there, I

5  need to hear from you all, open for discussion.

6          This is a long way of saying you're going to get

7  them back.  Study them.

8          MR. SARMA:  Thank you, Your Honor.

9          THE COURT:  Okay.  Anything else before we break?

10  All right.  Great.  Thanks so much.

11          THE CLERK:  Court stands in recess.

12          (Recess held from 12:23 to 12:45 p.m.)

13          THE COURT:  All right.  Are we ready for the jury?

14          MR. SARMA:  Yes, Your Honor.

15          THE COURT:  Okay.

16      (The jury came back into the courtroom at 12:47 p.m.,

17          and the following proceedings were had in the

18          presence of the jury.)

19          THE COURT:  All right, everybody.  Have a seat.

20          Government?

21          MR. SARMA:  The Government calls Joshua Robinson.

22          THE CLERK:  Sir, if you could make your way to the

23  witness box.  If you could just remain standing and raise

24  your right hand for me, please.

25

1                    JOSHUA ROBINSON

2    having been called as a witness and having been duly sworn,

3    was examined and testified as follows:

4                    THE CLERK:  You may have a seat.

5                    And while speaking into the microphone, can you

6    please state your full name and then spell your last name for

7    the record.

8                    THE WITNESS:  Joshua Robinson; R-O-B-I-N-S-O-N.

9                    THE CLERK:  Thank you.

10                   DIRECT EXAMINATION

11   BY MR. SARMA:

12   Q.   Good afternoon, Mr. Robinson.

13   A.   Good afternoon.

14   Q.   Would you mind speaking up a little bit?

15   A.   Good afternoon.

16   Q.   Where do you work?

17   A.   Qualifacts Health Systems, Incorporated.

18   Q.   And how long have you worked at Qualifacts?

19   A.   20 years.

20   Q.   And what is your title?

21   A.   I am a senior support manager.

22   Q.   As a senior support manager, what are your roles and

23   responsibilities?

24   A.   I oversee the trouble-shooting of the software,

25   Credible, for Credible Behavioral Health as well as the

1    technical issues related to the software.

2    Q.    And you just referred to Credible.  Are Credible and

3    ICMS similar?

4    A.    Credible is the software that ICMS uses; correct.

5    Q.    And based on your job, do you know whether the D.C.

6    Department of Behavioral Health uses Credible?

7    A.    Yes.  D.C. Department of Behavioral Health does use the

8    Credible system.

9    Q.    And do you know -- if I refer to the Department of

10   Behavioral Health as DBH, will you know what I'm talking

11   about?

12   A.    I will.

13   Q.    Do you know if DBH requires its mental health providers

14   to log in through Credible?

15   A.    Yes.  The DCDBH does require their users to log in.

16   Q.    And from the period of January 2015 to September 2021,

17   where were Credible's servers located?

18   A.    Both in Chicago and Ashburn, Virginia.

19   Q.    I am now going to show you what has been marked as I2.

20   Can you tell the jury what this document is?

21   A.    This appears to be a service header for a visit entered

22   into the Credible system.

23   Q.    And according to this document, who entered the service?

24   A.    It was entered by the staff name Nicholas Nde.  I

25   apologize if I have the last name wrong.

DIRECT OF JOSHUA ROBINSON BY MR. SARMA        305

1   Q.   And according to this note, who approved it?

2   A.   Mbom1 is the user name that approved that down in the

3   "approved by/on" field.

4   Q.   This one right here?

5   A.   That's correct.

6   Q.   Thank you.

7        Briefly just turning back to the server, so if a note

8   was entered in ICMS here in Maryland, would it then be stored

9   on a server either in Virginia or in Illinois?

10  A.   It would actually be stored in both.  It's the disaster

11  recovery for the Credible Behavioral Health software.  We

12  have a redundant system that the Chicago database mirrors the

13  Ashburn one.

14  Q.   I'm very lucky I'm a lawyer; right?  I only kind of

15  understood that.

16  A.   I'm sorry.

17  Q.   And according to this note, what was the time in for

18  this service?

19  A.   That would be 10:15 a.m. Eastern Time.

20  Q.   And so what time zone are the times in this note for?

21  A.   DCDBH is set up to use Eastern Time, so it would be in

22  Eastern Time.

23  Q.   And what does "time in" mean?

24  A.   Time in is the time that the employee says that they

25  started the service with the client.

1  Q.   And is that a manual-entered field?

2  A.   It is.

3  Q.   And then do you see the time out?

4  A.   I do.

5  Q.   What does that field represent?

6  A.   That represents the time the employee says that the

7  service ended with the client.

8  Q.   And is that a manual-entered field?

9  A.   It is.

10  Q.   Do you see this date here?

11  A.   I do.

12  Q.   What does that date field represent?

13  A.   That is the date of service entered in by the employee.

14  Q.   Do you see this duration field?

15  A.   I do.

16  Q.   What does the duration field --

17  A.   The duration is a calculation between time in and time

18  out to equal the number of minutes that the service was for.

19  Q.   And does the system automatically calculate?

20  A.   It does.  It auto-calculates it based on the time

21  in/time out selected by the end user, the employee in this

22  case.

23  Q.   And then there's this "Units" field.  Is that an

24  auto-populated field, or is that manual?

25  A.   It's an auto-populated field; but, again, like the

1   duration, it is a calculation based off of the time in and
2   time out entered by the employee for the number of units that
3   are going to be billed to the payer.
4   Q.   And do you see the "Status" field?
5   A.   I do.
6   Q.   What does the status field mean?
7   A.   So, the status is the status of the service itself as it
8   moves through the process.  So in this case, it says, "Paid,"
9   which means that there are $0 owed on that service.
10  Q.   $0 owed to whom?
11  A.   To the agency, DCDBH or one of its subsidiaries.
12  Q.   And do you see this "Transferred" field?
13  A.   I do.
14  Q.   What does that transferred field have --
15  A.   So, that is the system time that the service actually
16  entered into the system as a service for review by
17  supervisors and hopefully on to billing.
18  Q.   And do you see this time next to this user name here?
19  A.   I do.
20  Q.   What does that time mean?
21  A.   So, that is the actual time that the user, Imbom1 (sic),
22  came in and physically pushed the approved button to send it
23  to billing.
24  Q.   And is that a manual-entered field, or is that captured
25  by the system?

 1   A.   That is a -- that is based on the action of them
 2   approving it.  So it is automatically captured when the
 3   approver actually clicks the button "approve" on the service.
 4   Q.   Do you see what I just highlight on the screen?
 5   A.   I do.  The staff signature.
 6   Q.   Can you describe -- what does the staff signature field
 7   represent?
 8   A.   So, the staff signature field represents the signature
 9   of the staff member that is listed on the service.  And the
10   time and date stamp below it represent the date and time that
11   that service was signed.
12   Q.   Can you describe at a high level what this is?
13   A.   So, this is called our log.  It is a working log of all
14   the actions taken against a specific services, in this case
15   the IDs in the top right-hand corner, and it logs every
16   action that takes place against that service, whether it's
17   viewing it or approving it, so forth.
18   Q.   And is this the log for the note we were just looking
19   at?
20   A.   It is.
21   Q.   And can you tell that based on the ID number?
22   A.   On the ID number, yes.  The 5074662, which was on the
23   previous screen.
24   Q.   And then can you tell the jury what this date field
25   means?

DIRECT OF JOSHUA ROBINSON BY MR. SARMA          309

1   A.   So, that is the date and time, in Eastern Time, that the

2   action that occurred, that is listed in the Action column.

3   Q.   And what does the User field mean?

4   A.   The user is the person that completed the action.   In

5   the case of the one on top, it looks like Jim Moran printed

6   the client visit.

7   Q.   And then scrolling here, do you see where it says,

8   "access client visit"?

9   A.   I do.

10  Q.   Who was that done by?

11  A.   L. Mbom.

12  Q.   And does ICMS capture when that event occurred?

13  A.   It does.

14  Q.   Okay.

15  A.   It's the date and time stamp off to the left.

16  Q.   And then do you see where it says "approve client

17  visit"?

18  A.   I do.

19  Q.   What does that mean?

20  A.   That means that is the date and time that the user

21  actually clicked the "approve visit" to send this visit on to

22  the next step, which for DCDBH is billing.

23  Q.   And is that an auto -- sorry.

24       Is that an auto-inputted date and time?

25  A.   The date and time is captured by the system, yes.   It is

1   automated.

2   Q.   Do you know whether health care providers are able to

3   create accounts for their employees?

4   A.   Yes.  And inside of the Credible system, it is a

5   security right to be able to create employee users.

6   Q.   And you mentioned security rights.  Are only certain --

7   only certain people have authorization to create new

8   accounts?

9   A.   That is correct.

10  Q.   And can providers deactivate employee accounts?

11  A.   Providers could deactivate employee accounts by marking

12  them inactive.  But it is a security right to be able to do

13  so, again.

14  Q.   And do only certain people have the ability to

15  deactivate new accounts?

16  A.   Yes, that is correct.

17  Q.   And are those the same people that have the authority to

18  create the accounts?

19  A.   Not necessarily.  The security rights are assigned

20  independently of each other.

21          MR. SARMA:  A minute, Your Honor.

22          (Pause.)

23          We pass the witness.

24          THE COURT:  Okay.  Mr. Robbins?

25          MR. ROBBINS:  Thank you, Your Honor.

1                    CROSS-EXAMINATION

2    BY MR. ROBBINS:

3    Q.   Good afternoon, sir.

4    A.   Good afternoon.

5    Q.   Gar Robbins.  I represent Mr. Mbom.

6         Is it fair for me to conclude that the signature block

7    we just saw, that's not an employee actually signing it each

8    time; is it?  There's some electronic signature saved in the

9    system?

10   A.   That is correct.  That signature is applied when the

11   user enters their unique password that's tied to their

12   log-in.

13   Q.   And so that's like any of the other auto-filled fields,

14   once they've logged in?

15   A.   Sorry, I couldn't hear.

16   Q.   That's like the other auto-filled fields; once they

17   logged in and started entering things, their signature is

18   going to show up at the bottom?

19   A.   That's correct.

20              MR. ROBBINS:  Thank you very much.  I appreciate

21   it.

22              THE COURT:  All right, Sir.  That concludes your

23   testimony.  You may step down.  You are free to leave.  Have

24   a great day.

25              THE WITNESS:  Thank you, Your Honor.

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     312

1          THE COURT:  Government?

2          MS. COLLINS:  Thank you, Your Honor.

3          The Government calls Victoria Margolis.

4          THE CLERK:  Step up into the witness box, please.

5          And if you would just remain standing and raise

6    your right hand for me, please.

7                    VICTORIA MARGOLIS

8    having been called as a witness and having been duly sworn,

9    was examined and testified as follows:

10         THE CLERK:  You may have a seat.

11         While speaking clearly into the microphone, can you

12   please state your full name and then spell your last name for

13   the record.

14         THE WITNESS:  Yes.  Victoria Margolis.  Margolis is

15   spelled, M-A-R-G-O-L-I-S.

16         THE CLERK:  Thank you.

17                   DIRECT EXAMINATION

18   BY MS. COLLINS:

19   Q.   Good afternoon, Ms. Margolis.  How old are you?

20   A.   65.

21   Q.   Where do you live?  Just the city and state.

22   A.   Washington, D.C.

23   Q.   Directing your attention back to the 2019 to 2021 time

24   period, where did you work?

25   A.   Holy Health in Washington, D.C. at the MLK location.

1  Q.   When you say the "MLK location," is that also sometimes

2  referred to as the southeast location?

3  A.   Yes.  MLK SE Avenue, yes.

4  Q.   And there's a court reporter taking this, so if you'll

5  just let me finish my question before you answer, that way

6  the record's clear.

7  A.   Okay.  All right.

8  Q.   Now, when you began working at Holy Health, did you

9  visit any other locations of Holy Health?

10  A.   Yes, I did.

11  Q.   And where was that?

12  A.   At the North Capitol location in the northwest part of

13  D.C.

14  Q.   What was your position at the southeast location?

15  A.   I was the front desk person and the office manager.

16  Q.   Generally, what were your responsibilities as the front

17  desk person and office manager?

18  A.   Generally, I would schedule the appointments.  We'd

19  greet the consumers as they came in.  In some cases, I would,

20  you know, have to do some of the intake for people that were

21  starting with us for the first time, get their papers signed,

22  things like that.

23  Q.   I'm going to show you what's been marked as Government's

24  Exhibit M3.  Do you recognize the area shown on this map?

25  A.   Yes.  That's the southeast neighborhood where the office

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS      314

1   was.

2   Q.   Sorry.  I couldn't hear you.

3   A.   That's the neighborhood where the office was located.

4   Q.   Can you indicate on this map where the southeast Holy

5   Health office was?

6   A.   Yes.  On this map, there's a Social Security

7   Administration.  And in that building where that location was

8   was also where our offices is, you know, were in that same

9   office complex.

10  Q.   I'm going to show you what's marked as Government's

11  Exhibit A16.  Do you recognize what's shown in this picture?

12  A.   Yes.  That's the front desk area of the waiting room

13  area of the southeast office.

14  Q.   And where did you sit?

15  A.   I sat behind the desk.  If you can see that barrier

16  right there, I sat there at that desk.  That was the entry to

17  the office.

18  Q.   Now, at some point, did you become a source for law

19  enforcement in connection with the investigation of Holy

20  Health?

21  A.   Yes, I did.

22  Q.   Approximately when did that occur?

23  A.   I recall it was possibly the January time frame.  It was

24  very, very cold.  January or February of 2021.

25  Q.   2021?

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     315

1   A.   2021, yes, thank you.

2   Q.   What, if anything, did you receive in exchange for

3   acting as a source?

4   A.   Absolutely nothing.

5   Q.   Why did you agree to act as a law enforcement source?

6   A.   I just saw things that I thought were irregular and, you

7   know, wanted to be of support to law enforcement.

8   Q.   Approximately, when did you begin working for Holy

9   Health?

10  A.   In August of 2019.

11  Q.   Did you have an interview before you started working

12  there?

13  A.   Yes, I did.

14  Q.   Who did you interview with?

15  A.   I interviewed with Julius Bakari and Betty Gatewood.

16  Q.   You mentioned Julius Bakari.  What was Mr. Bakari's

17  position at Holy Health?

18  A.   He was the CEO and the owner of the business.

19  Q.   You also mentioned Ms. Gatewood.  What was

20  Ms. Gatewood's, her position?

21  A.   I don't know her exact title.  I know she did some

22  clinical-type work and, you know, had some direct contact

23  with the clients.

24  Q.   Are you also familiar with an individual named Lambert

25  Mbom from your work at Holy Health?

1  A.    Yes, I am.

2  Q.    What was Mr. Mbom's position?

3  A.    Again, I don't know the exact title that he held, but I

4  know that he did train and provide technical support to the

5  Community Support Workers.

6  Q.    When you say he "provided technical support," what do

7  you mean by that?

8  A.    Anything having to do with getting into the ICMS system,

9  you had to be allowed in by means of either getting your

10  ID into the system or your ability to access the client

11  records, all that had to go through Mr. Mbom.

12  Q.    And what type of agency was Holy Health?

13  A.    A mental health clinic, a medicaid mental health clinic.

14  Q.    And what sort of services was it supposed to provide as

15  a mental health clinic?

16  A.    Generally, we provided therapy, mental health therapy,

17  talk therapy, and medication management by means of a

18  psychiatrist and community support.

19  Q.    Now, who did you consider to be management at Holy

20  Health?

21  A.    I considered Mr. Bakari, Mrs. Bakari, and Mr. Mbom as

22  management.

23  Q.    Now, you also mentioned Mrs. Bakari.  What was her first

24  name?

25  A.    Eugenie.  But that was the name I called her.

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     317

1   Q.   And why did you consider those three individuals to be

2   management?

3   A.   That's who I took my orders from to do anything in the

4   office.

5   Q.   Did the clients at Holy Health have a particular type of

6   insurance?

7   A.   Medicaid.

8   Q.   When you first started working at Holy Health, what was

9   the status of the southeast office?

10  A.   It hadn't been opened yet.  It was just, you know,

11  prepared.  It was renovated.  The offices were painted and

12  equipment was there, but there was no activity at that time.

13  Q.   And, approximately, when did the southeast office

14  actually begin operating?

15  A.   Probably sometime in the beginning or mid-October after

16  we got our certificate of occupancy.

17  Q.   October of what year?

18  A.   Of 2019.

19  Q.   Now, when you first began at Holy Health, did you spend

20  any time at the North Capitol location?

21  A.   Yes, I did.

22  Q.   And why did you go to the North Capitol location?

23  A.   For training and to get familiar with the procedures

24  that Holy Health Care had in the front desk.

25  Q.   Who did you train with there?

1  A.   Jane?  I don't remember her last name.  But Jane was the
2  front desk person that was my counterpart.
3  Q.   And when you say your "counterpart," was she the front
4  desk person at the North Capitol office?
5  A.   Yes, she was the front desk person at the North Capitol
6  office.
7  Q.   And what, if anything, did you observe regarding how the
8  front desk operated while you were at the North Capitol
9  office?
10 A.   What I observed was, you know, just the basic of, you
11 know, operations of people coming in and going, getting --
12 you know, signing in.
13      And also as they were -- there was a point in time
14 that -- where a group of people, maybe 20 or so people were
15 in a line waiting to leave.  And each one of them had like a
16 sticky note with them.  And they handed the sticky note in to
17 someone and they received money in return for that.
18 Q.   And how were the consumers paid?
19 A.   They were paid in cash with $10 bills or $10.
20 Q.   Did anyone provide you with an explanation as to the
21 reason for those payments?
22 A.   No.
23 Q.   While you were at the North Capitol location, did you
24 observe anything about how consumers were being transported
25 to Holy Health?

1   A.   Yeah.  I saw vans outside.  And I saw the people, you
2   know, after they got their money, they all kind of left at
3   the same time.  And when I left, the vans were gone.
4   Q.   Now, when you started, then, working at the -- when you
5   then started working at the southeast location, did you
6   receive any instruction on paying consumers at the southeast
7   location?
8   A.   Yes.
9   Q.   Who gave you this instruction?
10  A.   Mr. Bakari, for the most part.
11  Q.   And what did he tell you?
12  A.   To -- that we were to give $5 to consumers as a stipend.
13  Q.   When you say "stipend," were you given any instruction
14  on how to describe the money that was being given to
15  consumers?
16  A.   We sometimes -- generally, we would prefer to it as a
17  travel stipend, you know.
18  Q.   Now, did the -- when you say a "travel stipend," did the
19  amount of the payment to the consumers depend on how they
20  were being transported to and from the office?
21  A.   No.  Everyone received the same amount of money.
22  Q.   Were there any consumers who did not get the $5?
23  A.   No.
24  Q.   So, did you actually consider it to be a stipend for
25  travel?

1    A.    Not really, no.

2    Q.    What did you think it was?

3    A.    Kind of an enticement, incentive.

4    Q.    How did you track which consumers had been paid?

5    A.    I began tracking them using the general sign-in sheets

6    that you would see typically at a doctor's office where the

7    names would be on there.  And then they'd strip off, you

8    know, the names so the following, you know, client could not

9    see the name of the people.  So it's a HIPAA, you know,

10   maintaining HIPAA privacy, we use that kind of form.

11   Q.    And why did you keep track of the payments to consumers

12   on that sign-in sheet?

13   A.    Because that was the way that I was able to record what

14   money was given out that day to the clients.

15   Q.    What did you do with these sign-in sheets after you

16   filled them out?

17   A.    After they were completed for the day, I would scan them

18   and email them to the northwest office for Eugenie and/or

19   Bakari and Mr. Mbom to see that these are the people that

20   came in, this is the amount of money that was used that day.

21   And I would also include the next day's appointments.

22   Q.    So, I'm going to show you what's been marked as

23   Government's Exhibit E8.  And I'll start by zooming in at the

24   top of Page 1 here.  Do you see the email address in the

25   "From" field?

1   A.   Yes.

2   Q.   That's infov@holyhealthcareservices.org?

3   A.   Uh-huh.

4   Q.   And whose email address is that?

5   A.   That would be mine.

6   Q.   And do you also see the three email addresses in the

7   "To" field?

8   A.   Yes.

9   Q.   And whose email addresses are those?

10   A.   Eugenie, Julius Bakari, and Lambert Mbom.

11   Q.   And the subject on this is, "Sign-in sheet 12/31/2019,

12   schedules for 01/02/20 and 1/3/20."

13   A.   Yes.

14   Q.   When was that sent?

15   A.   That was sent on that day, the 31st of December.

16   Q.   So, going down to Page 2 of this document, is this the

17   email that you sent?

18   A.   Yes.

19   Q.   And going to Page 3 of this document, is this one of the

20   attachments to that email?

21   A.   Yes, it is.

22   Q.   And what is this?

23   A.   This is the copy of the sign-in sheet once it was

24   completed for the day with the, you know, the strips posted

25   to the bottom, to the back pages.

1  Q.   So, what are the names on the left side of the sheet?

2  A.   Those are the clients, consumers that came in for, you

3  know, whatever services they received that day:  Community

4  support, therapy, or perhaps the doctor, as well.

5  Q.   Okay.  And then what are the -- there are numbers 5 and

6  10 on the right side of the sheet.  What do those numbers

7  indicate?

8  A.   That would be the amount of money given to those

9  individuals that day.

10  Q.   So, looking at the top name, it says Randolph Bowman, do

11  you see this?

12  A.   Yes.

13  Q.   And the number listed for him is 10.  Why is that?

14  A.   Mr. Bowman brought someone in, a referral.  So, we gave

15  him an additional $5 for that referral.

16  Q.   So, it was $5 for himself and then $5 for the referral?

17  A.   Yes.

18  Q.   And what's the word that's written next to the 10 there?

19  A.   Refer.

20  Q.   And then looking down at Line 9 for Odom Jose, what was

21  he paid for?

22  A.   Another referral.

23  Q.   And that's indicated by the word "referral" there?

24  A.   Yes.

25  Q.   Why did you send this sheet to Mr. Bakari, Mrs. Bakari,

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    323

1  and Mr. Mbom?

2  A.   Because they are the -- they would Cash App me or Zelle

3  money to an account that I would use for the purpose of

4  giving the stipends out.  So I needed to let them know what I

5  had spent on a given day so that they would know -- I would

6  have a record of what they sent me against what I actually

7  used and spent that day.

8  Q.   So, going to Pages 4 and 5 of this document, what are

9  these?

10 A.   This is the schedule for the upcoming days to let them

11 know, you know, what clients we were expecting in.  And it

12 also served as a way of me confirming or requesting the

13 amount of money that might be needed for that, to manage

14 giving stipends to the clients that would come in that day.

15      So, depending on how many people there were, I would

16 request the amount of money needed to give them the $5.

17 Q.   Now, I'm showing you Government's Exhibit E10 and

18 zooming in again at the top here.

19      Again, is this -- is that your email address in the

20 "from" field?

21 A.   Yes.

22 Q.   Who is this sent to?

23 A.   Eugenie, Lambert, and Julius Bakari.

24 Q.   And, again, the subject line here references a sign-in

25 sheet and a schedule?

1   A.   Yes.

2   Q.   So, scrolling down, is that your email signature block?

3   A.   Yes, it is.

4   Q.   And then on Page 3, what is this?

5   A.   That is the schedule for January 7th, the following day.

6   Q.   And then Page 4, what is this?

7   A.   This is the sign-in sheet for January 6, 2020.

8   Q.   And, again, why were you sending this?

9   A.   Again, to record the people that came in and then also

10  to record the amount of money that was paid to those

11  individuals, and to report that to the source of the money.

12  Q.   And where did the cash that was used to pay the

13  consumers come from?

14  A.   I would receive Zelle, Zelle deposits from Eugenie, or

15  Cash App deposits.  Occasionally, very, very occasionally,

16  Mr. Bakari would be -- would come physically to the office

17  and bring cash, but that was very rare.

18  Q.   And when you received these Zelle or Cash App payments

19  from Eugenie, were they always sent directly, or were they

20  sometimes sent through other people, as well?

21  A.   Once or twice one of the Community Support Workers did

22  step in and send money when there was a shortage.  And so I

23  did get money occasionally from another source, but it was

24  always at the behest of Eugenie or Mr. Bakari.

25  Q.   And how did you alert them if you needed additional

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    325

1    money?

2    A.    Email, phone calls, text messages.

3    Q.    Sorry?

4    A.    Text messages, for the most part.

5    Q.    I'm going to show you what's been marked as Government's

6    Exhibit B19.  Do you recognize what's shown in this image?

7    A.    Yes.  This is a text from my phone.

8    Q.    And who were you texting with here?

9    A.    Eugenie.

10   Q.    So, looking at the top message here, what date is this

11   from?

12   A.    January 8, 2020.

13   Q.    And who wrote the message that's in green here?

14   A.    I did.

15   Q.    So, when you said, "Please send stipends, we have

16   nothing," what were you referring to?

17   A.    I was referring to the fact that for that day and for

18   the clients that would come in that day, there would be no --

19   I had no money to give them.

20   Q.    Why did you call them stipends?

21   A.    That was the word that had been used throughout the, you

22   know, that was how it was initially presented to me.  And

23   that's what, you know, we continued to use to call them that.

24   Q.    So, scrolling down to the bottom here, what's the image

25   at the bottom of this message?

1  A.   That's another sign-in sheet that I pictured and

2  emailed -- I mean, texted to her.

3  Q.   I'll show you what's marked as Exhibit B21.  Do you

4  recognize what's shown here?

5  A.   Yes.  This is a text message from me to Julius on the

6  18th of July -- sorry -- 18th of January, 2020.

7  Q.   And who wrote the text that's in green here?

8  A.   I did.

9  Q.   So, you talk about reimbursements for supplies.  And

10  then at the end you write, "I'm also waiting for the

11  reimbursement for the stipends."  Again, what is stipends

12  referring to here?

13  A.   The $5 given to the clients.

14  Q.   And when you talk about reimbursements, are there

15  instances where you fronted your own money to pay the

16  consumers?

17  A.   Yes, I did.

18  Q.   Why did you front the money out of your own pocket to

19  pay the consumers?

20  A.   Well, at that point, being in the front desk, I was the

21  first person and very accessible to the clients who came into

22  the office.  And by that time, the practice of giving

23  stipends had become very commonplace and expected.  And I

24  felt quite vulnerable when there wasn't money.  And at times

25  I would, to protect myself from, you know, difficulties with

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     327

1  the clients who were disappointed by that, just to have the
2  money so that we could just take care of it.
3  Q.   Were there instances where consumers became aggressive
4  because there was not money to pay them?
5  A.   There was, yes, there were.
6  Q.   Could you describe that?
7  A.   Just, you know, in the street terms, get in my face and
8  say stuff and, you know, complain, you know, curse me out,
9  things like that.
10 Q.   I'm going to show you what's marked as Government's
11 Exhibit F6a.  Do you recognize the check here?
12 A.   Yes.
13 Q.   And who is this check to?
14 A.   It's to me.
15 Q.   And it's from Holy Health?
16 A.   Yes.
17 Q.   Now, looking at the memo line, do you see it says, "1440
18 payroll, 375 refund"?
19 A.   Yes.
20 Q.   And what was that a refund for?
21 A.   Possibly a combination of supplies as well as stipends
22 that I gave out of my own pocket.
23 Q.   Now, at some point, did the sign-in sheets that you used
24 to log the payments to consumers change?
25 A.   Yes, they did.

1   Q.   And how did they change?

2   A.   I was sent a sign-in sheet with the header of the Agatha

3   Foundation on it.

4   Q.   What did you understand the Agatha Foundation was?

5   A.   It was a nonprofit that Ms. Eugenie ran.

6   Q.   How did you know that?

7   A.   Visiting the office, there was quite a lot of signage

8   about it.  And I, you know, kind of looked them up on the

9   Internet to see what it was.

10  Q.   When you said you were visiting their office?

11  A.   The northwest office.  I had different occasions because

12  sometimes we'd have to actually pick up our paychecks from

13  there.  So I, from time to time, would be one of the people

14  to do that.  So I would see things around the office.

15  Q.   Who, if anyone, directed you to start using a sign-in

16  sheet with the Agatha Foundation letterhead to record the

17  payments to consumers?

18  A.   Ms. Eugenie.

19  Q.   So, I'm going to show you what's been marked as

20  Government's Exhibit E13.  And zooming in at the top here,

21  whose email is in the "From" field?

22  A.   From Eugenie.

23  Q.   And who is this to?

24  A.   To me.

25  Q.   Do you see the subject says, "Agatha Foundation Signing

1   Sheet"?

2   A.   Yes.

3   Q.   So, scrolling down to the attachment here, what is this?

4   A.   This is the actual copy of the sheet that she sent me

5   that I would reproduce once I, you know, it was sent to me

6   electronically.  And I made copies to use.

7   Q.   What was your understanding about why you were supposed

8   to begin using the Agatha Foundation sign-in sheets?

9   A.   Among them were that we heard that another agency had

10  been approached or raided by the FBI for fraud.  And this was

11  given as a way to show that the money was being given, but to

12  make it appear to be coming from a nonprofit agency.

13  Q.   Now, when the -- excuse me.

14       When you began using the Agatha Foundation sign-in

15  sheets, did anything about the source of money that you were

16  using to pay consumers change?

17  A.   No.

18  Q.   And when you began using the Agatha Foundation sign-in

19  sheets, other than the sign-in sheets themselves, did

20  anything about the payments you were making to consumers

21  change?

22  A.   No, nothing at all.

23  Q.   Outside of paying consumers when they came to the Holy

24  Health office, are you aware of any benefits that Agatha

25  Foundation provided to Holy Health's consumers?

1   A.   No.

2   Q.   Did you actually try to have Agatha Foundation provide

3   other benefits or services to consumers?

4   A.   Yes, I did.

5   Q.   Can you explain what happened?

6   A.   Well, I, you know, seeing this and knowing that, you

7   know, we're working in a population that's very, you know,

8   underprivileged and challenged, I thought it would be a great

9   opportunity to use the Agatha Foundation to garner donations,

10  you know, gift cards, in-kind donations to support the

11  consumers that were coming to our office for different

12  various things that we might find.

13  Q.   And who did you propose that to?

14  A.   I proposed that to Eugenie.  And I -- yeah, I proposed

15  it to Eugenie.

16  Q.   And what happened?

17  A.   Well, I sent a letter, a mockup letter, you know, kind

18  of a generic letter that we could use to send to different --

19  you know, Giant Food and different places like that, under

20  the auspices of Agatha Foundation request donations and

21  in-kind donations, as well.

22  Q.   And what happened after you sent that mockup letter?

23  A.   Nothing.

24  Q.   Now, I'm showing you what's marked as Government Exhibit

25  K86.  Do you generally recognize this document?

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    331

1   A.   Yes.

2   Q.   And I'm scrolling down to the second page.  What are

3   these?

4   A.   These are the names of the consumers that came in that

5   day that received a stipend.  And the signature line was

6   confirmation that they actually received the money.

7   Q.   And so just zooming in at the top of Page 2, is this an

8   example of one of the Agatha Foundation sign-in sheets?

9   A.   Yes.

10  Q.   And what's the date this is for?

11  A.   March 25, 2020.

12  Q.   And so looking at the names that are listed on the left

13  side, what are these?

14  A.   These are the consumers that were regulars at the

15  southeast office.

16  Q.   So, for example, do you see the name Brian Wesley listed

17  here?

18  A.   Yes.

19  Q.   And Joel Mayo?

20  A.   Yes.

21  Q.   And what is this that ends in Willis?

22  A.   Yes.  Cherise Willis.

23  Q.   When you said they are regulars at the southeast office,

24  did they receive the payment every time they came?

25  A.   Yes.

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    332

1   Q.    Was there any maximum amount of money they could receive
2   over time?
3   A.    No.
4   Q.    So, did each of these people that are listed here
5   receive the $5 payment when they came to the southeast office
6   on March 25, 2020?
7   A.    Yes.
8   Q.    Now, did you have any concerns about the practice of
9   paying consumers?
10  A.    Yeah.  It always seemed odd and unusual.  You know, you
11  go to any doctor's office, you don't get a stipend for your
12  transportation or for any reason to come.
13  Q.    And if you had concerns about it, why did you do it?
14  A.    I was instructed to do so.
15  Q.    At some point during your time at Holy Health, did you
16  stop providing cash payments to consumers at the southeast
17  location?
18  A.    Yes, we did.
19  Q.    Approximately when did you stop paying consumers at the
20  southeast location?
21  A.    I'm thinking it was probably around November of 2020.
22  Q.    Who made the determination to stop paying consumers at
23  the southeast location?
24  A.    It was made between myself and our therapist, Linda
25  Morton.  We decided that we would stop doing it and see what

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    333

1   happens, if people still came.

2   Q.    And why did you decide to stop?

3   A.    Just was -- both of us never felt comfortable about it.

4   And we wanted to stop doing it, wanted to separate ourselves

5   from that practice.

6   Q.    Now, was anyone in management at Holy Health involved in

7   that decision to stop paying consumers?

8   A.    No.

9   Q.    In connection with your work at Holy Health, did you

10  occasionally assist consumers in getting cell phones?

11  A.    Yes.

12  Q.    Just briefly, how did you do that?

13  A.    Well, in the initial time of people coming in, you know,

14  we're getting people from, you know, just people coming off

15  the street.  A lot of them didn't have phones.  And in order

16  to maintain contact with their Community Support Workers and

17  to be engaged in services, we needed to have communication

18  with them.

19       And I had observed different locations around town where

20  they were giving away phones.  And I looked into it online.

21  And I found, you know, the website where you can order the

22  phones.  And I would just, you know, as people were coming in

23  and they were becoming part of our agency, I would just order

24  them a phone.

25  Q.    And was this like a Government program to provide people

1   phones?

2   A.    Yes.   It was a Government phone.

3   Q.    Approximately how long did it take you to sign someone

4   up for a phone?

5   A.    You know, I would take -- I'd do several of them at the

6   same time because it was all an online process.   So it may

7   take me 10, 15 minutes at the most to do one, you know, when

8   I first began.   It got easier and quicker as I got more

9   familiar with the process.

10  Q.    At some point did you discuss with Mr. Mbom the phones

11  that you were ordering for consumers?

12  A.    Yes.

13  Q.    And what, if anything, did Mr. Mbom say to you regarding

14  these phone orders?

15  A.    At some point, after I'd made about 40 or so orders, I

16  sent him -- he requested a list of the names of the people,

17  the dates that I ordered the phones.   And I provided him with

18  what he requested.

19  Q.    What reason did he give you for wanting that list?

20  A.    I didn't ask and he didn't give me one.

21  Q.    Now, after this, did you observe any documentation

22  relating to these phone orders?

23  A.    Yes, I did.

24  Q.    Where did you observe that documentation?

25  A.    In the client profiles, there is a place where you can

1  see that community support notes were written or whatever

2  action had been taken with a particular client.  And I saw

3  some community support notes written by another CSW that I

4  didn't know, where they described having, you know, obtained

5  the -- provided them with a phone and described how to use

6  the phone, you know, and various things like that in the

7  note.

8  Q.   And is this all in the ICMS system?

9  A.   Yes.

10  Q.   Why did you have access to the ICMS system?

11  A.   Part of my job.  I had access to it to make appointments

12  and to -- you know, I had a lot of access to that service

13  because of the role that I played.

14  Q.   Now, did you observe just one note for each consumer for

15  the phones, or at times did you observe more than one?

16  A.    I observed about two or three notes per each person

17  that -- or for several people.  I didn't know if for each

18  person, I didn't do -- you know.  But I noticed two or three

19  notes about the phone itself.

20  Q.   And can you describe what sort of notes you're talking

21  about?

22  A.   They were the community support notes that were

23  submitted for payment.  They were like -- it's how billing

24  was done.

25         So, you have a note per -- for a period of time where

1   the person describes the encounter with that person.  And

2   then that note would go into the ICMS system and be submitted

3   for billing.

4   Q.   So, I'm showing you what's marked as Government's

5   Exhibit E6.  And looking up at the top of this page, who is

6   this email from?

7   A.   It is from me.

8   Q.   And who is the email to?

9   A.   It is to Mr. Mbom.

10  Q.   Do you see the subject line is, "List of phone orders

11  for SE"?

12  A.   Yes.

13  Q.   And when did you send this email?

14  A.   December 6, 2019.

15  Q.   So, scrolling down to Page 3, and I'll just scroll

16  through Page 3 and 4.  Do you recognize this document?

17  A.   Yes.

18  Q.   What is this?

19  A.   This is the response to the request for the names of the

20  consumers who received phones and the dates that they were

21  ordered.

22  Q.   And who wrote this list?

23  A.   That was a handwritten note by me.

24  Q.   Why did you write it?

25  A.   On the request of Mr. Mbom, his request to ask, you

1    know, for who got phones and when.

2    Q.    And was this the attachment to the email to --

3    A.    Yes.

4    Q.    -- Mr. Mbom?

5    A.    Yes, it is.

6    Q.    Now, showing you what's been marked as Government's

7    Exhibit E11.  And, again, zooming in at the top here, who is

8    this email from?

9    A.    This is from me.

10    Q.    And who is it to?

11    A.    To Mr. Mbom.

12    Q.    It says, "Lifeline phone ordering procedure."  Do you

13    see that?

14    A.    Yes.

15    Q.    And what's the date this was sent?

16    A.    January 7, 2020.

17    Q.    Now, going to the body of the email, what generally were

18    you sending Mr. Mbom here?

19    A.    The process that I used.  I identified the site that you

20    would go to, you know, to make the order, to put the

21    information in and then to, you know, place the order for the

22    phones itself.  You know, it's step-by-step what you do and

23    where you go.  And each, you know, one of those websites

24    would give you instructions to complete the process.

25    Q.    So, pulling back up Exhibit E6, and I'll go down to

1   Page 3, what is the first name on the list of phones that you

2   had ordered that you sent to Mr. Mbom?

3   A.   The name is Gregory Clowe.

4   Q.   And what was the date that was ordered?

5   A.   November 15, 2019.

6   Q.   So, now I'll pull up what's been marked as Government's

7   Exhibit I180.  Do you recognize, generally, what type of

8   document this is?

9   A.   Yes.  This is the document that you will find the

10  encounter note written on.

11  Q.   So, the consumer name here is the same Gregory Clowe?

12  A.   Yes.

13  Q.   And what's the date of this particular note?

14  A.   October 15, 2019.

15  Q.   So one month off?

16  A.   Yes.

17  Q.   And what is the staff name that's listed here?

18  A.   Divine Anjeh.

19  Q.   Who is Divine Anjeh?

20  A.   I don't know.

21  Q.   Did you ever meet Mr. Anjeh?

22  A.   No.

23  Q.   Now, scrolling down to the bottom here and looking at

24  the Documentation field, generally what's described here in

25  the Documentation field?

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS      339

1   A.    This is the general, you know, format of the notes:  The

2   goal, the intervention, the response, and the plan.  And the

3   goal here is to, you know, identify the CSWs helping

4   Mr. Clowe with his emotional challenges associated with his

5   lack of a cell phone or communications.

6   Q.    So, looking at the last paragraph here, it says, "CSW

7   concluded the session by helping Mr. Gregory Clowe navigate

8   through and fill out the phone application."

9         Who filled out the phone application for Mr. Clowe?

10  A.    I did.

11  Q.    Did Mr. Divine Anjeh play any role in filling out that

12  phone application?

13  A.    No.

14  Q.    Is what's written here true?

15  A.    No.

16  Q.    And then looking at the paragraph that starts,

17  "Intervention," it begins, "CSW started the day session at

18  the main office of Holy Health Care Services on 6210 North

19  Capitol Street NW."

20        Just -- which office were you in when you filled out the

21  phone application for Mr. Clowe?

22  A.    I was at the 24- -- the southeast location on Martin

23  Luther King Avenue.

24  Q.    And looking at this paragraph as a whole, did the events

25  described here actually occur?

1   A.   No.

2   Q.   Now, looking at the next paragraph beginning,

3   "CSW proceeded to educate Mr. Gregory Clowe on the importance

4   of communication."  Did that actually occur when you signed

5   Mr. Clowe up for a phone?

6   A.   No.

7   Q.   And then at the next paragraph, "CSW continued to engage

8   Mr. Clowe by introducing him to free and subsidized phone

9   services," did the events described in that paragraph

10  actually occur when you signed Mr. Clowe up for a phone?

11  A.   No.

12  Q.   So, scrolling back up to Page 1 here and zooming in at

13  the top, do you see the duration here listed is 55 minutes?

14  A.   Yes.

15  Q.   Approximately how long did it actually take to sign

16  someone up for a phone?

17  A.   Not very long, like, 10, 15 minutes.

18  Q.   So, is the duration listed on this note accurate?

19  A.   No.

20  Q.   And, finally, who approved this note?

21  A.   Mr. Mbom.

22  Q.   Going back to Exhibit E6, and again, scrolling down to

23  the attachment, what is the last name that's listed here?

24  A.   Joel Mayo.

25  Q.   And what's the date of the phone ordered for Mr. Mayo?

1    A.   10/17/2019.

2    Q.   Now, I'll pull up what's marked as Government's Exhibit

3    I212.   And zooming in at the top of this note, is this a note

4    for Joel Mayo?

5    A.   Yes.

6    Q.   And what's the staff name this note was entered under?

7    A.   Divine Anjeh.

8    Q.   What's the date of this note?

9    A.   10/17/2019.

10   Q.   And what is the duration of this note?

11   A.   55 minutes.

12   Q.   And now scrolling down within this note to the

13   Documentation section and just looking at this, generally,

14   how does the documentation described here compare to the last

15   note for Mr. Clowe we just reviewed?

16   A.   It is identical with the exception of the address of

17   where it took place.

18   Q.   And is the information described in this note for Joel

19   Mayo true?

20   A.   No.

21   Q.   Why not?

22   A.   Most cases on these phone orders, because I was able to

23   access the information of the client from the ICMS system, I

24   would be able to provide -- you know, order these phones

25   without them even being present because all I needed was, you

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     342

1   know, their identifying information.

2        So, there's a lot of times when I just, you know, knew

3   that they wanted a phone; and at the end of the day or

4   whenever I had time, I would just go ahead and order the

5   phones even without them being there.

6   Q.   And is the duration information on this note accurate?

7   A.   No.

8   Q.   So, going back up to the top, who approved this note?

9   A.   Mr. Mbom.

10  Q.   Did you ever provide Divine Anjeh with information about

11  the consumers you ordered phones for?

12  A.   No.  I don't know who he is.

13  Q.   Did you ever provide that information to anyone other

14  than Mr. Mbom?

15  A.   No.

16  Q.   Now, outside of the notes for phone orders, were you

17  aware of Mr. Mbom being involved with entering any notes for

18  events that didn't happen?

19  A.   Yes.

20  Q.   Can you explain it to me?

21  A.   One that I recall was a note on a Mr. Brian Wesley where

22  he had -- there was a note regarding a conversation between

23  Mr. Wesley and Mr. Mbom that took place at the southeast

24  office that didn't happen.

25  Q.   And why did you say it didn't happen?

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    343

1   A.   Because I was there the day that Mr. Wesley was there.

2   I believe Mr. Wesley was there to see the psychiatrist.  And

3   Mr. Mbom was not there that day.

4   Q.   And when you say "Mr. Wesley was there to see the

5   psychiatrist," what sort of note was it that was entered?

6   A.   It seemed to be a community support note talking to him

7   about his mental state or emotional state.  Or, you know, it

8   was a general community support note-type thing, nothing --

9   Q.   But not a psychiatrist note?

10  A.   No, not -- I didn't observe -- I didn't look for the

11  psychiatrist note.  I just happened to see the one that --

12  because it caught my attention because Mr. Mbom's name was on

13  the ICMS form as the author of the note.

14  Q.   Now, directing your attention to December of 2020, did

15  you attend a meeting at the North Capitol location of Holy

16  Health?

17  A.   Yes, I did.

18  Q.   Who else attended that meeting?

19  A.   I believe it was Mr. Bakari; Mrs. Bakari; Lambert Mbom;

20  my counterpart, Jane, who was also in the front desk; Julie

21  Cabongy; I believe Elinore, who was also a support person at

22  the front desk.

23  Q.   So, just to go over that, I believe you mentioned Julius

24  and Eugenie Bakari, as well as Mr. Mbom?

25  A.   Yes.

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     344

1   Q.   And Jane, the front desk person from North Capitol?

2   A.   Yes.

3   Q.   And then you also mentioned Julie Cabongy.  Who was she?

4   A.   I'm not sure of her title.  She was also a member of the

5   staff that worked in some of the administrative roles.

6   Q.   What did you understand was the purpose of the meeting?

7   A.   It was kind of, you know, kind of a postmortem for 2020

8   and a kickoff for 2021, related to what the front desk people

9   were supposed to be, you know, attending to.

10  Q.   Who led the meeting?

11  A.   For the most part, it was Mr. Mbom.

12  Q.   Did you record it?

13  A.   Yes, I did.

14  Q.   How did you record the meeting?

15  A.   With my iPhone.

16  Q.   To your knowledge, did anyone else in the meeting know

17  you were recording?

18  A.   No.

19  Q.   If you'll look in front of you, there's a disc that's

20  marked Government Exhibit L3a through L3d.  Do you recognize

21  that disc?

22  A.   Yes, I do.

23  Q.   How do you recognize it?

24  A.   I had signed it.

25  Q.   And did you listen to the contents before you signed it?

1  A.   Yes, I did.

2  Q.   Does that contain excerpts of the recording you made

3  during that meeting from December of 2020?

4  A.   Yes, it does.

5  Q.   There's also a set of transcripts in front of you

6  labeled Exhibits T3a through T3d.  Did you review those

7  transcripts before coming into court?

8  A.   Yes, I did.

9  Q.   And do those transcripts correspond to the recordings on

10  the disc?

11  A.   Yes.

12  Q.   Are they accurate, to the best of your understanding?

13  A.   Yes.

14        MS. COLLINS:  Your Honor, at this point I'd ask

15  that we be permitted to distribute the transcripts to the

16  jury.

17        THE COURT:  Sure.

18        MS. COLLINS:  And, Your Honor, I'm about to play a

19  series of recordings.  I'm happy to start now.  But if we

20  want to take a break, it might make sense to do that now.

21        THE COURT:  Let's take our last break of the day.

22  We'll break until 2 o'clock and we'll hear the recordings.

23  All right.  Thanks.

24        (The jury left the courtroom at 1:45 p.m., and the

25        following proceedings were had out of the presence of

1          the jury.)

2               THE COURT:  You, too, Ms. Margolis, get a break.

3     Don't talk to anybody about your testimony.  We'll see you

4     back here at 2:00.

5               Counsel, anything?

6               All right.  See you at 2:00.

7               THE CLERK:  This court stands in recess.

8               (Recess held from 1:46 to 2:01 p.m.)

9               THE COURT:  Are we ready go now?  Do we have a

10    witness?

11              While I'm doing that, what should I tell them about

12    our tentative schedule?  Should I say I make no promises, but

13    we think we will go dark on Friday and close on Monday?  And

14    just leave it like that?

15              MR. SARMA:  I'm just noting that maybe there will

16    be a defense case on Monday?

17              MR. ROBBINS:  I think it's safe to say we'll finish

18    early next week.

19              THE COURT:  Should I tell them that we'll be dark

20    on Friday?  At least that?

21              MR. SARMA:  Yes, I think that --

22              MR. ROBBINS:  I think that will prevent issues in

23    two cases.

24              MS. COLLINS:  I think we are comfortable that we're

25    on track in the Government's portion of its case, so then we

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     347

1    can say dark on Friday and return on Monday.

2              THE COURT:  Okay.

3              MR. ROBBINS:  And I'm not going to be multiple

4    days, I promise.

5              THE COURT:  And tomorrow we'll have to let them

6    know when on Monday; right?

7              MS. COLLINS:  Yes.

8              THE COURT:  But for now, they can make plans for

9    Friday being dark.  Okay.  Ready.

10          (The jury came back into the courtroom at 2:03 p.m.,

11            and the following proceedings were had in the

12            presence of the jury.)

13             THE COURT:  All right, everyone, you may have a

14   seat.

15             And, Government, whenever you're ready.

16   BY MS. COLLINS:

17   Q.   All right, Ms. Margolis, when we went for a break, we

18   were discussing a meeting that you attended at the North

19   Capitol location of Holy Health in December 2020; is that

20   right?

21   A.   Uh-huh.

22   Q.   And you made a recording of that meeting?

23   A.   Yes, I did.

24   Q.   Now, we've talked about some excerpts from that

25   recording.  If you'll look in front of you, there's

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     348

1   Exhibit L3.  Do you see that?

2   A.   Yes.

3   Q.   And you also reviewed a disk that contained the full

4   recording; is that right?

5   A.   Yes.

6   Q.   Is it fair to say that recording is quite lengthy?

7   A.   Yes.

8   Q.   Over an hour?

9   A.   Pretty much, yeah.

10  Q.   So we won't go through the whole thing.  But we'll

11  review those excerpts.

12       So let me switch back and I'm going to play for you

13  what's marked as Government's Exhibit L3a.  And that is

14  Transcript T3a.

15                    (Audio played.)

16       Just pausing at 8 seconds.  Do you recognize the voice

17  you just heard?

18  A.   Yes, that's Mr. Mbom.

19  Q.   I'll keep playing.

20                    (Audio played.)

21       So, just pausing at 50 seconds, what did you understand

22  Mr. Mbom meant when he said, "We are supposed to be billing a

23  minimum of 400 services a week"?

24  A.   Submitting 400 notes per week.

25  Q.   Why do you say "400 notes per week"?

1   A.    Because that's how billing was accomplished, by

2   submitting notes to the Department of Behavioral Health.

3   Q.    Continue playing.

4                    (Audio played.)

5        Now, later during the course of this meeting, did you

6   begin to talk about various issues at the southeast office?

7   A.    Yes.

8   Q.    So, I'm going to move forward and I'll play for you

9   what's marked as Government's Exhibit L3b and the

10   corresponding transcript of Exhibit T3b.

11                    (Audio played.)

12       Just pausing at 9 seconds.  Who's speaking here?

13   A.    That was me.

14   Q.    I'll keep playing.

15                    (Audio played.)

16       So, just pausing at 57 seconds.  At the beginning of

17   this portion of the recording, who are you talking about

18   paying consumers?

19   A.    In the neighborhood of our location, there were several

20   other mental health clinics like ours in the near vicinity of

21   our office.

22   Q.    And were they the ones you were discussing paying

23   consumers?

24   A.    That was, yeah, those were the ones that were being told

25   to me that were paying, yes.

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS   350

1  Q.   And why was it an issue that other agencies were paying

2  consumers?

3  A.   Because they were enticing them to come and join their

4  agency with, you know, money.

5  Q.   So I'll keep playing.

6                    (Audio played.)

7       So, pausing at 1 minute and 49 seconds.  Why were you

8  emphasizing that the people we write notes on are the people

9  that we see?

10 A.   I wanted to be clear that, you know, we are not engaging

11 in anything unethical or fraudulent.  I say "we" here because

12 I'm specifically referring to the southeast office and the

13 staff that were focused on that location.  And we just, you

14 know, we kind of ran a little bit autonomously in the way

15 that we didn't really have any intervention from the other

16 office.  So, there was no contact from the other office.

17      Mr. Lambert rarely, you know, made an appearance at our

18 office.  Mr. Bakari or Ms. Eugenie never came to our office.

19 Very rarely.  And if they did, they didn't stay very long.

20      So, we kind of took on our own way of doing things at

21 our office that we felt was ethical.  We knew that there were

22 notes being written on people that they didn't see.  We had

23 already experienced the situation with the phones.  So, you

24 know, we knew that there were certain things going on that,

25 you know, shouldn't be happening.

1    So, we made a very honest effort to service the clients
2  and give them the things that they were coming there for.
3  Q.   And when you said "we knew that there were notes that
4  were being written for things that hadn't been done," what do
5  you mean by that?
6  A.   You know, I had seen things on my own.  The notes about
7  the phones, I had observed that.  I observed the note about
8  Mr. Wesley having been seen by Mr. Mbom when I knew that
9  didn't happen.
10    I had seen a note on another situation that was
11  extremely disturbing as, you know, I saw notes written about
12  a particular client in our office who had been -- who had a
13  stroke.  This gentleman could not speak and could not really
14  understand.  He could understand what you're saying to him,
15  but he could not respond back to you in a way that, you know,
16  represented he understood what you were asking him.
17    And I knew that the CSW who was working with him, and I
18  happened to -- you know, I have many occasions to look in the
19  ICMS for different people.  And I saw in Mr. -- in this case,
20  that this Mr. CSW had written like many, many notes on this
21  person referring to having had conversations with him on the
22  phone and meeting him here and there.
23    And they were sitting next to each other in the office
24  one day.  He didn't recognize her.  She didn't recognize him.
25  And they were literally next to each other in the office.

1    And I observed -- because you saw the way the office was

2   from where I sat at the front desk, I could see, you know,

3   what was happening in the waiting room.  And they were

4   sitting next to each other, you know, just as nice as you

5   please, not speaking to each other, not acknowledging each

6   other; but yet this particular CSW had written many, many

7   notes on Mr. Johnson, in this case.

8   Q.   So, I'm going to continue playing at 1:49.

9                        (Audio played.)

10    So, pausing at 2:22.  Who was Iffy?

11  A.   Iffy was a CSW that was one of the first to work out of

12  the southeast office.

13  Q.   And why did you tell Mr. Bakari and that some of Iffy's

14  notes weren't okay?

15  A.   You know, when I would read Iffy's notes from time to

16  time, I would see, you know, where she's referring to she's

17  meeting with a woman and referring to them in the male gender

18  and vice versa.

19    And just, you know, the notes were just -- they looked

20  cookie-cutter, you know, there was no specifics.  It was just

21  very generic kind of stuff written.  And they were similar

22  notes throughout her, you know, the notes that I saw of hers.

23    But oftentimes I would see incorrect gender and

24  sometimes incorrect names attached to her notes.

25  Q.   And what reaction, if any, did Mr. Mbom have to this?

1   A.   None.

2   Q.   You also mentioned when you were talking here of

3   Rachael, who was Rachael?

4   A.   Rachael is my daughter.

5   Q.   What did your daughter do at Holy Health?

6   A.   She's a Community Support Worker.

7   Q.   Did you help your daughter get a job there?

8   A.   Yes, I did.

9   Q.   And if you were concerned about what was happening at

10  Holy Health, why'd you recommend your daughter there?

11  A.   Well, it was the pandemic.  And my daughter had been a

12  server and a bartender, and she had no job.  She had no way

13  to pay her rent.  And I knew that she would do a good job, so

14  I recommended her to hire, to apply.

15  Q.   Okay.  I'll keep playing.

16                   (Audio played.)

17       Now, you mentioned Stella there.  Who was Stella?

18  A.   A CSW.

19  Q.   And was that the story you were just talking about,

20  about the CSW who had entered notes who didn't recognize her

21  own consumer?

22  A.   Yes, that was the story -- the person I was referring

23  to.

24  Q.   What, if anything, was Mr. Mbom's reaction when you

25  talked about Stella being unable to recognize her consumer?

1  A.   No response.

2  Q.   Okay.   Now, was this the only time you informed Mr. Mbom

3  of an instance that you were concerned a CSW had not actually

4  seen a consumer they were documenting on?

5  A.   No.

6  Q.   What other instances did you speak to Mr. Mbom about?

7  A.   One of our clients had been murdered on Good Hope Road

8  on March 20th of 2020.   And part of my job was to write, what

9  they call it, an unusual incident report that required that I

10 provide her particulars, her name, address, information about

11 her.

12       So, in going into ICMS to get that information, I

13 observed a note written on March 24th about this same

14 consumer.   I opened the note and read it.   And the note read

15 that, "I met Ms. Brinkley in the community.   She was dressed

16 appropriately," you know, various descriptions of physical,

17 actual contact with her on the day of March 24th.

18 Q.   And just to be clear, so that interaction was being

19 recorded on the day of March 24th.   When did this consumer

20 pass away?

21 A.   She passed away on March 20th of 2020.

22 Q.   So, four days earlier?

23 A.   Yes.

24 Q.   What was the name of this consumer?

25 A.   Her name was Lagloria Brinkley.

1   Q.   What was the CSW under whom -- whose name that note was

2   written?

3   A.   Her first name was Success.

4   Q.   And what did you do after you saw that note that had

5   been written by Success for Lagloria Brinkley after

6   Ms. Brinkley's death?

7   A.   I was really angry and outraged about it.   And I

8   informed Mr. Mbom about it, you know, hoping that -- just

9   informing him of it because I know his job is to supervise

10  and train the CSWs.   So I thought he was the appropriate

11  person to bring that to his attention.

12  Q.   And what, if anything, happened after you spoke with

13  Mr. Mbom about that particular note?

14  A.   I went back into the system, you know, I don't know why,

15  but I saw back in the system that that note that had been

16  initially written by Success was now scrubbed and made into a

17  contact note.

18  Q.   What's a contact note?

19  A.   A contact note refers to, you know, making an effort to

20  contact somebody and leaving a message or not receiving --

21  it's kind of a way to account for the work that we're, you

22  know, that is being done.   So, "I called this person.   They

23  weren't there."   So, it's a note that depicts that work was

24  done and we couldn't reach the person.

25  Q.   But it describes an unsuccessful contact?

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS     356

1   A.   An unsuccessful contact, yes.

2   Q.   Now, going back to this meeting that took place at the

3   North Capitol office in 2020, in addition to the clips that

4   we're reviewing, were there a number of other issues that

5   were discussed over this lengthy meeting?

6   A.   Yes.

7   Q.   And during the course of that discussion, did you have a

8   disagreement with Mr. Mbom about the topic of reimbursements

9   for supplies?

10  A.   Yes, I did.

11  Q.   In general, is it fair to say that you didn't always

12  agree with Mr. Mbom's management style?

13  A.   Not really, no.  No.

14  Q.   Anything about that disagreement or issues affecting

15  your testimony today?

16  A.   No.

17  Q.   All right.  So, moving forward, I'm going to play for

18  you what's marked as Government's Exhibit L3c, which is

19  Transcript T3c.

20                    (Audio played.)

21       So, just pausing -- and I'll go back a little bit.  Just

22  pausing at 8 seconds.  Who said, "We have lost too many

23  consumers"?

24  A.   Mr. Mbom.

25  Q.   Playing.

 1                    (Audio played.)

 2        And who, then, shouts, "Too many"?

 3   A.   Mr. Bakari.

 4   Q.   Keep playing.

 5                    (Audio played.)

 6        So, pausing at 20 seconds.  When Mr. Mbom said,

 7   "Southeast there has more consumers than us," what was he --

 8   what was the "us" he was comparing to southeast?

 9   A.   He was comparing to it the northwest office on North

10   Capitol.

11   Q.   Keep playing.

12                    (Audio played.)

13        So, pausing here, who said, "You heard Ms. Victoria say

14   here that consumers continue to come even without the

15   incentive"?

16   A.   Mr. Mbom.

17   Q.   And what did you understand Mr. Mbom meant by

18   "incentive"?

19   A.   The $5 that we were giving out.

20   Q.   That was the cash payments?

21   A.   Cash payments to the consumers when they came in.

22   Q.   And why did you understand he referred to those cash

23   payments as an incentive?

24   A.   Because that's what they were really intended to be.

25   Q.   An incentive to do what?

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    358

1    A.   To come back and to come.

2    Q.   Now, at the time you made this recording, was the

3    southeast office still paying consumers?

4    A.   No, we had stopped.

5    Q.   What role, if any, did Mr. Mbom have in the southeast

6    location no longer paying consumers?

7    A.   None.

8    Q.   Sorry?

9    A.   None at all.  None at all.

10   Q.   To your knowledge, had the North Capitol location

11   stopped paying consumers at this time?

12   A.   I don't know, but I don't believe they had stopped.

13   Q.   I'll keep playing.

14                   (Audio played.)

15        Stopping at 1 minute and 12 seconds.  What did Mr. Mbom

16   instruct you to do with agencies that were paying consumers?

17   A.   To report them to the Department of Behavioral Health in

18   D.C.

19   Q.   And he referred to an MUI.  What's an MUI?

20   A.   That's a general form used to report any unusual

21   incident.  Like, I used it for the reporting of

22   Ms. Brinkley's death.  Issues that are a major -- a fight, a

23   police report, anything gets submitted to D.C. Government in

24   the form of a major unusual incident report.

25   Q.   And what did Mr. Mbom say could happen to another agency

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    359

1  if he reported them for paying consumers?

2  A.   That they would be suspended from taking in new clients.

3  Q.   Keep playing.

4                      (Audio played.)

5       Pausing at 2 minutes and 33 seconds.  Who says, "What

6  we've done over the years is we have babysat these people for

7  too long"?

8  A.   Mr. Mbom.

9  Q.   And what "people" did you understand he was referring

10 to?

11 A.   The clients that would come to that office, like the

12 ones I described earlier.

13 Q.   And when Mr. Mbom said, "They see Mr. Oro for five

14 minutes and then they are given a card."  What did you

15 understand he meant by that?

16 A.   I don't know who Mr. Oro is.  I believe he was a

17 therapist or one of the professionals that, you know, met

18 with clients.

19      And then the card would be, like I described, the

20 Post-It notes that they'd bring to the front desk with a

21 signature of whomever they were visiting with to get the $10.

22 Q.   Keep playing.

23                      (Audio played.)

24      When Mr. Mbom said, "We need to get into a different

25 atmosphere advertising ourselves by showing that we are

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS      360

1    actually providing services," what did you understand he

2    meant?

3    A.    That word of mouth brings in clients.  Word of mouth

4    based on success and results and help will have a great

5    impact on bringing people to the office.

6    Q.    And how was that a different atmosphere from what was

7    being done?

8    A.    They were using incentives, like money, to bring people

9    in and just to have them come to the office.

10   Q.    All right.  Now I'm going to play for you what's marked

11   as Government's Exhibit L3d.  And this is Transcript T3d.

12                      (Audio played.)

13        What does "intake" refer to?

14   A.    The first day that a person, you know, joins the

15   agency -- or they may have signed up and gotten in our

16   database, but they come in for the first time to get service,

17   the intake would be the general name, information, ID,

18   insurance card, you know, signing consents to be serviced by

19   our agency, signing an authorization for his or their

20   information to be shared, if necessary, description of what

21   we do.

22        Just -- there is a set number of things that were in

23   ICMS that were part of the intake process that were to be

24   completed when the person was sitting with you.

25   Q.    And when Mr. Mbom said, "You can now do your 30

DIRECT OF VICTORIA MARGOLIS BY MS. COLLINS    361

1  minutes," what did you understand he was referring to?

2  A.    That the intake process itself was to be a community

3  support note that would be a 30-minute note.

4  Q.    And did you, in fact, enter some 30-minute intake notes?

5  A.    Yes, I did.

6  Q.    Did all of those intakes actually take 30 minutes?

7  A.    No.

8  Q.    Why did you enter them as 30-minute notes?

9  A.    That was the instruction I was given.

10 Q.    And to be clear, did those intakes sometimes take a lot

11 less than 30 minutes?

12 A.    Oftentimes they did.

13 Q.    So, who instructed you to write a 30-minute intake note?

14 A.    Mr. Mbom.

15 Q.    Were you signed up as a source for law enforcement at

16 the time you recorded this meeting in December of 2020?

17 A.    No, I was not.

18 Q.    Okay.  Was this before or after you were signed up as a

19 source?

20 A.    Before I was signed up as a source.

21 Q.    Did anyone direct you to record this meeting, or did you

22 do it on your own?

23 A.    I did it on my own.

24 Q.    And later did you, then, provide the recording to law

25 enforcement?

CROSS OF VICTORIA MARGOLIS BY MR. ROBBINS      362

1    A.    Yes, I did.

2              MS. COLLINS:  We pass the witness, Your Honor.

3              THE COURT:  Okay.  Mr. Robbins?

4              MR. ROBBINS:  My screen is frozen.

5                        CROSS-EXAMINATION

6    BY MR. ROBBINS:

7    Q.    Good afternoon, Ms. Margolis.

8    A.    Hello.

9    Q.    You told us on Direct -- I'm sorry, I'm Gar Robbins.  I

10   represent Lambert Mbom.

11         You told us on Direct that you perhaps had some

12   differences in views of the way to run an organization from

13   what Lambert thought, some management disagreements?

14   A.    They weren't whole, big, you know, differences.  There

15   were some basic things that were, you know, required and some

16   things that were standard.  There were just some smaller

17   issues that we differed on and that we had challenges in

18   communicating about.

19   Q.    And your goal in your role in southeast was to try to

20   serve the client base, the consumers who came to your office?

21   A.    Yes.

22   Q.    Was it your impression that Lambert was also concerned

23   about the well-being of consumers?

24   A.    No.

25   Q.    You didn't think so?

1   A.   No.

2   Q.   Did he appear to be under a great deal of pressure to

3   keep everything moving forward?

4   A.   I don't understand what you mean by that.

5   Q.   Did he have a great deal of pressure in answering to

6   Mr. Bakari to make sure that he was meeting his benchmarks to

7   Mr. Bakari?

8   A.   I would imagine so.  I don't know that, you know, the

9   dynamic between those two.

10  Q.   When you needed to get checks, you said you sometimes

11  had to go to the North Capitol Street office to pick up

12  checks.

13  A.   Uh-huh.

14  Q.   Were the employees at Holy Health 1099 employees?  Were

15  they all independent contractors?  Or were some of them on

16  salary?

17  A.   All of -- I was a 1099.  And I think the CSWs were,

18  also.

19  Q.   Did you find that you would end up having to call

20  Mr. Bakari from time to time because Lambert just couldn't

21  answer your questions or wasn't available or you didn't feel

22  like you were getting enough support for it?

23  A.   When I could -- I had an easier time of communicating

24  with Mr. Bakari.  Because Mr. Bakari had created an

25  atmosphere between us that made it comfortable to communicate

CROSS OF VICTORIA MARGOLIS BY MR. ROBBINS      364

1   with him.  So I often, you know, would refer to him when he

2   was available and discuss with him issues.

3   Q.   And during the time before you stopped the stipend

4   program at the MLK office, if there was a shortage to pay the

5   stipends, you all either called Mr. Bakari or Eugenie?

6   A.   Yes.

7   Q.   You testified that at some point they sent you a sign-up

8   sheet that indicated that those were actually coming up from

9   the Agatha Foundation?

10  A.   Yes.

11  Q.   Do you know where the money was coming from before you

12  had those sheets?

13  A.   They appeared to be -- oh, some of them were Zelle

14  accounts, so they must have been from, you know, checking

15  account to -- from one checking account from Ms. Eugenie to

16  my checking account.  So, it seems like it was coming from

17  personal checking account to my personal checking account.

18  Q.   Do you know what the relationship between Eugenie Bakari

19  and Agatha was?

20  A.   Just that her name was attached to it.  I didn't really

21  know much more.

22  Q.   So, would it be possible that there was Agatha money

23  flowing through her to you?

24  A.   I have no idea.

25       MR. ROBBINS:  Thank you.  No further questions,

CROSS OF VICTORIA MARGOLIS BY MR. ROBBINS      365

1  Your Honor.

2         THE COURT:  Okay.  Any Redirect?

3         MS. COLLINS:  No, Your Honor.

4         THE COURT:  All right.  Ms. Margolis, that

5  concludes your testimony.  You may step down.  You are free

6  to go.  Thank you so much.

7         THE WITNESS:  Thank you.

8         THE COURT:  Government?

9         MS. COLLINS:  Government calls Johanna Yee.

10        THE COURT:  Did you say Gee?

11        MR. SARMA:  Johanna Yee.

12        THE COURT:  Thank you.

13        THE CLERK:  And if you could just remain standing

14  and raise your right hand for me, please.

15                         JOHANNA YEE,

16  having been called as a witness and having been duly sworn,

17  was examined and testified as follows:

18        THE CLERK:  While speaking clearly into the

19  microphone, could you please state your full name and spell

20  your last name for the record.

21        THE WITNESS:  Yes.  My name is Johanna Yee.  It's

22  spelled J-O-H-A-N-N-A.  Last name spelled, Y-E-E.

23        THE CLERK:  Thank you.

24

25

1                        DIRECT EXAMINATION

2    BY MR. SARMA:

3    Q.   Good afternoon, Ms. Yee.

4    A.   Good afternoon.

5    Q.   Give me one second.

6         Ms. Yee, what do you do?

7    A.   I am a forensic accountant for the FBI.

8    Q.   How long have you been with the FBI?

9    A.   I have been with the FBI since October 2021, so just shy

10   of two years.

11   Q.   Are you assigned to a particular squad or unit at the

12   moment?

13   A.   I'm assigned to the health care fraud squad.

14   Q.   And when did you start with that squad?

15   A.   When I began at the FBI in October 2021.

16   Q.   Could you describe for the jury kind of the training you

17   have received since joining the FBI?

18   A.   All forensic accountants when they start at the FBI,

19   regardless of background experience, are required to take a

20   five-week FBI academy training.  It covers training on

21   obtaining and analyzing financial records, training on

22   tracing funds through bank accounts and other best practices

23   on conducting financial investigations.

24   Q.   And can you describe your educational background?

25   A.   I graduated from Virginia Tech with a bachelor's of

1   science in accounting and information systems and a

2   bachelor's of science in marketing.

3   Q.   And what certifications, if any, do you have in

4   connection with your work?

5   A.   I have a CPA license, Certified Public Accountant.

6   Q.   Is that license currently active?

7   A.   Yes, it is.

8   Q.   And prior to joining the FBI, what did you do?

9   A.   I was a forensic accountant with PricewaterhouseCoopers.

10  Q.   Since joining the FBI, can you describe your general

11  duties as a forensic accountant?

12  A.   I analyze financial records and other relevant records

13  to gather the facts of the case.  I look at large volumes of

14  data and summarize it into something that's more digestible

15  and easy to understand.

16  Q.   And when you say financial records, does that include

17  bank records?

18  A.   Yes, it does.

19  Q.   And does that include claims data?

20  A.   Yes, it does.

21  Q.   Does that include claim data for Medicaid?

22  A.   Yes, it does.

23  Q.   In your role with the FBI, have you been assigned to

24  work on a case involving a company called Holy Health?

25  A.   Yes, I have.

1   Q.   And can you describe at a very high level kind of what

2   your role has been in the investigation?

3   A.   I have looked at the financial records for Holy Health,

4   the owners Julius Bakari and Eugenie Bakari, other subjects

5   of the investigation, and I also analyzed the medical

6   Medicaid claims data.

7   Q.   And based on your review, what did you prepare and to

8   kind of summarizing the records that you reviewed?

9   A.   Yes, I have.

10  Q.   And I know generally you said you have experience

11  reviewing Medicaid's claims data.   In this particular case,

12  did you review Medicaid claims data for Holy Health?

13  A.   Yes, I did.

14  Q.   And have you created summaries of the information

15  contained in that Medicaid claims data for Holy Health?

16  A.   Yes, I have.

17  Q.   And do those summaries look at the claims that Medicaid

18  actually paid to Holy Health?

19  A.   Yes, they do.

20  Q.   All right.   I am going to show you what has been marked

21  as Exhibit S4.   This is a two-page exhibit.   Do you recognize

22  this?

23  A.   Yes, I do.

24  Q.   And how do you recognize it?

25  A.   I created it.

1  Q.   Generally speaking, does this exhibit summarize the Holy
2  Health claims data that you received as part of your
3  investigation?
4  A.   Yes, it does.
5  Q.   And is that claims data contained in Government Exhibits
6  G1 through G5?
7  A.   Yes, it is.
8  Q.   And is that data voluminous?
9  A.   Yes, very.
10 Q.   Does it contain very, very large spreadsheets?
11 A.   Yes.
12 Q.   Can you describe in a very high level what you are
13 summarizing on these two pages.
14 A.   This shows the total Medicaid claims paid to Holy Health
15 across January 2017 to August 2021.  And as you can see, at
16 the bottom it's broken out by date of service, by year.  So
17 the total bar equates to the total amount that was paid to
18 Holy Health in that given year.
19 Q.   And then for 2021, is that all of 2021?
20 A.   No.  That only includes January through August of 2021.
21 Q.   And then do you see where it says, "total dollar value"?
22 A.   Yes, I do.
23 Q.   Can you describe to the jury what total dollar value is?
24 A.   That is the total amount that Holy Health received for
25 the Medicaid claims they were paid.  For example, in 2019,

1  you can see that just under $1.5 million were paid to Holy

2  Health.

3  Q.   And you have been referring to claims paid.  Can you

4  explain to the jury why you looked at claims paid instead of

5  the claims billed by Holy Health to Medicaid?

6  A.   Yes.  This was in order to avoid double counting any

7  claims that may have been denied and resubmitted and later

8  paid.  So, looking at just the claims that were paid allows

9  us to not double count those.

10  Q.   Were there situations where Medicaid paid on a claim and

11  then that amount was adjusted after the fact?

12  A.   Yes.  That would be incorporated within the total amount

13  paid in this chart here.

14  Q.   And so I've already disclosed to the jury I'm

15  colorblind, but I'm going to try my best here.  I know, I'm

16  the odd man out here.

17      Can you describe what this light blue is?

18  A.   The light blue refers to procedure code 90837 which you

19  can see over here is for psychotherapy for 60 minutes with a

20  patient.

21  Q.   And then I'm not even going to try to guess this color,

22  this 19%, what color is that and what does it represent?

23  A.   That is gray.  And the gray refers to the other -- all

24  other procedures outside of procedure code 90837 and

25  procedure code H0036.

DIRECT OF JOHANNA YEE BY MR. SARMA          371

1   Q.   And -- sorry.  And what is the third color here, the

2   darker color?

3   A.   The dark blue refers to procedure code H0036, which you

4   can see is community psychiatric supportive treatment,

5   face-to-face per 15 minutes.

6   Q.   And in your analysis, why did you focus on H0036 and

7   90837?

8   A.   As you can see by the amount of blue versus gray, those

9   were the two procedures that were the most amount of money

10  was paid to Holy Health for Medicaid claims.

11  Q.   And in compiling these summaries, how did you determine

12  under what procedure code a claim was billed and paid?

13  A.   It's contained within the claims data.  It's contained

14  as a column in the claims data.  So, it's easy to filter and

15  determine what procedure code each claim is related to.

16  Q.   And in 2017, what percentage of the total Medicaid

17  claims paid to Holy Health were for H0036?

18  A.   0% in 2017.

19  Q.   And can you describe for the jury how that changed over

20  time.

21  A.   Yes.  Beginning in 2018, you can see that H0036 is first

22  introduced in July of 2018 and then it drastically increases

23  to 67% of all of the Medicaid claims that were paid to Holy

24  Health in 2019.  And it continues to be a larger and larger

25  percentage of the Medicaid claims paid to Holy Health.  By

DIRECT OF JOHANNA YEE BY MR. SARMA          372

1    2021, you have 90% of all the Medicaid claims were related to

2    H0036.

3    Q.   I think you previously mentioned that for 2021, that

4    period is just January 21, 2021, to August 31, 2021; is that

5    correct?

6    A.   Yes, that's correct.

7    Q.   Did you calculate whether on an average monthly basis

8    Holy Health was getting paid more in 2020 or in 2021?

9    A.   Yes, I did.  They were getting paid more on an average

10   monthly basis for 2021.

11   Q.   And do you know when the FBI conducted its search of

12   Holy Health's offices?

13   A.   Yes.  April 2nd, 2021.

14   Q.   And did you calculate what -- for 2021, did you

15   calculate whether Holy Health was getting paid more on an

16   average monthly basis before or after the FBI search?

17   A.   Yes.  Holy Health was being paid more on average monthly

18   basis before the search in 2021.  It decreased after the

19   search.

20   Q.   I'm going to scroll now down to the second page here.

21   Are you relying on the same data as in the first chart?

22   A.   Yes, I am.

23   Q.   Just looking at this chart, in total, how much did

24   Medicaid pay Holy Health for the entire time period

25   calculated?

1  A.   The total amount paid was $5,698,179.

2  Q.   And for H0036, how much did Holy -- did Medicaid pay

3  Holy Health?

4  A.   For H0036 specifically, it was $3,343,781 for the entire

5  time period.

6  Q.   I am now going to show you what has been marked as

7  Government Exhibit S6.  Do you recognize this document?

8  A.   Yes, I do.

9  Q.   How are you able to recognize it?

10  A.   I created it.

11  Q.   And, again, this is a two-page document; correct?

12  A.   Yes.

13  Q.   Let's go back to the first page.  Can you describe for

14  the jury what this graph is showing?

15  A.   This shows the most common unit number of units billed

16  for Procedure Code H0036 across the time period January 2017

17  to August 2021.

18  Q.   And for H0036, what does one unit equal?

19  A.   As you can see over here, one unit would be 15 minutes

20  according to the description.

21  Q.   And where were you pulling that description from?

22  A.   The Medicaid claims data.

23  Q.   And based on your analysis, what was the most commonly

24  billed number of units for H0036?

25  A.   Four units.  As you can see, 77% of all the H0036 claims

1  that were paid to Holy Health were for four units, were

2  billed for four units of service.

3  Q.    And what was the second most common number of units?

4  A.    5 units at 12% of all the H0036 claims.

5  Q.    Moving down here to the second page, are you relying on

6  the same data when you put this together?

7  A.    Yes, I am.

8  Q.    And this is, again, for the time period between

9  January 1st, 2017, and August 31, 2021?

10  A.    Yes, that's correct.

11  Q.    And do you see where it says here number, percentage of

12  claims, do you see where it says 100 percent?

13  A.    Yes, I do.

14  Q.    Oops.  Let me go back to that.

15       Now, if you were to sum up the numbers in this column,

16  would it equal 100% or would it equal a different number?

17  A.    It would equal 101%.  There is a rounding issue.  Some

18  of the percentages extend into the decimal points.  And for

19  simplicity, I rounded them to the whole number.

20  Q.    And of the total years of service billed under H0036,

21  what percentage were billed for four, five, or six units?

22  A.    91% for four or more units.

23  Q.    And as part of your work in connection with this case,

24  have you looked at Holy Health's bank records?

25  A.    Yes, I have.

DIRECT OF JOHANNA YEE BY MR. SARMA          375

1   Q.   And so let's take a look at Government Exhibits S7, I
2   believe it is.  Do you recognize this exhibit?
3   A.   Yes, I do.
4   Q.   How are you able to recognize it?
5   A.   I created it.
6   Q.   And is this also a two-page document?
7   A.   Yes, it is.
8   Q.   And to prepare this document, did you look at the bank
9   records from Holy Health's Bank of America account ending in
10  1589?
11  A.   Yes, I did.
12  Q.   And are those records contained in Government Exhibits
13  F1 through F14?
14  A.   Yes, they are.
15  Q.   And did you look at Holy Health's Bank of America
16  account ending in 8983?
17  A.   Yes, I did.
18  Q.   And are those records contained in Government Exhibits
19  F17 through F32?
20  A.   Yes, they are.
21  Q.   And did you look at the bank records from Holy Health's
22  PMC account ending in 6738?
23  A.   Yes, I did.
24  Q.   And are those records contained in F60 through F62?
25  A.   Yes, they are.

1  Q.   And did you look at the bank records for Holy Health's
2  Truist account ending in 8860?
3  A.   Yes, I did.
4  Q.   Are those records contained in Government Exhibit S65?
5  A.   Yes, they are.
6  Q.   Did you look at bank records from Holy Health's Truist
7  account ending in 8894?
8  A.   Yes, I did.
9  Q.   And are those records contained in Government Exhibit
10 F65?
11 A.   Yes, they are.
12 Q.   And did you look at the bank records from Holy Health
13 Wells Fargo account ending in X8229?
14 A.   Yes, I did.
15 Q.   Are those records contained in Government's Exhibits F68
16 through F70?
17 A.   Yes, they are.
18 Q.   And are those bank records we were just discussing
19 voluminous?
20 A.   Yes, they are.
21 Q.   And does Exhibit F7 fairly and accurately summarize the
22 information contained in those bank records?
23 A.   Yes, it does.
24 Q.   And do you see at the top here it says, "Holy Health
25 bank inflows"?

1  A.    Yes.

2  Q.    Can you describe for the jury what an inflow is.

3  A.    It's any money coming into a bank account.

4  Q.    And at a general level, what does this particular first

5  page exhibit show?

6  A.    This shows the total amount of inflows coming into the

7  Holy Health bank accounts across January 2017 through

8  August 2021.

9  Q.    And 2017, what was the percentage of income coming from

10  Medicaid claim payments?

11  A.    The percentage in 2017 was 88% of all the Holy Health

12  bank inflows were related to Medicaid claim payments.

13  Q.    How did that change over time?

14  A.    It continued to increase in -- across-the-board in 2018,

15  2019, 2020.  And in 2021, it went down slightly but was still

16  85 percent of all the account inflows were related to

17  Medicaid claim payment.

18  Q.    Scrolling down to the second page and looking at this

19  first chart here, are you relying on the same data we were

20  just discussing?

21  A.    Yes.

22  Q.    And how did the amount of Medicaid claim payments change

23  over time between 2017 and 2021?

24  A.    They increased across 2017 to 2019.  From 2018 to 2019,

25  increased by, you know, roughly 50- -- or sorry, roughly

1   500,000.  And then there was a slight decline in 2020, and a

2   slight decline in 2021, with 2021 still having $1.2 million

3   in Medicaid claim payments.

4   Q.   And in this time period, what percentage of Holy

5   Health's inflows came from Medicaid claim payments?

6   A.   The total amount from Medicaid claim payments was

7   $5,587,487.

8   Q.   And what percentage of total inflows were from Medicaid

9   claim payments?

10  A.   90% of the total inflows were related to Medicaid claim

11  payments.

12  Q.   Now I'll turn to S8.  Do you recognize this exhibit?

13  A.   Yes, I do.

14  Q.   How do you recognize it?

15  A.   I created it.

16  Q.   And in creating this exhibit, did you rely on the same

17  bank records we were discussing in G7?

18  A.   Yes, I did.

19  Q.   In a general level, what does this exhibit show?

20  A.   This shows the top 20 staff members who received the

21  most payments from Holy Health across January 2017 to

22  August 2021.

23  Q.   And you said "payments."  Did you attempt to determine

24  whether a payment was made for the purposes of either salary,

25  wages, or are we just looking at overall transfers?

1   A.   It would be overall transfers.

2   Q.   And so looking at 2018, how much was Mr. Lambert Mbom

3   paid?

4   A.   In 2018, he was paid $23,888.

5   Q.   And how did that change over time?

6   A.   From 2018 to 2019, that amount more than doubled.  And

7   then from 2019 to 2020, that amount -- the amount in 2019

8   doubled again to $121,618.  And then it declined in 2021 to

9   $43,000, the last payment being in June of 2021.

10  Q.   And in total for the time period you were examining, how

11  much money was paid to Mr. Mbom from Holy Health?

12  A.   $245,321.

13  Q.   Who was -- who received the most payments from Holy

14  Health during this time period?

15  A.   Jeanne Foe.

16  Q.   And who was second?

17  A.   Lambert, Mr. Mbom.

18          THE COURT:  Mr. Sarma, do you have more of this

19  witness?  Is this a good time to stop?

20          MR. SARMA:  I think I have about 10 more minutes.

21  But we could stop today, yeah.

22          THE COURT:  Okay.  All right.

23          Ladies and Gentlemen, it's 3 o'clock.  And as

24  promised, I'm going to let you go for today.

25          A couple words about the schedule.  We're moving at

1   a good pace.  So this is likely not going to take two full

2   weeks of testimony.  Friday we will not sit.  So I'm going to

3   do lawyer stuff with the lawyers on Friday and you get the

4   day off.  Okay?

5           Tomorrow, though, you'll be back regular time.

6   We'll start promptly at 8:45.  And at the end of the day,

7   I'll have more information for you about, you know, the

8   Monday.  We'll be back for sure on Monday.  Okay?  All right.

9           And remember:  No talking, no texting, no tweeting,

10  no Internetting, no communication whatsoever.  You can leave

11  the transcripts on the seat with your notes.  Have a really

12  peaceful evening.  See you back here promptly for 8:45 start.

13  Thanks so much.

14          THE CLERK:  All rise for the jury.

15          (The jury left the courtroom at 2:58 p.m., and

16          proceedings were had out of the presence of the jury

17          not herein transcribed.)

18          THE COURT:  Thank you all.  Have a good evening.

19          THE CLERK:  All rise.  This honorable court now

20  stands in recess.

21          (Court recessed for the day at 3:03 p.m. and

22  reconvened on August 9, 2024, at 8:53 a.m.)

23                  End of Volume 2

24          Transcript continues in Volume 3 at Page 381

25

UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND


CERTIFICATE OF OFFICIAL REPORTER

I, Kathy Cortopassi, RDR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the District of Maryland, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 24th day of March, 2024.


/s/ Kathy Cortopassi
Kathy Cortopassi, RDR, CRR, CRC
U.S. Official Court Reporter