IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

```
_____
                                 )
UNITED STATES OF AMERICA,        )
                                 )
         Plaintiff,              )
                                 )
                                 )Docket Number
             vs.                 )8:22-cr-109
                                 )
LAMBERT MBOM,                    )
                                 )
         Defendant.              )
_____)
```

TRANSCRIPT OF JURY TRIAL - VOLUME 3
BEFORE THE HONORABLE PAULA XINIS
UNITED STATES DISTRICT COURT JUDGE
THURSDAY, AUGUST 10, 2023 AT 8:53 A.M.

APPEARANCES:

On Behalf of the Plaintiff:

      CHRISTOPHER M. SARMA, ESQ.
      U.S. Attorneys' Office
      6406 Ivy Lane, 8th Floor
      Greenbelt, MD 20770
      301-344-4431
and
      JESSICA CAROLINE COLLINS, ESQ.
      MEGAN SAMANTHA McKOY, ESQ.
      U.S. Attorneys' Office
      6500 Cherrywood Lane, Suite 200
      Greenbelt, MD 20770
      301-344-4516


On Behalf of the Defendant:

      G. ARTHUR ROBBINS, ESQ.
      Chesapeake Meridian
      1997 Annapolis Exchange Pkwy, Suite 300
      Annapolis, MD 21401
      443-454-7675

    KATHY CORTOPASSI, RDR, CRR, CRC - Official Court Reporter
      United States District Court, Greenbelt, Maryland

I N D E X

GOVERNMENT'S CASE IN CHIEF ----------------------------

WITNESS:                                          PAGE

JOHANNA YEE

 Further Direct Examination by Mr. Sarma            385

 Cross-Examination by Mr. Robbins                   395


JEANNE MBOE-FOE

 Direct Examination by Mr. Sarma                    398

 Cross-Examination by Mr. Robbins                   426

 Redirect Examination by Mr. Sarma                  432


JAMES MORAN

 Further Direct Examination by Ms. McKoy            442

 Cross-Examination by Mr. Robbins                   483

 Redirect Examination by Ms. McKoy                  485

                    * * * * * * * * *

 Defendant's Argument Rule 29 Motion - Mr. Robbins  490

 Government's Argument Rule 29 Motion - Mr. Sarma   492

 Court's Ruling                                     494

 Jury Instruction Conference                        495

    ****PLEASE NOTE:  PLEASE CHECK THE COURT DOCKET FOR THE
         OFFICIAL RECORD OF ALL EXHIBITS RECEIVED.***

1          THE COURT:  Good morning, everyone.  You-all can

2    have a seat.  Would the Government call the case.

3          MR. SARMA:  Case is United States versus Lambert

4    Mbom, PX22-19.  We are here today for Day 4 of jury trial.

5          Christopher Sarma of United States of America,

6    joined at counsel's table by Jessica Collins, Megan McCoy,

7    and FBI Special Agent Jim Moran.

8          THE COURT:  Okay.  Good morning.

9          MR. ROBBINS:  Good morning, Your Honor.  Gar

10   Robbins here with Lambert Mbom, the defendant in the case.

11         THE COURT:  All right.  Are we ready for the jury?

12         MR. SARMA:  Yes, Your Honor.

13         THE COURT:  Okay.  And do we have our witness?

14         MR. ROBBINS:  She's here.  I saw her earlier.

15         THE COURT:  Okay.  Great.  I don't think we have

16   any preliminary matters, so we can get the jury while we get

17   the witness.  Great.  Thank you.

18         (The jury came back into the courtroom at 8:54 a.m.,

19             and the following proceedings were had in the

20             presence of the jury.)

21         All right.  Good morning, everyone.  You can have a

22   seat.

23         Okay.  We are going to pick up where we left off

24   with Ms. Yee's testimony.

25         Ms. Yee, I remind you, you're still under oath.

FURTHER DIRECT EXAMINATION                    385

1              And whenever you're ready, Mr. Sarma.

2              MR. SARMA:  Thank you, Your Honor.

3                           JOHANNA YEE

4    having been called as a witness and having been duly sworn,

5    was examined and testified as follows:

6                     FURTHER DIRECT EXAMINATION

7    BY MR. SARMA:

8    Q.   Good morning, Ms. Yee.

9    A.   Good morning.

10   Q.   As part of your investigation in this case, did you also

11   track individual payments that Holy Health made to Francis

12   Senesie and Lambert Mbom?

13   A.   Yes, I did.

14   Q.   Did you look at the Holy Health bank records for the

15   Bank of America account ending in 1589 to do that part of the

16   investigation?

17   A.   Yes, I did.

18   Q.   And just so the jury understands, are those records

19   contained in Government Exhibits F1 through F18?

20   A.   Yes, they are.

21   Q.   Did you prepare summary charts with these payments?

22   A.   Yes, I did.

23   Q.   And do you believe that those summaries will assist the

24   jury in understanding your testimony about the payments made

25   from Holy Health both to Mr. Mbom as well as Mr. Senesie?

1  A.   Yes, I do.

2          MR. SARMA:  I'm going to show this F96.  This is

3  for identification only.

4          THE COURT:  So then not to the jury?

5          MR. SARMA:  Just to the jury as demonstrative, not

6  to go in as evidence.  We're moving this as a demonstrative

7  but not as substantive evidence that would go back to the

8  jury.

9          THE COURT:  Okay.  All right.  I think I

10 understand.  Let me see what it is.

11 BY MR. SARMA:

12 Q.   Do you recognize this chart, Ms. Yee?

13 A.   Yes, I do.

14 Q.   How do you recognize this chart?

15 A.   I created it.

16 Q.   Would you describe for the jury what this chart is?

17 A.   This is a list of all the Holy Health payments to

18 Lambert Mbom with the exception of one payment that was not

19 related that I could distinguish was related to something

20 other than Holy Health business.  The rest I was not able to

21 distinguish or it's stipulated as such.

22 Q.   Can describe for the jury what that one check you

23 determined was not related to Holy Health business was for?

24 A.   Yes.  There was one check for $250 related to church

25 contribution in 2019.

1   Q.   And according to your chart, when was the first transfer

2   made from Holy Health to Mr. Mbom?

3   A.   In May 25 of 2018.

4   Q.   And then this is a three-page document.  I'm going to

5   stroll down here.  I think you probably testified to this --

6   I think you did testify to this fact yesterday, but just for

7   the jury again, do you recall when the FBI searched Holy

8   Health's offices?

9   A.   Yes, it was April 2nd of 2021.

10  Q.   Based on your analysis, did you identify checks that

11  Holy Health issued to Mr. Mbom between April 2, 2021, and

12  June 5, 2021?

13  A.   Yes, I did.

14  Q.   How many checks were issued?

15  A.   You can see the checks down here.  So there's six

16  checks.

17  Q.   And then was there also one issued on the day of the

18  search?

19  A.   Yes.  And one, as well, on the day of the search.

20  Q.   What was the smallest check that was issued during this

21  period?

22  A.   $2500.

23  Q.   What was the largest?

24  A.   $3500.

25  Q.   Scrolling.  And do you know if Mr. Mbom cashed these

FURTHER DIRECT EXAMINATION                          388

1    checks?

2    A.    Yes.   So, some of these checks were deposited into his

3    bank account, but the vast majority were cashed, brought into

4    the bank and cashed for cash.

5    Q.    I am now going to show you F97 which we're offering as a

6    demonstrative.

7                 THE COURT:   Okay.

8    BY MR. SARMA:

9    Q.    Do you recognize this chart?

10   A.    Yes, I do.

11   Q.    How do you recognize it?

12   A.    I created it.

13   Q.    And what is this charge?

14   A.    This is a list of all the Holy Health payments to

15   Francis Senesie.

16   Q.    When was the first payment made from Holy Health to

17   Francis Senesie?

18   A.    On February 12, 2021.   That was the date that the check

19   was dated.   And as you can see from the posting date, the

20   date it was deposited or cashed was on February 16, 2021.

21   Q.    Just scrolling down to the next.   Do you see under

22   Method of Payment, you listed "returned check" for two on

23   February 26, 2021?

24   A.    Yes, that's correct.   Those relate to checks that

25   bounced, so he was not able to cash or deposit them.   And he

1    attempted twice, it appears, based on the fact that there are

2    two instances.

3         If you look at the row below that, you can see the same

4    amount is later sent via Cash App.

5    Q.   Did you see any returned checks for Mr. Mbom?

6    A.   No, I don't believe so.

7    Q.   Would it help you if you looked back at F96?

8    A.   Yes, it would.  Oh, there was one check from -- that was

9    posted on October 3, 2018, that was not able to be deposited.

10   There was no check date on that.

11   Q.   And then?

12   A.   Yes.  And then followed by the instance of what appears

13   to be the same check deposited on October 5, 2018.

14   Q.   Going back to F97, did Mr. Senesie receive any checks

15   from Holy Health after the FBI searched the offices?

16   A.   Yes, he did.

17   Q.   And are these, what I just highlighted, are these the

18   checks that he received?

19   A.   Yes, they are.

20   Q.   I'm now going to show you what has been marked as F7a.

21        Do you -- is this a check that Holy Health issued to

22   Mr. Francis Senesie?

23   A.   Yes, it is.

24   Q.   And what is the date of this check?

25   A.   It's dated April 23, 2021.

FURTHER DIRECT EXAMINATION                           390

1   Q.   And what is the amount?

2   A.   The amount is $1,194.55.

3   Q.   And now turning to Page 2, is this the back of that same

4   check?

5   A.   Yes, it is.

6   Q.   And can you tell from the second page whether this check

7   was cashed?

8   A.   Yes, I can.  This stamp here indicates that it was

9   cashed for physical cash at the bank.  And as you can see

10  right here, it's actually cashed at New Hampshire Avenue,

11  Maryland branch.

12  Q.   And do you know what date it was cashed?

13  A.   Yes.  It was cashed on April 23, 2021.  You can see it

14  here.  It's a little bit hard to see.  You can also see it

15  right here or right here.

16  Q.   Scrolling down to the third page.

17       Is this a different check that Holy Health issued to

18  Mr. Francis Senesie?

19  A.   Yes, it is.

20  Q.   What date is this check written for?

21  A.   Also April 3, 2021, but you're able to tell it's a

22  different check both in the amount and also the check number.

23  Q.   And what is the amount on this check?

24  A.   $2,223.55.

25  Q.   Scrolling down, is this the back of the check?

1    A.   Yes, it is.

2    Q.   Can you tell whether this check was cashed?

3    A.   Yes, I can.   Again, the stamp indicates that this check

4    was cashed for physical cash at the bank.   And, again, at New

5    Hampshire Avenue, Maryland branch on April 23, 2021.

6    Q.   I'm now going to show you what has been marked as F7b.

7    Do you recognize this check?

8    A.   Yes, I do.

9    Q.   Is this another check that Holy Health issued to Mr.

10   Francis Senesie?

11   A.   Yes, it is.

12   Q.   Do you know if this is a different check than ones we

13   were previously looking at?

14   A.   Yes, it is.   Again, you can tell by the amount of the

15   check as well as the check number.

16   Q.   And what was the amount?

17   A.   $1,518.30.

18   Q.   Going to the second page here, do you know whether this

19   check was cashed?

20   A.   Yes.   Based on the stamp that's on the back of this

21   check, you can tell that it was cashed for physical cash at

22   the New Hampshire Avenue, Maryland branch on May 14, 2021.

23   Q.   Now, showing you what has been marked as F8a.   Is this

24   another check that Holy Health issued to Mr. Francis Senesie?

25   A.   Yes, it is.   Again, you can tell it's a different check

1   based on the check number and the amount and the date.

2   Q.   And what is the amount on this one?

3   A.   $3500.

4   Q.   Turning to the seconded page here, can you determine

5   whether this check was cashed?

6   A.   Yes.  The stamp on the back here indicates that it was

7   cashed for physical cash at the New Hampshire Avenue,

8   Maryland branch on July 30, 2021.

9   Q.   Going to Page 3, is this another check that Holy Health

10  issued to Mr. Francis Senesie?

11  A.   Yes, it is.  Again, you can tell that it's different

12  based on the amount, date, and check number.

13  Q.   And what was the date it was written for?

14  A.   July 30, 2021.

15  Q.   And what was the amount?

16  A.   $2,500.

17  Q.   And looking at the back of the check, can you tell

18  whether it was cashed?

19  A.   Yes.  The stamp here indicates that it was cashed for

20  physical cash at the New Hampshire Avenue, Maryland branch on

21  July 30, 2021.

22  Q.   I'm now going to show you what's been marked as F7.  As

23  you can see, this is Page 1 of 1,016.  Is this a series of

24  documents obtained from Holy Health's bank records?

25  A.   Yes, it is.

FURTHER DIRECT EXAMINATION                                    393

1   Q.   And I can assure everyone I will not be showing you all
2   1,000 pages.
3        Okay.  I'm showing you what's -- you can see the bottom,
4   page 805.  Can you tell the jury what this is?
5   A.   This is a check from Holy Health to Lambert Mbom.
6   Q.   And what date was this check written for?
7   A.   It was dated May 14, 2021.
8   Q.   What is the amount for the check?
9   A.   $2,500.
10  Q.   Okay.  Is this the back of that same check?
11  A.   Yes, it is.
12  Q.   And can you tell whether this check was cashed?
13  A.   Yes.  This stamp right here on the back of the check
14  indicates that it was cashed for physical cash at the Queens
15  Chapel, Maryland location on May 14, 2021.
16            MR. SARMA:  Thank you.  I may have one or two
17  additional questions.
18            THE COURT:  Okay.
19  BY MR. SARMA:
20  Q.   Ms. Yee, as part of your analysis, did you also review
21  bank records from the Agatha Foundation?
22  A.   Yes, I did.
23  Q.   And did the Agatha Foundation have bank accounts at
24  Capital One and Congressional?
25  A.   Yes, they did.

1  Q.   And during your investigation, did you observe any

2  transfers of money between Holy Health and the Agatha

3  Foundation?

4  A.   Yes, I did.

5  Q.   And were there check transfers that you observed?

6  A.   They were primarily wire transfers, but there may have

7  been a check or two, I can't recall.

8  Q.   And just for us who are not accountants, can you

9  describe at a high level what a wire transfer is?

10  A.   Yes.  It's just a transfer that's initiated by a bank

11  from one bank account to another bank account.

12  Q.   And in those transfers, which direction was the money

13  flowing?

14  A.   It was flowing out primarily.  There was --

15  Q.   Out of what account?

16  A.   I apologize.  Out of the Holy Health 1589 account and

17  the Holy Health Bank of America 8983 account.

18  Q.   Into what account?

19  A.   Into the Agatha Congressional bank account ending in

20  7436.

21  Q.   And I'm not asking for an exact number, but kind of what

22  order of magnitude:  Hundreds of dollars, thousands of

23  dollars, if you recall?

24  A.   I can't recall exactly the amount.

25  Q.   Do you recall kind of what order of magnitude, or no?

1   A.   I think it was a small amount.  I don't recall it being

2   a large amount.

3           MR. SARMA:  All right.  No further questions.

4   Thank you, Your Honor.

5           THE COURT:  Okay.

6                    CROSS-EXAMINATION

7   BY MR. ROBBINS:

8   Q.   Good morning, Ms. Yee.

9   A.   Good morning.

10  Q.   So I'm Gar Robbins.  I think we've met before.  I

11  represent Lambert Mbom.  I only have a few questions.

12       One of the first summary charts that you showed us, I

13  think it was S4, it was looking at the income of Holy Health,

14  and you were talking about where the cash flow came from

15  different services.

16       Did you factor in the change in status of what Holy

17  Health's role was at any point in time?

18  A.   I --

19  Q.   Hold on.

20       Holy Health changed from a freestanding clinic to a core

21  services agency at some point.  Did that correspond to where

22  those cash flows changed?  Because there was a pretty

23  dramatic difference in when CSW work picked up.

24  A.   I looked at the total change as well as corresponding

25  that to the claims data.  And considering the change in the

1   amount of claims, I'm not sure I understand your question.

2   Q.   The question is:  Did you try to compare that date to

3   when Holy Health changed from being a freestanding clinic to

4   being a core services agency?  In one, you have community

5   service workers and the other you don't.

6   A.   I did consider that, at least in the grand scheme

7   looking at the entire time period to try and identify what

8   might have caused that increase.  It was such a drastic

9   increase that it still -- I mean, it nearly doubled between

10  2017 and 2019.  So even factoring that in, the amount was

11  just so great that we were -- we looked at the trend.

12       So it was considered, but each procedure is billed at a

13  different rate.  So it's not entirely comparable to

14  compare -- it's apples to oranges because the procedure code

15  rate is billed differently.

16  Q.   Right.  And different providers, too; right?

17  A.   Can you clarify "different providers?"

18  Q.   CSWs provide different procedure code services than

19  freestanding health clinic would provide?

20  A.   Correct.  The procedure code, my understanding, is H0036

21  versus the 90837 that we were referring to before.  Those two

22  are the ones that I was referring to are billed at different

23  rates.  All procedures are billed at different rates.  But

24  those two primary ones that we were looking at yesterday are

25  billed at different rates.

1   Q.   When you were looking at the overall cash flows of Holy

2   Health, would it be fair to say that their account varied

3   from having enough money to being barely operational?

4   A.   I can't speak to what would have been operational; I

5   don't know.  I'm not privy to their operation, their specific

6   operations and how much that would cost.

7   Q.   Did their balance get very low on occasion?

8   A.   Yes, it did go into the negatives quite frequently.

9   Q.   And you looked at, specifically, for the summary

10  exhibits you showed today, checks that were immediately

11  cashed by Lambert and by Mr. Senesie.  Was that uncommon for

12  the workers, or would payroll checks typically be cashed

13  immediately?

14  A.   No, that was not uncommon.

15  Q.   And the checks that you showed us today all seemed to

16  have the same signator -- signer -- the person who signed the

17  check, whatever the right word for that is in

18  accountant-speak.  Did you identify who that person was?

19  A.   I can't definitively say because it's a signature.  I

20  don't feel comfortable making that assumption.

21  Q.   All right.  I'll leave it there.

22            MR. ROBBINS:  Thank you, Your Honor.  Thank you.

23            THE COURT:  All right.  Mr. Sarma, anything?

24            MR. SARMA:  No, Your Honor.

25            THE COURT:  Okay.  Ms. Yee, this concludes your

DIRECT OF JEANNE MBOE-FOE BY MR. SARMA                398

1  testimony.  You are free to step down, free to leave.  Have a
2  great day.
3           THE WITNESS:  Thank you.
4           THE COURT:  Government?
5           MR. SARMA:  The Government calls Ms. Jeanne Foe.
6           THE CLERK:  Ma'am, if you could remain standing and
7  raise your right hand for me, please.
8                        JEANNE MBOE-FOE
9  having been called as a witness and having been duly sworn,
10 was examined and testified as follows:
11          You may have a seat.  And while speaking clearly
12 into the microphone, can please state your full name and
13 spell your last name for the record.
14          THE WITNESS:  Jeanne Mboe-Foe.
15          THE COURT:  And how do you spell the last name?
16          THE WITNESS:  M-B-O-E F-O-E.
17          THE CLERK:  Thank you.
18                      DIRECT EXAMINATION
19 BY MR. SARMA:
20 Q.   Good morning, Ms. Foe.
21 A.   Good morning.
22 Q.   I know sometimes it's nerve-racking to talk in court.
23 But could you please speak up a little bit.  Use the
24 microphone, as well.
25          THE COURT:  Yeah, the microphone moves, so if you

1  can move it closer to you, that would be great.  Perfect.

2  BY MR. SARMA:

3  Q.   Ms. Foe, what country were you born in?

4  A.   Republique Democratic du Congo.

5  Q.   And how many languages do you speak?

6  A.   Two.

7  Q.   What are those?

8  A.   English and French.

9  Q.   Which one is your first language?

10  A.   French.

11  Q.   When did you learn English?

12  A.   In 2009.

13  Q.   And when did you come to the United States?

14  A.   2009.

15  Q.   Did you work at a company called Holy Health?

16  A.   Yes.

17  Q.   When did you begin working there?

18  A.   Around 2013, 2014.

19  Q.   When did you stop working there?

20  A.   April 2021.

21  Q.   Was there a particular location of Holy Health that you

22  worked at?

23  A.   Yes.

24  Q.   What location was that?

25  A.   North Capitol Street NW.

DIRECT OF JEANNE MBOE-FOE BY MR. SARMA                400

1   Q.   And what city was that in?

2   A.   Washington, D.C.

3   Q.   Did you use a particular work email address while

4   working at Holy Health?

5   A.   Yes.

6   Q.   Could you tell us what that work email address was?

7   A.   Info@holyhealthcareservices.org.

8   Q.   By the time -- by the end of your time at Holy Health,

9   how much were you being paid per paycheck?

10  A.   Can you please rephrase the question?

11  Q.   Yes.

12       Did you receive paychecks while working at Holy Health?

13  A.   Yes, I did.

14  Q.   And towards the end of your time at Holy Health,

15  approximately how large were those paychecks?

16  A.   $1500.

17  Q.   For how long of a period?

18  A.   I don't quite remember.

19  Q.   Do you know an individual named Mr. Lambert Mbom?

20  A.   Yes, I do.

21  Q.   Did you work with Mr. Mbom?

22  A.   Yes.

23  Q.   Do you see Mr. Mbom in the courtroom today?

24       MR. ROBBINS:  And we'll once again stipulate that

25  this witness can identify him.

1            THE COURT:  All right.  Mr. Mbom is next to
2   Mr. Robbins.
3            Go ahead, Mr. Sarma.
4   BY MR. SARMA:
5   Q.   What role did Mr. Mbom have at the company?
6   A.   He was the chief administrator.
7   Q.   Outside of work, did you have a relationship with Mr.
8   Mbom?
9   A.   Yes.
10  Q.   Can you describe for the jury what that relationship
11  was?
12  A.   I can say it was flirting.
13  Q.   Did you have a physical relationship with Mr. Mbom?
14  A.   Yes.
15  Q.   And I know this is sometimes awkward, but can you just,
16  very high level, describe what that relationship was?
17  A.   We kissed a few times.
18  Q.   And at some point, did that relationship end?
19  A.   Yes.
20  Q.   And from your perspective, why did it end?
21  A.   I can just say because I couldn't continue with the
22  relationship.
23  Q.   Now, while working at Holy Health, did you work at the
24  front desk of the North Capitol location?
25  A.   Yes.

1   Q.   And at a high level, can you tell the jury what did you

2   do while working at the front desk?

3   A.   My role was to answer phone calls, emails, check the

4   emails, check the mails, verify consumers when they are

5   coming in, to check them out and check them in.

6   Q.   And did you ever give cash to consumers?

7   A.   Yes, I did.

8   Q.   How often did you give cash to consumers?

9   A.   Every time they have been seen, like after each visit.

10  Q.   Who instructed you to give the cash to the consumers?

11  A.   Ms. Eugenie Bakari.

12  Q.   And did you ever tell consumers that you were giving

13  them cash as a transportation stipend?

14  A.   Yes.

15  Q.   Was that true?

16  A.   Yes.

17  Q.   It's your testimony that you were giving them a

18  transportation stipend when you were handing them the cash?

19  A.   I received the instruction from Ms. Eugenie saying that

20  I have to give the money to consumers and I have to tell them

21  that it's for transportation.

22  Q.   Thank you, Ms. Foe.  I'm asking you a slightly different

23  question.

24       Was it actually true that you were giving them cash as a

25  transportation stipend?

1    A.   Can you rephrase your question?

2    Q.   Did Holy Health have a van?

3    A.   Yes.

4    Q.   What did the van do?

5    A.   Pick up consumers and drop them off.

6    Q.   And where would they pick them up, generally?

7    A.   They would pick them up at a shelter.  And there was a

8    place where they called park.

9    Q.   And where did they drop them off?

10   A.   At Holy Health Care North Capitol Street.

11   Q.   How much did a consumer have to pay to ride the van?

12   A.   Nothing.

13   Q.   Did you give consumers money even if they rode the free

14   van?

15   A.   Yes.

16   Q.   I think you previously testified that Ms. Eugenie Bakari

17   told you to say that these were transportation stipends; is

18   that correct?

19   A.   Yes.

20   Q.   And did she tell you why you were supposed to say that?

21   A.   No, she never did.

22   Q.   Did you ever talk to Mr. Mbom about giving consumers

23   cash when they came to the Holy Health offices?

24   A.   Yes, I did.

25   Q.   When was that?

1   A.   I don't quite remember the period when I spoke to him
2   about that.
3   Q.   Do you recall when the FBI searched Holy Health's
4   offices?
5   A.   Yes.
6   Q.   Was it before or after that search that you first spoke
7   to him?
8   A.   It was before.
9   Q.   Was it a couple months before?  A couple years before?
10  A.   A couple years before.
11  Q.   And what did you say to him the first time you spoke
12  about it?
13  A.   I told Mr. Mbom that this practice we should stop, that
14  we have to find a way to stop it.
15  Q.   And did Mr. Mbom respond to you?
16  A.   Yes, he did.
17  Q.   And what did he say to you?
18  A.   He said he is going to first talk with the CEO and COO.
19  Q.   Who was the CEO?
20  A.   Mr. Julius Bakari.
21  Q.   And who is the COO?
22  A.   Ms. Eugenie Bakari.
23  Q.   And after that conversation, did you continue to pay
24  cash to consumers?
25  A.   Yes.

1   Q.   After that conversation, did Mr. Mbom ever see you

2   personally pay cash to consumers?

3   A.   Yes.

4   Q.   Where were you sitting when you handed cash to

5   consumers?

6   A.   At the front desk.

7   Q.   A moment ago we were talking about the van.  Do you ever

8   see Mr. Mbom personally see the van?

9   A.   Yes.

10  Q.   Have you heard of the Agatha Foundation?

11  A.   Yes.

12  Q.   Can you tell the jury what is the Agatha Foundation?

13  A.   It's a nonprofit organization.

14  Q.   And do you know what the Agatha Foundation does?

15  A.   No, I don't.

16  Q.   Do you know who ran the Agatha Foundation?

17  A.   Yes.

18  Q.   Who was that?

19  A.   Ms. Eugenie Bakari.

20  Q.   I have put on the screen what's marked as Exhibit A1.

21  Do you recognize what's shown in this photo?

22  A.   Yes, I do.

23  Q.   What is it?

24  A.   That's the entrance of Holy Health Care.

25  Q.   And at the entrance, was there a signage both for Holy

1  Health as well as the Agatha Foundation?

2  A.   Yes.

3  Q.   Were there other signs for the Agatha Foundation within

4  the office?

5  A.   Yes.

6  Q.   By 2021, were you personally telling consumers that the

7  Agatha Foundation was providing the cash that you were

8  handing out?

9  A.   Yes.

10 Q.   Did you ever hear Mr. Mbom discuss with others why the

11 Agatha Foundation should be paying the cash?

12 A.   Can you rephrase your question?

13 Q.   Yeah.

14     Did you ever overhear a conversation where Mr. Mbom was

15 talking about the Agatha Foundation providing the cash for

16 consumers?

17 A.   Yes.

18 Q.   Who was that conversation with?

19 A.   It was with Ms. Eugenie Bakari and Mr. Julius Bakari.

20 Q.   And what did you hear Mr. Mbom say?

21 A.   He was saying that we should use Agatha Foundation as

22 a -- to pay consumers, like Agatha Foundation is the one who

23 pay actually consumers.  We should put Holy Health Care aside

24 of this.

25 Q.   And during that conversation, did he say why he wanted

1    to put Holy Health Care aside?

2    A.    No.

3    Q.    Do you recognize what has been marked as K10?

4    A.    Yes.

5    Q.    Can you describe what this is?

6    A.    That's the spreadsheet of Agatha Foundation.

7    Q.    And do you use this sheet to determine who to pay?

8    A.    Yes.

9    Q.    After you started using these sheets to track payments,

10   did anything change about how you got the money to pay

11   consumers?

12   A.    No, no.

13   Q.    Who gave you the money?

14   A.    Ms. Eugenie Bakari or Mr. Julius Bakari.

15   Q.    I'm going to show you what's been marked as F83.

16         MR. SARMA:  Give me one second, Your Honor.

17   BY MR. SARMA:

18   Q.    This is at Page 12.  Do you recognize this check?

19   A.    Yes, I do.

20   Q.    And who is the recipient of the check?

21   A.    It's me.

22   Q.    And who is paying it?

23   A.    Mr. Julius.

24   Q.    Is that the CEO of the company?

25   A.    Yes.

1    Q.   And do you see this memo line?

2    A.   Yes.

3    Q.   What did you understand this memo line to mean?

4    A.   He's saying consumers and the date.

5    Q.   And what does "consumer" mean in this context?

6    A.   Consumer is patients, so meaning that is -- I'm going to

7    use -- like this check was made to be used on that particular

8    day.

9    Q.   And so did you get to keep any of the money that

10   Mr. Bakari was giving you with this check?

11   A.   No.

12   Q.   What were you going to do with the money?

13   A.   I would use the money to pay consumers.

14   Q.   And this is the back of that check?

15   A.   Yes.

16   Q.   And where did you go to deposit this check?

17   A.   New Hampshire, Bank of America on New Hampshire Avenue.

18   Q.   Do you recall what state that was in?

19   A.   Maryland.

20   Q.   Do you recall -- or do you recognize what's been marked

21   as J1?

22   A.   Yes.

23   Q.   What is this?

24   A.   That's my bank statement.

25   Q.   Looking at Page 3, do you see a transfer here from the

1   Holy Health bank account?

2   A.    Yes, I do.

3   Q.    What amount was that for?

4   A.    $300.

5   Q.    Do you know what that transfer was for?

6   A.    It was to pay consumers.

7   Q.    Did you consider this payment to be part of your salary?

8   A.    No.

9   Q.    Did you keep any of this money for yourself?

10  A.    No.

11  Q.    Scrolling down to Page 4.  On that same day, did you

12  make a withdrawal from the Bank of America?

13  A.    Yes, I did.

14  Q.    And for what amount?

15  A.    $300.

16  Q.    And what Bank of America did you withdraw the money

17  from?

18  A.    The same one; New Hampshire Avenue at Maryland.

19  Q.    And what did you use this money for?

20  A.    To pay consumers.

21  Q.    Turning to J2, is this another one of your bank

22  statements?

23  A.    Yes.

24  Q.    And going here to Page 3, on October 5, did you receive

25  a Zelle transfer?

1  A.   Yes, I did.

2  Q.   And do you see the name Mboutchock Kabiwa?

3  A.   Yes.

4  Q.   Did I pronounce that correctly?

5  A.   Yes.

6  Q.   Okay.  Did that person go by another name?

7  A.   Yes.

8  Q.   Who?

9  A.   Eugenie Kabiwa.

10 Q.   Is that the COO of the company?

11 A.   Yes.

12 Q.   And what was the amount of the transfer?

13 A.   $300.

14 Q.   And why was she transferring you money?

15 A.   To withdraw it to pay consumers.

16 Q.   Scrolling down here to the next page.  On the same day,

17 did you make two withdrawals that totaled $300?

18 A.   Yes, I did.

19 Q.   Why did you do it in two separate withdrawals?

20 A.   It was for me to have small bills.

21 Q.   And why did you need small bills?

22 A.   So that I would pay consumers with small bills.

23 Q.   Did you keep any of this money for yourself?

24 A.   No.

25 Q.   Scrolling back up.  On October 9, did you receive

1  another Zelle transfer payment from Ms. Mboutchok Kabiwa?

2  A.   Yes, I did.

3  Q.   What was the amount?

4  A.   $150.

5  Q.   What did you understand she was sending you the transfer

6  for?

7  A.   To pay consumers, as well.

8  Q.   And then did you go to the Bank of America of

9  Hyattsville to withdraw the money?

10 A.   Yes, I did.

11 Q.   Did you use that money to pay consumers?

12 A.   Yes, I did.

13 Q.   Is this another one of your bank statements?

14 A.   Yes, it is.

15 Q.   On November 23, 2020, did Mr. Bakari send you $300?

16 A.   Yes, he did.

17 Q.   Was that by a Zelle transfer?

18 A.   Yes.

19 Q.   And why was he sending you that money?

20 A.   To pay consumers.

21 Q.   And then did you go, on that same day, make cash

22 withdrawals from the Bank of America in Hyattsville?

23 A.   Yes, I did.

24 Q.   Was it for $300 in total?

25 A.   Yes.

1   Q.   And why did you do it here on two separate withdrawals?

2   A.   To have small bills so that I can pay consumers.

3   Q.   Is this another one of your bank accounts or bank

4   statements?

5   A.   Yes, it is.

6   Q.   And on February 19, 2021, did Ms. Mboutchock Kabiwa

7   transfer you $400?

8   A.   Yes.

9   Q.   And why was she transferring you $400?

10  A.   It was to pay consumers.

11  Q.   And then did you withdraw that $400 from the Bank of

12  America in Hyattsville?

13  A.   Yes, I did.

14  Q.   And did you keep any of that money for yourself?

15  A.   No, I didn't.

16  Q.   At some point, did you perform research on whether the

17  payments you were making to consumers was legal?

18  A.   Yes, I did.

19  Q.   And when did you do that research, approximately?

20  A.   That was before the FBI came to the office.

21  Q.   Was it months before, years before, days before?

22  A.   No, that was years ago.  Years before.

23  Q.   And why did you do that research?

24  A.   Because I feel like it was not right because I just put

25  myself, like why, when I'm going to see my doctor, I don't

1  receive any of those payments, so meaning maybe that's

2  something that is not right.

3  Q.   And what did you conclude based on your research?

4  A.   My conclusion was that it is fraud, like it's not okay.

5  Q.   Did you ever tell Mr. Mbom that you thought these

6  payments were fraud?

7  A.   Yes, I did.

8  Q.   And in relation to the search by the FBI, when did you

9  tell him that?

10 A.   That was probably one or two years ago.

11 Q.   When you say "one or two years ago," is that one or two

12 years prior to the search?

13 A.   Yes.

14 Q.   Where did you tell him that?

15 A.   In his office.

16 Q.   Was anyone else there?

17 A.   No.

18 Q.   What did you say to him?

19 A.   I told him that we have to find a way to stop it.

20 Q.   And did Mr. Mbom reply to you?

21 A.   He say that he need to talk with Mr. Bakari and

22 Ms. Eugenie Bakari.

23 Q.   After that conversation, did you stop making payments to

24 consumers?

25 A.   No.

1  Q.   Once you had decided that you thought these were, these

2  payments were fraud, why did you continue to make them to

3  consumers?

4  A.   Because I was receiving instruction from Mr. (sic)

5  Eugenie Bakari.

6  Q.   But you believed you were breaking the law at that

7  point?

8  A.   Yes.

9  Q.   And so why did you continue to break the law?

10  A.   Because I was receiving instruction; and at that period

11  of time, I didn't have another option to look for another

12  job.

13  Q.   Just at a very high level, why did you think you didn't

14  have any other options?

15  A.   Because at that period of time, my documentation was not

16  out yet.

17  Q.   And when you refer to "documentation," are you referring

18  to your immigration status?

19  A.   Yes.

20  Q.   Do you know if consumers ever used the cash that you

21  paid them to buy drugs?

22  A.   Yes.

23  Q.   Did you tell Mr. Mbom, once you learned, that consumers

24  were buying drugs using the cash?

25  A.   Yes.

DIRECT OF JEANNE MBOE-FOE BY MR. SARMA                415

1    Q.   When did you tell Mr. Mbom that in relation to the FBI
2    search?
3    A.   Probably one year, one year ago.
4    Q.   And where did you have that conversation?
5    A.   In his office.
6    Q.   Was anyone else there?
7    A.   No.
8    Q.   And what did you say to Mr. Mbom?
9    A.   I told him that I receive a report that consumers are
10   using that money to pay drugs.
11   Q.   And what did Mr. Mbom say?
12   A.   Mr. Mbom say that he's going to report to discuss with
13   Mr. Bakari and Ms. Eugenie Bakari.
14   Q.   And after that conversation, did you continue to make
15   cash payments to consumers?
16   A.   Yes.
17   Q.   I am now going to show you what been marked as A1.  Can
18   you remind the jurors what is this?
19   A.   That's the entrance of Holy Health Care at North Capitol
20   Street.
21   Q.   And here is A2.  Do you -- can you tell the jurors what
22   this is?
23   A.   This is the front desk.
24   Q.   And when you say you worked at the front desk, is this
25   where you were sitting?

DIRECT OF JEANNE MBOE-FOE BY MR. SARMA          416

1   A.   Yes.

2   Q.   And what is at the other side of the room from the front

3   desk?

4   A.   The offices.

5            MR. SARMA:   Give me one second.

6   BY MR. SARMA:

7   Q.   I'm going to now show you A4.   This is a touchscreen.

8   Can you circle where the front desk is?

9   A.   (Witness complies.)

10  Q.   Thank you.   And then do you see some chairs?

11  A.   Yes.

12  Q.   What are those chairs?

13  A.   That was the waiting room where consumers are going to

14  sit and wait to be called.

15  Q.   And would they be called by CSWs?

16  A.   Yes.

17  Q.   And just kind of pointing on the screen, once they were

18  called, where would the consumers go with the CSW?   What

19  direction?

20  A.   They were going this way.

21  Q.   And so based on where you were sitting at the front

22  desk, did you see consumers leaving the waiting room and

23  going with their CSWs?

24  A.   Yes.

25  Q.   And then could you, then, see those same consumers come

1  back to the waiting room?

2  A.   Yes.

3  Q.   As a general matter, how long were consumers seeing

4  their CSWs?

5  A.   10, 15, 20 minutes.

6  Q.   Without going into any specifics about what you were

7  told, did you ever hear complaints from consumers about CSWs

8  for short periods of time?

9  A.   Yes.

10  Q.   And did you ever tell those complaints to Mr. Mbom?

11  A.   Yes, I did.

12  Q.   And what did you say to him?

13  A.   I told him that consumers are complaining that they are

14  not fully receiving the help from CSW.

15  Q.   And what did Mr. Mbom say?

16  A.   He say that he's going to address it to the respective

17  CSW.

18  Q.   And do you know if any CSWs were fired based on the

19  complaints you reported?

20  A.   No.

21  Q.   Do you know an individual named Aja Oro?

22  A.   Yes.

23  Q.   Can you tell the jury who is Aja Oro?

24  A.   He was a therapist at Holy Health Care.

25  Q.   What location did Mr. Oro work?

1  A.    North Capitol Street NW.

2  Q.    And as a therapist, did he see patients?

3  A.    Yes.

4  Q.    Did you observe consumers going from the waiting room to

5  see Mr. Oro?

6  A.    Yes.

7  Q.    And did you see them then return back to the waiting

8  room after seeing Mr. Oro?

9  A.    Yes.

10  Q.    And based on your observations, how long, in general,

11  did Mr. Oro see his patients?

12  A.    Five minutes.

13  Q.    Did you ever talk to Mr. Mbom about what you observed

14  about Mr. Oro?

15  A.    Yes, I did.

16  Q.    And when was that?

17  A.    I don't quite remember the time, the period of that

18  time, but it was before the FBI came.

19  Q.    And where did you and Mr. Mbom have this conversation?

20  A.    In his office or in the conference room.

21  Q.    And what did you tell him?

22  A.    I told him that consumers are complaining that they are

23  not receiving the full services like the therapies, therapy

24  they are not receiving.

25  Q.    And what did Mr. Mbom say?

1  A.   Mr. Mbom say that he's going to address it and talk with

2  Mr. Mbom, Julius Bakari, and Ms. Eugenie Bakari.

3          MR. SARMA:  At this point, Your Honor, I'd like to

4  hand out a transcript to the jurors.

5          THE COURT:  All right.

6          MR. SARMA:  May I approach the jurors?

7          THE COURT:  Sure.  Could we get on this for a

8  second?

9          Turn on the husher, please.

10          Okay.

11          (A bench conference was held on the record but out

12  of the hearing of the jury as detailed below beginning at

13  9:52 a.m.)

14          MR. ROBBINS:  Sorry, Your Honor.  But the

15  transcript wasn't identified.  I don't know if this is

16  something --

17          THE COURT:  I was about to ask:  Do you have for

18  Mr. Robbins and for me a transcript number?  I'd like an

19  exhibit number.

20          MR. SARMA:  Yeah, I can give it to you right now,

21  Your Honor.  I apologize.

22          THE COURT:  And do you have a copy for Mr. Robbins

23  and for me, as well?

24          MR. SARMA:  It's the one we handed out yesterday.

25  It's T3c.

1              MS. COLLINS:  T3c.

2              THE COURT:  Hold on.  So we should both have it?

3              MR. SARMA:  Yes, Your Honor.  I can provide it

4   again, though.

5              MR. ROBBINS:  And then the other thing, Your Honor,

6   is it's been a day or two since we reminded the jury.

7              THE COURT:  Yes, I can do that.

8              MR. ROBBINS:  Thank you.

9              THE COURT:  T3c, you said.  Is that the only one

10  you've handed out?

11             MR. SARMA:  Yes, Ma'am.

12             THE COURT:  Okay.  Very good.

13             MR. ROBBINS:  I could use another.

14             MR. SARMA:  No problem.

15             (The bench conference concluded at 9:53 a.m., and

16  proceedings resumed within the hearing of the jury.)

17             THE COURT:  Okay.  All right.  We have located the

18  transcripts.

19             So let me just remind you, Ladies and Gentlemen,

20  that these transcripts are not evidence.  The recording is

21  the evidence.  This is merely the Government giving this to

22  you to help guide you.  So be sure if you're going to make

23  any notes, make them in your notebook; okay?

24             All right.  Very good.

25             Mr. Sarma?

1          MR. SARMA:  Yeah, so I just handed out -- but I
2   apologize.  I should have put it on the record.
3          Before this, I handed out transcript T3c, which
4   goes along with an audio clip, Exhibit 11-3c, which is
5   already in evidence -- L3c.  It's L3c is the recording.
6   BY MR. SARMA:
7   Q.   And before we get there, Ms. Foe, prior to testifying
8   here today, did you listen to a recording of a Holy Health
9   meeting that took place in December of 2020?
10  A.   Yes.
11  Q.   And did you personally attend that meeting?
12  A.   Yes.
13  Q.   I'm going to begin playing on 2 minutes, 8 seconds.  On
14  the transcript, that should be about a third of the way down
15  the final page.
16                       (Audio played.)
17  BY MR. SARMA:
18  Q.   Did you hear the voice of that man?
19  A.   Yes.
20  Q.   Whose voice is that?
21  A.   Mr. Lambert Mbom.
22                       (Audio played.)
23  BY MR. SARMA:
24  Q.   Did you hear Mr. Mbom say, "Mr. O?"
25  A.   Yes.

1   Q.   Do you know who Mr. Mbom was referring to?

2   A.   Yes.

3   Q.   Did you hear Mr. Mbom referring to Mr. O handing out a

4   card?

5   A.   Yes.

6   Q.   Do you know what he was referring to by a card?

7   A.   Yes.

8   Q.   Can you explain to the jury what the card is?

9   A.   It was the sticky note.  After consumers seeing

10  therapist or CSW or doctors, any staff, they are going to

11  handle (sic) them sticker note.

12  Q.   And what could they use the sticker note for?

13  A.   To receive their payment.

14  Q.   Had you spoken to Mr. Mbom about Mr. O before or after

15  this particular recording?

16  A.   Before.

17  Q.   And do you know Mr. O's full name?

18  A.   Yes.

19  Q.   Can you tell the jury what that full name is?

20  A.   Oro, Aja.

21  Q.   At some point, did you help consumers who came to Holy

22  Health get free cell phones?

23  A.   Yes, I did.

24  Q.   Who taught you how to obtain those free cell phones?

25  A.   It was the order front desk at the SE location.

1  Q.   Do you recall the name of that person?

2  A.   Yes.  Victoria.

3  Q.   Do you remember her last name?

4  A.   No, I don't.

5  Q.   Other than you and Ms. Victoria, do you know if there

6  were other Holy Health employees getting free cell phones for

7  consumers?

8  A.   No.

9  Q.   Can you describe the process for obtaining a free cell

10  phone for a consumer?

11  A.   So, a consumer come to me and we sit down and I have to

12  explain him the process.  He need to bring his ID, food stamp

13  card, Medicaid ID, as well.  And we go on the online, the

14  website is Assurance Wireless.  We go in there and then we

15  fill up some paperwork.

16       And if he's approved, he's going to -- I mean, the

17  system of a transfer screen is going to tell us if the

18  consumer has been approved or not.

19  Q.   And approximately how long did it take to do all those

20  steps?

21  A.   15 -- less than 20, about 15 minutes.

22  Q.   Are you familiar with the Credible system?

23  A.   Yes.

24  Q.   Is that sometimes also known as the ICMS system?

25  A.   Yes.

DIRECT OF JEANNE MBOE-FOE BY MR. SARMA                424

1   Q.   Did you enter notes into ICMS when you applied for these
2   phones?
3   A.   Yes.
4   Q.   Whose name did you use to enter the notes in the ICMS
5   system?
6   A.   Eugenie Bakari.
7   Q.   And why did you use Eugenie Bakari's name?
8   A.   Because Mr. Mbom told me I cannot, technically I cannot,
9   he cannot create a log-in under my name because I do not have
10  a Social Security Number.  So I have to use Ms. Eugenie
11  Bakari log in.
12  Q.   Was there a password associated with Ms. Bakari's ICMS
13  account?
14  A.   Can you rephrase your question.
15  Q.   To log into Ms. Bakari's ICMS account, did you need a
16  password?
17  A.   Yes.
18  Q.   Who gave you that password?
19  A.   Mr. Lambert Mbom.
20  Q.   I am now showing you what has been marked as I220.  Do
21  you recognize this document?
22  A.   Yes.
23  Q.   I'm going to start by scrolling down to Page 3.  Do you
24  see where it says, "Mr. Ray expressed relief after knowing
25  that he will soon be the owner of a phone"?

1   A.   Yes.

2   Q.   Who helped Mr. Ray get this phone?

3   A.   Me.

4   Q.   According to this note, what staff member helped Mr. Ray

5   get the phone?

6   A.   Eugenie Bakari.

7   Q.   And who was the individual who approved this note?

8   A.   Mr. Lambert Mbom.

9   Q.   Are you saying that because of the user name that I've

10  just highlighted?

11  A.   Yes.

12  Q.   Since leaving Holy Health, have you seen Mr. Mbom?

13  A.   Yes.

14  Q.   How often have you seen him?

15  A.   We used to see him once, once a week, once or two times

16  a week.

17  Q.   Do you know the last time you saw him?

18  A.   No, I don't remember.

19  Q.   Do you know if you saw him in 2023?

20  A.   Yes.

21  Q.   Was it the winter?  Was it the spring?  Was it the

22  summer?

23  A.   I think it was back in January.

24  Q.   Did you say January?

25  A.   Yes.

1    Q.    And since leaving Holy Health, have you communicated

2    with Mr. Mbom via WhatsApp?

3    A.    Yes.

4    Q.    How often would you exchange WhatsApp communications?

5    A.    It was every day.  But and then the communication has

6    been cut off.

7    Q.    And when was the communications cut off?

8    A.    I don't remember.

9    Q.    Do you know if it was this year or 2022 or 2021?

10   A.    2023.

11          MR. SARMA:  Just a minute, Your Honor.

12          (Pause.)

13          Thank you.  We pass the witness.

14          THE COURT:  Okay.  Mr. Robbins?

15          MR. ROBBINS:  Thank you, Your Honor.

16                       CROSS-EXAMINATION

17   BY MR. ROBBINS:

18   Q.    Good morning, Ms. Foe.

19   A.    Good morning.

20   Q.    My name is Gar Robbins.  I represent Lambert Mbom.  We

21   haven't talked before, you and I?  You and I have never

22   talked before?

23   A.    No.

24   Q.    Okay.  I'm going to ask a few questions.  Mostly based

25   on what you testified to already.

1   A.   Okay.

2   Q.   Am I loud enough?  Can you hear me?

3   A.   Yes.

4   Q.   Okay.  You started working at Holy Health, you said,

5   sometime in 2013, I believe?

6   A.   Yes.  2013, 2014.

7   Q.   Somewhere in there.

8        And so you worked there for a pretty good long time

9   before Lambert ever showed up on the scene.

10  A.   Yes.

11  Q.   In the time that you were working there, the patterns of

12  Holy Health were fairly well-established?

13  A.   Can you rephrase your question?

14  Q.   Sure.

15       Were you at the front desk the whole time?

16  A.   No.

17  Q.   Where did you start?

18  A.   I was sitting in the back.

19  Q.   What did you do in the back?

20  A.   Just typing some documents.

21  Q.   When did you move from working in the back typing

22  documents to working up front?

23  A.   I don't quite remember.

24  Q.   But you were working up front before Lambert showed up

25  on scene?

1   A.   Yes.

2   Q.   You were already the front desk person?

3   A.   Yes.

4   Q.   In fact, when Lambert first showed up on scene for

5   some -- little while after he was there, you had -- you

6   didn't like the way he was trying to manage Holy Health?

7   A.   Not that I didn't like the way he was managing.  It was

8   new.  Like, it was new.  Everybody was new.  And you have to

9   be -- like, when somebody comes to your agency where you have

10  been working, you have to be conscious that -- to know more

11  the person before putting yourself, you know, sort of opening

12  up to that person.

13  Q.   And it seemed to you that he might have a different

14  approach, might be more demanding in some ways than his

15  predecessor?

16  A.   Yes.

17  Q.   At the time that Lambert Mbom came, the Bakaris already

18  had the system of providing payments to consumers in place.

19  A.   Yes.

20  Q.   And so those incentives had been going on for some

21  period of time.

22  A.   Oh, yes, uh-huh.

23  Q.   You talked about overhearing a conversation between

24  Lambert and both the Bakaris, Eugenie and Julius, about those

25  payments being made, stipends or any other label.  You heard

1    a discussion about that; correct?

2    A.    Yes.

3    Q.    And that discussion came after you had told Lambert that

4    you didn't like those payments?

5    A.    Can you rephrase your question?

6    Q.    You told us that you had had a point where you got

7    curious about the payments and wondered about whether they

8    were appropriate.  And you did research?

9    A.    Yes, I did research.

10   Q.    And based on your conclusions from the research, you

11   thought that those payments were probably, at least,

12   inappropriate and maybe illegal?

13   A.    Yes.

14   Q.    And you told Lambert that?

15   A.    Yes, I did told him that.

16   Q.    And you overheard a conversation between Lambert and the

17   Bakaris about those payments?

18   A.    Yes.

19   Q.    Did you hear that entire conversation?

20   A.    I can say not the entire conversation.

21   Q.    Did you hear Lambert telling the Bakaris that there was

22   a problem with those payments?

23   A.    No.

24   Q.    Did you hear the Bakaris tell Lambert that those

25   payments were okay because they were coming from Agatha

1    Foundation?

2    A.    No.   The Bakaris did not tell Lambert.   It's Lambert who

3    told them that the stipends supposed -- it's good that Agatha

4    Foundation take care of that, that Holy Health Care needs to

5    be out of the payment.

6    Q.    Okay.   So he said it's good that it's Agatha that's

7    doing it?

8    A.    That's what he said.

9    Q.    All right.   So then at that point, was that the time

10   when he told them that Agatha was the one that was really

11   paying it, that the sign-in sheet should show that?

12   A.    Can you rephrase your question?

13   Q.    Yes, I'm sorry.

14         At some point Lambert told the Bakaris, Julius and

15   Eugenie, that if the money for the stipends from coming from

16   Agatha, that the sign-in sheet that showed the stipends were

17   going to consumers should reflect that so that you could tell

18   where it's coming from.   Were you there for that

19   conversation?

20   A.    Yes.   That's what he said.

21   Q.    That's the conversation, okay.   I thought that was the

22   one.

23         Was there sometimes a problem cashing your paychecks

24   from Holy Health?

25   A.    Yes.

1    Q.   Is that -- did you have to make sure you got to the bank

2    quickly after receiving the check?

3    A.   Yes.

4    Q.   And so most of your paychecks would either be cashed or

5    maybe deposited into your account, but it would be done

6    pretty much on the same day that you got it?

7    A.   Yes.

8    Q.   And if you didn't do that, you might have to worry about

9    whether there was going to be any money or it would be a

10   bounced check?

11   A.   Yes.

12   Q.   When you went to Lambert with things that needed to be

13   changed or improved, was his answer often that he needed to

14   talk to Julius or Eugenie before anything would happen?

15   A.   Yes.

16   Q.   Did you sometimes get the sense that Lambert was very

17   frustrated with the way things worked at Holy Health?

18   A.   Yes.

19   Q.   Could you tell the source of that frustration?

20   A.   Mostly the frustration was when the staff, like, the

21   staff never received their payment.

22   Q.   Did you hear him in discussions with the Bakaris?  Or

23   did people go to Lambert and then he had to go see the

24   Bakaris when they didn't get paid?

25   A.   No.

1          MR. ROBBINS:  I have no further questions, Your
2     Honor.
3          THE COURT:  Okay.
4          MR. ROBBINS:  Thank you.
5          THE WITNESS:  You're welcome.
6          THE COURT:  Mr. Sarma, any Redirect?
7          MR. SARMA:  Very short.
8          THE COURT:  Okay.
9                     REDIRECT EXAMINATION
10    BY MR. SARMA:
11    Q.   I believe it's something you testified that Mr. Bakari
12    was the CEO of the company; is that correct?
13    A.   Yes.
14    Q.   And what was Ms. Eugenie's role?
15    A.   The COO.
16    Q.   And so why did you go to Mr. Mbom when you discovered
17    that these payments might be illegal?
18    A.   Because he was my supervisor.
19    Q.   And why did you go to Mr. Mbom when you received
20    complaints about Aja Oro?
21    A.   Because he was my supervisor.
22    Q.   And why did you go talk to Mr. Mbom about the consumers
23    using the cash payments to buy drugs?
24    A.   Because he was my supervisor.
25    Q.   And what changes, if any, did you see happening at Holy

REDIRECT OF JEANNE MBOE-FOE BY MR. SARMA                433

1  Health after you went and had those conversations?

2  A.    Nothing has changed.

3              THE COURT:  Okay.  Ms. Foe, that concludes your

4  testimony.  You may step down.  You're free to leave.

5              THE WITNESS:  Thank you so much.

6              THE COURT:  Have a great day.

7              THE WITNESS:  You, too.

8              THE COURT:  All right, Ladies and Gentlemen, let's

9  take our morning break.  So we're on break for 20.

10             THE CLERK:  All rise for the jury.

11          (The jury left the courtroom at 10:16 a.m., and

12             proceedings were had out of the presence of the jury

13             as follows:)

14             THE COURT:  All right, everyone.  Let me just check

15  in with you all about scheduling.  The Government has to

16  recall Agent Moran.  Is there anyone else you're calling?

17             MR. SARMA:  Not in the case-in-chief, Your Honor.

18             THE COURT:  Okay.  Estimated time of the remaining?

19             MS. McKOY:  I'd say for the Direct, Your Honor,

20  maybe two hours.

21             THE COURT:  Okay.  All right.  And then you'll rest

22  in front of the jury.

23             Okay.  And then, Mr. Robbins, I would expect, then,

24  that you'll voir dire Mr. Mbom today so we know whether he is

25  testifying or not; okay?

REDIRECT OF JEANNE MBOE-FOE BY MR. SARMA          434

1    So, you make your Rule 29 motion, we'll get that
2    done, but that needs to happen today.  You've known now what
3    the Government's case is for quite sometime.  I don't want
4    this to drag into Monday and we still don't know what we're
5    doing; okay?  So, take your time to talk with Mr. Mbom.
6         MR. ROBBINS:  In the next 15 minutes?
7         THE COURT:  No.  And then you can have, if you need
8    more time, you can have more time.  But Mr. Mbom has sat
9    through the entire trial.  You've represented him throughout
10   this case.  You're a good lawyer.  I know you've shared with
11   Mr. Mbom all of the discovery in this regard.  So, he needs
12   to make that decision.  And we need to know it before we go
13   into Monday so that I can tell the jury when to show up.
14        MR. ROBBINS:  I understand that, Your Honor.  I was
15   perhaps a little too flippant in the way I asked the
16   question.  All I'm asking is that I may need more than a few
17   minutes to do the prep before the voir dire again just
18   because it has been -- it's an issue that's very close to his
19   heart.
20        THE COURT:  Sure.
21        MR. ROBBINS:  And we've had a lot of discussions.
22   But everybody who's been in the courtroom knows that reality
23   is perceived differently once someone has sat through
24   evidence.  And because it is such a critical decision to
25   make, I may ask the Court to give us another little break at

1  the point just before we do the voir dire.

2          THE COURT:  Okay.  Well, that's fine.

3          MR. ROBBINS:  It shouldn't hold up the jury in any

4  fashion.  But I may need more time.

5          THE COURT:  Here's my only question with the jury.

6  I understand you may need more time.  But I need to tell them

7  when -- well, let's do it this way.  No matter what, they're

8  coming back Monday morning.  And they're coming back regular

9  time.  So whether you all, we charge and close -- meaning

10  8:45.  Whether we charge and close or Mr. Mbom testifies, I'm

11  going to tell them to come back at that time.

12          I guess, then, we don't need the jury for that.

13  But I think we do need to know so that --

14          MR. ROBBINS:  Everybody's properly prepared.

15          THE COURT:  Correct.  And we know whether we're

16  closing or not on Monday.

17          MR. ROBBINS:  I understand.

18          THE COURT:  Okay.

19          MR. ROBBINS:  And on that front, the parties did

20  receive your instructions yesterday.  We have exchanged

21  emails.  The last thing that I did before I got kicked off of

22  the court's Internet access this morning was I sent my reply

23  to the Government's reply.  So I can't get back to that

24  particular email at this point.  But if there's -- they may

25  want to add something else to it.  But then I think we can

REDIRECT OF JEANNE MBOE-FOE BY MR. SARMA          436

1   probably share the dialogue that we had back with chambers.

2          MS. COLLINS:  That's fine.  Actually because of

3   when it was sent, I haven't seen his reply to my reply.

4          THE COURT:  Is this the substantive jury

5   instruction question?

6          MS. COLLINS:  Yes.

7          THE COURT:  All right.  Well, the jury instructions

8   were kind of a bear, as I mentioned to you, which is why we

9   had to redo them completely.  So if there's -- I have added,

10  because you have introduced demonstratives, so I've added

11  that pattern instruction back in.

12         We're doing this in open court on the record the

13  charge conference.  I don't do it back in chambers.  So y'all

14  may want to share with me before we talk after the jury goes

15  home what it is.

16         MR. ROBBINS:  That's kind of where I was headed,

17  Your Honor.  Is that we can give you a little bit of

18  preview --

19         THE COURT:  Sure.

20         MR. ROBBINS:  -- of where we disagree.  I don't

21  think it will take the Court a long time to go through it.

22         MS. COLLINS:  I apologize.  I really haven't seen

23  his reply to my reply.  I'm hoping that some of the issues I

24  have raised we can reach a resolution.

25         THE COURT:  Okay.  Why don't you all talk about it

1    and then we'll figure out how much of it you need me for.

2    Very good.

3              MR. SARMA:  May I make one other scheduling

4    comment, Your Honor?

5              THE COURT:  Sure.

6              MR. SARMA:  Which I think would be, the Court is

7    sensitive to this.  If Mr. Mbom does testify and we start

8    8:45 on that on Monday morning, we would ask:  There are

9    pending -- there is at least one pending motion that would

10   need to be resolved.

11             THE COURT:  We're going to have to address it.  It

12   seems to me that all the motions are about Mr. Mbom's prior

13   conversations with the Government; right?

14             MR. SARMA:  One with pretrial services and one with

15   the Government.  There are two separate motions.

16             THE COURT:  Okay.  Pretrial services, you mean

17   statements made?  Because I haven't looked at them.  I saw

18   that this was in the event.  It was a conditional.  And I

19   wasn't going to deal with it unless we had to.

20             MR. SARMA:  Sure.

21             THE COURT:  There were statements made to pretrial

22   services that you wish to use?

23             MR. SARMA:  To impeach on.

24             THE COURT:  I'll tell you my initial reaction is no

25   to that because pretrial is -- we don't use it as a tool for

REDIRECT OF JEANNE MBOE-FOE BY MR. SARMA                    438

1    litigation generally.  If there are cases that you cited in
2    the motion, I'm happy to look at it.  I see the proffer is
3    different as long as you're expecting that Mr. Mbom would
4    testify differently than what he said to you all and you
5    confront him on that and then you'd call the agent if you
6    needed to if there's some dispute about that, maybe, we'll
7    see.
8            But I guess what -- do you have Fourth Circuit case
9    law that says you can use statements made in pretrial?
10           MR. SARMA:  So, we say there is not a Fourth
11   Circuit case.  There are unanimously -- for all other
12   circuits to address the issue it is you can use it for the
13   purposes of impeachment.  I can't use it as substantive
14   evidence.  But statements he made to pretrial that were false
15   statements.
16           THE COURT:  I tell you that's a really perilous
17   area because pretrial, were they uncounseled?  So post-arrest
18   uncounseled?
19           MR. SARMA:  These were a couple -- these were a
20   couple weeks ago.
21           MR. ROBBINS:  I was not there.
22           THE COURT:  Okay.  And they're on the subject
23   matter of squarely relevant to the charges?  What is pretrial
24   talking to the defendant about that's squarely relevant to
25   the charges?

1        MR. SARMA:  It would be his credibility.  This is

2   my proffer on it.  He was --

3        THE COURT:  Okay.

4        MR. SARMA:  We alerted pretrial that we believed he

5   was having contact with individuals, including Ms. Foe.

6   Pretrial then asked him about that and he said he had had

7   contact with certain witnesses but that he did not have

8   contact with both Ms. Foe or Mr. Forka who have now both

9   testified in court that they did have contact with him.

10       THE COURT:  Ms. Foe just said she hadn't had

11  contact with Mr. Mbom since January of this year?

12       MR. SARMA:  Right.  But there was a pretrial

13  condition set back in 2021 that said he was not to have

14  contact with any Holy Health employees.

15       THE COURT:  So the marginal relevance is he

16  violated a pretrial rule.  There's nothing to suggest --

17  nothing has come in that I heard that Mr. Mbom -- any witness

18  has testified he's influenced them in any way.

19       MR. SARMA:  That's not what the Government -- the

20  Government's position is that he violated his pretrial

21  condition, that he then denied it to pretrial.  That would be

22  the basis for impeaching his credibility.

23       THE COURT:  I think it's a very long road to a

24  small house that invites error.  And so I'm not inclined to

25  go there.

1      But, you know, that's where I am right now.  If

2 that's the full extent of the impeachment, I think it's --

3 it's -- and if I had to call it now, I would deny it.

4      MR. SARMA:  Okay.

5      THE COURT:  With regard to the proffer statements,

6 once we know more about -- I mean, I think, Mr. Robbins --

7      MR. ROBBINS:  There are an abundance of proffer

8 statements, Your Honor.  And I think the Government's going

9 to be on much stronger ground for using this.  There's not

10 much I am going to be able to say about it.

11      THE COURT:  Exactly.  So that you, Mr. Mbom, know

12 that.  And I'm sure, Mr. Robbins, you will talk to him about

13 that.

14      Okay.  Very good.  Take our break.

15      THE CLERK:  All rise.  The Court stands in recess.

16      (Recess held from 10:25 to 10:42 a.m.)

17      THE COURT:  All right.  Ready for the jury?

18      MS. COLLINS:  Your Honor, I just one thing close

19 the loop on the jury instructions.  I did see Mr. Robbins'

20 responses and speak with him.  We are in agreement except for

21 two small issues.

22      THE COURT:  Okay.

23      MS. COLLINS:  What I will plan to do is make those

24 changes and email that back to the Court and highlight the

25 two issues to be resolved.

REDIRECT OF JEANNE MBOE-FOE BY MR. SARMA          441

1          THE COURT:  So you'll email me an updated Word
2    version?
3          MS. COLLINS:  Yes, Your Honor.  And I'll put in
4    track changes so you can see what is going on.
5          THE COURT:  Perfect.  Sounds good.  Thanks.
6          THE CLERK:  Are you ready for the jury now?
7          THE COURT:  I believe we are, yeah.
8       (The jury came back into the courtroom at 10:44 a.m.,
9          and the following proceedings were had in the
10          presence of the jury.)
11          THE COURT:  All right, everyone.  You can have a
12    seat.
13          Government, you can call your next witness.
14          MS. McKOY:  The Government calls, again, Special
15    Agent Jim Moran.
16          THE CLERK:  Your Honor, does the witness need to be
17    re-sworn?
18          THE COURT:  Yes, please, since it's been some time.
19          THE CLERK:  Please raise your right hand.
20                        JAMES MORAN
21    having been called as a witness and having been duly sworn,
22    was examined and testified further as follows:
23          THE WITNESS:  I do.
24          THE CLERK:  If you could have a seat.  Please
25    restate your name for the record.

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          442

1          THE WITNESS:  James Moran, M-O-R-A-N.

2          THE CLERK:  Thank you.

3                    FURTHER DIRECT EXAMINATION

4     BY MS. McKOY:

5     Q.    Welcome back.

6     A.    Thank you.

7     Q.    On Tuesday you discussed that the FBI raided Holy

8     Health's offices on April 2, 2021.  After the raid, was Holy

9     Health still operating?

10    A.    Yes.

11    Q.    For how much longer after that point?

12    A.    Approximately five months.

13    Q.    What happened at that point?

14    A.    In September of 2021, the company was shut down by D.C.

15    Department of Behavioral Health.

16    Q.    Yesterday, did you hear Francis Senesie testify about

17    fake CSWs for whom he was entering notes on ICMS?

18    A.    Yes, I did.

19    Q.    And as a part of your investigation, did you pull

20    reports of ICMS' accounts for those individuals?

21    A.    Yes.

22    Q.    Were those reports in the form of Excel spreadsheets?

23    A.    Yes, that's what the export came out as.

24    Q.    Looking at the box next to you, I'm directing your

25    attention to what's been marked and already admitted as

1    Government's Exhibits I272 through I277.  Is that a CD?

2    A.    It is.

3    Q.    Does that CD contain the spreadsheets you pulled from

4    ICMS for the individuals named Etongwe Nanjeh, Lancelot

5    Pajouo, Melanie Teche, Romeo Ngassa, Shadrack Nakoba, and

6    Zilefac Foretia?

7    A.    Yes.

8    Q.    Were PDF versions of those spreadsheets generated?

9    A.    They were.

10   Q.    Are you familiar with the first name I listed?  Etongwe

11   Nanjeh?

12   A.    Only the name.

13   Q.    And did you review notes written by Mr. Senesie under

14   that name?

15   A.    Yes.

16   Q.    I'm showing you what's been marked as Government's

17   Exhibit I272.  And looking at the staff name listed here, and

18   zooming in, what name is there?

19   A.    Etongwe Nanjeh.

20   Q.    At a high level, what does this spreadsheet show?

21   A.    This is a spreadsheet showing basically listing the

22   services that were documented under the name Nanjeh, or

23   Etongwe Nanjeh in ICMS.

24   Q.    And going to the last page of this spreadsheet, how many

25   notes were entered on ICMS under the name Etongwe Nanjeh?

1   A.   1,534.

2   Q.   Going to Page 17, Row 897, do you see the name Arif

3   Ahmed?

4   A.   I do.

5   Q.   What does this row show for Mr. Ahmed?

6   A.   This row shows that a community -- shows that a note was

7   entered for a community support service on June 9, 2021.  It

8   was entered by Etongwe Nanjeh.  And it appears that $121.35

9   was billed for that note.

10  Q.   And based on your review of Mr. Ahmed's recorded visits

11  at Holy Health, did he receive any services from the Holy

12  Health provider on that day, June 9, 2021?

13  A.   No, he did not.

14  Q.   Do you know if there were any other notes entered for

15  Mr. Ahmed under the name Etongwe Nanjeh?

16  A.   Yes.

17  Q.   I won't go through all of them with you, but just

18  quickly jumping to Page 26, and looking at Row 1407 here, is

19  Mr. Ahmed's name listed here as the consumer again?

20  A.   Yes, it is.

21  Q.   And what is the service date provided here?

22  A.   August 24, 2021.

23  Q.   So between -- sorry.

24       So did Mr. Ahmed receive any services from a Holy Health

25  provider that day?

1  A.    No, he did not.

2  Q.    So between June 9, 2021, which we just looked at, and

3  now, August 24, 2021, were there other notes entered

4  periodically for Mr. Ahmed under the name Etongwe Nanjeh?

5  A.    Yes, there were.

6  Q.    I'm now showing you what's been marked as Government's

7  Exhibit I273a.  What's the staff name listed here?

8  A.    Lancelot Pajouo.

9  Q.    And so at a high level, what does this chart show?

10 A.    Same as before.  This is a spreadsheet pulled from

11 Credible or ICMS showing a report of notes for services

12 entered under the name Lancelot Pajouo.

13 Q.    And going down to the last page, Page 12, how many notes

14 were entered on ICMS under the name Lancelot Pajouo?

15 A.    644.

16 Q.    Now, going to Government's Exhibit I274a, what is the

17 staff name listed here?

18 A.    Melanie Teche.

19 Q.    And is this spreadsheet like the first two spreadsheets

20 that we just looked at?

21 A.    Yes.

22 Q.    Going to the last page here, Page 4, how many notes were

23 entered under ICMS under the name Melanie Teche?

24 A.    158.

25 Q.    Going back to the first page and looking at Row 12,

1   what's the consumer name listed here?

2   A.   Darlene Williams.

3   Q.   And what is the service date provided here?

4   A.   March 18, 2021.

5   Q.   What does this row show for Ms. Williams on that date?

6   A.   It shows that a community support note was entered under

7   the name of Melanie Teche for -- and it was billed to

8   Medicaid for $121.35.

9   Q.   And based on your review of Ms. Williams' recorded

10  visits at Holy Health, did Ms. Williams receive any services

11  from a Holy Health provider on that day?

12  A.   No, she did not.

13  Q.   And were there any other notes entered under the name

14  Melanie Teche for services allegedly given to Ms. Williams?

15  A.   Yes, there were.

16  Q.   Let's look at another, quickly.  Going to Page 3, Row

17  113, do you see Ms. Williams' name listed here again?

18  A.   Yes.

19  Q.   And what is the date of service?

20  A.   April 1, 2021.

21  Q.   Did Ms. Williams receive any services from a Holy Health

22  provider that day?

23  A.   No, she did not.

24  Q.   And so between March 18, 2021, and April 1, 2021, were

25  there other ICMS notes entered for Ms. Williams under the

1   name Melanie Teche?

2   A.    Yes.

3   Q.    I'm showing you another spreadsheet that's marked as

4   Government Exhibit I275a.  Is this spreadsheet similar to the

5   ones that we just reviewed?

6   A.    Yes.

7   Q.    What's the staff name listed here?

8   A.    Romeo Ngassa.

9   Q.    Jumping to the last page, Page 6, in total, how many

10  notes were entered on ICMS under the name Romeo Ngassa?

11  A.    289.

12  Q.    Now, looking at Government Exhibit I276a, what's the

13  staff name provided here?

14  A.    Shadrack Nakoba.

15  Q.    Going to the last page, Page 5, in total, how many notes

16  were entered on ICMS under the name Shadrack Nakoba?

17  A.    223.

18  Q.    Now, looking at Page 1, Row 133, who's the consumer name

19  listed here?

20  A.    That is Arif Ahmed.

21  Q.    And what is the service dated provided here?

22  A.    March 13, 2021.

23  Q.    And what does this row show for that service date?

24  A.    It tells us that a community support note was entered

25  under the name of Shadrack Nakoba and -- for Arif Ahmed and

1  billed to the Medicaid for $97.08.

2  Q.   Now, looking at Row 202, Page 4, of the same

3  spreadsheet, do you see Mr. Ahmed's name here again?

4  A.   Yes.

5  Q.   And what's the service date?

6  A.   April 6, 2021.

7  Q.   Did Mr. Ahmed receive any services from the Holy Health

8  provider that day?

9  A.   No, he did not.

10 Q.   And for the entry that we just looked at, March 13,

11 2021, on the first page, did Mr. Ahmed receive any services

12 from the Holy Health provider that day?

13 A.   No, he did not.

14 Q.   Between March 13, 2021, and April 6, 2021, were ICMS

15 notes entered periodically for Mr. Ahmed under the name

16 Shadrack Nakoba?

17 A.   Yes.

18 Q.   Looking at the last spreadsheet here, what's the staff

19 name provided here?

20 A.   Zilefac Foretia.

21 Q.   And, again, going to the last page, how many names were

22 listed under the name Zilefac Foretia?

23 A.   118.

24 Q.   Going back to Page 1 and looking at Row 26, is

25 Mr. Ahmed's name provided here again?

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          449

1   A.   Once again, yes.

2   Q.   And what does this row provide for Mr. Ahmed?

3   A.   That's another community support note entered under

4   Zilefac Foretia's name billed for $121.35.

5   Q.   What day?

6   A.   February 26, 2021.

7   Q.   And based on your review of Mr. Ahmed's recorded visits

8   at Holy Health, did he receive any services from a Holy

9   Health provider that day?

10  A.   No, he didn't.

11  Q.   Yesterday, did you hear Victoria Margolis testify about

12  30-minute intake notes?

13  A.   Yes, I did.

14  Q.   And in the course of your investigation, did you

15  identify an intake note for Mr. Arif Ahmed?

16  A.   Yes.

17  Q.   I'm now showing you Government Exhibit I142.  What is

18  this document?

19  A.   It's a note in ICMS for Arif Ahmed.

20  Q.   And what's the staff name listed here?

21  A.   Victoria Margolis.

22  Q.   And what is the date of service?

23  A.   September 1, 2020.

24  Q.   And what is the duration for this session that's listed

25  here?

1   A.   27 minutes.

2   Q.   I'm next showing you what has been marked and admitted

3   as Government Exhibit E14.   And zooming in on the To, From,

4   and CC line, who is this email from?

5   A.   Gbetty@holyhealthcareservices.org.

6   Q.   And who is this email to?

7   A.   Eugenie@holyhealthcareservices.org and

8   Eugenie@theagathafoundation.org and it is CC'd to

9   Lambert.mbom@gmail.com.

10  Q.   Going to Page 2 of this email, is this the body of the

11  email?

12  A.   Yes, it is.

13  Q.   And looking at the first line here, Victoria's using her

14  own personal money to pay the consumers a $5 stipend when

15  they come into the office.   Who do you understand Victoria to

16  be here?

17  A.   Victoria Margolis.

18  Q.   And what was her role at Holy Health?

19  A.   She was the front desk receptionist at the location off

20  of Martin Luther King, Jr. Avenue.

21  Q.   Yesterday, did you also hear Ms. Margolis testify about

22  notes for phone orders that she had completed and then found

23  in ICMS?

24  A.   Yes.

25  Q.   I'm now showing you what's been marked as Government

 1  Exhibit E11.  Is this the email -- zooming in at the top, is
 2  this the email, the phone ordering procedures, that we
 3  discussed yesterday with Ms. Margolis?
 4  A.    Yes.
 5  Q.    And who is this email from?
 6  A.    Infov@holyhealthcareservices.org.
 7  Q.    Are you familiar with the Holy Health employee who is
 8  associated with this account?
 9  A.    Yes.  Victoria Margolis.
10  Q.    And who is this email to?
11  A.    Lambert@holyhealthcareservices.org.
12  Q.    And what's the subject provided here?
13  A.    Lifeline Phone Ordering Procedure.
14  Q.    And when was this email sent?
15  A.    It was sent Tuesday, January 7, 2020.
16  Q.    As a part of your investigation, did you identify a
17  related email sent by Mr. Mbom?
18  A.    Yes, I did.
19  Q.    I'm now showing you Government Exhibit E12.  Is this the
20  email from Mr. Mbom that you identified?
21  A.    Yes, it is.
22  Q.    And who is this email sent to?
23  A.    A_Danjeh@yahoo.com.
24  Q.    Are you familiar with a Holy Health employee named D.
25  Anjeh?

1    A.   Yes.

2    Q.   And who is that?

3    A.   Divine Anjeh.

4    Q.   I'm now showing you Government Exhibit E6.  Who is this

5    email from?

6    A.   Infov@holyhealthcareservices.org or Victoria Margolis.

7    Q.   And who is this email sent to?

8    A.   Lambert@holyhealthcareservices.org.

9    Q.   And what is the subject here?

10   A.   List of Phone Orders for SE, or southeast.

11   Q.   And what is the date provided?

12   A.   6 December 2019.

13   Q.   Going down to Page 3, is this the list of phone orders

14   that we discussed yesterday with Ms. Margolis?

15   A.   Yes, it is.

16   Q.   And as a part of your investigation, did you look for an

17   email related to this email?

18   A.   Yes, I did.

19   Q.   On the right, I'm now showing you what's been marked as

20   Government Exhibit E9.  Is this the email that you identified

21   that was related to the first email that we looked at on the

22   left?

23   A.   Yes.

24   Q.   Who is this email from?

25   A.   This email is from Lambert@holyhealthcareservices.org.

1   Q.   And who was this email sent to?

2   A.   Danjeh@yahoo.com.

3   Q.   And what is the subject line here?

4   A.   Forward List of Phone Orders for SE.

5   Q.   And what did you understand "forward" to mean here?

6   A.   He was forwarding a previous email he received with,

7   now, the subject line, "List of Phone Orders for SE."  He's

8   forwarding the email that he received from Ms. Margolis.

9   Q.   And when was this email forwarded?

10  A.   It was forwarded January 3, 2020.

11  Q.   Going to the attachment to this email, Page 2, how does

12  this list from Government Exhibit E9 compare to the list from

13  E6 that's pictured on the left?

14  A.   They're the same list.

15  Q.   As a part of your investigation, did you look in ICMS to

16  see if notes were entered for phone orders for any of the

17  individuals on this list?

18  A.   Yes, I did.

19  Q.   And were you able to identify any ICMS notes for the

20  individuals?

21  A.   Yes, several.

22  Q.   I'm directing your attention to Government's Exhibits

23  I1E through I212b in the box next to you.  Are those

24  documents the ICMS notes for the individuals on the phone

25  order list?

1   A.   They are.

2   Q.   Let's look at one example.

3        I'm showing you what's been marked as Government's

4   Exhibit I212.   Is this an ICMS note?

5   A.   Yes, it is an ICMS note.

6   Q.   And is this the same ICMS note for Joel Mayo's phone

7   order that we discussed yesterday with Ms. Margolis?

8   A.   Yes, I believe so.

9   Q.   Who approved this note?

10  A.   Mr. Mbom.

11  Q.   And is this ICMS note consistent with the notes entered

12  for phone orders for the other individuals listed on the

13  phone order list?

14  A.   Yes.

15  Q.   Who also approved those other notes?

16  A.   At this time, I don't recall.

17  Q.   Let's take a look at an example.   Is this another ICMS

18  note for a phone order?

19  A.   Yes, it is.

20  Q.   Who approved this note?

21  A.   Mr. Mbom.

22  Q.   Let's go back to the first note that we just looked at.

23       Showing you the first note that we looked at for Joel

24  Mayo, what is the original date of service listed here?

25  A.   10/17/19.

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          455

1   Q.   And what is the original time in, the beginning time of

2   this session listed here?

3   A.   5:13 p.m.

4   Q.   When did this session purportedly end?

5   A.   6:10 p.m.

6   Q.   Were any of these values, then, subsequently revised?

7   A.   Yes.  Both of them were.  The time in was revised to

8   10/30/19 at 1:15 p.m. and 10/30/19 at 10:10 p.m.

9   Q.   I'm now showing you Government Exhibit I212a.  What is

10  this document?

11  A.   This document is a service log for the note we were just

12  looking at.

13  Q.   And so what does this log generally show about the note

14  we just looked at?

15  A.   It shows whether or not -- it's an activity log.  It

16  shows who accessed it, when it was accessed, and whether or

17  not changes were made to the log.

18  Q.   And looking at the row that I just highlighted here,

19  what does this row show?

20  A.   It shows that the client visit record was updated by

21  Mr. Mbom on January 29, 2020.

22  Q.   And if you clicked on Details here, would more details

23  pop up?

24  A.   Yes.  It's a hyperlink.

25  Q.   I'm now showing you Government Exhibit I212b.  Is this

1   document the details that would pop up?

2   A.   Yes, it is.

3   Q.   And what does this show about the note that we just

4   looked at?

5   A.   It shows how the times were revised.  Time in,

6   October 17, 2019, at 5:13 p.m. to October 30, 2019, at

7   1:15 p.m.  Time out October 17, 2019, at 6:10 p.m. to

8   October 30, 2019, at 2:10 p.m.

9   Q.   When Ms. Margolis testified yesterday, did you also hear

10  that she saw follow-on notes for the use of these telephones?

11  A.   Yes.

12  Q.   And in reviewing Holy Health's ICMS notes, did you

13  identify some of those follow-on notes?

14  A.   Yes, I did.

15  Q.   Now, directing your attention to Government Exhibit's

16  1214 to 1216 in that box, are those documents -- oh, they're

17  not in there?

18  A.   Not in there.

19          MS. McKOY:   Court's indulgence.

20  BY MS. McKOY:

21  Q.   I'm not going to pull them right now, Special Agent

22  Moran, but were those notes, did you review those notes

23  before coming in to court today?

24  A.   Yes, I did.

25  Q.   Were those notes the ICMS notes for the follow-on

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          457

1   telephone orders that you identified?

2   A.   Yes.

3   Q.   Let me show you one of them.

4        This is Government Exhibit I126.   What is the consumer

5   name listed here?

6   A.   Joel Mayo.

7   Q.   And is that the same consumer for whom we just looked at

8   an original ICMS note for?

9   A.   Yes.

10  Q.   And what is the staff name provided here?

11  A.   Lambert Mbom.

12  Q.   What is the date of service?

13  A.   November 19, 2019.

14  Q.   And looking at the documentation version history at the

15  bottom here, who originally created this document?

16  A.   Divine Anjeh.

17  Q.   I'm now showing you Government Exhibit I126a.   Does this

18  document correspond to the ICMS note we just looked at?

19  A.   Yes.

20  Q.   And directing your attention to the row with the date

21  February 3, 2020, what does this row show?

22  A.   It shows Mr. Mbom made changes to the notes.

23  Specifically, they relinked the employee on the client visit.

24  Q.   After this change was made to the note that we just

25  looked at, who, if anyone, then viewed the note subsequently?

1    A.   It appears on February 5, V. Margolis viewed the visit.

2    Q.   This morning, did you hear Ms. Jeanne Foe testify about

3    entering ICMS notes for phone orders under Ms. Eugenie

4    Bakari's ICMS account?

5    A.   Yes.

6    Q.   And as a part of your investigation, did you identify

7    ICMS notes related to phone orders written under

8    Mrs. Bakari's ICMS account?

9    A.   Yes.

10   Q.   Let's look at an example.  I'm now showing you

11   Government's Exhibit I220.  What's the staff name listed

12   here?

13   A.   Eugenie Bakari.

14   Q.   Who does this document show approved this note?

15   A.   Mr. Mbom.

16   Q.   When did he approve this note?

17   A.   8/21/2020.

18   Q.   Let's look at another example.  What is the staff name

19   provided here?

20   A.   Eugenie Bakari.

21   Q.   Who does this document show approved this note?

22   A.   Mr. Mbom.

23   Q.   When did he do so?

24   A.   August 5, 2020.

25   Q.   And looking at a third, zooming in at the top, is this

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          459

1   the same staff name provided as the first two notes that we

2   just looked at?

3   A.    Yes, Eugenie Bakari.

4   Q.    And who approved this note, too?

5   A.    Mr. Mbom.

6   Q.    When did he do so?

7   A.    He did so on the 20th of November, 2020.

8   Q.    And are all of these notes, these three notes we just

9   looked at, are they all related to phone order applications?

10  A.    Yes, they are.

11  Q.    Yesterday afternoon, did you also hear Ms. Margolis

12  testify about a note that was entered for an individual named

13  Lagloria Brinkley on March 24, 2020, after Ms. Brinkley's

14  death?

15  A.    Yes.

16  Q.    And as a part of your investigation, did you review ICMS

17  notes that were entered for services allegedly rendered to

18  Ms. Brinkley?

19  A.    Yes, I did.

20  Q.    Let's look at one example.

21        I'm showing you what's been marked as Government's

22  Exhibit I230.  What is the consumer name listed here?

23  A.    Lagloria Brinkley.

24  Q.    And what is the staff name listed here?

25  A.    Without going through the full name, it's Success

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          460

1  Ambebi.

2  Q.    And what is the date of service provided here?

3  A.    It is listed as March 24, 2020.

4  Q.    And looking at the billing matrix, what is shown here?

5  A.    It's shown as a contact note.

6  Q.    And again looking at the date March 24, 2020, this was a

7  note from four days after Ms. Brinkley's death?

8  A.    Yes.

9  Q.    I'm now showing you on the right Government's Exhibit

10  I231.  What is this document?

11  A.    This is the service log for the note for Lagloria

12  Brinkley.

13  Q.    Which is the note that's on the left that we just looked

14  at?

15  A.    Yes, it is.

16  Q.    Looking at the first page and then scrolling down to the

17  second page and zooming in here for you so that you can see

18  this better.

19        So, again, looking at the second page and the first

20  page, generally what does this log show for the note on the

21  left?

22  A.    It shows that numerous changes were made to the original

23  note.

24  Q.    After the changes were made and looking at rows for the

25  dates April 1, 2020, and March 3, 2020, who, then, viewed the

1  note?

2  A.    V. Margolis.

3  Q.    And then on April 8, 2020, who then viewed the note?

4  A.    Mr. Mbom.  He also did so on April 3, 2020.

5  Q.    And did you look at the details of the changes that were

6  made to the ICMS note?

7  A.    Yes, I did.

8  Q.    I'm showing you on the right Government's Exhibit I232.

9  What does this document show?

10  A.    This shows us that the note was originally put in, the

11  note that was entered on March 26, 2020, was originally put

12  in as a community support note reflecting 4 units of service

13  were provided and $97.08 were billed to Medicaid.

14  Q.    And what were those values then changed to?

15  A.    They were changed to zero billed to Medicaid, one unit,

16  and this was changed to a contacts note.

17  Q.    I'm now showing you Government's Exhibit I235, which is

18  the second ICMS note for the consumer Lagloria Brinkley.

19  What is the staff name listed here?

20  A.    Nicole Aminkeng.

21  Q.    And what is the listed date of service?

22  A.    May 2, 2020.

23  Q.    Approximately, how long is May 2, 2020, after

24  Ms. Brinkley's death?

25  A.    Approximately six weeks.

1  Q.   So on the left I still have Government Exhibit I235 and
2  on the right, I've now pulled up Government Exhibit I236.  Is
3  this another service log?
4  A.   Yes, it is.
5  Q.   And does this correspond to the note that we just looked
6  at for Ms. Brinkley?
7  A.   Yes, it does.
8  Q.   And does this log show that any changes were made to
9  that ICMS note?
10  A.   It does appear it was modified on the 13th of May, 2020.
11  Q.   And who made that change?
12  A.   A.D. Lubega.
13  Q.   And now looking at May 11, 2021, who, then, accessed
14  this note after that change was made?
15  A.   Lambert Mbom.
16  Q.   Yesterday, did you also hear Ms. Margolis testify that
17  she saw ICMS notes written under Mr. Mbom for a consumer
18  named Brian Wesley?
19  A.   Yes.
20  Q.   And as a part of your investigation, did you identify
21  ICMS notes that were written under Mr. Mbom for Brian Wesley?
22  A.   Yes, I did.
23  Q.   Let's look at one example.
24       I'm showing you Government's Exhibit I240.  And zooming
25  in at the top here, is Brian Wesley the consumer name listed

1   here?

2   A.    Yes.

3   Q.    What is the staff name?

4   A.    Lambert Mbom.

5   Q.    And what is the date of service provided here?

6   A.    March 25, 2020.

7   Q.    And what is the original time in?

8   A.    2 p.m.

9   Q.    And what is the original time out or end of the session

10  that's listed here?

11  A.    2:30 p.m.

12  Q.    Was the end of the session time, then, subsequently

13  revised?

14  A.    Yes.  It was changed to 2:54 p.m.

15  Q.    How many units did Holy Health bill Medicaid for

16  services allegedly rendered to Mr. Wesley on March 25, 2020?

17  A.    Four units, or one hour.

18  Q.    And who does this document show approved this note?

19  A.    Mr. Mbom.

20  Q.    And when did he do so?

21  A.    He did so on March 27, 2020.

22  Q.    And then looking at the Documentation Version History at

23  the bottom here, what does this section generally show about

24  this note?

25  A.    It shows the versions of the note.

1   Q.   And there are two versions here.  Who made the first

2   version?

3   A.   A Rayleen Olarte.

4   Q.   And who made the second version?

5   A.   Lambert Mbom.

6   Q.   So on the left, I still have the same ICMS note that we

7   just discussed, I240.  And now on the right, I've pulled up

8   Government's Exhibit I241.  What is this document on the

9   right?

10  A.   It's the service log for the Brian Wesley note we were

11  looking at.

12  Q.   And looking at March 27, 2020, for the user L. Mbom,

13  what does this row show?

14  A.   It shows he made some sort of update to the note.

15  Q.   And did you review the details for that change?

16  A.   Yes, I did.

17  Q.   And when was that change made?

18  A.   It was made on March 27, 2020, the same day he approved

19  it.

20  Q.   On the right is Government's Exhibit I242.  Are these

21  the details of the changes for the note on the left?

22  A.   Yes, they are.

23  Q.   And what does this show here?

24  A.   It tells us that the time was changed from 2:30 to

25  2:54 p.m. on the same day.  And that, then, increased the

1  number of units billed from 2 to 4, or $48.54 billed to

2  $97.08 billed to Medicaid.

3  Q.   Directing your attention to January 12, 2022, did you

4  conduct an interview with Mr. Mbom that day?

5  A.   Yes, I did.

6  Q.   Where did that interview take place?

7  A.   Riverdale, Maryland.

8  Q.   And was Mr. Mbom in custody at this point?

9  A.   Yes, he was.

10 Q.   Was the interview recorded?

11 A.   Yes, it was.

12 Q.   How was the interview recorded?

13 A.   Using an FBI device.

14 Q.   Prior to the beginning of the interview, was Mr. Mbom

15 advised of his Miranda rights?

16 A.   Yes, he was.

17 Q.   How was he advised of his Miranda rights?

18 A.   I allowed him to read the document while I read it to

19 him out loud.

20 Q.   What document are you referencing?

21 A.   An FD-395, which is an Advice of Rights Form.

22 Q.   And did Mr. Mbom advise that he was willing to speak

23 with an agent?

24 A.   He said he was willing to speak with an agent.  He also

25 signed the Advice of Rights Form.

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          466

1   Q.   Pulling up Government's Exhibit L2, is this the Advice

2   of Rights Form that you just referenced?

3   A.   Yes, it is.

4   Q.   And who signed this document?

5   A.   Mr. Mbom signed it.

6   Q.   And who are the witnesses listed here?

7   A.   Myself, Jim Moran, and Special Agent Benjamin Mathis.

8   Q.   Who is Special Agent Benjamin Mathis?

9   A.   He's another Special Agent at the FBI.

10  Q.   Directing your attention to the CD in the box that's

11  marked as Government Exhibit L1a through L1k.  Does that

12  CD contain excerpts of the recordings of your interview with

13  Mr. Mbom?

14  A.   Yes, it does.

15  Q.   And were the recordings retained in a secure FBI system?

16  A.   Yes, they were.

17  Q.   I'm also directing your attention to transcripts marked

18  as Government's Exhibits T1a through T1k.  And did you review

19  those transcripts before coming to court today?

20  A.   I did.  I did.

21       MS. McKOY:  Your Honor, we have copies of

22  transcripts that we'd like to distribute to the jury at this

23  point.

24       THE COURT:  Okay.

25

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY            467

1   BY MS. McKOY:

2   Q.   At the beginning of your interview with Mr. Mbom, did

3   you ask him about his role and responsibilities at Holy

4   Health?

5   A.   Yes, I did.

6   Q.   I am first playing for you what's been marked as

7   Government's Exhibit L1a, which corresponds to Transcript

8   T1a.

9        I'm playing from the beginning here.

10       One second.  Let me turn on the volume.

11                       (Audio played.)

12   BY MS. McKOY:

13   Q.   Stopping at 3 seconds.  Do you recognize that voice?

14   A.   Could you honestly play it for a few more seconds?

15   Q.   Yes.

16   A.   It's very muffled.

17                       (Audio played.)

18            THE COURT:  I can't hear it.

19            THE WITNESS:  I can't hear it, either.

20   BY MS. McKOY:

21   Q.   Okay.  Let's try this again.  Starting from the

22   beginning.

23                       (Audio played.)

24   A.   That's me.

25   Q.   Let's continue playing at 3 seconds.

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          468

1                        (Audio played.)

2    BY MS. McKOY:

3    Q.    Pausing at 7 seconds.  Do you recognize that voice?

4    A.    That's Mr. Mbom.

5    Q.    Okay.  Let's play again from the beginning.

6                        (Audio played.)

7    BY MS. McKOY:

8    Q.    Later in the interview, did you ask Mr. Mbom about

9    fraudulent notes being put in the ICMS system?

10   A.    Yes.

11   Q.    I'm next playing for you Government's Exhibit L1b, which

12   corresponds to Transcript T1b.

13                       (Audio played.)

14   BY MS. McKOY:

15   Q.    In the course of your investigation, did you review ICMS

16   notes for FBI confidential source Omar Murdoch that were

17   approved by Mr. Mbom?

18   A.    Yes, I did.

19   Q.    I'm now showing you Government's Exhibit S1, which we

20   discussed on Tuesday.  Can you remind the jury what this

21   chart generally shows?

22   A.    This is billing for versus time for services rendered

23   for Omar Murdoch.

24   Q.    Looking at April 18, 2019, that date of service, based

25   on your review of Mr. Murdoch's recordings at Holy Health,

1   approximately how long did Mr. Murdoch meet with a Holy
2   Health provider that day?
3   A.   Seven minutes.
4   Q.   How many units did Holy Health bill for services
5   allegedly rendered to Mr. Murdoch that day?
6   A.   Four units, or approximately 60 minutes.
7   Q.   Now, looking at Government's Exhibit I26, is this an
8   ICMS note for Mr. Murdoch's April the 1st, 2019, visit?
9   A.   Yes, it is.
10  Q.   Who is the staff member here?
11  A.   Evelyn Chung.
12  Q.   Who does this document show approved this ICMS note?
13  A.   Mr. Mbom.
14  Q.   Let's go back to the chart for Mr. Murdoch and look at
15  May 22, 2019.  Did Mr. Murdoch meet with a Holy Health
16  provider that day?
17  A.   No, he did not.
18  Q.   How many units did Holy Health bill Medicaid for
19  services allegedly rendered to Mr. Murdoch for that day?
20  A.   Four units.
21  Q.   Looking at Government's Exhibit I39, is the date of
22  service May 2, 2019, here?
23  A.   Yes, it is.
24  Q.   And is this for Mr. Murdoch?
25  A.   Yes, it is.

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY        470

1   Q.   What is the staff name provided here?

2   A.   Evelyn Chung.

3   Q.   Who does this document show approved this ICMS note?

4   A.   Mr. Mbom.

5   Q.   Let's go back to the recordings.

6        Yesterday, did you hear Mr. Dominic Forka testify in

7   court?

8   A.   Yes.

9   Q.   And in the course of your interview of Mr. Mbom, did you

10  ask him about notes by Mr. Forka?

11  A.   Yes, I did.

12  Q.   I'm pulling up Government's Exhibit L1c, which

13  corresponds to Transcript at T1c.

14       Playing from the beginning.

15                      (Audio played.)

16  BY MS. McKOY:

17  Q.   Later in the interview, did you ask Mr. Mbom, again,

18  about notes entered by Mr. Dominic Forka?

19  A.   Yes.

20  Q.   Playing for you the next clip, Government's Exhibit L1d,

21  which corresponds to Transcript T1d.

22                      (Audio played.)

23  BY MS. McKOY:

24  Q.   In the course of your investigation, did you pull ICMS

25  notes that were entered by Mr. Forka and then approved by

1   Mr. Mbom?

2   A.   Yes.

3   Q.   And was that data pulled as an Excel spreadsheet marked

4   as Government's Exhibit I271?

5   A.   Yes.

6   Q.   And was a PDF version then generated?

7   A.   Yes.

8   Q.   I'm now showing you Government's Exhibit I271a.  Is this

9   the PDF that was generated?

10  A.   Yes, it is.

11  Q.   And what does this spreadsheet, generally, show?

12  A.   Exactly what you said it is.  It's a spreadsheet with

13  all the services that were written under the name Dominic

14  Forka and approved by Mr. Mbom in ICMS.

15  Q.   And so going to the column where it says, "APPR user,"

16  what does that column prefer to?

17  A.   That's who approved the notes.

18  Q.   And what user is provided there?

19  A.   Lmbomb1.

20  Q.   And looking at the Base Units Column, how many units are

21  provided in this column?

22  A.   Four.

23  Q.   Going to the last page of this spreadsheet, in total,

24  how many notes were entered under Mr. Forka that were then

25  approved by Mr. Mbom?

1    A.    1,402.

2    Q.    In looking -- going back to the first page -- I'm

3    looking at the Location Column here.   What does location

4    refer to?

5    A.    Where the service happened.

6    Q.    And what is listed as a location for these notes?

7    A.    For these first 51, it appears home is listed as the

8    location.

9    Q.    And would that be the consumer's home?

10   A.    Yes.

11   Q.    And just scrolling through this spreadsheet, what are

12   the other locations provided here?

13   A.    Predominantly we see home and homeless shelter with a

14   little bit of office sprinkled in, which I believe office

15   would refer to Holy Health office.

16   Q.    Let's look at one of these ICMS notes.

17         So I'm now showing you Government's Exhibit I105.

18   Zooming in at the top here, who is the consumer name listed

19   here?

20   A.    Darlene Williams.

21   Q.    What is the staff name?

22   A.    Dominic Forka.

23   Q.    And what is the date of service?

24   A.    January 26, 2020.

25   Q.    And based on your review of Ms. Williams' recorded visit

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          473

1   at Holy Health, did she see a consumer -- excuse -- did she

2   see a Holy Health provider that day?

3   A.    No, she did not.

4   Q.    How many units did Holy Health bill Medicaid for

5   services allegedly rendered to Ms. Williams?

6   A.    Four units.

7   Q.    And who, according to this document, approved this note?

8   A.    Mr. Mbom.

9   Q.    In your interview with Mr. Mbom, did you ask him about

10  payments to Holy Health consumers?

11  A.    Yes, I did.

12  Q.    Let's go to the next clip.  I'm about to play

13  Government's Exhibit L1e, which corresponds to transcript

14  T1e.

15                        (Audio played.)

16  BY MS. McKOY:

17  Q.    Further in the interview, did you ask Mr. Mbom about

18  Julius Bakari's awareness of fraudulent notes in ICMS?

19  A.    Yes, I did.

20  Q.    I'm next going to play for you Government's Exhibit L1g.

21  So we're just skipping over one clip from now.  That

22  corresponds to transcript T1g.

23        Playing from the beginning here.

24                        (Audio played.)

25

1   BY MS. McKOY:

2   Q.   Yesterday, did you hear Francis Senesie testify in

3   court?

4   A.   Yes, I did.

5   Q.   And in the interview with Mr. Mbom, did you ask him

6   about Mr. Senesie?

7   A.   Yes, I did.

8   Q.   I'm next pulling up Government's Exhibit L1h, which

9   corresponds to Transcript Government's Exhibit T1h.  Let's

10  play.

11                      (Audio played.)

12  BY MS. McKOY:

13  Q.   Later in the interview, did you ask Mr. Mbom, again,

14  about Mr. Senesie?

15  A.   Yes, I did.

16  Q.   Let's go to the next clip, which has been marked as

17  Government's Exhibit L1i, which corresponds to the Transcript

18  T1i.  Playing from the beginning.

19                      (Audio played.)

20  BY MS. McKOY:

21  Q.   In that clip, Mr. Mbom mentions "Dedicated."  Are you

22  familiar with what Dedicated is?

23  A.   Yes.  Dedicated Health is another behavioral health

24  agency in Washington, D.C.

25  Q.   In the course of your investigation, did you also review

1   text communications between Mr. Mbom and Mr. Senesie?

2   A.   Yes, I did.

3   Q.   I'm now showing you what's been admitted as Government's

4   Exhibit B38.  Zooming in on the participants section of the

5   first page, who's listed here?

6   A.   Lambert Mbom and Francis Senesie.

7   Q.   Jumping to Page 19 and zooming in on the green message

8   here, who is this message, this text from?

9   A.   It is from Mr. Mbom.

10  Q.   And is it being sent to Mr. Senesie?

11  A.   Yes.

12  Q.   And under the message, "text me please," there's, then,

13  a status:  "Read."  When was this message read by

14  Mr. Senesie?

15  A.   It was read on July 15, 2021.

16  Q.   How many months is that after the FBI search of Holy

17  Health's offices?

18  A.   A little over two months.

19  Q.   Earlier this week, did you hear Mr. Fru Nde testify in

20  court?

21  A.   Yes.

22  Q.   And in your interview with Mr. Mbom, did you ask him

23  about Mr. Nde?

24  A.   Yes.

25  Q.   Going to Government's Exhibit L1f, which is the next

1    clip, corresponds to the Transcript T1f.  Playing from the
2    beginning.
3                        (Audio played.)
4    BY MS. McKOY:
5    Q.    Further in the interview, did you ask Mr. Mbom about
6    Mr. Nde?
7    A.    Yes, we spoke about it in the interview.
8    Q.    Going to the next clip, Government's Exhibit L1j, which
9    corresponds to the Transcript T1j.  Playing from the
10   beginning.
11                       (Audio played.)
12   BY MS. McKOY:
13   Q.    Pausing at 50 seconds.  In this clip, did you receive a
14   personal phone call?
15   A.    Yes.  My wife Jessica.
16   Q.    That's not Mia calling Ms. Collins; right?
17   A.    No.  My wife is also named Jessica.
18                       (Audio played.)
19   BY MS. McKOY:
20   Q.    In that clip, Mr. Mbom mentions that Mr. Nde and another
21   individual named Alfred Fielding came in together to Holy
22   Health.  In the course of your investigation, did you review
23   ICMS notes entered under Fru Nde and Mr. Alfred Fielding?
24   A.    Yes, I did.
25   Q.    I'm now showing you Government's Exhibit I2.  What is

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          477

1   the consumer name listed for this ICMS note?

2   A.   Steven Blyther.

3   Q.   And who is listed as the staff name?

4   A.   Nicholas Nde.

5   Q.   And what is the provided date of service?

6   A.   1/12/2021.

7   Q.   And what is the time in or the beginning of this session

8   listed as?

9   A.   10:15.

10  Q.   And what is the time out or the end of the session?

11  A.   11:15.

12  Q.   Who approved this note?

13  A.   Mr. Mbom.

14  Q.   How many units did Holy Health bill Medicaid for

15  services allegedly rendered to Mr. Blyther?

16  A.   Four units.

17  Q.   On the left, I still have the same ICMS notes we

18  discussed, I2.  And on the right I've now pulled up I250.

19  What is the consumer name here?

20  A.   Steven Blyther, again.

21  Q.   Is that the same consumer listed in the first note that

22  we just looked at?

23  A.   Yes, it is.

24  Q.   And what is the staff name?

25  A.   Alfred Fielding.

1   Q.   And the date of service?

2   A.   Once again, January 12, 2021.

3   Q.   And so that's the same as the first note we just looked

4   at?

5   A.   Yes, same day.

6   Q.   And what is the time in?

7   A.   Time, this is 11:45.

8   Q.   And what is the time out or the end of the session?

9   A.   12:36.

10  Q.   And who approved this note?

11  A.   Mr. Mbom did.

12  Q.   How many units did Holy Health bill Medicaid for

13  services allegedly rendered to Mr. Blyther?

14  A.   Three units.

15  Q.   Now, let's just look at both notes.  Zooming in again.

16  And just looking at the time in and time out listed for both

17  notes.

18       You just discussed that for the second note for

19  Mr. Blyther on January 12, 2021, the beginning of that

20  session was 11:45.  And looking at that value and then

21  comparing to it the time out for the first note for

22  Mr. Blyther from the same date, how soon after is that second

23  session purportedly starting at the first session?

24  A.   30 minutes.

25  Q.   Now, let's just go to the documentation sections of both

1  notes.  Go down.  And zooming in on the Documentation section

2  for this first note, what does this section generally

3  provide?

4  A.    This tells us what, theoretically, happened or allegedly

5  happened during the service.

6  Q.    Let's go to the Documentation section of I250.

7  Scrolling down, so this is the second note, again, for

8  Mr. Blyther on January 12, 2021.  And looking at the section

9  I just highlighted here, what is generally discussed in this

10  note for the second session that purportedly happened that

11  day?

12  A.    Well, in the section you highlighted, they talk about

13  Mr. Blyther's bed bug infestation and his sadness that he has

14  bed bugs and their plans to, I guess, talk to the apartment

15  complex about the bed bug infestation.

16  Q.    And then going back to that first note from Mr. Blyther

17  from the same day, and looking at the Documentation section,

18  any mention of bed bugs?

19  A.    No bed bugs.

20  Q.    Later in the interview with Mr. Mbom, did you ask him

21  about notes that were entered by Mr. Nde for a period prior

22  to when he started working at Holy Health?

23  A.    Yes, I did.

24  Q.    Let's play another clip, Government's Exhibit L1k, which

25  corresponds to Transcript T1k.  Playing from the beginning.

FURTHER DIRECT OF JAMES MORAN BY MS. MCKOY          480

1                          (Audio played.)

2    Q.   On Tuesday you discussed that in the course of your

3    investigation, you reviewed an ICMS account creation report.

4    A.   Yes.

5    Q.   I'm now showing you Government's Exhibit I260a.  Is this

6    the report that you pulled?

7    A.   Yes.

8    Q.   Well, PDF version of it.

9    A.   Yes.

10   Q.   And looking again at the row that's listed for N. Nde.

11   Is that Mr. Nde who testified in court earlier this week?

12   A.   Yes, Fru Nicholas Nde.

13   Q.   And according to the reports pulled from ICMS, who

14   created Mr. Nde's ICMS account?

15   A.   Mr. Mbom.

16   Q.   And when was Mr. Nde's account created by Mr. Mbom?

17   A.   December 21, 2020.

18   Q.   In the course of your investigation, did you review

19   ICMS' notes that were entered by Mr. Nde and then approved by

20   Mr. Mbom?

21   A.   Yes, I did.

22   Q.   I'm now showing you Government's Exhibit I10.  Zooming

23   in on the top here, who is the consumer?

24   A.   Shelly Baltimore.

25   Q.   And what is the staff name?

1   A.   Nicholas Nde.

2   Q.   How many units did Holy Health bill Medicaid for

3   services allegedly rendered to Ms. Baltimore?

4   A.   Four units.

5   Q.   Apologies.  What is the date of service provided here?

6   A.   October 13, 2020.

7   Q.   Comparing that date to the date for when Mr. Nde's ICMS

8   account was created, how many months before is this date of

9   service from when Mr. Nde's ICMS account was created?

10  A.   This date of service is about 2-1/2 months before an

11  ICMS account was created for Fru Nicholas Nde.

12  Q.   And how many units did Holy Health bill Medicaid for

13  services allegedly rendered by Mr. Nde on October 13, 2020?

14  A.   Four units.

15       Well, four units for this particular service.

16  Q.   And who approved this note?

17  A.   Mr. Mbom.

18  Q.   And just scrolling down to the documentation version

19  history, according to this section, who created this note?

20  A.   Nicholas Nde created the note.

21  Q.   When did he create this note?

22  A.   On December 30, 2020.

23  Q.   And how long after is that from the date of service

24  provided for this note?

25  A.   2-1/2 months.

1          MS. McKOY:  The Government passes the witness, Your

2     Honor.

3          THE COURT:  Okay.  Why don't we take our second

4     break of the day, give you all 20, and we'll be back and

5     Mr. Robbins will have his Cross.  Thanks so much.

6          THE CLERK:  All rise for the jurors.

7          (The jury left the courtroom at 12:23 p.m., and the

8          following proceedings were had out of the presence of

9          the jury.)

10          THE COURT:  All right, Counsel.  Need me for

11    anything?

12          MS. COLLINS:  No, Your Honor.

13          MR. ROBBINS:  No.

14          THE COURT:  Be back in 20.  Thanks.

15          THE CLERK:  Court stands in recess.

16          (Recess held from 12:24 to 12:53 p.m.)

17          THE COURT:  All right, everybody.  Are we ready for

18    the jury?

19          (The jury came back into the courtroom at 12:53 p.m.,

20          and the following proceedings were had in the

21          presence of the jury.)

22          All right, everyone.  You could have a seat.

23          Mr. Robbins, whenever you're ready.

24          MR. ROBBINS:  Thank you, Your Honor.

25

1                          CROSS-EXAMINATION

2     BY MR. ROBBINS:

3     Q.    Special Agent Moran, good afternoon.

4     A.    Good afternoon.

5     Q.    I'm still Gar Robbins.

6           You've testified for a fairly significant period of time

7     between the first day of trial and today.  I have only a

8     couple of small areas of questions.

9           When you testified about your confidential human

10    sources, the people like Darlene Williams or Arif Ahmed, you

11    talked about the videos that you made; correct?

12    A.    Yes.

13    Q.    And you had a couple of summary exhibits that we looked

14    at about their visits; correct?

15    A.    Yes.

16    Q.    On those summary exhibits, you have lines where you said

17    that those individuals did not go to Holy Health; correct?

18    A.    Yes.

19    Q.    And those, when you say the individuals did not go to

20    Holy Health, that's based on the fact that you did not have

21    them wired and did not observe them going to Holy Health?

22    A.    Correct.

23    Q.    It wasn't that you had stakeouts set up in front of Holy

24    Health and watched whether they came in?

25    A.    Correct.  I did not have 24/7 surveillance.

1  Q.   Right.  That wouldn't be reasonable to expect.

2       Your first day of testifying, you told us from your

3  background you were a naval officer at one time --

4  A.   Yes.

5  Q.   -- before you were in the FBI, a long time ago.

6       Did you happen to serve in ships?

7  A.   Yes.

8  Q.   Were you ever exposed to the circumstances where gunnery

9  exercises occurred and there are lots of rounds fired fairly

10 rapidly?

11 A.   Yes, it happened.

12 Q.   When that happens, the gunnery department's supposed to

13 keep track of all those rounds and what sequences they get

14 fired in; correct?

15 A.   Yes.

16 Q.   And yet in a wild environment, sometimes they have to

17 generate those logs after the fact; don't they?

18 A.   Well, so here it is.  I was actually the gunnery officer

19 on my ship.  And, no, that's not really how it works.  You

20 actually do all that accounting beforehand.  And basically

21 because you've got all open sea, you fire every round you

22 accounted for in advance.

23       And, no, it's 100 percent accountability.

24 Q.   Have you ever heard the term -- if you were a gunnery

25 officer, this is even better.

1     Have you ever heard the term "gun decking?"

2  A.   I've heard the term gun decking.

3  Q.   Maybe it's an old school term now that there are

4  computers, but what was gun decking?

5  A.   I don't recall the derivation of the term, but gun

6  decking simply refers to falsifying something.

7  Q.   Is it falsifying or is it trying to build a record after

8  it actually occurred?

9  A.   We always used it as falsifying.  It was a pretty

10  derogatory term.

11        MR. ROBBINS:  All right.  Thank you.

12        No further questions, Your Honor.

13        THE COURT:  Redirect?

14        MS. McKOY:  Yes, Your Honor.

15              REDIRECT EXAMINATION

16  BY MS. McKOY:

17  Q.   Mr. Robbins asked you about the FBI's confidential

18  sources that were used in your investigation.  Were those

19  confidential human sources prior patients at Holy Health?

20  A.   No, they were not.

21  Q.   They weren't already patients of Holy Health before law

22  enforcement directed them to visit Holy Health?

23  A.   No, they were not.

24  Q.   Did they only go to Holy Health at all because the FBI

25  directed them to go to Holy Health?

1   A.    Yes.

2              MS. McKOY:  No further questions, Your Honor.

3              THE COURT:  Okay.  All right.

4              Agent Moran, that concludes your testimony.  You

5   may step down.

6              Government?

7              MR. SARMA:  The Government rests at this point,

8   Your Honor.

9              THE COURT:  Okay.  All right.

10             So, Ladies and Gentlemen, this means that you guys

11  get to go home.  Since the Government's case is rested, you

12  all will have today, the rest of the day, and tomorrow off.

13  So I will see you back here Monday morning ready to start at

14  8:45.

15             So, with the long weekend for you all, extra

16  reminder:  No talking, no texting, no tweeting, no

17  Internetting, no research, no communication about this case

18  whatsoever.  Just enjoy your long weekend.  And be back here

19  for 8:45 start.

20             And just let me confirm.  Mr. Clerk, you have all

21  of the cell phones numbers of all of our jurors?

22             THE CLERK:  I do, Your Honor.

23             THE COURT:  Okay.  Great.

24             So, I don't anticipate we'll need to contact you,

25  but out of an abundance of caution.  All right?

1        Thank you all.  Have a great weekend.

2        THE CLERK:  All rise for the jury.

3        MS. McKOY:  Your Honor, briefly.  Just, if you

4  could let the jurors know to leave their transcripts here.

5        THE COURT:  Oh, yes.  Thank you.

6        If you would, just leave your notes and your

7  transcripts on your seats, and we'll take care of it.

8        A JUROR:  Oh, on the seats?

9        THE COURT:  Yep.  Or in front of you, either way.

10  We'll be able to pick them up.  Just don't take them with

11  you.

12        (The jury left the courtroom at 1:00 p.m., and the

13         following proceedings were had out of the presence of

14         the jury.)

15        THE COURT:  All right, everyone.  When would you

16  all like to reconvene?  I'm open this afternoon.  I was going

17  to be spending it with you all, so you tell me.

18        MS. COLLINS:  We defer to defense counsel on this.

19        MR. ROBBINS:  Your Honor, we can make the Rule 29

20  motion at any time.  I would like probably 25 minutes, maybe

21  30, with my client.

22        THE COURT:  Okay.

23        MR. ROBBINS:  I think we're closer to a decision

24  than we had been when I made my first representation to the

25  Court, but it's still something -- it's just a serious phase.

REDIRECT OF JAMES MORAN BY MS. MCKOY                488

1          THE COURT:  Sure, sure, sure.  No, I understand.

2          So, let me ask it a little more specifically.

3          Do you all want to pick a time where you come back,

4   you make your Rule 29 motion, we do the instructions and the

5   voir dire of Mr. Mbom all at the same time so then when we're

6   done, you all are on your way?

7          MR. ROBBINS:  That sounds marvelous, Your Honor,

8   from our perspective.  In that case, I would want more than

9   30 minutes.

10         THE COURT:  Sure.

11         MR. ROBBINS:  Because I also need to go through --

12   we've discussed the instructions.  And I think that we're

13   pretty close with a couple of small areas that we'll probably

14   end up having to be resolved by the Court.  But if we could

15   come back at 1400, that would be 2 o'clock.

16         THE COURT:  2 o'clock, yeah, I know.  Even though I

17   did not serve in the military, I've been around enough to

18   know how to convert military time.

19         MR. ROBBINS:  Well, you know, if you ever want to

20   catch a train in Europe, they're important things to know.

21         THE COURT:  Right.  This is true.

22         So, 2:00 is fine by me.

23         Does that work for the Government?

24         MS. COLLINS:  That works for the Government, Your

25   Honor.

REDIRECT OF JAMES MORAN BY MS. MCKOY                    489

1          THE COURT:  Okay.

2          MS. COLLINS:  And, Your Honor, I did email a copy

3   with the changes incorporated, and it's highlighted where the

4   few remaining areas of disagreement are.

5          THE COURT:  Okay.  So if it's redline and it's not

6   highlighted, you all agree; and as long as I'm good with it,

7   I can accept the change?

8          MS. COLLINS:  Yes, Your Honor.  That should be the

9   case.  I had given it to Mr. Robbins, just to double-check.

10  So I would ask you not incorporate quite yet.

11         THE COURT:  Don't do it quite yet.

12         MS. COLLINS:  Yes.

13         THE COURT:  All right.

14         MR. ROBBINS:  I just got them in my hands, so...

15         THE COURT:  No problem.

16         Do you all need me to print out hard copies for

17  2 o'clock?

18         MR. ROBBINS:  No.  The Government was gracious

19  enough to provide them.

20         THE COURT:  Okay.  So you've got it.  We'll just

21  take it from the top at 2:00.  All right?  Very good.

22         All right.  Thanks.

23         THE CLERK:  All rise.  This court stands in recess.

24         (Recess held from 1:03 to 2:03 p.m.)

25         THE COURT:  All right.  Good afternoon, everybody.

DEFENDANT ARGUMENT RULE 29 MOTION - MR. ROBBINS      490

1   You all can have a seat.

2          Okay.  I was thinking why don't we take,

3   Mr. Robbins, your Rule 29 motion first, then we can discuss

4   jury instructions and then finally the voir dire.

5          MR. ROBBINS:  Thank you, Your Honor.

6                    DEFENDANT'S ARGUMENT

7          Rule 29 motion is going to concern three counts,

8   one of those counts being the submission of false statements.

9   We are not going to argue that the Government does not have

10  enough evidence to proceed there.

11         THE COURT:  Okay.

12         MR. ROBBINS:  So, that's Count Two.  Count Two we

13  offer no argument.

14         On the fraud, we believe that the Government has

15  failed to present adequate evidence to go to the jury --

16  that's Count One -- in that they have not shown that there

17  was any intent on the part of --

18         THE COURT:  You know what, it might be better if

19  you go to -- yeah, yeah.

20         MR. ROBBINS:  I'm whispering again.

21         THE COURT:  Perfect.

22         MR. ROBBINS:  I didn't used to have that problem.

23  It must be the failing voice with the years.

24         On the first count, Count One, the fraud count, we

25  urge the Court to dismiss that count at this stage on the

DEFENDANT ARGUMENT RULE 29 MOTION - MR. ROBBINS     491

 1   basis that the Government has not presented evidence to show

 2   that Mr. Mbom participated in that conspiracy knowingly and

 3   willingly with the intent to commit fraud.  And I'll note on

 4   the element of intent, there's not adequate evidence.

 5         The third count, the Anti-Kickback Statute, is

 6   stronger yet.  Not only was there no intent, but there's

 7   really been no evidence whatsoever about Mr. Mbom being

 8   involved in what appears to be the basis of the Government's

 9   theory, which is the incentive payments being made to the

10   consumers, and Mr. Mbom was not involved in that in any way.

11   That was Mr. Bakari's operation and Mrs. Bakari.  Mrs. Bakari

12   offered a lot of funding with respect to the consumers.  And

13   the arrangement with respect to recruiting was ultimately

14   also negotiated by Mr. Bakari.

15         If you remember the testimony about the approach to

16   Holy Health about being a client recruiter, the witness that

17   I went to see, Lambert Mbom, and he said, "I don't know.  I

18   will bring that information to Bakari.  That's not something

19   I'm going to have anything to do with."And he connected the

20   participants.

21         So, to the extent that his connection of the

22   participants is a participation conspiracy, that would be the

23   extent of the Government's evidence.  We suggest that that's

24   not enough evidence to go to trial -- I mean, to pass that

25   count to the jury to make a decision on his participation on

1  that offense.

2               THE COURT:  Okay.  All right.  Thank you.

3          Mr. Sarma, do you wish to be heard?

4                    GOVERNMENT'S ARGUMENT

5          MR. SARMA:  Very, very briefly, Your Honor.

6          THE COURT:  Uh-huh.

7          MR. SARMA:  As to Count One, we think that between

8  the text messages and other communications entered into

9  evidence as well as testimony from both the charged and

10  uncharged co-conspirators, that there are communications with

11  Mr. Mbom.  We think there's a reasonable inference here to

12  suggest that Mr. Mbom did intend to defraud Medicare.

13          I'm not sure -- if there's a charge for wire fraud,

14  it would be under the same theory, that there were

15  communications including with Mr. Forka.  Mr. Forka would

16  write notes in Maryland; the purpose of those notes was to

17  defraud Medicaid.

18          So, that is to Count One.

19          As to Count Three, again, that's charged.  If I

20  understand Mr. Robbins' argument on that one, the Government

21  didn't ever allege, you know, dispute Mr. Mbom was never

22  handing the cash, right.  This is a charge of conspiracy.

23          THE COURT:  Conspiracy, right.

24          MR. SARMA:  The Government -- you heard testimony

25  today, for example, that Ms. Foe had conversations about

GOVERNMENT'S ARGUMENT RULE 29 MOTION - MR. SARMA     493

1   paying the cash, which informed him that she believed they

2   were illegal, went to talk to him directly; and then he had

3   conversations with Bakari.  The payments didn't stop.

4        There were also conversations -- Ms. Margolis also

5   testified true knowledge of the payments.  We're alleging

6   that he was in the conspiracy with others, including Ms. Foe,

7   Bakari, Ms. Margolis in order to pay these cash bribes to

8   consumers.

9        THE COURT:  On that last one, what evidence would

10  you point to regarding active participation in the conspiracy

11  part?  Do you see what I'm saying?  Like, I totally agree

12  with you it doesn't take, frankly, much under conspiracy.

13  Mr. Robbins is saying there's none.  And mere presence isn't

14  enough.  So, what is it?

15       MR. SARMA:  I would figure it would be the

16  discussions where people are putting him on alert.

17  There's -- I think the fact that he talks to Mr. Bakari and

18  Mrs. Bakari and then, you know, the overt acts continue.  At

19  least the evidence showed that they had some conversation.

20  They decided to let these acts continue onward.

21       THE COURT:  So, you're saying in the context of the

22  larger conspiracy.

23       MR. SARMA:  Right.

24       THE COURT:  This part of it, which included the

25  kickbacks, or the bribes, some of the strongest evidence

1   would be that Mr. Mbom knew, directly knew, directly

2   consulted with his co-conspirators even in the face of others

3   saying don't do it, and they decided to continue with it.

4           MR. SARMA:  Exactly.

5           THE COURT:  That goes to intent?

6           MR. SARMA:  And we would also offer, there was also

7   a discu- -- and I think there would be argument on either

8   side to the jury on this.  I think it's a question for the

9   jury.

10          I think our position's going to be the conspirators

11  decided to paper over it by putting it into the -- you know,

12  claiming it was the Agatha Foundation.  We showed Ms. Foe

13  evidence today, as well as Ms. Margolis yesterday, that the

14  money was coming from the same source.  So, the fact that

15  they were kind of shifting the name even though the source of

16  the funds was coming from the same place -- in fact, it was a

17  foundation run out of the same company as Holy Health -- is

18  further indic- -- and that, I think there was also testimony

19  today that Mr. Mbom also thought that was a good idea to say

20  it was the Agatha Foundation, further shows his active

21  participation in continuing in the conspiracy and trying to

22  hide it from the Government.

23                          COURT'S RULING

24          THE COURT:  Okay.  I understand it.  Thank you.

25          So, you know, the test in this regard is quite

1  unforgiving for the defense.  It's all evidence in the light

2  most favorable to the Government, is the way in which I need

3  to assess a Rule 29 motion.  And if there's a scintilla of

4  credible evidence, that, you know, as thin as it may be from

5  the defendant's perspective, if it's evidence by which a

6  reasonable inference could be drawn that Mr. Mbom

7  participated in the scheme to defraud, as alleged in Count

8  One, and then the -- this is my word -- subset, if you will,

9  of the anti-kickback conspiracy, which I think is really part

10  and parcel of the larger fraud, then it does go to the jury.

11      I do find that there is sufficient evidence by

12  which a jury could conclude guilt as to Counts One and three,

13  and it would be a fair and rational inference.

14      Of course, Mr. Robbins, you are free to resurrect

15  this motion at the conclusion of all the evidence.  And if

16  there's something more specific you wish for me to consider

17  or look at, I'm happy to do it.

18      But as to your motion today, it is denied.

19      MR. ROBBINS:  Understood, Your Honor.

20                  JURY INSTRUCTION CONFERENCE

21      THE COURT:  Okay.  Jury instructions.

22      I have taken what you all have recently sent, and

23  I've inserted the additional instruction that I mentioned

24  before we broke, which is -- now is new Jury Instruction 20,

25  charts and summaries not admitted as evidence.  That's the

1    only addition I made.  So you have both charts and summaries,

2    admitted and not admitted.

3            And with that -- and obviously once we get to the

4    voir dire, Mr. Mbom, whichever way he goes, we'll prepare the

5    instructions accordingly.

6            I will say this, Counsel.  Everyone should operate

7    in parallel tracks, though, because if for some reason

8    Mr. Mbom says one thing today and another thing Monday

9    morning, we will all be prepared to pivot and act

10   accordingly.  So, if Mr. Mbom says today he's testifying and

11   decides otherwise, then we're going to go right to

12   closings -- instructions and closings and vice versa.  So I

13   just wanted to put that out there so that there's no Monday

14   morning, Oh, please, please, please let's wait till

15   tomorrow;" okay?

16           With that, the first instruction -- wait a minute.

17   Let me get the redlined version.

18           You tell me the first instruction that you want me

19   to look at in order to resolve any dispute.  Let me make sure

20   I have the same.

21           MS. COLLINS:  Your Honor, I believe that is

22   Instruction 15.

23           THE COURT:  Yeah, okay.  All right.

24           And what's the Government's position on this added

25   language?

1          MS. COLLINS:  Your Honor, we oppose the added

2    language.  I think it's clear as written that answers are

3    evidence, and I think the jury understands how questions and

4    answers work.

5          So, I just find the additional added language to be

6    confusing.

7          MR. ROBBINS:  Your Honor, before we get to that,

8    also, the language that was proposed is supposed to be the

9    penultimate sentence, not the ultimate sentence.

10          THE COURT:  Yeah.  I figured as much, that if I was

11    going to do it, I'd put it -- yeah.  Yes.

12          MR. ROBBINS:  It just -- it got put in the wrong

13    place.

14          It's understandable that the Government takes the

15    position that it does; but the way that the instruction is

16    presently structured, it all leans one direction.  It seems

17    to cabin the jury on one side and not the other.  It's really

18    up to the jury to decide what they're doing with an answer

19    once there is an answer.  And there are two different ways

20    you can get an answer.  The covered instruction doesn't seem

21    to acknowledge that there are two different ways you can get

22    there.

23          THE COURT:  I mean, it's really just asking for a

24    balanced instruction.  It's a good -- it's a point well

25    taken.  Do I think it's going to be the hill to die on for

1   either side?  No.  But it does make sense to me.

2            I'm just going to try to simplify the language a

3   little bit so that it says -- right now it reads:  "If the

4   witness denies the truth of a statement and there's no

5   evidence in the record proving the assumed fact is true, then

6   you may not consider the fact to be true simply because it

7   was contained in the lawyer's question.  But if the witness

8   confirms the truth of a fact included in the lawyer's

9   question, then you may consider that fact to be true on the

10  basis of the witness's answer."

11           It seems to just give the flip in the cleanest way

12  I can think of.  And then, of course, it will end:  "In

13  short, questions are not evidence; answers are."

14           Okay.  So that's -- I will make that change.

15           Okay.  Next one.

16           MS. COLLINS:  Your Honor, the next one -- and it's

17  the same objection with respect to each of the three

18  instructions that includes the indictment language that

19  starts on 39.

20           THE COURT:  So, let me just ask you, before we get

21  there, there are some redlined changes made.  And there is no

22  objection to those; am I getting that right?

23           So, for example, on 24, admission is now statements

24  of defendant, and there has been evidence that the defendant

25  made certain statements, period, in deciding.

1          MS. COLLINS:  That's correct, Your Honor.  We agree

2   that we didn't think it was necessary to categorize them as

3   admissions or otherwise.

4          THE COURT:  Okay.

5          And I just, let's make sure the record is clear.  I

6   have no problem with adopting that, so we'll make the change.

7   Make the grammatical change on witness credibility, that

8   instruction.  So, we'll accept that change.

9          MS. COLLINS:  There was just a correction to the

10  title of 30(b).  We're in agreement about that.

11         THE COURT:  Okay.  So depending on which way we go.

12  Okay.

13         The next one that I have, which I had a question

14  for you all on, is highlighted in the instruction on

15  willfully.  I highlighted it because I didn't know if I was

16  giving the good faith instruction.  It was in the

17  conditional.

18         MS. COLLINS:  I think I would ask to hear from the

19  defense first on that one.

20         MR. ROBBINS:  I think you will -- giving that

21  instruction is prudent, Your Honor.  That's appropriate

22  for --

23         THE COURT:  It seems to me it is, as well, but I

24  didn't know if you were asking for it.

25         MR. ROBBINS:  It's the appropriate instruction to

1    give.

2              MS. COLLINS:  No objection, Your Honor.

3              THE COURT:  Okay.  So then it'll read:  "A

4    defendant's conduct is not willful if it was due to

5    negligence, inadvertence, mistake, or was the result of a

6    good faith misunderstanding of the requirement of the law.

7    In this connection, it is for you --" and then the rest of

8    it.

9              And I'll take out the parens.  Okay.  Very good.

10             And now we're at, I believe, the Count One, the

11   objected-to language.

12             MS. COLLINS:  Yes, Your Honor.

13             THE COURT:  Okay.

14             MS. COLLINS:  So, my understanding is the defense

15   is proposing the language that's listed here at the beginning

16   of each heading, bolded heading, within the indictment

17   language; or beginning each of the paragraphs in the

18   indictment language, what the Government alleges.  I think we

19   found that confusing to put that within the indictment

20   language.  There's already in the introductory paragraph a

21   statement that's merely an accusation.

22             We don't have any objection to adding, you know,

23   "it's up to you to decide if it was proven by the evidence,"

24   which, I think, is the other substantive portion of that, but

25   we are just asking it not be broken up into the indictment

1  language itself.

2          THE COURT:  Okay.  I think I understand.  Part of

3  this is a placement question.

4          MS. COLLINS:  Yes, Your Honor.

5          THE COURT:  And what you're asking for is, for

6  example, this was -- I took the indictment language and then

7  put, right before I was about to read it, "Count One of the

8  indictment charges conspiracy to commit healthcare fraud and

9  wire fraud."

10         Again, let me remind you, an indictment is not

11  evidence; it is merely an accusation.  It will be up to

12  you -- what was that language? -- to decide if the accusation

13  or something to that effect.  That's where you're saying if I

14  put anything else, it should go there?

15         MS. COLLINS:  Yes, Your Honor.  That's what we

16  would propose to put that there.

17         THE COURT:  And then, you know, perhaps,

18  Mr. Robbins, what makes sense is the indictment as to Count

19  One alleges.  So instead of reads, it alleges.  And then I

20  read it.

21         But what else?  Right now, to me, this was a very

22  clear statement that I could -- I'm going to say every time I

23  read that sort of relevant portion of the indictment, so it

24  shows up, I believe, in every -- it should -- as the

25  preliminary statement before I read the indictment.

1        So, with a couple tweaks -- well, right now it

2    would be:  "Count One of the indictment charges conspiracy to

3    commit healthcare fraud and wire fraud.  Again, let me remind

4    you, an indictment is not evidence.  It is merely an

5    accusation.  The indictment as to Count One alleges:"

6            What else would you want to put there?

7            MR. ROBBINS:  Your Honor, I think the language that

8    was originally proposed works when it's a relatively

9    short-form indictment.

10           The problem that we have is that when it's a

11   long-form indictment, with lots of paragraphs, and the jury

12   has been instructed that they're being told controlling law

13   from the bench, if it goes on for too long on the indictment,

14   without a reminder somewhere that this is just at allegation,

15   then it starts to sound like the judge has decided all these

16   things and they don't need to think about it anymore.  That's

17   the concern.

18           And there are a number of different ways to do it.

19   One is to say the Government alleges each time.  I abandoned

20   that and did the, let's just do a reminder at the start of

21   each section.  But then the Government didn't like that idea,

22   either, so I put them both back in.

23           My concern is that if we don't say something before

24   we get to the next instruction that says, "that's a reminder,

25   those are the allegations of the Government," it could Come

1  At The Very End Of --

2         THE COURT:  So i was about to say, what if I do it

3  at the end?

4         MR. ROBBINS:  That would be perfect, Your Honor.

5         MS. COLLINS:  No objection to putting it at the

6  end.  We were just asking that it not be in the middle.

7         THE COURT:  Yeah.  So we can do it this way.

8         Because you've also, if I get it right, you've also

9  redlined out all the --

10         MR. ROBBINS:  Yes.

11         THE COURT:  -- the Medicaid and the --

12         MS. COLLINS:  We have redlined out all the

13  background to try and streamline that.

14         MR. ROBBINS:  The Government did a good job of

15  making it much more compact, but there's still bit of a

16  remaining concern.

17         THE COURT:  It's still -- right.  Okay.  So let's

18  do this.

19         Okay.  So, what I can do is I can start it as we --

20  what I just read to you, and then at the end of it conclude

21  with, "As I said, the indictment allegations are not

22  evidence; they are merely the allegations as to Count One."

23  Good?

24         MR. ROBBINS:  That's perfect, Your Honor.  And if

25  we do that for each of the three counts, I think we'll be

1    there.

2              THE COURT:  Okay.  All right.

3              And Government doesn't have a problem with that?

4              MS. COLLINS:  No, Your Honor.

5              THE COURT:  Okay.  So, let me make sure.  Just give

6    me one second so I write it consistently.

7              That's Count One.

8              Then the next one is Jury Instruction, Count Two,

9    Conspiracy, which is old 49.  It's going to be new 50.

10             All right.  So, what I'm going to do is it doesn't

11   read identically, so I'm going to make sure it reads

12   identically.  Count Two of the indictment charges, and do it

13   exactly the same way.

14             So, when we get this back to you in redline, please

15   check my work.

16             Insert.  And then -- where are we with that?  Okay.

17             Okay.  All right.  We've got that resolved.

18             What's the next one?

19             MS. COLLINS:  The next is 42.  It revises the

20   description of the wire fraud statute.  We tried to -- there

21   were some sort of grammatical issues with how it was written

22   and then to make it conform a little more closely to the

23   statutory language.

24             THE COURT:  Okay.  And, Mr. Robbins, any issues

25   with this?

JURY INSTRUCTION CONFERENCE                    505

1          MR. ROBBINS:  No issues from the defense, Your

2    Honor.

3          THE COURT:  Okay.

4          MS. COLLINS:  And then the next is 43, the same

5    thing with the health care fraud statute.

6          THE COURT:  And no issue?

7          MR. ROBBINS:  And, again, we consent.

8          THE COURT:  Okay.  All right.  Very good.

9          MS. COLLINS:  There's a typographical question --

10    or typographical correction on Instruction 46.

11          THE COURT:  So, the last part that you've redone --

12    oh, wait a minute.

13          MS. COLLINS:  I was -- I think 46 is the venue.  It

14    said "over elements" instead of "other elements."

15          THE COURT:  Why don't I see it?  Why am I missing

16    it?  Oh, here we go.  Okay.

17          And where am I looking?  What line?

18          MS. COLLINS:  At the very bottom.

19          THE COURT:  Ah, got it.  Okay.  Yeah.  Yep.

20          MS. COLLINS:  And 47 there is, again, just a

21    typographical correction in the description right under the

22    heading.  Commit and offense.

23          THE COURT:  Yep.  Got it.

24          MS. COLLINS:  48, again, just change the

25    description of the health care -- the false statement

1  statute.

2         THE COURT:  And no issue with that, Mr. Robbins?

3         MR. ROBBINS:  No, Your Honor.

4         THE COURT:  Okay.  All righty.

5         MS. COLLINS:  49 I think we've addressed.

6         THE COURT:  Looks like the next change is 53.

7         MS. COLLINS:  At 52, there's a typographical

8  change.  It says Counts 2 to Count Two in the first sentence.

9         THE COURT:  Okay.  Where am I?  Why can't I see

10 this?

11        Which one are you at?

12        MS. COLLINS:  Instruction 52.

13        THE COURT:  52 -- okay.  I'm there.  I see it, yep.

14 It's really small.

15        MS. COLLINS:  Yeah, sorry.

16        THE COURT:  No, it's not your fault.  Even though

17 it's printed in color, I'm like -- okay.

18        MS. COLLINS:  And then, yeah, 53 is the next

19 substantive change.  So, again, we changed to conform that a

20 little more closely to the statutory language of the

21 Anti-Kickback Statute.

22        And then the other sort of substantive part there

23 is before it included offer, pay, solicit, receive, which are

24 all within the Anti-Kickback Statute, but the indictment

25 is -- the object of the indictment is specific offer and pay.

1          THE COURT:  Okay.  So you just took those out.

2          MS. COLLINS:  Yep.

3          THE COURT:  Great.

4          And no problem with that, Mr. Robbins?

5          MR. ROBBINS:  No objection, Your Honor.

6          THE COURT:  Okay.

7          MS. COLLINS:  And then 54 we've addressed.

8          Then the next instruction, which for some reason is

9   also coming up as 54 for me, we just changed the Roman

10  Numerals to the number 2.

11          THE COURT:  Yep.  I see that.  And then we're going

12  to have to make sure that -- that's why I left it

13  highlighted, that we refer back to the right instruction for

14  the conspiracy instruction.

15          MS. COLLINS:  Yeah.

16          THE COURT:  The elements of the -- my intention was

17  to go back to the general.

18          So, with the inserted new instruction, the general

19  conspiracy elements, the first time it's mentioned is where?

20          MS. COLLINS:  I think we added -- there's one

21  additional instruction.  So I think it would be 51 --

22          THE COURT:  51, right?

23          MS. COLLINS:  -- instead of 50.  Yes.

24          THE COURT:  Okay.  That's what I have.

25          MS. COLLINS:  One thing I would notice, Your Honor,

1   it won't affect that, but it looks like there are two

2   Instruction 54s right now.

3           THE COURT:  I saw that and I think Ms. Brown

4   changed it.

5           MS. COLLINS:  Okay.

6           THE COURT:  But we're going to double and triple

7   check the numbers because it got all wonky.

8           MS. COLLINS:  I figured.

9           And then I believe that is everything.

10          THE COURT:  Okay.  So then let's make sure.

11          Yeah, the other place that we're going to make

12  sure, so the conspiracy charge is like a Hummel doll.  It's,

13  the first ones are the first three elements, and then we have

14  the second one that adds an element, and then the third one

15  goes back to the second one.  So we'll make sure that all of

16  the instructions line up.

17          That was actually a suggestion the last jury I had

18  made, is to put the instruction that it refers back to --

19  instead of saying, "I've previously instructed you on

20  conspiracy," which I thought was a good suggestion, so that's

21  why we're going to do it here.  And it doesn't sound like

22  anyone has a problem with that.

23          MR. ROBBINS:  I don't believe I've had a jury

24  review, Your Honor.

25          THE COURT:  What -- yes.

1          MR. ROBBINS:  I don't believe I've done a jury

2     review.  You give a copy of the written instructions to the

3     jury?

4          THE COURT:  I do to every juror as well as a

5     verdict form to every juror so that they're not sharing,

6     especially in these post-pandemic times.

7          MR. ROBBINS:  Understood.

8          THE COURT:  Everyone gathered around 50 pages is

9     not a good look.  So they get their own.

10         MR. ROBBINS:  Okay.  Thank you, Your Honor.

11         THE COURT:  Okay.  Anything else on the

12    instructions?

13         MS. COLLINS:  Nothing for the Government, Your

14    Honor.

15         MR. ROBBINS:  Nothing from the defense.

16         THE COURT:  Okay.  Then we'll make these changes,

17    get it back to you for one more read.

18         If you would just, overnight if you find anything,

19    any typos, any nits or anything more specific that you want

20    me to address, just put them in an email so we make sure we

21    get the cleanest copy for Monday.

22         Okay.  Mr. Robbins?

23         MR. ROBBINS:  Thank you, Your Honor.

24         We're at the stage where you want to know whether

25    or not Mr. Mbom is going to testify.

1    THE COURT:  Yeah, I'm happy to voir dire him, or do
2  you want to do it and then I'll come behind you?  How would
3  you like to do that?

4    MR. ROBBINS:  I'll lay the groundwork, Your Honor.

5    THE COURT:  Okay.  All right.

6    MR. ROBBINS:  Do you want him under oath?

7    THE COURT:  Yes.  Yes.  Absolutely.

8    Okay.  So, Mr. Gurevich, would you place Mr. Mbom?

9    THE CLERK:  Raise your right hand for me, please.

10    (Oath administered.)

11    DEFENDANT:  I do.

12    THE CLERK:  Would you please state your full name
13  for the record, please.

14    DEFENDANT:  Lambert Mbom.

15    THE CLERK:  Thank you.  You may lower your hand.

16    MR. ROBBINS:  Good afternoon, sir.

17    THE DEFENDANT:  Good afternoon.

18    MR. ROBBINS:  We've been working on this case
19  together for a while now; right?

20    THE DEFENDANT:  Correct.

21    MR. ROBBINS:  So, one of the things that we've
22  talked about from fairly early on was what was implied if you
23  testified or didn't testify.

24    THE COURT:  And you all can sit if it's easier to
25  speak into the microphone.

1          MR. ROBBINS:  Thank you, Your Honor.

2          THE COURT:  Sure.

3          MR. ROBBINS:  You understand that it's absolutely

4    your right to make the decision whether or not you testify in

5    this case?

6          THE DEFENDANT:  I do.

7          MR. ROBBINS:  You understand that the jury will be

8    instructed if you choose not to testify that they cannot

9    consider that in any way against you in determining what the

10   outcome of this case will be?

11         THE DEFENDANT:  I do.

12         MR. ROBBINS:  You also understand that 3if you

13   choose to testify, there's another instruction the jury would

14   get that says they need to consider you like any other

15   witness and determine whether you have any interests that

16   might influence what you say?

17         THE DEFENDANT:  I do.

18         MR. ROBBINS:  You've had an opportunity to listen

19   to all of the evidence given in this case?

20         THE DEFENDANT:  I have.

21         MR. ROBBINS:  And you have, of course, communicated

22   with me over a long period of time about your desires in this

23   case?

24         THE DEFENDANT:  I have.

25         MR. ROBBINS:  Your final decision is one that we've

1   reached just this afternoon; correct?

2            THE DEFENDANT:  Correct.

3            MR. ROBBINS:  So, the question the judge wants to

4   know is whether you would exercise your right to remain

5   silent and not testify or whether you prefer to testify in

6   the trial.

7            THE DEFENDANT:  I will exercise my right to remain

8   silent.

9            THE COURT:  Okay.  All right.

10            Mr. Mbom, let me make sure today, are you under the

11   influence of any drugs or alcohol or anything that affects

12   your judgment?  And what I mean by judgment is your ability

13   to understand what's going on around you and make decisions

14   for yourself.

15            DEFENDANT:  I'm not.

16            THE COURT:  Okay.  And were you at any point during

17   this trial?

18            DEFENDANT:  No.  I have not.

19            THE COURT:  Okay.  Because I observed that you were

20   paying close attention, taking notes, participating with your

21   counsel.

22            So, the next question is:  Today, do you suffer

23   from any mental or physical illness that would affect your

24   judgment?

25            DEFENDANT:  No, Your Honor.

1          THE COURT:  Okay.  And so it's fair that throughout

2   this trial you have been fully present, aware, and understood

3   what's going on, with the help of your counsel?

4          DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Okay.  And knowing that, you are going

6   to exercise your constitutional right to remain silent -- and

7   I will make sure that the jury is properly instructed that

8   they are not to hold that decision against you.  Okay?

9          DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Do you have any questions?

11          DEFENDANT:  No, Your Honor.

12          THE COURT:  Okay.  Anything else either side wishes

13   for me to put on the record in that regard?

14          MR. SARMA:  No, Your Honor.

15          MR. ROBBINS:  No, Your Honor.  Nothing from the

16   defense.  Thank you.

17          THE COURT:  Okay.  So, then what we will do Monday

18   morning is I'm not going to make the -- unless you're --

19   Mr. Robbins, you're not putting on any other evidence;

20   correct?

21          MR. ROBBINS:  That's correct, Your Honor.

22          THE COURT:  Okay.  So, I will just tell the jury

23   that I'm going to instruct them, and then we'll go right to

24   closing, okay?  So that there's no -- nothing said either

25   way.

1    And then closings, just roughly, timing?

2         MS. McKOY:  An hour for the Government, Your Honor,

3    including rebuttal.

4         THE COURT:  Okay.

5         MR. ROBBINS:  I always try to come in under that,

6    but I'm not sure I'll promise you.

7         THE COURT:  All right.  Yeah, that's fine.

8         I just wanted to get a general sense of like when

9    we're going to have to order lunch and stuff like that.

10        Okay.  All right.

11        So, between now and then, have you all made sure

12   exhibits are in good shape with Mr. Gurevich?  Because that

13   would be a good thing to do today before you get out of here.

14        MS. COLLINS:  We've been stamping and comparing

15   with him.  And we will try to make sure that we have the

16   boxes that are ready with just the admitted exhibits.

17        THE COURT:  And like a laptop that works with the

18   passwords?  I mean, that's always a delay for us is...

19        MS. COLLINS:  So, we have asked our paralegals that

20   nothing should be encrypted with passwords.

21        THE COURT:  Okay.  On the exhibits.

22        MS. COLLINS:  On anything that's electronic that

23   are drives or disks should not have passwords.

24        THE COURT:  Okay.  We'll make sure.

25        Dennis, if you would make sure to talk to IT today

1    about needing that jury laptop for Monday.

2              THE CLERK:  Okay.

3              THE COURT:  If it's working and maybe they can even

4    test it tomorrow to make sure everything works so they just

5    get it on Monday.

6              MS. COLLINS:  And we're happy if it would help with

7    IT to get together just to actually test the disks and the

8    drives.

9              THE COURT:  Maybe we can actually do it today since

10   you're here.  You have it all?

11             MS. COLLINS:  That would also be completely -- we

12   would be happy to do that.

13             THE COURT:  That would probably be best.

14             Would you mind?

15             THE CLERK:  I can contact IT, Your Honor.

16             THE COURT:  Okay, great.  Perfect.

17             Anything else we need to do before we see each

18   other again Monday morning?

19             MS. COLLINS:  Nothing for the Government.

20             MR. ROBBINS:  Nothing for the defense, Your Honor.

21             THE COURT:  All right.  Thank you all.  We'll get

22   you the instructions shortly.  Appreciate it.

23             THE CLERK:  All rise.  This court stands adjourned.

24             (Court is adjourned at 2:38 p.m.)

25             Transcript continues in Volume 4 at Page 517

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CERTIFICATE OF OFFICIAL REPORTER

I, Kathy Cortopassi, RDR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the District of Maryland, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 24th day of March, 2024.


/s/ Kathy Cortopassi
Kathy Cortopassi, RDR, CRR, CRC
U.S. Official Court Reporter